FILED
2020 JUL 21 AM 9: 39
CLERK
US BANKRUPTCY COURT
DISTRICT OF DELAWARE

**ADELSO ADRIANZA**
113 Washington Street – Newton, MA 02458 – U.S.A.
M: (859) 803-2279 | aaadrianza@gmail.com

<u>**VIA REGISTERED LETTER**</u>

July 14, 2020

The Honorable Judge L. Selber Silverstein
U.S. Bankruptcy Court – District of Delaware
824 North Market Street, 6th Floor
Wilmington, DE 19801

Dear Judge Silverstein,

This communication is in reference to Crystallex International Corporation (the Company) and the Reply Brief in Further Support of Its Motion for an Order Approving the Process of Sale of Shares of PDV Holding, Inc. filed by its legal counsel in relation to the Delaware District Court case (1:17-mc-00151-LPS Document 201 Filed 07/13/20).

One of the fundamental pillars on which the U.S. Bankruptcy Code rests is the protection and maximization of the debtor's assets. Failure to do so runs counter to the purpose and objectives of the statute and the protection of the public and private interests that the U.S. Congress and the Canadian Parliament pursued by enacting the bankruptcy laws.

Two overarching objectives of the U.S. and Canadian bankruptcy laws are to preserve the countervailing interests of creditors and other parties in interest by maximizing and distributing the estate's assets in an orderly and efficient manner, and to enable its financial rehabilitation. The latter is generally only possible through compromise amongst the parties in interest, unless, as in the instant case, the estate gains access to assets not available to it pre-petition. The trustee and the bankruptcy court are entrusted with the administration and execution of a proceeding that ensures the statute's purpose and objectives. If the fiduciaries involved fail to act as required, the bankruptcy court must step in to ensure the proceeding meets the fair and equitable results the statute is intended to achieve.

In my previous communication to the Bankruptcy Court (DEBK Court) and the District Court (DEDC Court) I delineated a series of actions and omissions by the Debtor in Possession (DIP), the Monitor and the CCAA Court that undermine the purpose and objectives of the U.S. and Canadian bankruptcy laws with respect to the protection and maximization of the debtor's assets. Stripping and misuse of estate assets are included in the distribution scheme built into the Credit Agreement between the Company and the DIP Lender and approved by the Monitor and the CCAA Court that is intended to be used to distribute the estate's assets. Said distribution scheme includes post-petition interest on unsecured debt ranging from over 20% to the Noteholders and 5% for all other junior creditors, and tax loss carryforward benefits to the DIP Lender, which are disallowed by the U.S. and Canadian bankruptcy laws. More recently, the Company reaffirmed its intention to continue to undermine the purpose and objectives of the bankruptcy laws, as elaborated further below, that compelled me to write this letter to your Honor.

This state of affairs calls for the DEBK Court to take measures to prevent serious and irreparable harm to the estate and, as a consequence, to parties in interest. Measures such as restricting the transfer, encumbrance, disposition or distribution of the estate's assets are warranted until such time as the

DEBK Court or an appellate court conclusively confirms the fairness and reasonableness of the reorganization or liquidation plan. The absence of these measures could result in the estate and stakeholders being deprived of the right to protect their interests as a consequence of equitable mootness.

**THE PRESERVATION AND MAXIMIZATION OF THE VALUE OF THE ESTATE'S ASSETS MANDATE**

In the afore-mentioned reply brief, the Company's legal counsel makes the following statement (III, page 5):

> "Crystallex has a valid lien on the shares of PDVH and nearly $1 billion outstanding on its judgment."

In my letter to your Honor dated May 28, 2020 (case 1:17-mc-00151-LPS Doc. 176 filed on 06/04/20 p. 14) in which I copied Chief Judge Stark; I wrote the following regarding the amount owed to the Company by the Republic:

> The main objective of the Company's legal proceedings in the U.S. courts is the enforcement of the ICSID award and the Delaware District Court's writ of attachment on the CITGO shares owned by the Republic through Petróleos de Venezuela (PDVSA). Since the Republic did not honor the second settlement agreement, the amount to be collected through the attachment of the CITGO shares is reset to the award amount (US $1.2 billion), the pre-award interest (US $200 million), the post-award interest (US$ 165 million as of Dec. 2019) and the value of the mining data (US$ 300 million), for an estimated US$ 1.9 billion total. This amount needs to be reduced by the partial payments received by the Company worth an estimated US$ 300 million. The US$ 469 million in payments received by the Company included US$ 350 million in Venezuelan bonds at market value at the time of the payment, which were frozen by the OFAC regulations and are currently worth a fraction of this amount.

