**ADELSO ADRIANZA**

113 Washington Street – Newton, MA 02458 – U.S.A.
M: (859) 803-2279 | aaadrianza@gmail.com

<u>**VIA REGISTERED LETTER**</u>                 2020 DEC 28  AM 9: 32

CLERK
U.S. BANKRU **December 14, 2020**
DISTRICT OF DELAWARE

The Honorable Judge L. Selber Silverstein
U.S. Bankruptcy Court – District of Delaware
824 North Market Street, 6th. Floor
Wilmington, DE 19801

Dear Judge Silverstein,

This communication is in reference to Crystallex International Corporation (the Company) - Case 11-14074-LSS - and its motion (the Motion) for a court order authorizing case filings under seal (D.I. 317) filed by the Canadian CCAA Court Monitor (the Foreign Representative). I am acting pro se in this case and writing this letter as a shareholder of the Company to oppose the Motion. My opposition to the Motion is grounded in precedential U.S. Third Circuit and Canadian Supreme Court decisions and on the conviction that it fails to overcome the fundamental tests established by both Courts to warrant the approval of a sealing order.

**Background**

The issues with the instant case transcends the Motion at the Delaware Bankruptcy Court (the U.S. Court). Although not mentioned in the Motion, the CCAA Court and the Monitor declined to endorse sealing portions of the Monitor's 33rd Report in the CCAA Court order dated June 8. 2020, which had been opposed by the Noteholders' Ad Hoc Committee alleging that the Company and the DIP Lender were seeking to restrict the flow of basic information to the Company's stakeholders[1,2]. As a consequence, the Company and Tenor (the DIP Lender) filed a motion for leave to appeal the CCAA Court's to the Ontario Court of Appeals (ONCA).[3] The CCAA Court subsequently approved temporarily the Company's motions to seal the Monitor's Report and the tenth extension and fourteen amendment of the Credit Agreement (i.e. the Motion) as originally proposed pending the outcome of the appeal. [4]

Two defining characteristics of the Company's CCAA proceeding closely connected from its start eight years ago are:

1.  the unparalleled secrecy involved and the resulting harm to its shareholders. The unparallel secrecy can be ascertained through a perusal of the Monitor's Reports and the CCAA Court's orders at the E&Y Restructuring Documents Center internet site and the U.S. Court Chapter 15 case docket. The consequential harm to the shareholders' interests and rights is particularized in my letter to the Honorable Justice G. Strathy, Chief Justice of Ontario, dated Nov. 6, 2020 in which your Honor was copied;[5] and

2.  the unabating disregard of the Board of Directors (BOD) for the shareholders' interest and rights while advancing the intertwined self-interests of the DIP Lender and the Interested Directors.

**The Legal Framework**

**Canada**

The Company's appeal to the CCAA Court's decision to disallow the sealing of portions of the proposed orders is predicated on the Canadian Supreme Court (the SCC) decision in *Sierra Club* (Sierra Club).[6] In Sierra Club, the SCC set out a two-step test for determining under what circumstances the public should be denied access to documents filed in a civil proceeding. This decision set forth a logical framework that balanced the right to an open court and other important societal values and commercial interests that are so important that may justify granting a sealing order. Speaking for a unanimous court, the Honorable Justice F. Iacobucci outlined the two-part test as follows:

> *A confidentiality order under [Federal Court] Rule 151 should only be granted when:*
>
> *(1) such an order is necessary in order to prevent a serious risk to an important interest, including a commercial interest, in the context of litigation because reasonably alternative measures will not prevent the risk; and,*
>
> *(2) the salutary effects of the confidentiality order, including the effects on the right of civil litigants to a fair trial, outweigh its deleterious effects, including the effects on the right to free expression, which in this context includes the public interest in open and accessible court proceedings.*

The two parts of the test deal with "necessity" and "proportionality". To succeed in the "necessity" part of the test, three elements must be proven:

- First, the potential risk to the interest which the sealing order is sought to protect must be "real and substantial".[7] The applicant must demonstrate that the risk is well grounded in the evidence and poses a serious threat to the interest in question.[8]
- Second, the applicant must demonstrate that there are no reasonably available alternative measures that can be taken to protect the interest at risk aside from granting a sealing order.[9] If there is a reasonable alternative option then a sealing order will not be granted. However, the Supreme Court also emphasized that judges are not required to opt for the absolutely least restrictive alternative.[10] An alternative option must be reasonable in nature and adequately protect the interest at risk to be an alternative option acceptable to the court.

The "necessity" part of the test becomes relevant only if the interest being protected by the sealing order is a bona fide protectable commercial interest.[11] For this to be the case, the party seeking the order must prove that the commercial interest is an "important commercial interest" in terms of a broader public interest in protecting confidentiality. To qualify as an "important commercial interest", the interest involved must not only be specific to the party requesting the order, but advance the public interest in general.[12]

Relying on Sierra Club to maintain confidentiality in commercial actions sets a high bar for a motion to seal information strictly related to a self-centered commercial interest. To be worthy of protection, the motion must be able to be expressed as a public interest in confidentiality to overcome the strong presumption in favor of public access to legal proceedings. The onus is on the party seeking to deny

access to show why this presumption should be set aside.

When the applicant seeks protection of a commercial interest, the court will examine objectively the nature of the confidential information. In order to attract protection, it must have three characteristics:

1. it must have been treated at all relevant times as confidential;

2. on a balance of probabilities, the company's proprietary, commercial and scientific interests could reasonably be harmed by the disclosure of the information; and

3. it must have been accumulated with a reasonable expectation of it being kept confidential.[13]

If all of the three elements of the "necessity" part of the test are proven, the court will move on to consider the "proportionality" part of the test in which it must consider whether granting the sealing order would produce more benefit than harm. In Sierra Club, the SCC set out a variety of factors that judges must consider when they evaluate the positive and negative effects of granting a sealing order.

