**ADELSO ADRIANZA**
113 Washington Street – Newton, MA 02458 – U.S.A.
M: (859) 803-2279 | aaadrianza@gmail.com

FILED
2021 JUN -4  AM 9:32
CLERK
U.S. BANKRUPTCY COURT
DISTRICT OF DELAWARE

June 1, 2021

The Honorable
Chief Judge Leonard Stark
U.S. District Court - Delaware
844 N. King Street, Unit 26, Room 6124
Wilmington, DE 19801-3555

Dear Chief Judge Stark,

This communication is about Crystallex International Corporation (Case 1:17-mc-00151-LPS, the Company) and regarding this Court's order appointing the Special Master (D.I. 258) to prepare the execution of the money judgement the Company holds against Venezuela (the Republic). I am writing this letter, pro se, as one of the hundreds of U.S. citizens that are beneficial owners of shares in the Company, which my wife and I acquired over many years as investment for our retirement and our children's college education.

## I. BACKGROUND

The motivation behind this letter is the long-standing concern on my part, which is shared by many similarly situated shareholders, that their economic interests and rights have been and continue to be disregarded by four of the five directors (the Interested Directors) on the Company's Board of Directors (BOD) through the implicit lack of adequate representation. The Company's filing for insolvency protection in Canada was predicated on the opportunity to pursue the arbitration against the Republic to pay its creditors in full and for the benefit of its shareholders. The value of the expropriated gold mine (set at $3.4 billion in the arbitration request) and US$ 110 million in unsecured debt underscored the strength of the Company's representations regarding the opportunity and the CCAA filing objectives, which were fully endorsed by the CCAA Court in no uncertain terms. The following statements make this self-evident.

**A.** <u>Robert Fung, President and Chairman of the BOD:</u>

"Crystallex firmly believes that a CCAA is the most fair and equitable way to obtain maximum value for all Crystallex's shareholders."

Bankr. D. Del. Case No. 1 1:11-bk-14074, D.I. 2 – Exh. B (CCAA Affidavit of Robert Fung sworn Dec. 22, 2011) at 79.1

"... the issuance of an initial order under the CCAA provisions is necessary and desirable to facilitate the prosecution of arbitration, an orderly payment of Crystallex's debt and assurance of residual benefit to Crystallex's shareholders".

Ibid at 88.

B. The CCCA Monitor's DIP Financing Bid Terms Dated Jan. 20, 2012

DD. **Lender Back-End Entitlement** means consideration (in addition to repayment of principal and interest) paid to the Lender in the form of: (i) a payment obligation of Crystallex contingent upon the value of the et Arbitration Proceeds; (ii) an equity interest in C1ystallex; or (iii) a right to convert amounts outstanding under the Financing to an equity interest in Crystallex; provided, however, that the structure, timing of receipt, and quantum of such additional consideration shall conform to all applicable legal requirements, including but not limited to, Canadian usury laws. In no circumstance shall the Lender Back-End Entitlement involve, or contemplate directly or indirectly, either (i) an acquisition of control of Crystallex, (ii) an acquisition of any interest in the Arbitration Proceeding, or (iii a receipt of value exceeding a minority of the et Arbitration Proceeds.

C. The initial CCAA Court Order

[13] The Crystallex application seeks the authority to file a plan of compromise and arrangement, an order that it remain in possession of its assets with the authority to continue to pursue the arbitration against Venezuela and continue to retain all of the various experts necessary for that purpose.

[20] The CCAA is intended to provide a structured environment for negotiation of compromises between a debtor company and its creditors for the benefit of both. Where a debtor company realistically plans to continue operating or to otherwise deal with its assets, but it requires the protection of the court in order to do so and it is otherwise too early for the court to determine whether the debtor company will succeed, relief should be granted under the CCAA. See *Re Lehndorff General Partner Ltd, (1993), 17 C.B.R. (3d) 24*, per Farley J, the benefit to a debtor company could, depending upon the circumstances, mean a benefit to its shareholders.