Sophisticated financiers and businessmen as the DIP Lender and the Company's Management and Officers are, they would not mistakenly refer to a US$ 1.9 billion dollars debt amount as "nearly $1 billion". According to the Merriam-Webster Dictionary, "nearly" means "almost but not quite". Therefore, the Company's expectation to collect less than US$ 1 billion through the writ of attachment proceeding at the Delaware District Court is further confirmation of the disregard of the fiduciaries involved for their duty to preserve and protect the estates' assets as required by the CCAA and the Bankruptcy Code.

The Canada – Venezuela Bilateral Investment Treaty sets forth the following expropriations and compensation rules:

**Article VII - Expropriation**

1. <u>Investments or returns of investors of either Contracting Party shall not be nationalized, expropriated or subjected to measures having an effect equivalent to nationalization or expropriation</u> (hereinafter referred to as "expropriation") in the territory of the other Contracting Party, <u>except for a public purpose, under due process of law, in a non-discriminatory manner and</u> **against prompt, adequate and effective compensation. Such compensation** shall be based on the genuine value of the investment or returns expropriated immediately before the expropriation or at the time the proposed expropriation became public knowledge, whichever is the earlier, shall be payable from the date of expropriation with interest at a normal commercial rate, **shall be paid without delay**

**and shall be effectively realizable and freely transferable.** [Emphasis added].

It follows that as long as the ICSID award compensation is not adequate and effective, it remains due. The US$ 350 million payment to the Company with Venezuelan bonds was not adequate and effective compensation then, and is much less so today, given that the bonds were and remain frozen due to OFAC regulations. These bonds may remain frozen indefinitely due to questions regarding their provenance. Being this the case, a prudent fiduciary would pursue the collection of the full amount due to the estate and return the frozen bonds to the Venezuelan government.

The continued disregard for the protection and maximization of the estate's assets is in direct violation of the Canadian and U.S. bankruptcy laws and policies whose paramount objectives were set forth by both statute and common law and affirmed by the U.S. and Canadian Supreme Courts:

The Supreme Court of Canada in *9354-9186 Québec Inc. v. Callidus Capital Corp.*, 2020 SCC 10:

> [40] Together, <u>Canada's insolvency statutes pursue an array of overarching remedial objectives</u> that reflect the wide ranging and potentially "catastrophic" impacts insolvency can have (Sun *Indalex Finance, LLC v. United Steelworkers*, 2013 SCC 6, [2013] 1 S.C.R. 271, at para. 1). <u>These objectives include: providing for timely, efficient and impartial resolution of a debtor's insolvency;</u> **preserving and maximizing the value of a debtor's assets; ensuring fair and equitable treatment of the claims against a debtor; protecting the public interest; and,** <u>in the context of a commercial insolvency,</u> **balancing the costs and benefits of restructuring or liquidating the company...** [Emphasis added].

The United States Supreme Court in *Local Loan Co. v. Hunt*, 292 U.S. 242-245 (1934) ...

> **One of the primary purposes of the Bankruptcy Act is to "relieve the honest debtor from the weight of oppressive indebtedness, and permit him to start afresh free from the obligations and responsibilities consequent upon business misfortunes."** (citing *Williams v. U.S. Fidelity & Guaranty Co.*, 236 U. S. 549, 236 U. S. 554-555).
>
> **This purpose of the act has been again and again emphasized by the courts as being of public, as well as private, interest, in that it gives to the honest but unfortunate debtor who surrenders for distribution the property which he owns at the time of bankruptcy a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.** *Stellwagen v. Clum*, 245 U. S. 605, 245 U. S. 617; *Hanover National Bank v. Moyses*, supra; *Swarts v. Fourth National Bank*, 117 F. 1, 3; *United States v. Hammond*, 104 F. 862, 863; *Barton Bros. v. Texas Produce Co.*, 136 F. 355, 357; *Hardie v. Swafford Bros. Dry Goods Co.*, 165 F. 588, 591; *Gilbert v. Shouse*, 61 F.2d 398. **The various provisions of the Bankruptcy Act were adopted in the light of that view, and are to be construed when reasonably possible in harmony with it so as to effectuate the general purpose and policy of the act. Local rules subversive of that result cannot be accepted as controlling the action of a federal court.**