On the benefit side, the SCC stressed that judges must place considerable weight on a sealing order's ability to protect the right of civil litigants to present their case or, more generally, the public interest in the right to a fair trial.[14] If the confidential information will unequivocally be required at trial and without a sealing order the party seeking the order would, more likely than not, be unable to put forward crucial elements of its case, then granting a sealing order will be seen to have significant benefits in furthering the right to a fair trial.[15]

### The U.S. - Third Circuit Court of Appeals
In *Pennsylvania National Mutual Casualty Insurance Company v. Everest Reinsurance Company*, the Third Circuit Court of Appeals (the Third Circuit) found that the correct analysis to apply in deciding when to seal documents is the standard articulated in *In Re Avandia Mktg., Sales Practices and Prods. Liab. Litig. (*Avandia*).[16,17] Specifically, the Third Circuit described the three distinct standards governing confidentiality in court proceedings:

1. the standard governing protective orders (the Protective Order Standard);
2. the standard for filing court documents under seal (the Common Law Standard); and
3. the First Amendment Right of Access Standard.[18]

According to the Third Circuit, protective orders are meant to ensure the confidentiality of discovery documents that are not filed with the court. Whether a protective order should remain confidential should be analyzed under the Protective Order Standard, which uses the seven-factor balancing test articulated in *Pansy v. Borough of Stroudsburg*, 23 F.2d 772 at 787-788 (3d Cir. 1994):

1. Whether disclosure will violate any privacy interests;
2. Whether the information is being sought for a legitimate purpose (or for an improper purpose);
3. Whether disclosure of the information will cause a party embarrassment;
4. Whether confidentiality is being sought over information important to public health and safety;
5. Whether the sharing of information among litigants will promote fairness and efficiency;
6. Whether a party benefitting from the order of confidentiality is a public entity or official; and
7. Whether the case involves issues important to the public.

In contrast, when court documents are filed under seal, courts should employ the more rigorous Common Law Standard, which provides that "there is a presumptive right of public access to pretrial motions of a non-discovery nature, whether preliminary or dispositive".[19] This common law presumption is not absolute. To overcome that strong presumption of access, the party seeking to overcome it bears the burden of showing "that the interest in secrecy outweighs the presumption".[20] And the District Court must articulate "the compelling, countervailing interests to be protected," make "specific findings on the record concerning the effects of disclosure," and "provide an opportunity for interested third parties to be heard."[21] This may be achieved by demonstrating that disclosure of the material will work a clearly defined, serious injury to the party seeking to keep documents under seal. A party must be able to articulate the compelling, countervailing interests to be protected, "In delineating the injury to be prevented, specificity is essential".[22] "Broad allegations of harm, bereft of specific examples or articulated reasoning, are insufficient" to permit documents to be sealed and remain confidential.[23]

Finally, the First Amendment Right of Access Standard applies to the public right of access to civil proceedings.[24] It "requires a much higher showing than the common law right [of] access before a judicial proceeding can be sealed." If the First Amendment right of access applies, "there is a presumption that proceedings will be open to the public." This can be overcome by demonstrating that there is an overriding interest in excluding the public, provided that maintaining documents under seal is essential to "preserve higher values and is narrowly tailored to serve that interest".[25]

The party seeking closure or sealing in the face of the First Amendment right of access "bears the burden of showing that the material is the kind of information that courts will protect and that there is good cause for the order to issue".[26] Good cause means "that disclosure will work a clearly defined and serious injury to the party seeking closure"; "[t]he injury must be shown with specificity".[27] "For example, an interest in safeguarding a trade secret may overcome a presumption of openness".[28] Bad business practices, in the absence of other circumstances, do not overcome the presumption.[29]

### The Sealing Order Approval Motion

The Foreign Representative's Motion fails to meet the standards set forth by both the SCC and the Third Circuit for several reasons:

1. It does not meet the Sierra Club "Necessity" and "Proportionality" tests required to protect a "important commercial interest" threatened by a "real and substantial" risk to the Company. Per Avandia, a party must be able to articulate the compelling, countervailing interests to be protected, "In delineating the injury to be prevented, specificity is essential". "Broad allegations of harm, bereft of specific examples or articulated reasoning, are insufficient" to permit documents to be sealed and remain confidential.

   Per the Third Circuit in Avandia, the applicant bears the burden of proving a "good cause" for the sealing order to issue, where good cause stands for specific proof "that disclosure will work a clearly defined and serious injury to the party seeking closure". Bad business practices, in the absence of other circumstances, do not overcome the presumption of the First Amendment Right of Access Standard.

The compelling, countervailing interests to be protected are non-existent in the instant case and the threat of attendant injury is subjectively hypothetical. The valid reasons required for the Company to request and obtain confidentiality protection are sorely lacking:

a) the confidentiality agreements with Venezuela and the DIP Lender are no longer valid or have been made public;

b) the risk that other parties pursuing arbitration awards or other debt collection actions against Venezuela could hinder the Company's collection of its arbitration award has been preempted by the writ of attachment issued by the Delaware District Court. Here it is important to point out that:

    I. Venezuela's interest in CITGO has been estimated to be worth US$ 6-8 billion, and

    II. the outstanding amount of the Venezuelan debt collateralized by CITGO and adjudicated by U.S. Courts as valid and enforceable is a fraction of its market value. According to Reuters, the PDVSA 2020 bonds, a US$ 3.4 billion issue at par value (collateralized by 50.1% of its CITGO shareholding), have traded as low as 10-12 cents on the dollar and 45-50 cents on the dollar in October 2020, after the SDNY Court declared them valid and enforceable (the Guido government has indicated that it will appeal this decision). The US$ 1.5 billion Rosneft loan to PDVSA (collateralized by 49.9% of its CITGO shareholding) is deemed a non-issue. Rosneft transferred all of its oil production investment in Venezuela and its PDVSA loans to Roszarubezhneft, a state-owned Russian company, to avoid the impact of U.S. Venezuela-related sanctions on its business. Geopolitical considerations are said to have persuaded the Russian government to hold on to the PDVSA loan until Venezuela can pay it off, and as long as it is necessary to protect Russian interests.

c) the disclosure of the data the Company is seeking to seal cannot be used against it in court and would be made available in litigation discovery;

d) the liquidating CCAA proceeding underway will preempt the Company's exposure to post-liquidation liability, and permissible releases to the parties involved will foreclose legal actions against them, except for breaches of law non-releasable by statute.