[24] Crystallex has spent over $500 million on the project. In the event that Crystallex only recovered that amount without interest and without any compensation for the loss of the ability to develop the project, Crystallex would still have more than enough to pay all of its debts and have substantial value left over for its shareholders.

Bankr. D. Del. Case No. 1 1:11-bk-14074, D.I. 2 – Exh. A

[Emphasis added.]

## II. THE HARM TO THE ESTATE

The arbitration award issued to the Company by the ICSID established that the Republic was required to compensate it for its gold mining operation expropriation as follows:

| **Component** | **US$ Millions** |
|---|---|
| • Award | 1,200 |
| • Pre-Award Interest | 200 |
| • Post-Award Interest (est. thru. Dec. 2020) | 200 |
| Total | $1,600 |

In the failed settlement agreements (Settlement Agreements) with the Republic, the Company gave up the value of the pre- and post-award interest (worth $400 million as of the end of 2020) as well as the value of the La Cristinas mining data (worth at least $300 million) to entice the Republic to enter agreements advantageous to the Controlling DIP Lender and the Interested Directors. Proof of this can be found in the settlement agreement between Gold Reserve and the Republic in Aug. 2016, which preceded the company's Amended Settlement Agreements (the ASA) by over two years (Nov. 2018).

The Settlement Agreements with the Republic resulted in the following payments:

| Payments | US$ Millions |
|---|---|
| • Settlement Agreement | 75 |
| • Amended Settlement Agreement | |
|     o Cash | 75 |
|     o Venezuelan Securities | 350 |
| Total | $500 |

The Company has not been able to monetize the Venezuelan securities it received as part of the initial payment for the ASA, given the U.S. economic sanctions placed on the Republic on securities issued by it. Selling the securities requires a license from the Dept. of Treasury's OFAC, which the Company requested but has not received. In the ASA, the Republic committed to make the Company whole if the securities involved would lose value in the interim period up until the agreement was perfected.

The Canada – Venezuela Bilateral Investment Treaty for the Promotion and Protection of Investments (Article VII – Expropriation, No. 1), which was the basis for the ICSID arbitration award, stipulates that that investments cannot be expropriated *"except for a public purpose, under due process of law, in a non-discriminatory manner <u>and against prompt, adequate and effective compensation…</u>"* and *"<u>shall be paid without delay and shall be effectively realizable and freely transferable.</u>"* [Emphasis added].

The settlement agreements became void and null when the Republic reneged on the commitments made therein. Hence, the Company is not bound to any terms and conditions agreed thereto.

Recent indications by the Company and the CCAA Monitor regarding the uncertainty about the full realization of the award are puzzling considering the Company's position in the execution of the writ of attachment on the CITGO shares.

### The CCAA Monitor's Report # 33 Dated April 30, 2020

17. Notwithstanding the challenges and material adverse developments described above, the Applicant continues to pursue its dual-track strategy with respect to the Award. However, <u>there are increasing uncertainties in terms of timing and quantum of proceeds realizable from the Award. Therefore, while the Applicant's desire is to have some recovery for its shareholders, the Monitor's view is that such result is uncertain at this time.</u>

<u>CCAA Motion Dated May 4, 2021 – Robert Fung Affidavit (Page 11)</u>

11. ... <u>As will be discussed below, the Initial Payment Securities do not represent a good prospect of recovery for the Company's stakeholders at this time because they cannot be liquidated</u> [what follows is redacted].

Ernst & Young Restructuring Document Center (https://documentcentre.ey.com/#/detail-engmt?eid=166) [Emphasis added].

The foregoing are the Company's and the Monitor's misrepresentations that short-change the Estate's right to full and effective compensation as established in the ICSID award and the money judgment by U.S. Courts. Importantly, the Venezuelan securities involved had a $350 million market value at the time the initial payment on the ASA was made, November 2018, and the agreement committed the Republic to make the Company whole for any loss in value until it was perfected. Today, the securities are worth a fraction of the original value and is doubtful they can be sold, given lingering questions about their provenance.