... and in *United States v. Whiting Pools, Inc.*, 462 U.S. 198 p. 203 (1983):

> **In proceedings under the reorganization provisions of the Bankruptcy Code, a troubled enterprise may be restructured to enable it to operate successfully in the future.** Until the business can be reorganized pursuant to a plan under 11 U.S.C. §§ 1121-1129 (1976 ed., Supp. V), the trustee or debtor-in-possession is authorized to manage the property of the estate

and to continue the operation of the business. See § 1108. **By permitting reorganization, Congress anticipated that the business would continue to provide jobs, to satisfy creditors' claims, and to produce a return for its owners.** H.R.Rep. No. 95-595, p. 220 (1977). Congress presumed that the assets of the debtor would be more valuable if used in a rehabilitated business than if "sold for scrap." Ibid. **The reorganization effort would have small chance of success, however, if property essential to running the business were excluded from the estate.** See 6 J. Moore & L. King, Collier on Bankruptcy 3.05, p. 431 (14th ed. 1978). Thus, **to facilitate the rehabilitation of the debtor's business, all the debtor's property must be included in the reorganization estate.**

Section 1501(a) of the Bankruptcy Code sets forth the purpose and objectives of Chapter 15:

1. Encourage cooperation between courts of the United States, foreign courts, trustees, examiners, debtors, and debtors-in-possession in cross-border insolvency cases,
2. Provide greater legal certainty for international trade and investments,
3. **Promote the fair and efficient administration of cross-border insolvencies to protect the interests of all creditors, the debtor and other interested parties,**
4. **Protect and maximize the value of the debtor's assets,**
5. Facilitate the rescue of financially troubled businesses, thereby protecting investment and preserving employment.

Section 1521 sets forth the means whereby the U.S. bankruptcy courts becomes the enablers of the Chapter's purpose and objectives:

(a) Upon recognition of a foreign proceeding, whether main or nonmain, **where necessary to effectuate the purpose of this chapter and to protect the assets of the debtor or the interests of the creditors, the court may, at the request of the foreign representative, grant any appropriate relief, including—**

**(3) suspending the right to transfer, encumber or otherwise dispose of any assets of the debtor to the extent this right has not been suspended under section 1520(a);**

(4) providing for the examination of witnesses, the taking of evidence or the delivery of information concerning the debtor's assets, affairs, rights, obligations or liabilities;

**(5) entrusting the administration or realization of all or part of the debtor's assets within the territorial jurisdiction of the United States to the foreign representative or another person, including an examiner, authorized by the court;**

(6) extending relief granted under section 1519(a); and

(7) granting any additional relief that may be available to a trustee, except for relief available under sections 522, 544, 545, 547, 548, 550, and 724(a).

[Emphasis Added.]

The DEBK Court's authority to protect local interests is underscored by the UNCITRAL Model Law on Cross-Border Insolvency with Guide to Enactment and Interpretation publication (2014) as follows:

<u>Article 21. Relief that may be granted upon recognition of a foreign proceeding</u>

192. **The "turnover" of assets to the foreign representative** (or another person), as envisaged in paragraph 2, **is discretionary.** It should be noted that **the Model Law contains several safeguards designed to ensure the protection of local interests before assets are turned over to the foreign representative. Those safeguards include the following: the general statement of the principle of protection of local interests in article 22, paragraph 1; the provision in article 21, paragraph 2, that the court should not authorize the turnover of assets until it is assured that the local creditors' interests are protected; and article 22, paragraph 2, according to which the court may subject the relief that it grants to conditions it considers appropriate.**

[Emphasis Added.]

The latent irreparable harm to the estate through equitable mootness arises from the DIP's and the Foreign Representative's approval of or lack of action against measures harmful to it. The risk involved is made self-evident by the U.S. Supreme Court ruling in *Law v. Siegel*, 571 U. S., 8 (2014):

> "We have held that a trustee's failure to make a timely objection prevents him from challenging an exemption. *Taylor v. Freeland & Kronz*, 503 U. S. 638, 643–644 (1992)."