What the BOD is actually striving to accomplish with the appeal to the Ontario Court of Appeals and the Motion at the U.S. Court is to:

a) maintain the cloak of secrecy it successfully enforced over the past eight years to advance the self-interests of the DIP Lender and the Interested Directors,

b) keep under wraps bad business practices and judgement underlying the BOD's decisions that have caused significant harm to the Company and the estate in the liquidating CCAA proceeding that I particularized in my letter to the Honorable Justice R. Strathy (see Exhibit 1), and

c) prevent the individual shareholders from getting timely information about the BOD's self-interested actions and omissions detrimental to their rights and interests. A relevant fact here is that although the BOD opposed adequate legal representation for its shareholders despite the self-evident conflicting interests of four of its five members, it approved the payment of tens of millions of U.S. dollars in legal and other fees incurred by the DIP Lender and the Noteholders' Ad Hoc Committee; in spite of the fact that the former stands to earn over US$ one billion plus 10% interest on a US$ 76 million DIP loan, and the latter lost all the legal actions against the Company

in Canada, where the English rule provides that the party who loses in court pays the other party's legal costs. Thus, instead of recovering the fees incurred defending the Company in court, the BOD agreed to reimburse the Noteholders' Ad Hoc Committee over US$ 10 million dollars it spent challenging the Company in court.

The approval of the Motion will enable the continuation of the harm inflicted by the Company under the control of the Interested Directors upon its estate, its stakeholders in general, and hundreds of Canadian and U.S. shareholders like me in particular; who have been starved of adequate protection for their rights and interests in the CCAA bankruptcy proceeding. The unparallel secrecy, the lack of adequate legal representation and the highly effective exclusion of the shareholders from the outset in the eight-year long CCAA proceeding have made their rights and interest highly vulnerable to self-interested actions and omissions by the DIP Lender and the Interested Directors.

**Prayer for Relief**
Based on the foregoing, I pray that this Court:

1. Postpone the U.S. Court's review and decision on the Motion until the Ontario Court of Appeals issues its ruling on the Company's leave to appeal the CCAA Court's decision to disallow the sealing of certain information and documents;

2. Enjoin the Foreign Representative from pursuing approval and relief from the U.S. Court prior to this and other present and future matters involved being fully settled in the Canadian Courts;

3. Dismiss the Motion and related future motions for its failure to meet the standards set forth in precedential decisions by the Third Circuit and other courts above, and for being contrary to a fundamental constitutional guarantee: the First Amendment right of access;

4. Appoint an examiner to coordinate the administration and supervision of the debtor's assets and affairs in respect to the interests of absentee and unrepresented U.S. parties in interest in the bankruptcy proceedings, or in the alternative…;

5. Issue an order directing the Company to provide for adequate legal representation for its shareholders for the duration of the proceeding in the U.S. Court, if just and proper;

6. Such further and other relief as this Court deems just and proper.

The U.S. Court has the authority to grant the requested relief pursuant to sections 105(a), 107(b), 1522 / (a), (b), (d), 1525(b) and 1527 / (1),(3) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the Bankruptcy Code).

Date: December 14, 2020

Adelso A. Adrianza, Pro se

Enclosures: 1.- Footnotes page
2.- Distribution List
3.- Exhibit 1: A. Adrianza letter to Justice Strathy, Ontario Nov. 6, 2020

## FOOTNOTES

[1] See E&Y Restructuring Document Center, Crystallex International Corporation at blob:https://documentcentre.ey.com/2e62ba59-dc5d-46ab-9869-c106035ef401.

[2] See Crystallex CCAA Court order Dated June 8, 2020 *at* https://documentcentre.ey.com/#/detail-engmt?eid=166

[3] See Crystallex request for leave for appeal to the Ontario Court of Appeals the CCAA Court order Dated June 8, 2020 *at* blob:https://documentcentre.ey.com/1cbe2455-27ec-4792-af8b-0cd991285e42.

[4] See Crystallex CCAA Court order Dated Nov. 3, 2020 *at* blob:https://documentcentre.ey.com/864e2464-59e4-4b70-9463-7ad42aff87e2, page 8.

[5] Exhibit 1: A. Adrianza letter to Justice Strathy, Ontario Nov. 6, 2020 (enclosed).

[6] *Sierra Club of Canada v. Canada (Minister of Finance),* 2002 SCC 41.

[7] Ibid., at para. 54.

[8] Ibid.

[9] Ibid., at para. 57.

[10] Ibid., at para. 66.

[11] Ibid., at para. 66.

[12] Ibid., at para. 66.

[13] Ibid., at para. 60.

[14] Ibid., at para. 70.

[15] Ibid., at para. 71.

[16] *Pa. Nat'l Mut. Cas. Ins. Co. v. Everest Reinsurance Co.*, 1:18-mc-653 (M.D. Pa. Mar. 14, 2019).

[17] *In Re: Avandia Marketing, Sales Practices and Products Liability Litigation*, 0:18-cv-02656, (3d Cir. 2019).

[18] Ibid., at 7, section II.

[19] Ibid at 12, citing *In re Cendant Corp.*, 260 F.3d at 192.

[20] Ibid. at 12, citing *Bank of Am.*, 800 F.2d at 344.

[21] Ibid at 13, citing *In re Cendant Corp.*, 260 F.3d at 194.

[22] Ibid.

[23] Ibid.

[24] Ibid. at 13, citing *In re Cendant Corp., 260 F.3d at 198 n.13.*

[25] Ibid. at 14, citing *Publicker Indus.*, 733 F.2d at 1073

[26] Ibid. at 15, citing Publicker Indus., 733 F.2d at 1071

[27] Ibid.