In addition to the above-mentioned gifts to the Republic, the Company is giving up the collection of the costs involved in the Republic's protracted legal strategy to prevent and delay the payment of a money judgement that has been confirmed valid and enforceable by U.S. Courts all the way up to the U.S. Supreme Court. As required by its fiduciary position, the Debtor in Possession (DIP) has the duty to protect the interests and property of the Estate by recovering the significant losses the Company has suffered over the five years since the ICSID issued the award. The award was issued to wipe out all the consequences of the illegal act by the Republic and reestablish the company's situation to what would have existed if that illegal act had not been committed. Per Delaware Law, the Estate is entitled to such recovery:

> RULE 54.1. Taxation of Costs.
> (a) Costs.
> (1) Unless otherwise ordered by the Court, the prevailing party shall be entitled to costs. The party shall, within 14 days after the time for appeal has expired or within 14 days after the issuance of the mandate of the appellate court, file a bill of costs. Failure to comply with the time limitations of this Rule shall constitute a waiver of costs, unless the Court otherwise orders, or counsel are able to agree on the payment of costs. In the latter case, no bill of costs need be filed.

By diminishing the value of the NAP through gifts and the abandonment of property and opportunities to advance the interests of the Estate, the DIP, which is under the Control of the Interested Directors and the Controlling DIP Lender, is inflicting irreparable harm to it and negating it the possibility to emerge from insolvency as a going concern.

### III. STRUCTURED DISMISSAL

The harm to the Estate and the consequential harm to the shareholders is to be carried out through the distribution of the Estate's property via the execution of the structured dismissal in the Financing Credit Agreement (the Credit Agreement) the Company entered to fund the ICSID Arbitration and the award collection. The Mechanics of Distribution (MOD, Schedule F) in the Credit

Agreement sets forth the distribution of the Estate's property to pay the administrative costs incurred, to settle all debts dollar-for-dollar, pay all interest due on the debt and allocate the remaining property, defined as the Net Arbitration Proceeds (NAP), to the Controlling DIP Lender, as a special compensation per a contractual contingent liability, and the Estate, as its residual value. Twenty five percent (25%) of the Estate's residual value is pledged to pay for the Management Incentive Plan (MIP), which was established to compensate selected Company directors and executives for their efforts in pursuing and collecting the arbitration award. The MIP is in addition to the regular compensation and the NAP Transfer Agreement (worth close to $100 million) entered by two of the four Interested Directors and the DIP Lender to offset the dilution of the Estate's NAP share from 65% to 12%. The other two Interested Directors are the founding partner and Chief Operating officer of the DIP Lender. In addition, the Estate is required to use its share of the NAP to cover the cost of the arbitration and bankruptcy proceedings, the reimbursement of the expenses incurred by the Noteholders in their failed legal actions in Canada against the Company and other expenses. Notably, the English system used in Canada requires the losing party to pay the costs of the winning party.

The $76 Million DIP Loan entitles the Controlling DIP Lender to 10% P.I.K. interest p.a. (estimated to be worth $200 million as of Dec. 2020) and 88% of the NAP (estimated to be worth $800 million) by means of a contingent liability right that may be converted into the Company's common stock in proportion to the NAP Share (i.e., 88% of the common stock). The DIP financing auction established a 35% share of the NAP as special compensation for the $35 million DIP loan that the Company's legal counsel in the arbitration proceedings (Freshfields Bruckhaus Deringer) purportedly determined to be sufficient to pursue the arbitration effort, which on average requires close to four years. Prolific spending by the Company required $41 million in additional funding that per the Credit Agreement could only be provided by the Controlling DIP Lender, which raised its NAP share to 88%.