Two illustrations of harm to the estate by the DIP with the approval of or inaction by the Monitor are the post-petition interest on unsecure debt and the mining data giveaway. In the first instance, the Interested Directors and the DIP Lender agreed to allow post-petition interest on unsecured debt that ran counter to the law to the extent that it was granted outside of a plan of arrangement and that it far exceeded both the contractual and statutory rates. In the second instance, the DIP, led by four Interested Directors and one independent director, agreed to give away the Las Cristinas mining data to Venezuela despite the fact that another expropriated gold miner, Gold Reserve, Inc., had previously sold its mining data to the Republic for US$ 240 million. The reasons for these actions were first, to avoid a plan of arrangement that inexorably led to the Company's liquidation and the DIP's loss of control over the estate, and second, to entice the Republic to enter the two failed settlement agreements and monetize the ICSID award faster, in pursuit of their self-interest and at the estate's expense, respectively.

The law allows the Interested Directors and the DIP Lender to pursue their own interests, provided they absorb the costs involved.[1] A secured lender looking to pursue or avoid a reorganization or liquidation may, under certain conditions, provide a recovery outside the absolute priority rule to certain parties in interest, but not others, using its own bankruptcy entitlements. However, such discrimination is not permissible for value distributed against the debtor's estate under a plan of arrangement. Tellingly, when the share of the Net Arbitration Proceeds (NAP) assigned to the Management Incentive Plan (MIP) became materially impaired by the increase of the DIP Lender's NAP share from 35% to 88%, the DIP Lender and the Interested Directors entered into a NAP sharing agreement that transferred tens of millions of dollars from the former to the latter.

The Monitor's failure to take steps to prevent the attending harm to the estate and other parties in interest is, literally, contrary to the Code of Ethics issued by Office of the Superintendent of Bankruptcy – the Canadian governmental office that licenses and regulates insolvency professionals such as trustees, monitors and receivers. However, according to the Superintendent's office, the Monitor does not violate the Code of Ethics when breaches result from following the Company's instructions as

---

[1] See *In re Nuverra Environmental Solutions Inc.*, 17-1024 (D. Del. Aug. 21, 2018).

required by the CCAA Court orders. Thus, the Monitor's role in the CCAA and cross-border insolvency proceedings is generally to provide financial and administrative assistance to the CCAA Court and the Company. This fact is documented in an article by bankruptcy law experts from a leading Canadian corporate law firm as follows:

> *Lastly, the monitors are primarily officers of the court and as such have been described as the "eyes and ears" of the court. In this role, the monitor is an independent officer of the court that essentially implements the court's commercial oversight of the restructuring proceedings. In this regard, the monitor is not an adversary in the restructuring proceedings and generally avoids taking adversarial positions directly against any party. Rather, the monitor generally restricts itself to providing the court with its views on the commercial consequences of the positions of the parties. Therefore, the representations, suggestions and conclusions of the monitors are given substantial weight, and the courts give them considerable deference and, in most instances, are guided by their advice.[2]*

Thus, the Monitor's role is similar to that of a U.S. Trustee, who plays an administrative role in bankruptcy cases. In contrast, a court-appointed trustee is charged with protecting and administering the bankruptcy estate and his responsibilities encompass duties geared primarily to enable the estate to meet its debt obligations and, when feasible, to facilitate the reorganization and survival of the debtor as a going concern; which is, in essence, the purpose and objectives of the Canadian and U.S. bankruptcy laws. U.S case law underscores these duties:

> "First, **the fiduciary duty of the trustee runs to shareholders as well as to creditors.**". *CFTC v. Weintraub*, 471 U.S. 343 (1985) (citing *In re Washington Group, Inc.*, 476 F. Supp. at 250; *In re Ducker*, 134 F. 43, 47 (CA6 1905)).

> "Respondents also ignore that, **if a debtor remains in possession -- that is, if a trustee is not appointed -- the debtor's directors bear essentially the same fiduciary obligation to creditors and shareholders as would the trustee for a debtor out of possession.** *CFTC v. Weintraub*, 471 U.S. 343 (1985), (citing *Wolf v. Weinstein*, 372 U. S. 633, 372 U. S. 649-652 (1963)).

> "**Indeed, the willingness of courts to leave debtors in possession "is premised upon an assurance that the officers and managing employees can be depended upon to carry out the fiduciary responsibilities of a trustee."** *CFTC v. Weintraub*, 471 U.S. 343 (1985), (citing *Wolf v. Weinstein*, 372 U. S. 651)).

> "**The trustee also has a fiduciary obligation to conserve the assets of the estate and to maximize distribution to creditors.**" *In re Ridgen*, 795 F.2d 727 (9th Cir. 1986), (citing *In Re Benny*, 29 B.R. 754, 760 (N.D.Cal. 1983); 2A Collier on Bankruptcy ¶ 47.04 (14th ed. 1978)).