[28] Ibid. at 15, citing Publicker Indus., 733 F.2d at 1073

[29] Ibid. at 15, citing Publicker Indus., 733 F.2d at 1074

## Distribution List

**VIA USPS CERTIFIED MAIL**

To: The Honorable Judge L. Selber Silverstein, U.S. District Bankruptcy Court - District of
    Delaware

cc: The Honorable Justice J. Hainey, Ontario Superior Court of Justice

**VIA E-MAIL**

cc:     Mr. David Byers - via email (dbyers@stikeman.com)
       Mr. Robert Chadwick – via email (rchadwick@goodmans.ca)
       Mr. Alexander Cobb – via email (acobb@osler.com)
       Mr. Brian Denega – via email (brian.m.denega@ca.ey.com)
       Mr. Robert Fung – via email (rfung@crystallex.com)
       Mr. Sergio Marchi - via email (smarchi@crystallex.com)
       Mr. Timothy Pinos – via email (tpinos@casselsbrock.com)
       Mr. Clifton Prophet - via email (Clifton.Prophet@Gowlings.com)
       Mr. Jay A. Swartz - via email (JSwartz@DWPV.com)
       Mr. Robin B. Schwill – via email (rschwill@dwpv.com)

# EXHIBIT 1

**ADELSO ADRIANZA**

113 Washington Street – Newton, MA 02458 – U.S.A.
M: (859) 803-2279 | aaadrianza@gmail.com

November 6, 2020

The Honorable
George R. Strathy,
Chief Justice of Ontario
Court of Appeal for Ontario
Osgoode Hall
60 Queen Street W.
Toronto, ON M5H 2M3
Canada

Dear Chief Justice Strathy,

I am a shareholder of and writing to you in reference to Crystallex International Corporation (the Company) and its appeal to the Ontario Superior Court of Justice – Commercial List regarding the CCAA Court's order denying the Company's request to continue sealing case documents as confidential. In several communications to the CCAA Court, the Monitor and the Company, I have decried the excessive secrecy in this CCAA case since the beginning because of the unwarranted vulnerability it imposed on the Company's stakeholders and the distorted incentives it provided to a Board of Directors (BOD) dominated by self-interested members. I have also repeatedly denounced the lack of adequate legal representation afforded to the Company's shareholders to ensure their interests are protected; this especially considering the self-evident conflict of interest of four of the five Directors.

It is perilous to underestimate the harm self-interested Directors in control of a company can cause to its stakeholders when enabled to pursue their self-interest in a legal vacuum that prevents the stakeholders from making sure their fiduciaries are kept up to their duties. The list of actions and omissions by the Interested Directors detrimental to the Company is long and have been discussed in detail in my previous communications to the CCAA Court, the Company, the Monitor, and the Delaware District and Bankruptcy Courts. Therefore, I will limit the discussion that follows to the most relevant points in relation to the unwarranted secrecy in the Company's CCAA proceedings and the resulting harm to the interests of the Company in general and the shareholders in particular.

## THE FACTS

### The CCAA Filing

The Board of Directors filed for bankruptcy purportedly to protect the Company from being taken over by the Noteholders and to pursue a $3.4 billion arbitration award against Venezuela for the illegal cancellation of the Las Cristinas mining operating agreement (MOA). The CCAA filing was predicated and approved on the grounds that:

a) The Company needed to stay all legal proceedings while pursuing the ICSID arbitration award and reorganizing its operations to protect the company for the benefit of its stakeholders,

b) The Company's conviction that an arbitration award for as low as $US 500 million would suffice to pay fully all the Company's debt, the arbitration and operating costs involved, and allowed it to return a significant amount to its shareholders. Importantly, the distribution waterfall in the Credit Agreement between the DIP Lender and the Company provided for the residual value of the Net Arbitration Award (NAP) – the net amount of the arbitration award remaining after paying:

   I. the taxes owed
   II. the Directors' and Administration charges,
   III. 100% of the financing debt (including the DIP loan, the unsecure notes and all other verified claims) and the interest owed,
   IV. the projected arbitration, restructuring and operating expenses,
   V. the Management Incentive Plan (MIP),
   VI. the DIP Lender's entitlement to the NAP (35%).

The residual NAP (65%) accrued to the Company as a going concern, i.e., liquidation was not explicitly planned for then, and was only disclosed in the recent appeal to the Ontario Court of Appeals - ONCA. The Company is required to use fund from the residual NAP to pay the cost of:

   I. the CCAA and the Chapter 15 proceedings, and

   II. the pre- and post-filing legal fees incurred by the noteholders' Trustee to protect their rights in the Ontario courts. The Company defeated the Trustee's legal actions, yet it agreed to cover the Trustee's costs.

c) The pursuit of the arbitration award was warranted by the strong legal case against Venezuela and the Republic's past willingness to settle and pay arbitration awards,

d) The $3.4 billion claim against Venezuela for a gold mine with close to 17 million ounces of proven and probable gold reserves worth $US 20 billion was not guaranteed, but highly probable,

e) The high probability of a successful arbitration award worth as low as $US 500 million and the Company's $US 160 million total debt at the end of 2012 made it appropriate to consider the interest of the shareholders in the initial order,

f) The ultimate objectives of the CCAA filing approval was to:

   I. Enable the Company's financial rehabilitation through the pursuit of the arbitration claim,

   II. Protect and maximize the Company's property,

   III. Ensure the equitable distribution of the Company's assets among its stakeholders.

In the Reasons re Initial Order, Dec. 27, 2011, Justice Newbould stated:

[20] *The CCAA is intended to provide a structured environment for negotiation of compromises between a debtor company and its creditors for the benefit of both. Where a debtor company realistically plans to continue operating or to otherwise deal with its assets but it requires the protection of the court in order to do so and it is otherwise too early for the court to determine whether the debtor company will succeed, relief should be granted under the CCAA. See Re Lehndorff General Partner*

*Ltd, (1993), 17 C.B.R. (3d) 24, per Farley J, the benefit to a debtor company could, depending upon the circumstances, mean a benefit to its shareholders.*