In Court filings, the company has expressed its intention to use the MOD to effectuate the distribution of the Estate's property:

*CCAA Court Motion Dated May 4, 2021*

> 13. The Company's continued success in such efforts is necessary to permit Crystallex to ultimately make distributions to its stakeholders in accordance with the Court-approved waterfall.
>
> Ernst & Young Restructuring Document Center (https://documentcentre.ey.com/#/detail-engmt?eid=166)

Being the Credit Agreement a financing contract between a besieged insolvent company and a lender, which is, by its nature, not an arms-length transaction (as corroborated by its own terms and conditions), the use of the MOD to effectuate the Estate's property distribution is tantamount to a distribution through a structured dismissal. As such, it contravenes U.S. Law. As the U.S. Supreme Court decided in *Czyzewski v. Jevic Holding Corp.*, No. 15-649, S. Ct., 2017 WL 1066259):

> The priority system applicable to those distributions has long been considered fundamental to the Bankruptcy Code's operation. See H. R. Rep. No. 103–835, p. 33 (1994)

(explaining that the Code is "designed to enforce a distribution of the debtor's assets in an orderly manner . . . in accordance with established principles rather than on the basis of the inside influence or economic leverage of a particular creditor"); … [p. 12]

We recognize that the Third Circuit did not approve nonconsensual priority-violating structured dismissals in general. To the contrary, the court held that they were permissible only in those "rare case[s]" in which courts could find "sufficient reasons" to disregard priority. 787 F. 3d, at 175, 186. Despite the "rare case" limitation, we still cannot agree. [p. 16]

The consequences are potentially serious. … They include risks of collusion, i.e., senior secured creditors and general unsecured creditors teaming up to squeeze out priority unsecured creditors. See Bank of America Nat. Trust and Sav. Assn. v. 203 North LaSalle Street Partnership, 526 U. S. 434, 444 (1999) (discussing how the absolute priority rule was developed in response to "concern with 'the ability of a few insiders, whether representatives of management or major creditors, to use the reorganization process to gain an unfair advantage'" (quoting H. R. Doc. No. 93–137, pt. I, p. 255 (1973))) … [pp 17-18]

Structured dismissals also run counter to the objectives of the Model Law, which is the framework used in the Chapter 15 and CCAA statutes. Per the *UNCITRAL Model Law on Cross-Border Insolvency with Guide to Enactment and Interpretation*:

69. For a proceeding to qualify for relief under the Model Law, it must be a collective proceeding because the Model Law is intended to provide a tool for achieving a coordinated, global solution for all stakeholders of an insolvency proceeding. It is not intended that the Model Law be used merely as a collection device for a particular creditor or group of creditors who might have initiated a collection proceeding in another State.

70. In evaluating whether a given proceeding is collective for the purpose of the Model Law, a key consideration is whether substantially all of the assets and liabilities of the debtor are dealt with in the proceeding, subject to local priorities and statutory exceptions, and to local exclusions relating to the rights of secured creditors.

The Absolute Priority Rule (APR) is intended to prevent the squeezing out of junior creditors by giving them the right to vote against a plan of arrangement when it affects their rights. This gave rise to the collective agreement process leading to the fair and equitable distribution of the estate's property that is intended to make creditors whole to the extent that the available distributable assets allow. Once the creditors are made whole based on the strict application of the APR, the remaining assets, if any, are property of the estate. Distributing surplus property to other than the estate and/or misusing it for purposes that do not advance its best interest deprives the estate of the means to emerge from insolvency as a going concern and, therefore, runs afoul of the Bankruptcy Code's "Fair and Equitable Treatment" and the CCAA's "Fair and Reasonable" arrangements.

Here it is important to acknowledge that the unsecured creditors in the CCAA proceedings shall not be opposing the implementation of a structured dismissal. This because the DIP and the unsecured Noteholders entered a Standstill Agreement in which the latter waved their right to pursue a plan of arrangement in exchange for post-filing interest close to 20% p.a. (worth close to $100 million). The CCAA court approved the Standstill Agreement before the Supreme Court of Canada (SCC) decided an appeal on a case decided by Justice Newbould (the bankruptcy Judge presiding over the Company's CCAA proceedings from the beginning until he retired a couple of years later) in which it confirmed that post-petition interest on unsecured debt is not allowed in the absence of an approved plan of arrangement and cannot exceed 5% p.a. Yet, the MOD scheme remains in place to date, as if the SSC decision never took place.