> "**A bankruptcy or reorganization trustee has a duty to exercise that measure of care and diligence that an ordinary prudent person would exercise under similar circumstances.**" *In re Ridgen*, 795 F.2d 727 (9th Cir. 1986), (citing *In re Cochise College Park, Inc.*, 703 F.2d 1339, 1357

---

[2] The Role of the Monitor and its Impact on U.S. Restructuring, D. Ferland and C. Lachance, Davies Ward Phillips & Vineberg LLP, Dec. 2014, www.lexpert.ca.

(9th Cir. 1983)).

> **"Beyond the statutory duties, bankruptcy trustees owe to the beneficiaries of the estate the usual common law trust duties,** such as the duty of loyalty, which proscribes self-dealing." *In re Markos Gurnee P'ship*, 182 B.R. 211, 219 (Bankr. N.D. Ill. 1995), (citing *Mosser v. Darrow*, 341 U.S. 267, 271, 71 S.Ct. 680, 682, 95 L.Ed. 927 (1951) (**"Equity tolerates in bankruptcy trustees no interest adverse to the trust."**)).

[Emphasis Added.]

The disregard for the preservation of the bankruptcy estate's assets and its rehabilitation, as demonstrated by the asset stripping and gifting in pursuit of the DIP Lender's and the Interested Directors' self-interest, is in violation of the U.S. Bankruptcy Code's purpose and objectives. The failure of the DIP and Trustee, the Monitor and Foreign Representative, and the CCAA Court to prevent the misuse of assets is inadmissible and results in serious and irreparable harm to the estate and its stakeholders.

In view of this situation, it may be incumbent upon DEBK Court to implement measures such as restricting the transfer, encumbrance, disposition or distribution of the estate's assets until it or an appellate court conclusively confirms the fairness and reasonableness of the reorganization or liquidation plan. Otherwise, the bankruptcy estate and parties in interest improperly impaired will be deprived of the right to protect their interests as a consequence of equitable mootness.

Hundreds of individual U.S. investors like myself may be compelled to take action to protect the estate's assets and to assert their rights in U.S. courts, but may be constrained by court decisions rendering such intervention futile from the outset. Measures to allow a full review of the Company's bankruptcy proceeding by the DEBK Court or appellate U.S. courts are warranted by the actions and omission by the DIP / Trustee, the Monitor and the CCAA Court mentioned above. The DEBK Court's steps to enable the fullest case review to afford the bankruptcy estate the protection required by law are, therefore, essential.

In closing, there are aspects of the bankruptcy proceeding in discussion that may be considered self-evident but that, nonetheless, are worth mentioning. The Company and the bankruptcy estate are two entirely different legal persons that may have different goals in a bankruptcy proceeding. This is specially the case, as it is here, when the Company, the DIP Lender and the Trustee are one and the same, since they all are present in and represented by the Company's Board of Directors and officers; two of whom are the DIP Lender's nominee Directors and its leading partners - the CEO and the COO, and two Interested Directors are company insiders, whose interest in the outcome of the bankruptcy proceeding are closely tied to those of the DIP Lender.

The Credit Agreement between the Company and the DIP Lender is a financing contract that binds them, but not necessarily the bankruptcy estate. This agreement gives the DIP Lender the right to file a claim against the bankruptcy estate for value bargained with the Company under contract law, but this contract does not control the operation of the bankruptcy proceeding. Hence, the use of the distribution scheme in the Credit Agreement to allocate and dispose of the estate's assets as a proxy for a plan of arrangement or liquidation is impermissible to the extent that it is not the result of a collective process and fails to meet the fair and reasonable standard required by law.

Sincerely,



Adelso A. Adrianza

cc: The Honorable Justice J. Hainey, Ontario Superior Court of Justice
    Mr. David Byers - via email (dbyers@stikeman.com)
    Mr. Robert Chadwick – via email (rchadwick@goodmans.ca)
    Mr. Alexander Cobb – via email (acobb@osler.com)
    Mr. Brian Denega – via email (brian.m.denega@ca.ey.com)
    Mr. Robert Fung – via email (rfung@crystallex.com)
    Mr. Harry J. Near - via email (info@earnscliffe.ca)
    Mr. Timothy Pinos – via email (tpinos@casselsbrock.com)
    Mr. Clifton Prophet - via email (Clifton.Prophet@Gowlings.com)
    Mr. Jay A. Swartz - via email (JSwartz@DWPV.com)