### The DIP Financing

According to the case records, the DIP financing was meant to enable the pursuit of the arbitration claim to advance the objectives of the CCAA filing. The auction implemented for the DIP financing selection that favored Tenor Capital Management (the DIP Lender) was concluded under the following terms:

a) Total financing commitment for $US 36 million, which was purportedly estimated by the Company's arbitration counsel as the amount required to pursue and collect the claim against Venezuela over a three-year period,

b) 10% p.a. PIK interest and an entitlement to 35% of the NAP,

c) The Board of Directors was reduced from eight to five members and recomposed with two Tenor Management Capital nominee directors (Mr. R. Shah, and Mr. D. Kochav, Tenor's CEO and COO, respectively), two inside directors (Mr. R. Fung and Mr. M. Oppenheimer, the CEO and Chairman of the BOD and a former President and CEO, respectively), and an independent Director (Mr. H. Near until recently, following his resignation, and Mr. S. Marchi currently after being appointed recently to replace Mr. Near),

d) The DIP loan could not be paid off without the DIP Lender's consent and was to be deposited, together with the DIP Lender's share of the NAP, in a bank account in the Company's name for the exclusive benefit of the DIP Lender. Interest earned on the deposited funds accrue to the DIP Lender,

e) The payment of the DIP loan and the DIP Lender' share of the NAP is to be made over time per the DIP Lender's indications for it to avoid breaching the Canadian Criminal Interest Rate statute (Section 347 of the Canadian Criminal Code). Entering into financing arrangement or receiving interest compensation exceeding 60% per annum is deemed a criminal interest rate offence punishable by fine and imprisonment. When calculating breaches of Section 347, Canadian courts rely on actuarial calculations that by law must include all proceeds related to the loan, e.g. interest, any and all fees, fines and penalties, special or contingent compensation (e.g. CVRs) and the like.

f) The Preliminary and the final DIP Credit Agreements foreclosed any possibility for the Company to obtain financing from a source other than Tenor,

g) The Company spent the $US 36 million DIP loan in just over a year and obtained $40 million additional DIP financing from Tenor for an additional 53% share of the NAP, for a total $US 76 million loan and 88% share of the NAP. The latter is estimated at over $US 1 billion, assuming the collection of the full award and the pre- and post-award interest due ($US 1.6 billion),

The arbitration award was issued in April 2016, over four years after the Company filed its ICSID arbitration request.

### The Self-interested Actions & Omissions

The Director's self-interested acts and omissions are many, started before the CCAA filing and

continue to this date; some are publicly known, while others remain undisclosed. The list below is a partial list of those publicly known:

a) The terms of the DIP financing agreement were negotiated and agreed between Tenor and members of the Company's former and current BOD months before the CCAA filing. The Company had been exploring long-term financing opportunities for over a year prior to the CCAA filing to fund the pursuit of the arbitration award but chose to pursue Tenor's financing offer.

b) A Management Incentive Plan (MIP) proposed by the Interested Directors potentially worth $US 80 to 100 million was approved to benefit a selected number of the Company's officers and Directors. The MIP was originally tied to the shareholders' share of the NAP and set at 25% of the residual NAP to be distributed to the Company. The dilution of the shareholders' NAP share through the subsequent DIP Loan increases and the resulting increase of the DIP Lender's NAP share from 35% to 88% resulted in a NAP Transfer agreement between the Interested Directors and the DIP Lender geared to make the former whole,

c) The Company passed on the opportunity to execute a writ of attachment it obtained from a New York court in June 2017 on $US 710 million worth of Nomura Bank notes owned by Venezuela and held for sale by Nomura Securities in New York, which would have enable it to a) pay off all the outstanding debt at the time, b) emerge from Insolvency as a going concern and d) continue the arbitration award collection efforts. However, the execution of the attachment was not in the best interest of the DIP Lender and the Interested Directors, given that it would have triggered breaches of Canadian laws by an earlier-than-anticipated execution of the NAP distribution scheme in the Credit Agreement. The Nomura notes attachment was set aside to pursue the first settlement agreement with Venezuela that was announced in mid-September 2017, and which Venezuela did not honor by failing to make an initial $US 25 million payment due the same month.

d) The BOD and the Noteholders entered into a standstill agreement geared to avoid the implementation of a Plan of Arrangement, which involved paying post-petition interest on the unsecured notes at a rate over 20% p.a. versus the 10% contracted rate. Post-petition interest is disallowed by the Canadian bankruptcy laws unless included in a court-approved Plan of Arrangement and limited to the higher of the contracted rate or 7% p.a.,

e) The Company filed for CCAA protection purportedly to pursue the arbitration award and collection to enable it to pay back its debt and the interest due on a dollar for dollar basis, and to emerge from insolvency. However, the terms of the Credit Agreement with Tenor inexorably lead to the liquidation of the Company following the collection and distribution of the arbitration award. This realization seemingly compelled the Ontario Court of Appeals (ONCA) to include the following statement in its shareholders oppression case decision:

"[25] *In closing, we note that DIP financing was originally conceived to fund operations while a company under CCAA protection restructured. The disposition of this motion should not be interpreted as an endorsement or a rejection of the amendments approved by Newbould J.*"

f) The BOD opposed the approval of and funding for adequate shareholder legal representation in the CCAA proceedings in spite of the fact that four of its five members had conflicting interests as a result of the their self-interested goals as the CEO (R. Shah) and the COO (D. Kovach) of Tenor, and the NAP transfer agreement between R. Fung and M. Oppenheimer and Tenor.

Here is important to note that a Shareholders Committee (the Committee) was formed in March 2018 by several investors concerned by the lack of adequate representation in the CCAA proceedings. The Committee represented over 30% of the outstanding shares through an opt-in process and managed to get legal representation on a contingent basis seeking to redress the harm suffered by the shareholders. The Committee's legal counsel, Gowling WLG LLP, pursued a shareholders' oppression claim before the ONCA in June 2018 that was unsuccessful since, in the Court's opinion, it could not reversed the CCAA Court orders deemed to have caused the harm to the shareholders because the legal action was "too little too late". Gowling's legal representation agreement with the Committee ended after the shareholder oppression decision and, according to a member of the Company's legal counsel team, they withdrew from the case in January 2019.

**Other Important Facts**

The once probable arbitration award is today a legal certainty. The U.S. Supreme Court's decision to deny certiorari and to review the rulings by the Delaware District Court and the Third Circuit Court of Appeals made these final. In addition, the U.S. Justice Department acknowledged the validity of the Company's claim against Venezuela; while asking the Delaware District Court to delay the execution of a writ of attachment on Venezuela's CITGO shares to avoid conflict with "U.S. interests". While the Company's right to the award is certain, the timing of its collection in full is an open question and depends on the Delaware District Court's decision on the execution of the writ of attachment.