In this regard, there is a basic, yet fundamental tenet of U.S. jurisprudence that negates a party in legal proceeding to benefit from its own wrongdoing:

*"No one can take advantage of his own wrong".*

*"A party to a contract is not permitted to take advantage of its own breach of duty."*

Neither the Republic, nor the Interested Directors (including two Directors assigned by the Controlling DIP Lender) or the Controlling DIP Lender should be allowed to benefit from their failure to adhere to their commitments as parties to a contract and fiduciaries entrusted with the duty to protect the Estate and the Company's shareholders.

### IV. **OTHER CONTRAVENTIONS OF THE BANKRUPTCY CODE**

Other contraventions of the Bankruptcy Code that are beyond the scope of this letter, and whose review is better suited for another venue and occasion, include:

1. The DIP's continued disregard of its fiduciary duties to protect the Estate's interests and its going-concern viability,
2. The misappropriation of Estate property,
3. The prolific gifting of Estate property to advance the interests of the Interested Directors and the Controlling DIP Lender,
4. The breaches of statutes enacted to protect the interest of the Estate and its stakeholders, and Canadian and U.S. interests.

The actions and omissions by the DIP, the Interested Directors and the Controlling DIP Lender that underscore the harm to the Estate and the consequential injury to the shareholders have been disclosed to this Court, the DE Bankruptcy Court, the CCAA Court and the parties involved, including the Company, the Controlling DIP Lender, the Monitor, and their respective Counsel on several occasions. The documents involved are part of the case dockets and include:

- Delaware District Court: D.I. 134, 173, 196, 217 and 233.
- Delaware Bankruptcy Court: 311, 312, 313, 314, 318 and 325.
- Ontario Superior Court – Commercial List: No docket entries.

The docket of the CCAA proceedings (maintained by the Monitor on the Ernst & Young Restructuring Document Center) does not reflect any of the several communications I sent to the Court and the Monitor regarding the issues affecting the shareholders' rights and interest. To fill this information void, I have posted these communications (see Exhibit 1.) in an accessible folder that can be reached through the following link: https://drive.google.com/drive/folders/1Jj47p93-WFbf7yU3NqRDwtqkEzsV_jw7?usp=sharing

Because bankruptcy proceedings are primarily an adversarial, evidence-based process, if a party does not raise an issue, the court is unlikely to address it. In Canada, the cost of defending one's rights and interests is well beyond the means of individual litigants; specially in cases such as the Company's bankruptcy proceedings, which began in December 2011. As a result, self-representation In Canada accounts for more than 50 per cent of the litigants in some civil and family courts. However, pro se litigants are sidelined by the courts due to concerns such as impartiality and case management efficiency. Thus, the fact that my efforts to be heard have not been put on the record is but one more example of a legal system fraught with structural disadvantages for self-represented individuals.

## V. PRAYER FOR RELIEF

The relief requested is predicated on the need to protect the property and interests of the Estate in view of the disregard demonstrated by the DIP and the fiduciaries involved. Towards this end, I pray to the Court to:

a) Require the determination of the true and correct amount the Estate is owed by the Republic to ensure that the satisfaction of its money judgement under Delaware Law is in full to the extent the law allows to wipe out the consequences of the Republic's actions to deny and delay the Estate its rightful compensation for the illegal expropriation,

b) Protect the right of the U.S. citizens and equity-holders in the Company to timely pursue legal remedies in U.S. Courts by requiring an adequate time frame for the shareholders to intervene in the hearing to decide the release and transfer of the Estate's property in the U.S for final distribution. The lack of such an opportunity would result in irreparable harm to the shareholders, given that it would preempt them from defending their interests and rights through the irreversible effect of Equitable Mootness Doctrine,

c) Such further and other relief as this Court may deem just and proper.