In 2018 – 2019 the Company received cash payments for close to $US 100 million from Venezuela and a portion of Huntington Ingalls' attachment of a Venezuelan Defense Ministry account at the Bank of New York Mellon. Prudently managed, these funds should be enough to fund the company's collection efforts for several years. In addition, the $US 350 million in bonds received from Venezuela and the over $US one billion outstanding award balance to be collected provide the balance sheet strength to secure regular financing if needed.

**The Harm to the Shareholders Caused by Excessive and Unwarranted Confidentiality**

The ongoing and unprecedented number of sealing orders in the Company's CCAA case have injured and continues to harm the shareholders' interests. The CCAA proceedings have been cloaked in secrecy from the outset, which has prevented the shareholders from protecting their interests. Consequently, the shareholders' interests have been made vulnerable to acts and omission by the BOD that resulted in the shareholders' legitimate expectation being oppressed and their interests being disregarded.

When shareholders decide to invest their retirement funds, college education savings and the like, they hold several expectations that underscore their decision. And if the reasonableness of such expectations is in doubt, rational shareholders who depend on their savings for retirement or their children's education purposes will refrain from exposing their savings to undue risk. It is for good reason that small individual investors hold dear several fundamental expectations:

1.- The right to:

a. Having proportionate participation in earnings,
b. Sharing in the Stock's appreciation,
c. Receiving ongoing honest and transparent communications from the company,
d. Getting and exercising their voting rights,
e. Being able to sell the stock when their legitimate expectations are not met.

2. The reliance on the shareholders' ability to appoint a board of directors fully committed and dedicated to charting the company's future and living up to their duty as fiduciaries to:

a. Protect and advance the company's and its stakeholders' best interest,
b. Act loyally and with care in discharging their responsibilities,
c. Abide by the company's bylaws and governance policies,
d. Plan and chart the long-term viability of the business,
e. Keep the shareholders adequately informed about the affairs of and decisions affecting the company and the shareholders' interests,
f. Protect and use the company's property to advance the long-term operations and viability of the business,
g. Inform and obtain the shareholders' approval for fundamental changes to the company's equity structure.

The CCAA filing and the continued secrecy in the CCAA proceedings have allowed a self-interested BOD to set aside their duties as fiduciaries towards both the company and its shareholders despite two inescapable facts: 1) the Company has had all along the undisputable right to receive compensation potentially worth billions of dollars for the illegal cancellation of the Mining Operation Contract (MOA), and 2) the Company's liabilities at the time of filing for CCAA protection amounted to $US 160 million.

The undisputable right to the arbitration compensation worth at least $US 1.6 billion (the final amount can only be determined once full payment is received and the post-award interest due is calculated) was sealed and delivered by the U.S. Supreme Court's certiorari denial and the U.S. Department of Justice acknowledging the Company's right to collect the award (although the DOJ would rather delay the collection to protect current "U.S. Interests"). Hence, the validity of the award and the right to the corresponding compensation are indisputable; and its full and effective collection is only a question of the efforts and time required to execute it.

### The Fiduciary's Duties

"The basic function of the fiduciary concept is well-known: fiduciaries are obliged to abnegate all self-interest, as well as those of third parties, and focus solely on the best interests of their beneficiaries. This requires that fiduciaries not benefit themselves or third parties, whether financially or otherwise, from their positions as fiduciaries, nor confer a benefit upon third parties at the expense of their beneficiaries' interests if the latter are tangibly related to the fiduciary nature of the parties' interaction. These prohibitions are enforced by the fiduciary rules against conflicts of interest. The rule against conflicts includes both conflicts of interest and conflicts of duty, such that any combination of these two can give rise to the prohibition. The correlation to the strict duties imposed on fiduciaries is that their beneficiaries are entitled to rely upon the fiduciaries' good faith in discharging their duties without the need for this performance to be monitored."

Source: Understanding Fiduciary Duties and Relationship Fiduciarity, Leonard I. Rotman, McGill Law Journal, Volume 62:2 Jun. 2017 p. 984.

While well-known, the proper discharge of a fiduciary's duties is not guaranteed. Holding a fiduciary such as BOD members up to their duties requires ongoing scrutiny by its beneficiaries and the entities entrusted with the protection of the public interest and the enforcement of the applicable laws. Unrestricted ongoing secrecy runs counter to the accountability and transparency required towards this end. Only under such conditions can a fiduciary carry out detrimental actions and omissions against the interests of his beneficiaries, which in the instant case are the Company, its estate and its shareholders. This is made self-evident by the BOD's known acts and omissions listed below:

1. Freezing out of and depriving the shareholders of their proportionate rights to share the fruits of their US$ 500 million investment in the company to finance the development of the Venezuelan mining operation, while
   a. Making misrepresentations about the DIP financing process not being allowed to exceed more than half of equity participation by the selected DIP lender,
   b. Not allowing the shareholders to participate in the DIP financing process to enable them to maintain their proportionate rights despite the DIP Lender's commitment to do so.

2. Implementing a total and continued shareholder black-out that started right before the CCAA filing. The Company:

   a. Provided no notice to shareholders of the impending and the executed CCAA filing. It purportedly published a notice ex-post in two journals and on its website that neither I nor hundreds of individual investors ever saw or heard about,

   b. Requested and obtained a court order to discontinue the annual shareholders' meeting and reporting the Company's state of affairs,

   c. Issued no information to the shareholders regarding the BOD's plans and the Company's financial status neither prior nor after the CCAA filing,

   d. Allowed the delisting of the Company's shares from all stock exchanges even though listing could be transferred and maintained on the Pink Sheets and OTC markets. This prevented the shareholders from exercising the last option they have to extricate themselves from a BOD that disregards their interests,

   e. Allowed and enabled the disproportionate dilution of the shareholder's equity holdings that reduced their $US 500 million investment in the Company from 100% to less than a 10% minority interest for a $US 76 million DIP loan and by allowing the DIP Lender to convert its CVR to 88% of the common stock.