## VI. STANDING

As a shareholder, I have Article III standing under Lujan v. Defenders of Wildlife, 504 U.S. 555, 559 (1992), premised on a party having "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Standing is reasserted by the U.S. Supreme Court decision in in *Czyzewski v. Jevic Holding Corp.*, No. 15-649, S. Ct., 2017 WL 1066259)

Consequently, <u>the Bankruptcy Court's approval of the structured dismissal cost petitioners something. They lost a chance to obtain a settlement that respected their priority.</u> Or, if not that, they lost the power to bring their own lawsuit on a claim that had a settlement value of $3.7 million. <u>For standing purposes, a loss of even a small amount of money is ordinarily an "injury."</u> See, e.g., McGowan v. Maryland, 366 U. S. 420, 430–431 (1961) (finding that appellants fined $5 plus costs had standing to assert an Establishment Clause challenge). <u>And the ruling before us could well have cost petitioners considerably more. See Clinton v. City of New York, 524 U. S. 417, 430–431 (1998) (imposition of a "substantial contingent liability" qualifies as an injury). A decision in petitioners' favor is likely to redress that loss. We accordingly conclude that petitioners have standing.</u> [p. 11]

## VII. JURISDICTION AND VENUE

This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331, and 1367. Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and (c).

I thank you in advance for your time and consideration

Sincerely,

*[signature]*

Adelso A. Adrianza

cc: The Honorable Judge L. Selber Silverstein, Delaware Bankruptcy Court
    The Honorable Mr. Justice Hainey, Ontario Superior Court of Justice
    Mr. Matthew B. Lunn, Young Conaway Stargatt & Taylor, LLP
    Mr. Travis S. Hunter, Richards, Layton & Finger, PA
    Mr. T. Patrick Tinker, Assistant United States Trustee, Region 3
    Mr. R. Fung, President & Chairman, Crystallex International Corp. (RFung@crystallex.com)
    Mr. Robin B. Schwill, Davies Ward Phillips & Vineberg LLP (rschwill@dwpv.com)
    Mr. Brian Denega, Ernst & Young Inc. (brian.m.denega@ca.ey.com)

**EXIBIT 1**

**COMMUNICATION TO THE CCAA COURT AND THE MONITOR**

These communications can be accessed via:

https://drive.google.com/drive/folders/1Jj47p93-WFbf7yU3NqRDwtqkEzsV_jw7?usp=sharing

- 1.0 AAdrianza Comm J Haynes re KRY (122617)
- 2.0 AAdrianza Comm R Fung KRY (020318)
- 3.0 AAdrianza Comm R Fung KRY (030618)
- 4.0 AAdrianza Comm R Fung KRY (052618)
- 4.1 AAdrianza Comm R Fung KRY (052618) - ENCLOSURE
- 5.0 A Adrianza Comm to J Swartz DWPV (053118)
- 6.0 AAdrianza Comm KRY Monitor (120418)
- 7.0 AAdrianza Comm DE District Court (021919)
- 8.0 AAdrianza Comm R Fung KRY (101519)
- 8.1 AAdrianza Comm R Fung KRY (101519) - ENCLOSURE
- 9.0 AAdrianza Comm KRY (032420)
- 10.0 AAdrianza Comm EY BD (032920)
- 11.0 AAdrianza Comm JF KRYSC (040320)
- 12.0 AAdrianza Comm J Hainey (042020)
- 13.0 AAdrianza Comm DE Bcky Court (052820)
- 14.0 AAdrianza Comm DE Bcky Court (071420)
- 15.0 AAdrianza Comm J Hainey KRY (103020)
- 16.0 AAdrianza Comm JJ R Strathy ONCA KRY (110620)
- 17.0 AAdrianza Comm DE Bcky Court (121420)