   f. Granted the DIP Lender stock voting rights prior to exercising the CVR conversion to common stock and diluted the shareholders' pecuniary rights without any consideration for Company property not covered by the Credit Agreement (the mining data) and the tax benefits available only for the benefit of the shareholders that incurred the loss (the tax loss carry-forward), which by Canadian tax law expire upon a change of control,

   g. Approved the gifting of estate property worth hundreds of millions of dollars by giving away the mining data to Venezuela (over US$ 300 million), paying

excessive post-petition interest ($US 50 million), giving up the pre- and post-award interest on the arbitration award (US$ 340 million), allowing the DIP Lender to benefit from the available tax loss carry-forward deductions ($US 120 million) and risking the disallowance of this tax benefit upon a change in control at the expense of the legacy shareholder,

3. Failed to discharge its responsibility to adequately manage the financial and operating risks involved with the gold mining investment in Venezuela:

   a. The expropriation thread was made public by high-ranking Venezuelan government officials years prior to its execution,

   b. The BOD failed to prepare the company to deal with and provide for the resources needed to protect its rights. BODs of companies in similar situations (e.g. Gold Reserve and Rusoro Mining) planned and executed measures to protect the companies' interest and those of their stakeholders. Thus, these companies:

      i. Were adequately financed to pursue the arbitration award and collection,

      ii. Maintained their stock listing on the U.S. and Canadian stock markets,

      iii. Continue to provide timely reports on the status of the company's efforts to collect the arbitration award.

   c. The BOD failed to take action to protect the Company's property and rights after Venezuela rejected the approval of the environmental permit required to operate the mine, which effectively cancelled the MOA.  The BOD waited two years to file for ICSID arbitration, three times longer than Rusoro and twice longer than Gold Reserve, which filed the arbitration claims as soon as the required six-month arbitration notice waiting period expired,

According to the CBCA, the directors' duty of care requires a director to "exercise the care, diligence and skill that a reasonably prudent individual would exercise in comparable circumstances." The failure to prepare the company to deal with the impending expropriation is a clear breach of the duty of care.

4. Enabled the DIP Lender's de facto control over the Company through the DIP loans and the NAP sharing agreement with two non-independent Company Directors:

   a. The interim and final DIP loan terms precluded any DIP financing from a source other than Tenor and thereby gave Tenor de facto control over the company from that point onwards through the no-cancellation clause, the CVR conversion to common stock, the four interested directors on a five-directors BOD,

   b. The NAP sharing agreement provides for over US$ 80 million to R. Fung (CEO and Chairman) and M. Oppenheimer to compensate them for the diminished Management Incentive Plan (MIP) as a result of the dilution of the estate's residual NAP share from 65% to 12%. The MIP share was set at up to 25% of the residual NAP share,

c.  The NAP sharing agreement made the two non-independent Company Directors beholden to Tenor's interests. This resulted in four of the five BOD members becoming Interested Directors,

d.  Contrary to well-established corporate governance practice, the Company's by-laws allow BOD members to pursue their own self-interest if they a) disclose their self-interest and b) comply with the CBCA rules in that regard. However, the CBCA Director abdicates his duty to enforce the mandate to regulate Canadian business corporations and protect the integrity of the business environment in the public interest once a company files for bankruptcy protection. The Ontario Securities Commission (ONSC) does the same. The CBCA and the ONSC Directors do so by transferring their responsibilities to the CCAA/BIA courts, whose function and mandate is not necessarily to protect the shareholders' interests. This is one of the reasons why the U.S. Bankruptcy Code requires the appointment of a Trustee to protect the estate's interests.

5.  The Supreme Court of Canada noted in *Peoples Department Stores v. Wise* that the statutory fiduciary duty under the CBCA (and similar provincial statutes) requires that directors:

I.  Act honestly and in good faith vis-à-vis the corporation,

II.  Respect the trust and confidence that have been reposed in them to manage the assets of the corporation in pursuit of the realization of the objects of the corporation,

III.  Avoid conflicts of interest with the corporation,

IV.  Not abuse their position for personal benefit,

V.  Maintain the confidentiality of information they acquire by virtue of their position, and

VI.  Serve the corporation selflessly, honestly and loyally.

Section 122(1) of the CBCA provides that:
*Every director and officer of a corporation in exercising their powers and discharging their duties shall act honestly and in good faith with a view to the best interests of the corporation.*

a)  At a minimum, in advancing the "best interests of the corporation" the directors' fiduciary duty requires that they:

I.  Advance the long-term interests of the corporation, i.e. protect its going-concern status,

II.  Ensure that the corporation meets its statutory obligations, e.g. the CBCA and the ONSC regulations,

III.  Protect and manage prudently the company's property,

IV.  Provide for adequate corporate governance and business oversight,

b) By advancing the DIP Lender's interests to the exclusion of the other stakeholders, the Interested Directors abdicated their duty of care and loyalty owed to the Company and, by extension, unfairly disregarded the interests of the shareholders and oppressed their legitimate and reasonable expectations as investors in the company,

c) Other salient acts and omissions by the BOD in disregard of their fiduciary duties, which started with the bankruptcy filing and continued to date, are several and well-documented:

    I.    Replacing the shareholders' approved Rights plan with a BOD approved Rights plan tailor-made to facilitate the DIP Lender's takeover of the company,

    II.    Failing to abide to the company's bylaws and Corporate Governance guidelines and thus exposing it to breaches of law and financial losses by:

        i.    Hiring Venezuelan advisors to represent the company in settlement agreement negotiations with high ranking officials on the OFAC's Specially Designated Nationals and Blocked Persons List (SDN) for corruption and human rights violations,

        ii.    Indebting the company for and paying US$ 30 million to the Advisors that negotiated the two failed settlement agreements that yielded US$ 75 million in effective payments. This even though the Company:

            1.    had filed for bankruptcy protection,

            2.    was neither authorized by the CCAA Court to spend limited resources on, nor had it secured the funds needed to cover the cost of pursuing a settlement with Venezuela long before the ICSID arbitration panel rendered its decision,

            3.    made the payment as soon as the US$ 75 million cash payment from Venezuela was received, without any detailed documentation of the services provided and any certainty as to when the it would receive additional payments, and was incommensurate with the results obtained,

            4.    raised the spectrum of Foreign Corrupt Practices Act (FCPA) violations in a country notorious for pay-for-play government corruption, which has earned it a distinctive 16/100 score on a declining scale (with 87/100 [Denmark] being the least and 9/100 [Somalia] the most corrupt country) that measures the perceived levels of public sector corruption in 180 countries / territories around the world in Transparency International's 2019 survey.

Sir John Dalberg-Acton once said that "*Power tends to corrupt, and absolute power corrupts absolutely.*" His conclusion is well-founded by world history and validated by the many laws and regulations put in place to curtail its often-nefarious effects. Unchecked power to pursue one's self-interests is a great incentive to advance them and to expose other parties to unwarranted vulnerability. Trust, but verify - a Russian proverb that became internationally known when used by President Reagan regarding the nuclear arms treaty with Russia,

encapsulates the reason why checks and balances are needed when conflicting interests are in play. Unwarranted ongoing secrecy in a court of law is in fact the antithesis of the open court principle. As noted by the Supreme Court of Canada in *Vancouver Sun (Re)*, this principle enhances the public's confidence in the justice system:

> "*Public access to the courts guarantees the integrity of judicial processes by demonstrating "that justice is administered in a non-arbitrary manner, according to the rule of law". Openness is necessary to maintain the independence and impartiality of courts. It is integral to public confidence in the justice system and the public's understanding of the administration of justice. Moreover, openness is a principal component of the legitimacy of the judicial process and why the parties and the public at large abide by the decisions of courts.*"

The higher the secrecy in court proceedings, the bigger the potential for harm to the more vulnerable parties involved. The parties with a sizable stake in a legal proceeding and the wherewithal that allowed them to acquire that stake in the first place can and will protect their interests in court to the extent necessary. Individual shareholders that invest their retirement and the children's college funds cannot afford to do the same; and rely on the CBCA, the ONSC and other regulators appointed for that purpose. In the Company's CCAA proceeding, the harm befell the individual equity investors, who could not afford to have adequate legal representation in a proceeding currently in its eighth year, given the high entry barriers erected by the Interested Directors from the outset. The reason for this can be linked back to the successful efforts by the Interested Directors to foreclose all communications with the shareholders to keep them in the dark to advance their own interests, while running the statute of limitations clock out to scape responsibility.

Sincerely,

Adelso Adrianza

cc: The Honorable Justice J. Hainey, Ontario Superior Court of Justice
    The Honorable Judge L. Selber Silverstein, Delaware U.S. District Bankruptcy Court
    The Honorable Judge L Stark, Delaware U.S. District Court
    Mr. David Byers - via e-mail (dbyers@stikeman.com)
    Mr. Robert Chadwick – via e-mail (rchadwick@goodmans.ca)
    Mr. Alexander Cobb – via e-mail (acobb@osler.com)
    Mr. Brian Denega – via e-mail (brian.m.denega@ca.ey.com)
    Mr. Robert Fung – via e-mail (rfung@crystallex.com)
    Mr. Sergio Marchi – via e-mail (mail@crystallex.com)
    Mr. Timothy Pinos – via e-mail (tpinos@casselsbrock.com)
    Mr. Clifton Prophet - via e-mail (Clifton.Prophet@Gowlings.com)
    Mr. Jay A. Swartz - via e-mail (JSwartz@DWPV.com)

**ADELSO ADRIANZA**

113 Washington Street – Newton, MA 02458 – U.S.A.
M: (859) 803-2279 |

**VIA CERTIFIED MAIL**

**To:**   The Honorable George R. Strathy, Chief Justice of Ontario

**cc:**    Honorable Justice J. Hainey, Ontario Superior Court of Justice

The Honorable Judge L. Selber Silverstein, Delaware U.S. District Bankruptcy Court

The Honorable Judge L. Stark, Delaware U.S. District Court

**VIA E-MAIL**

**cc:**    Mr. David Byers - via e-mail (dbyers@stikeman.com)

Mr. Robert Chadwick – via e-mail (rchadwick@goodmans.ca)

Mr. Alexander Cobb – via e-mail (acobb@osler.com)

Mr. Brian Denega – via e-mail (brian.m.denega@ca.ey.com)

Mr. Robert Fung – via e-mail (rfung@crystallex.com)

Mr. Sergio Marchi – via e-mail (mail@crystallex.com)

Mr. Timothy Pinos – via e-mail (tpinos@casselsbrock.com)

Mr. Clifton Prophet - via e-mail (Clifton.Prophet@Gowlings.com)

Mr. Jay A. Swartz - via e-mail (JSwartz@DWPV.com)

Adelso Adrianza
113 Washington Street
Newton, MA 02458
U.S.A.

7019 2970 0001 7237 6386



U.S.M.S?
EX-RAY'

The Honorable
Chief Judge Leonard Stark
U.S. District Court - Delaware
J. Caleb Boggs Federal Building
844 N. King Street
Unit 26, Room 6124
Wilmington, DE 19801-3555

**ADELSO ADRIANZA**

113 Washington Street – Newton, MA 02458 – U.S.A.
M: (859) 803-2279 | aaadrianza@gmail.com

**VIA USPS MAIL**

To:   The Honorable Judge L. Selber Silverstein, U.S. District Bankruptcy Court - District of
      Delaware.

cc:   The Honorable Justice J. Hainey, Ontario Superior Court of Justice.
      Mr. Matthew B. Lunn, Young Conaway Stargatt & Taylor, LLP
      Ms. Karen S. Park, Shulte Roth & Zabel LLP

**VIA E-MAIL**

cc:   Mr. David Byers - via email (dbyers@stikeman.com)
      Mr. Robert Chadwick – via email (rchadwick@goodmans.ca)
      Mr. Alexander Cobb – via email (acobb@osler.com)
      Mr. Brian Denega – via email (brian.m.denega@ca.ey.com)
      Mr. Robert Fung – via email (rfung@crystallex.com)
      Mr. Sergio Marchi - via email (smarchi@crystallex.com)
      Mr. Matthew Lunn Marchi - via email mlunn@ycst.com
      Mr. Timothy Pinos – via email (tpinos@casselsbrock.com)
      Mr. Clifton Prophet - via email (Clifton.Prophet@Gowlings.com)
      Mr. Jay A. Swartz - via email (JSwartz@DWPV.com)