FILED

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE** JUL 26  AM II: 30

```
------------------------------------------------------------------ x  ------------------------------------------------
                                                                      U.S. BANKRUPTCY COURT
                                                                      DISTRICT OF DELAWARE
In re                                                            :    Chapter 15
                                                                 :
**CRYSTALLEX INTERNATIONAL CORP.**                               :    Case No. 11-14074 (LSS)
                                                                 :
Debtor in a Foreign Proceeding.                                  :
                                                                 :
------------------------------------------------------------------ x  ------------------------------------------------
```

## MOTION FOR AN ORDER DIRECTING THE APPOINTMENT OF AN EXAMINER AND INDEPENDENT COUNSEL FOR THE SHAREHOLDERS

Adelso Adrianza ("Movant"), a shareholder of the debtor ("Debtor"), Pro Se and on behalf of similarly situated U.S. shareholders ("Shareholders") moves the Court, pursuant to the provisions of the Bankruptcy Code, supplemented by provisions of the Canadian Companies' Creditors Arrangement Act ("CCAA"), rules of the Ontario Rules of Civil Procedures ("R.C.P."), and the Courts of Justice Act ("CJA"), hereinbelow to enter an order directing the appointing of an examiner ("Examiner") and independent legal counsel to represent the U.S. Shareholders ("Legal Counsel") and states:

### JURISDICTION

1.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper in this Court and in this District pursuant to 28 U.S.C. § 1410. The statutory predicates for the relief requested herein are the Bankruptcy Code Sections 105(a), 1104(a), 1104(c), 1129, 1501(a)(4),(a)(5), 1503, 1506, 1507(b), 1522(a) and 1527(1) and Bankruptcy Rule 2007.1, supplemented by CCAA Sections 18(6)(1),(2), 36(1)(1), 42, 44(c)-(e), 50, 52(3) and 61(1)-(2), R.C.P. Rule 10.01, and CJA Section 101.

## BACKGROUND

2.      A summary of the relevant history of the instant case ("DEBCC") is provided in D.I. 2 and 315, at para. 2-12, and D.I. 134 in the District Court Case (1:17-mc-00151-LPS, "DEDCC").

## INTRODUCTION

3.      The decision to seek the redress the harm to the Debtor and its estate (the "Estate"), and the reflective and direct injury to the Shareholders was not taken lightly. The attempts to persuade the Debtor, the Monitor and the CCAA Court to investigate and resolve the issues involved have been fruitless. And seeking to redress the harm in the CCAA Court was a financial and logistical impossibility from the outset. This is the case because the restrictions imposed and the cost to overcome these are well beyond the means for individual shareholders like me to afford; specially in a proceeding almost ten years old and still open.

## RELIEF REQUESTED

4.      By this Motion, the Movant respectfully requests the appointment of the Examiner and Legal Counsel to investigate the Debtor's affairs as they related to the harm to the Debtor, the Estate and the Shareholders by the acts and omissions alleged in the Motion, and to provide adequate legal representation to the Shareholders and a voice to defend their rights and interests in this proceeding, respectively.

## BASIS FOR THE RELIEF REQUESTED

5.      The present action is the only remaining option to prevent the concretion of the harm to the Debtor, the Estate, and the Shareholders through the execution of the distribution of the Estate's property via the Mechanics of Distribution (MOD) built into the DIP loan Credit Agreement, which is contrary to settled U.S. law. This is because the MOD, as approved by the CCAA Court, fails to meet settled U.S. law, statutory rules and principles and the Model Law

Requirements (see UNCITRAL. Model Law on Cross-Border Insolvency with Guide to

Enactment, at para. 69.-70.) that negate the recognition and protections granted under 11 U.S.C.

§§ 1517 and 1519; and precludes any further assistance to the foreign representative under 11

U.S.C. §§ 1507.

6.     The investigation and the report by the Examiner are a fundamental fact-finding

requirement to aid this Court to obtain an independent assessment of the harms against the Estate

and the Shareholders to assure that the Debtor's plan of arrangement or liquidation meets the "fair

and equitable" requirement of the Bankruptcy Code (the "Code").

7.     The appointment of Legal Counsel is necessary to provide adequate representation

to an absentee interested party in this proceeding to protect their rights and interests and pursue a

fair and equitable outcome for them.

8.     The harms against the Estate and the Shareholders represent statutory breaches that

left unresolved will result in irreparable harm to both. Namely,

| U.S. § | CAN § | Breaches of Law / Unmet Requirements | Hereinbelow See Section |
|---|---|---|---|
| 1501(a)(4) | 44(d) | Protection and maximization of the Debtor's assets. | [1] A.-E. |
| 1501(a)(5) | 44(e) | Facilitation of the rescue of a financially trouble business. | [1] A.-E. |
| 1503 | 61(2) | International Obligations of the U.S.: U.S. – Canada Tax Treaty. | [1] A. |
| 1506 | 61(2) | Public Policy Exception. | [1] A., E. |
| 1507(b)(1) | 44(c) 18(6)(1) | Just treatment of all holders of claims against or interest in the Debtor's property. | [1] A.-E., [2] |
| 1507(b)(3) | 36(1)(1) 18(6)(2) | Preferential or fraudulent disposition of property of the Debtor. | [1] A.-E. |
| 1507(b)(4) | - | Distribution of proceeds of the Debtor's property substantially in accordance with the order described by the statute. | [1] A.-E. |
| 1507(b)(5) | 44(e) | The provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns. | [1] A.-E. |
| 1522(a) | 18(6)(2) | The court may grant relief under section 1519 or 1521 or may modify or terminate relief under subsection (c), only if the interests of the creditors and other interested entities, including the debtor, are sufficiently protected. | [1] A.-E., [2] |

## **PRELIMINARY STATEMENT**

9.      The Debtor's fixed, unsecured, liquidated debts to U.S. creditors exceeds $5,000,000. Under the Code, upon request of an interested party such as the Movant, appointment of examiner is mandatory under 11 U.S.C. § 1104. Furthermore, the preponderance of the evidence warrants appointment of an examiner under §§ 1129, 1501 and 1522, as well as authority and precedent under Canadian law (see para. 14.A. and 60. infra).

10.     There is a controlling DIP lender ("DIP Lender") and a self-interested BOD ("BOD"), who have arranged first to control it, and then arranged the approval of the DIP Lender's entitlement to the net proceeds from an arbitration award ("Award") worth approximately $1.6 billion.  Other misconduct includes improper transfer of tax benefits from the Estate to the DIP Lender, transfer of valuable mining data for no consideration, improper waiver of the right to receive substantial interest in the hundreds of millions of dollars, an improper agreement with noteholders to pay excessive interest on their claims to waive their right to require the timely filing of a plan of arrangement or liquidation, mismanagement of the Estate's property and improper oversight over its interests.

11.     There is a fundamentally flawed premise in the instant case that has been conveniently used to sideline the Shareholders from the outset: they have little, if any, interest in it despite a US$ 3.4 billion arbitration claim and just over US$ 100 million in unsecured debt. And this premise has been purposefully sustained by actions and omissions by the BOD such as the delisting the stock, thereby precluding a market valuation, and raiding the Estate's property and sharing the spoils amongst them.

12.     The appointment of the Examiner is warranted to protect the Estate's property, the Shareholders' right to its residual value and the integrity of the insolvency proceedings. There cannot be a "fair and equitable" plan of arrangement or liquidation if the Estate's property is

misappropriated, misused, and mismanaged. To prevent this from happening, the legislature found it necessary to require that fiduciaries with specific roles and responsibilities be entrusted with the protection of the estate's interests and the safeguarding of its assets; and empowered the Bankruptcy Courts and the Justice Department to see to it through the appointment of a DIP, an insolvency Trustee, an examiner, and a Standing U.S. Trustee towards this end. Nonetheless, the checks and balance in the instant case have thus far failed to prevent the harm to the Estate and the Shareholders that the Code was enacted to protect.

13.    The appointment Legal Counsel is necessary to protect the interests of over 300 U.S. equity security holders that represent approximately 35% of the outstanding shares. The Debtor, the DIP Lender, and the unsecured creditors have all their fees and costs reimbursed by the Estate, while the Shareholders cannot afford adequate legal representation. This is the case although by law they are the legal residual owners of an Estate with assets worth US$ 1.6 billion ironclad judgement, US$ 100 million of pre-filing debt and a US$ 76 million DIP loan. This, by itself, demonstrates the Shareholders' significant and unwarranted disadvantage because of the lack of adequate representation, given the complexity of the instant case, whose outcome turns on expert knowledge and experience in resolving complicated questions of law and facts.

## THE COURT'S AUTHORITY

14.    This Court has the authority to appoint the:

A.    Examiner under 11 U.S.C. §§ 105(a), 1104(a), 1104(c), 1129, 1501(a)(4), 1505, 1522(c), 1526 and 1527, and Bankruptcy Rule 2007.1; supplemented by CCAA Sections 42, 44(d), 52(1), 52(3)(a) and 61(1)-(2), and CJA Section 101.

B.    Legal Counsel under 11 U.S.C. § 105(a), supplemented CCAA § 42 and R.C.P. Rule 10.01.

## BACKGROUND

### *The Parties*

15.     The Debtor is a Canadian mining company whose sole asset was a Mine

Operating Contract ("MOC") entered in 2002 with a Venezuelan Government enterprise, the Corporacion Venezolana de Guayana ("CVG"). The purpose of the MOC was to exploit the Las Cristinas gold mine located in the Bolivar State. The MOC was cancelled by Venezuela in 2011.

16.     Tenor Capital Management Company, L.P. (along with its subsidiary lenders, "DIP Lender Fund") is a private, New York based American investment and financing company and the Debtor's DIP lender in the Canadian Companies' Creditors Arrangement Act ("CCAA") proceedings through its wholly owned foreign subsidiaries.

17.     The Debtor issued 365 million common shares on the Canadian and U.S. stock exchanges. According to company reports, as of June 21, 2012, U.S. individual Canadian and U.S. investors held 219 million shares, of which 35% and 25% were owned by U.S. and Canadian shareholders, respectively. Institutional investors held the remaining 40% of the Debtor's equity.

### *In Rem Property*

18.     The Debtor filed an arbitration request in 2012 with the International Centre for Settlement of Investment Disputes ("ICSID") to pursue an award for $3.4 billion for the illegal cancellation of the MOC.  The ICSID rendered its decision in 2016 and awarded the Debtor a $1.4 billion dollar award ($1.2 billion award plus $200 million pre-award interest through the award date).  The award accrues interest at 6-month LIBOR + 1% interest - currently approximately 1.15%, until paid in full.

### *The Insolvency and The Administrative Claims*

19.     The Debtor filed a petition for arrangement (reorganization) in Canada on or about December 23, 2011.

20.     The Debtor holds unsecured debt significantly more than $5 million.

21.    The amount of fixed, unsecured, liquidated debts owed by the Debtor to U.S. creditors also significantly exceeds $5,000,000.

22.    While the Debtor, the unsecured creditors, and the DIP Lender have all obtained authorization to have the bankruptcy estate incur or reimburse them for costs and expenses worth over US$ 100 million on their behalf, the Shareholders have not been afforded the same protection. As a result, the Shareholders are at a substantial and unwarranted disadvantage versus other interested persons in this insolvency proceeding.

### *The Unconscionable Credit Agreement and The Directors*

23.    The DIP Lender entered into a credit agreement (the "Credit Agreement") with the Debtor to provide $36 million to fund the ICSID arbitration claim.

24.    The terms and conditions of the Credit Agreement gave the DIP Lender absolute control over the Debtor from the outset, given that:

A.    It prevented the Debtor from obtaining future financing from a source other than The DIP Lender without defaulting on the outstanding DIP loan,

B.    It required the appointment by the DIP Lender of two nominee directors to the Debtor's BOD following its recomposition from nine to five directors.

C.    It prevented the Debtor from paying off the outstanding DIP loan amount without the DIP Lender's consent, and

D.    It issued the DIP Lender a contingent value right ("CVR") initially worth 35% of the Net Arbitration Proceeds ("NAP"), which is equal to the difference between the gross proceeds from the Award less administrative expenses, taxes due, the outstanding principal, and interest due on the DIP loan, and the unsecured debt plus pre- and post-petition interest. The CVR can be converted into the Debtor's equity at an equivalent percentage (initially 35%).

25.    Subsequently, the DIP loan amount increased from $36 million to $76 million,

- 7 -

which increased the DIP Lender's entitlement to the NAP from 35% to 88% and reduced the Debtor's estate share from 65% to 12%.[1]

26.     Thereafter, the DIP Lender and two of the directors (R. Fung and M. Oppenheimer) entered a NAP sharing agreement worth up to $100 million for the benefit of the two directors. In so doing, four of the five directors on the board became self-interested directors ("Directors").

27.     The terms of the Credit Agreement gave the DIP Lender control over the Debtor. The increase of The DIP Lender's entitlement to the NAP from 35% to 88%, the conversion right to 88% of the Debtor's voting common shares, and the NAP share agreement with directors R. Fung and M. Oppenheimer, made the two shareholder-elected directors become beholden to The DIP Lender, giving The DIP Lender absolute *de facto* control over the Debtor.

28.     Examples of such control include (i) the terms of the DIP loan agreement that require the DIP Lender's approval before the Debtor can pay it and its share of the NAP share off; and (ii) the abandonment of the restraining notice (the "Restraining Notice") on the Nomura notes.[2]

29.     It is well established that as of December 2020, the Debtor held an ironclad money judgment worth $1.2 billion plus pre- and post-award interest worth $400 million. Nevertheless, The DIP Lender and the Directors state that the Award is only worth $1 billion. The reason for this is questionable and currently subject to discovery in the award collection proceedings at the Delaware District Court (Case 1:17-mc-00151 (LPS) ("DEDCC").[3]

## THE HARM THAT NEEDS TO BE REDRESSED

### 1. Improper Transfer and Use of Estate Property and Waiver of Interest

---

[1] Unconscionably, the initial $36 million DIP loan granted the DIP Lender 35% of a $ 3.4 billion arbitration claim as special contingent compensation, in addition to 10% interest p.a.

[2] The Debtor obtained in 2017 a court order from the SDNY Court authorizing it to seize the notes as payment towards its judgement against Venezuela and released it in 2018 under false justification.

[3] Venezuela transferred bonds to the Debtor originally worth $350 million as an initial payment on the amended settlement agreement. The current value of said bonds is a fraction of the original amount and cannot be traded due to OFAC regulations. The Debtor improperly applies the bond payment at full value against the Award, even though Venezuela renegued on the Amended Settlement Agreement.

## A. Fraudulent Transfer of Tax Benefits

30.     The Debtor has spent over $800 million to date on the development of Las Cristinas gold mine, the arbitration proceedings, and the collection of the Award.

31.     Canadian and U.S. tax laws allow the deduction of these costs and expenses only by the party that incurred them. (*See* DEBC D.I. No. 312, p. 5).

32.     Despite this, the Credit Agreement provides for the distribution of approximately 88% of the estimated $220 million in tax loss carryforward benefit to The DIP Lender which belongs to the Estate and is otherwise non-transferable under applicable U.S. and Canadian law and in violation of the U.S – Canada Tax Treaty ("Treaty").

33.     The improper use of the tax benefit also represents a tax evasion action, given that with the last assignment of the DIP loan to a tax-exempted Cayman Island subsidiary of the DIP Lender, the U.S. Treasury is deprived of the tax revenue it is owed under the Treaty.

## B. Misappropriation of Estate Property: The Las Cristinas Mining Data

34.     The terms of the Debtor's Credit Agreement with the DIP Lender make the Las Cristinas mining data (the "Mining Data") property of the Estate that cannot be distributed to the lender. It was originally purchased from the CVG and expanded at great expense to the Debtor to increase and enable the extraction of the mine's 20 million ounces of gold of proven and probable reserves.

35.     The government of Venezuela agreed to compensate two gold mining companies it also expropriated, Gold Reserve and Rusoro mining, with over US$ 200 million each for their mining data.  However, the Directors bundled the value the of Mining Data and the Award in the Amended Settlement Agreement and thus effectively transferred 88% of its value to the DIP Lender, given its 88% participation in the NAP. (*See* DEBC D.I. No. 312, p. 4).

## C. Illegal Post-Petition Interest Payment on Unsecured Debt

36.     The Debtor has failed to file a plan of arrangement (akin to reorganization) nine years after filing for CCAA protection. As a result, it has been taken to court in Canada by its unsecured lenders to press for the yet-to-be filed plan. To appease the noteholders, the Debtor (under the control of The DIP Lender) agreed to compensate said noteholders with post filing interest at close to 20% per annum at the Estate's expense, worth almost $100 million.

37.     However, post-petition interest is not allowed under Canadian bankruptcy statutes unless a plan or arrangement and compromise is approved by the court and then, only at the statutory rate of 5% per annum. (*See* DEBCC D.I. No. 312, p. 5).

38.     The law allows a secured lender to transfer part of its entitlements to unsecure creditors and equity holders when such transfer is necessary to obtain approval on a plan of arrangement or liquidation. Further, per 11 U.S.C § 1506(c) "The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim, …". The post-filing interest on unsecured debt and a long list of other charges worth over US$ 100 million have been and continue to be incurred for the sole purpose of preserving the collateral securing the DIP loan at the expense of the Estate and its opportunity to emerge from insolvency as a going-concern.

## E.  Breach of The Loyalty and Care Duties

39.     The $1.2 billion award issued to the Debtor by the ICSID in April 2016 required additional payment for pre- and post-award interest: each worth approximately $200 million through December 2020.

40.     In the two failed settlement agreements with Venezuela, the Debtor agreed to

forego both the pre- and post-award interest. This even though similar agreements between Gold Reserve and Rusoro mining included full compensation per the ICSID award, including pre- and post-award interest. The Gold Reserve settlement agreement was entered in July 2016 and the Rusoro Mining settlement agreement in October 2018.   The Debtor's Amended Settlement Agreement was entered in November 2018, over two years after the Gold Reserves and one month after Rusoro settlements, respectively. (*See* DEDCC D.I. No. 134, pp. 10-12)

### E.  Fraudulent Misrepresentations

The Credit Agreement

41.     The Shareholders relied on the representations made and the good faith professed by the BOD to protect their rights as their fiduciaries once entrusted with the pursuit of the arbitration claim. The application for protection under the CCAA was predicated on it being "the most fair and equitable way to obtain maximum value for all Crystallex's shareholders." (*See* DEBCC D.I. No. 2., Exh. B). In addition, the BOD represented in the DIP loan auction term sheet that:

> "In no circumstance shall the Lender Back-End Entitlement involve, or contemplate directly or indirectly, either (i) an acquisition of control of Crystallex, (ii) an acquisition of any interest in the Arbitration Proceeding, or (iii) a receipt of value exceeding a minority of the Arbitration Proceeds" were made after the BOD and the DIP Lender had negotiated and agreed on the terms under which the DIP loan would be made."

42.     As the issuer of shares to public investors and the consequential special relationship between the Debtor and the Shareholders, the BOD occupied a special position of confidence and trust such that the Shareholders reliance on its public statements was justified. However, the term sheet for the DIP loan was negotiated and agreed between the Debtor and the DIP Lender before the DIP loan auction. The CCAA records show that the DIP loan auction was required by the DIP Lender as a condition to extend the DIP loan. Therefore, the BOD knew that the representations

made were false and that material facts contrary to the representations made had been omitted at the time for the purpose of inducing the Shareholders to hold onto the Debtor's shares.

### Abandonment of The Nomura Restraining Notice

43.     The Debtor abandoned the right to execute the ex-parte Restraining Notice it obtained from a New York Court in June 2017 on US$ 710 million worth of Nomura Bank notes owned by Venezuela and held for sale by Nomura Securities in New York. The execution of the Restraining Notice would have enabled the Debtor to a) pay off all the outstanding debt at the time, b) emerge from Insolvency as a going concern and d) continue the Award collection efforts. However, the execution of the attachment was not in the best interest of the controlling DIP Lender and the Directors, given that it would have triggered breaches of Canadian law by an earlier-than-planned execution of the distribution scheme in the Credit Agreement. The second settlement agreement (the Amended Settlement Agreement) with the Republic was reached in September 2018 and was promoted by the Restraining Notice issued in June 2017. The BOD and the controlling DIP Lender set aside the attachment of the Nomura Notes to pursue the Amended Settlement Agreement, despite the well-known reluctance and failure of the Venezuela to acknowledge its debt and honor its commitments and the attending harm to the Estate. The amended agreement, like the original one, fell through when the Republic failed to provide security to guarantee the scheduled future payments. (*See* DEDC D.I. No. 134, pp. 7-9).

44.     The Monitor's report to the CCAA Court number 26 dated August 27, 2018, included a misrepresentation as justification for the abandonment of the Retraining Notice, by stating that…

"The Applicant agreed to withdraw the restraining notice in conjunction with the Ingalls Settlement Agreement (defined below). The Monitor has also been advised

by the Applicant that Nomura did not raise any cash from restructuring fixed-income securities and therefore the Applicant would not have been able to seize any Venezuela assets by pursuing this restraining notice."

45.     This justification was false on two counts: First, the Ingalls settlement agreement was entered into by the shipbuilder and the Debtor to share Venezuelan funds in a bank account at the New York Mellon Bank on which Ingalls had a restraining order issued by a Mississippi Federal Court for a frigate repair contract cost dispute with the Venezuelan Defense Ministry. Venezuela opposed the attachment of the funds and never agreed to release the funds voluntarily as payment towards the first settlement agreement with the Debtor. Second, the Nomura Notes were issued by Nomura Finance, an international financial organization with a AAA credit rating that are highly liquid securities traded in most financial markets. These could be sold on the secondary market or held to maturity, when Nomura was required to redeem them, in October. 2018 (US$ 390 million) and December 2023 (US$ 320 million).

46.     Per § 5222 of the NY CPLR (2012) - Enforcement of Money Judgments – Restraining Notice…

> A judgment debtor served with a Restraining Notice is forbidden to make any sale, assignment, transfer or interference with any property in which he or she has an interest, subject to narrow statutory exclusions, except upon direction of the sheriff or pursuant to Court order. Unlike Restraining Notices served on third parties, which expire after one-year, Restraining Notices served on judgment debtors remain in effect until the Judgment is satisfied.

The judgement in question, the US$ 1.2 billion award plus pre- and post-award interest, was not satisfied then and remains to be satisfied to date. Therefore, with the decision to withdraw the Restraining Notice the BOD gave up the collection of funds that would have ensured the Estate's emergence from insolvency and necessary to pursue the full collection of the Award.

### The Unpaid DIP Loan Principal

47.     A recent limited release of the Debtor's sealed financial information because of the ONCA's confirmation of the CCAA Court's order requiring it, the ONCA's

confirmation of the CCAA Court's order requiring it, the Debtor disclosed that it received US$ 150 million in cash payments towards the Award from the end of 2017 through the end of 2018. This amount corresponds to cash transfers by Venezuela as initial payments on the two failed settlement agreement and US$ 19 million from the seizure of Venezuela's Bank of New York Mellon bank account. The unsealed financial data shows that the Debtor's cash availability at the end of November 2020 was US$ 107 million, which indicates the DIP loan was not paid, despite the Debtor's large cash availability.

48.     Faithful fiduciaries entrusted with the management of an insolvent company would not hesitate to discharge the duties of care and loyalty they owe the Debtor by using US$ 76 million of the US$ 150 million cash it received to pay off the DIP loan to advance its best interest. The sole fact that not paying off the DIP loan cost the Estate US$ 30 million in 2019 - 2020 and will cots it US$ 17 million in 2021 in P.I.K. interest to the DIP Lender would have moved a faithful fiduciary to do so immediately.

## 2.  The Shareholders' Inadequate Representation

49.     No plan of arrangement or liquidation can be deemed "fair and equitable" when an interested party is not adequately represented, and their rights and interests are disregarded by the BOD. As made evident by the Motion, the BOD has disregarded their fiduciary duties to protect the Shareholders' interests to advance their own and those of the Controlling DIP Lender.

50.     In Canada, representation orders are commonly issued by the court in insolvency proceedings to facilitate the representation of a large group of individual stakeholders who are impacted by the insolvency. Representation orders allow the group to be represented by a single voice in the insolvency proceeding and ensure its members' rights are protected and advanced by independent legal counsel. Representation orders and the jurisdiction to appoint representative counsel are contained in Rule 10.01 of the Rules of Civil Procedure.

51.     In *Karasik v. Yahoo! Inc.*, 2020 ONSC 1440, Justice Perell decided that:

[11] The court has authority under Rule 10.01 of the Rules of Civil Procedure, to make a representation order, including the jurisdiction to appoint representative counsel. This is possible when persons who have an interest in or may be affected by a matter or a proceeding cannot be readily ascertained, found or served or where it appears necessary or desirable to make the order.

[17] Representation orders are a common phenomenon in proceedings under the Companies' Creditors Arrangement Act.

[18] *In Re CanWest Publishing Inc.*, Justice Pepall stated that factors that have been considered by courts in granting these orders include: (a) the vulnerability and resources of the group sought to be represented; (b) any benefit to the companies under CCAA protection; (c) any social benefit to be derived from representation of the group; (d) the facilitation of the administration of the proceedings and efficiency; (e) the avoidance of a multiplicity of legal retainers; (f) the balance of convenience and whether it is fair and just, including to the creditors

52.     There are over 300 hundred Shareholders of the Debtor who are United States residents.

53.     Approximately 35% of the issued and outstanding shares of the Debtor are beneficially owned by U.S. residents.

## LAW AND ARGUMENT

### 1.  CHOICE OF LAW

54.     A Chapter 15 petition by a foreign representative involves an implicit request for the U.S. Court for foreign law to be enforced and even take priority over the Code. This is premised on the purpose of Chapter 15 and the Model Law, the framework it is based on, their invocation of comity (§§ 1507 and 1509), and the requirement that U.S. Courts "*consider its international origin, and the need to promote an application of this chapter that is consistent with the application of similar statutes adopted by foreign jurisdictions.*" (§ 1508). [Emphasis added]

55.     The modified universalism adopted by Congress in enacting Chapter 15 circumscribed the relief afforded to a foreign representative by the need to protect fundamental rights bestowed on the U.S. citizens (§ 1506), important U.S. interests and commitments (§ 1503)

and the integrity of the Code and its purpose by ensuring the debtor's property and its distribution are managed in accordance with the law, statutory rules, and principles (§§ 1507 and 1522).

56. The enforcement of the law, statutory rules and principles to date points to the conclusion that, generally, substance prevails over form when determining the similarities of the statutes involved, or the lack thereof, based on the appropriateness of the solutions they yield. In this context, some relevant court decisions illustrate this:

- *In re Vitro, S.A.B. de C.V.*, 473 B.R. 117 (Bankr. N.D. Tex. 2012), confirmation of

plan of arrangement denied because:

*"Generally, reorganization pursuant to the LCM is found to be a fair process, worthy of respect. In other and subsequent cases this Court would expect that Concurso decisions would be enforced in this country. However, if approved for enforcement, the present order would create precedent without any seeming bounds. The Concurso plan presently before the Court discharges the unsecured debt of non-debtor subsidiaries. What is to prevent this type of plan from eventually giving non-consensual releases to discharge the liabilities of officers, directors, and any other person?"*

- *In re Cozumel Caribe, S.A. de C.V.* 508 B.R. 330 (Bankr. S.D.N.Y. 2014),

confirmation of plan of arrangement denied because:

"*The Motion raises very serious questions about the conduct of the Foreign Representative in this Court and in the Concurso Proceeding, as well as very serious questions about the conduct of the principals of the Foreign Debtor."*

## 2. BROAD POWERS OF THE BANKRUPTCY COURT

57. Section 105(a) of the Code provides a bankruptcy court with broad powers in its administration of a case under it: "*The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Code]*." The exercise of power under § 105(a) is proper provided that the bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Code. *See In re Pincus*, 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002; *In re Fesco Plastics Corp.*, 996 F.2d 152, 154 (7th Cir. 1993).

## 3.  APPOINTMENT OF AN EXAMINER UNDER THE CODE AND CANADIAN LAW

58.      In 11 U.S.C. § 1522, the Code provides that when an examiner is appointed in a

Chapter 15 proceeding, the provisions of § 1104(d) shall apply.  Section 1104(d) addresses how

the U.S. trustee appoints a disinterested person as an examiner upon order of the court, with

consultation with interested parties.  Section 1104(c)(2) provides that:

> (c) If the court does not order the appointment of a trustee under this section, then
> at any time before the confirmation of a plan, on request of a party in interest or the
> United States trustee, and after notice and a hearing, the court shall order the
> appointment of an examiner to conduct such an investigation of the Debtor as is
> appropriate, including an investigation of any allegations of fraud, dishonesty,
> incompetence, misconduct, mismanagement, or irregularity in the management of
> the affairs of the Debtor of or by current or former management of the Debtor, if—
>
> (2) the Debtor's fixed, liquidated, unsecured debts, other than debts for goods,
> services, or taxes, or owing to an insider, exceed $5,000,000.

59.      In the case at bar, the Debtor's debts far exceed $5,000,000.  This is a request for

appointment of an examiner by a shareholder.  Therefore, under the Code, appointment of the

Examiner is borne out by the preponderance of the evidence provided in the Motion.  *See In re*

*Anderson News, LLC, Case No. 09-10695 (CSS) (Bankr. D. Del. Aug. 22, 2012); In re Tribune*

*Co.*, Case No. 08-13141 (KJC) (Bankr. D. Del. Sep. 6, 2013).

60.      In Canada, the appointment of an investigative receiver (the equivalent of an

examiner in the U.S.) in civil proceedings emerged as "proper exercise of the court's "just and

convenient" authority under § 101 of the Courts of Justice Act. (*See Akagi v. Synergy Group (2000)*

*Inc.*, 2015 ONCA 368, (citing caselaw of several civil decisions, including shareholder oppression

(*Stroh v. Millers Cove Resources Inc.*, [1995] O.J. No. 1376 (Gen. Div.), and Bankruptcy and

Insolvency Act, (BIA) (*General Electric Canada Real Estate Financing Holding Co. v. Liberty*

*Assisted Living Inc.*, 2011 ONSC 4136)).  The appointment of an investigative receiver in CCAA

has likewise been approved where necessary for the court to resolve controversies amongst the

parties and fulfill its fact-finding requirements.

61.     In the instant case, the appointment of an investigative receiver is authorized by the

"proper exercise of the court's "just and convenient" and § 42 of the CCAA:

> **Act to be applied conjointly with other Acts**
>
> 42 The provisions of this Act may be applied together with the provisions of any
> Act of Parliament, or of the legislature of any province, that authorizes or makes
> provision for the sanction of compromises or arrangements between a company
> and its shareholders or any class of them.

62.     Per Justice Blair in *Akagi v. Synergy Group*:

> [66] Indeed, whether it is labelled an "investigative" receivership or not, there is
> much to be said in favour of such a tool, in my view – when it is utilized in
> appropriate circumstances and with appropriate restraints. Clearly, there are
> situations where the appointment of a receiver to investigate the affairs of a
> Debtor or to review certain transactions – including even, in proper
> circumstances, the affairs of and transactions concerning related non-parties –
> will be a proper exercise of the court's "just and convenient" authority under s.
> 101 of the Courts of Justice Act.
>
> [90] Some consistent themes emerge from these authorities:
> • The appointment of the investigative receiver is necessary to alleviate a risk
> posed to the plaintiff's right to recovery: Loblaw Brands, at paras. 10, 14 and 16.
> • The primary objective of investigative receivers is to gather information and
> "ascertain the true state of affairs" concerning the financial dealings and assets
> of a Debtor, or of a Debtor and a related network of individuals or corporations:
> *General Electric (Div. Ct.)*, at para. 15. One authority characterized the
> investigative receiver as a tool to equalize the "informational imbalance"
> between Debtors and creditors with respect to the Debtor's financial dealings:
> *East Guardian SPC v. Mazur*, 2014 ONSC 6403, at para. 75.

## II. ADDITIONAL AUTHORITIES THAT SUPPORT THE APPOINTMENT OF AN EXAMINER

63.     This motion alleges fraudulent misrepresentation, depletion of the Debtor's assets,

self-dealing by the BOD and conflicts of interest among appointed directors.  The drafters of the

Code wanted to provide extra protection to stockholders of public companies through mechanism of an examiner as an independent functionary (*see In re Gilman Services, Inc.*, 46 B.R. 322 (Bankr. D. Mass.1985). An examiner is an official appointed by the bankruptcy court to investigate issues or problems identified with the Debtor. As a court-appointed fiduciary, an examiner is in a unique position to investigate alleged improprieties from a neutral standpoint, without biases or client influence. The court may order the examiner to investigate any aspect of the case, the business, or events leading up to the bankruptcy case, and report its findings to the court and the parties (*see Weathering the Storm: The Appointment of an Examiner* (2009) citing Collier on Bankruptcy-15th Edition Rev. P 1106.01).

64.    Where a decision of a foreign court runs contrary to fundamental US law principles and public policy, US courts generally refuse to recognize and enforce it. *See Osorio v. Dole Food Co.*, 665 F. Supp. 2d 1307 (S.D. Fla. 2009) at para. 51-52, (*"As such, the Court declines to recognize this judgment because the "cause of action or claim for relief on which the judgment is based is repugnant to the public policy of this state."*); *Lehman Bros. Special Fin. Inc. v. BNY Corporate Tr. Servs. Ltd.*, 422 B.R. 407 at 418–20, (Bankr. S.D.N.Y. 2010), ("*courts will not extend comity to foreign proceedings when doing so would be contrary to the policies or prejudicial to the interests of the United States*"); *In re Sivec SRL*, 476 B.R. at 313, (*"Comity is only to be extended so long as the interests of U.S. creditors are sufficiently protected, and so long as any actions taken are not manifestly contrary to the public policy of the United States."*).

## DEMAND FUTILITY

65.    The several unanswered communications to the Debtor, the Monitor and the CCAA Court since December 2017 (see Exhibit 1) raising the issued and requesting to review and redress the issues harming the Estate and the Shareholders attest to the futility of additional efforts to promote the resolution of the issues involved outside the courts and the need for the

instant Motion.

## **PRAYER FOR RELIEF**

66.    WHEREFORE the Movant prays that this Court:

A.  To order the appointment of an Examiner to investigate and report on the Debtor's assets, its past and projected financial transactions, and their impact on the Estate's property to establish its rights and interest in a surplus, if any, once it meets its obligations according to the Code.

B.  To order the appointment of Legal Counsel to protect the Shareholders' rights and interests as residual owners of the Estate,

C.  Such further and other relief as this Court deems just and proper.

## **RESERVATION OF RIGHTS**

67.    Movant respectfully

A.  Reserves the right to amend or to supplement this motion,

B.  Does not consent to the entry of final orders or judgments by the Court if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## **CONCLUSION**

For all the reasons set forth herein, the Movant respectfully requests that the Court grant the relief sought in the Motion.

Respectfully submitted,

Dated:  July 24, 2021,
Newton, Massachusetts

Adelso Adrianza, Pro Se
113 Washington Street
Newton, MA 02458
aaadrianza@gmail.com
(859) 803-2279

## EXHIBIT A

## COMMUNICATIONS TO THE CCAA COURT AND THE MONITOR

The following communications can be accessed via the following link:

https://drive.google.com/drive/folders/1Jj47p93-WFbf7yU3NqRDwtqkEzsV_jw7?usp=sharing

### Communication / Subject Matter (SM)

1.0 AAdrianza  Comm J Haynes re KRY (122617)

SM: Lack of transparency, self-interested BOD, good faith requirement; the mining data property of the estate, not distributable.

2.0 AAdrianza Comm R Fung KRY (020318)

SM: Shareholders' interests, compliance with the law.

3.0 AAdrianza Comm R Fung KRY (030618)

SM: Self-serving BOD.

4.0 AAdrianza Comm R Fung KRY (052618)
4.1 ENCLOSURE

SM: Illegal distribution of tax loss carryforward benefits.

5.0 AAdrianza Comm to J Swartz DWPV (053118)

SM: Ownership of tax loss carryforward benefits.

6.0 AAdrianza Comm KRY Monitor (120418)

SM: Nomura Notes restraining notice abandonment and misrepresentations made, safeguarding the company's and its stakeholders' interests.

7.0 AAdrianza Comm DE District Court (021919) - (DE DC D.I. No. 134).

SM: The Shareholders' issues with the company and lack of redress.

8.0 AAdrianza Comm R Fung KRY (101519)
8.1 ENCLOSURE

SM: Venezuela bond payment not effective payment, gifting of the mining data.

9.0 AAdrianza Comm KRY (032420)

SM: The CCAA's new requirements: good faith and taking the Shareholders' interest in consideration.

10.0 AAdrianza Comm EY BD (032920)

SM: Debt payoff delay and Canada's Interest Stops Rule.

## Communication / Subject Matter (SM)

11.0 AAdrianza Comm JF KRYSC (040320) (Chapter 15 D.I. No. 311).

   SM: Shareholders' interests not adequately protected.

12.0 AAdrianza Comm J Hainey (042020) – (Chapter 15 D.I. No. 312).

   SM: Legally unenforceable Credit Agreement.

13.0 AAdrianza Comm DE Bcky Court (052820) – (Chapter 15 D.I. No. 313).

   SM: The Shareholders' issues with the company and lack of redress.

14.0 AAdrianza Comm DE Bcky Court (071420) – (Chapter 15 D.I. No. 314).

   SM: Preservation and maximization of the Estate's property.

15.0 AAdrianza Comm J Hainey KRY (103020)

   SM: Self-interested directors, their fiduciary duties and the harm to the Estate
      and the Shareholders.

16.0 AAdrianza Comm J. R Strathy ONCA KRY (110620) - (DE DC D.I. No. 233)

   SM: The Shareholders' issues with the company and lack of redress.

17.0 AAdrianza Comm DE Bcky Court (121420) – (Chapter 15 D.I. No. 325).

   SM: Oposition to motion to seal Debtor's financial information.

18.0 AAdrianza Comm DE District Court (060121) – (Chapter 15 D.I. No. 326).

   SM: Harm to the Estate and the Shareholders, structured dismissal and other
      contraventions of the Bankruptcy Code.

**EXHIBIT B**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

---------------------------------------------------------------------- x ----------------------------------------------------------

| | |
|---|---|
| In re | : Chapter 15 |
| | : |
| **CRYSTALLEX INTERNATIONAL CORP.** | : **Case No. 11-14074 (LSS)** |
| | : |
| | : |
| Debtor in a Foreign Proceeding. | : |
| | : **Related D.I.** ____ |
| | : |

---------------------------------------------------------------------- x ----------------------------------------------------------

## ORDER GRANTING MOTION FOR AN ORDER DIRECTING THE APPOINTMENT OF AN EXAMINER AND INDEPENDENT COUNSEL FOR THE SHAREHOLDERS

Upon consideration of the Motion *for an Order Directing the Appointment of An Examiner and Independent Counsel for The Shareholders* pursuant to Sections 105(a), 1104(a), 1104(c), 1129, 1501(a)(4), 1505, 1522(c), 1526 and 1527 of the Bankruptcy Code and Bankruptcy Rule 2007.1, supplemented by CCAA Sections 42, 44(d), 52(1), 52(3)(a) and 61(1)-(2), and CJA Section 101, regarding the appointment of the Examiner; and 11 U.S.C. § 105(a), supplemented by R.C.P. Rule 10.01. regarding the appointment of Legal Counsel, (the "Motion") [D.I. ____ ];[1,2] and the Court having found that: (i) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012, (ii) venue is proper in this district pursuant to 28 U.S.C. § 1410, (iii) this is a core proceeding pursuant to 28 U.S.C. § 157(b), (iv) notice of the Motion was sufficient under the circumstances; and the Court having reviewed the Motion and having considered the statements of the Movant and the Debtor's counsel and any objections filed to

---

[1] The Debtor in this chapter 15 case is Crystallex International Corporation and the last four digits of its federal tax ID number is 2628. The Debtors' service address is: 8 King Street East, Suite 1201, Toronto, Ontario, M5C 1B5, Canada.

[2] Capitalized terms used, but not defined herein, shall have the meaning ascribed to in the Motion.

the Motion and the evidence adduced with respect to the Motion at a hearing before the Court (the "Hearing"); and the Court having determined to:

    **I.**        Appoint an examiner under sections 105(a), 1104(a), 1104(c), 1129, 1501(a)(4), 1505, 1522(c), 1526 and 1527 of the Bankruptcy Code, supplemented by CCAA sections 42, 44(d), 52(1), 52(3)(a) and 61(1)-(2), and CJA section 101, to investigate the affairs of the Debtor; and the Court having further concluded that the nature, extent, and duration of the investigation to be conducted by the examiner as set forth herein is appropriate;

    **IT IS HEREBY ORDERED THAT:**

    1.      The United States Trustee is directed to appoint one examiner ("Examiner")

pursuant to Bankruptcy Code section 1104(c). to Bankruptcy Code section 1104(c).

    2.      The Examiner is directed to investigate and provide a report to the Court and parties in interest, and otherwise perform the duties of an examiner set forth in Bankruptcy Code sections 1106(a)(3) and 1106(a)(4), regarding the following subjects, as described in greater detail in the Motion, and any causes of action that may exist because of the alleged actions or inactions of the Debtors' BOD (collectively, the "Investigation"):

        a.     Whether the actual circumstances surrounding the negotiation of, and the bidding process involved in the DIP loan leading to the Credit Agreement and the alleged harm to the Estate and the Shareholders correspond to the representations made by the BOD,

        b.     Whether any of the Debtor's assets were improperly included, used, gifted, abandoned, or otherwise disposed of and to what extent these actions or omissions affect the Estate's property distribution in the MOD with respect to the requirements of the Bankruptcy Code,

        c.     Whether Estate property has been or is projected to be used for improper, disallowed purposes according to the Bankruptcy Code,

d.   Whether the actual and projected charges to the Administrative Expense carve-outs confer a benefit on the Estate or are otherwise appropriate under the Bankruptcy Code,

e.   Whether the acts or omissions by the BOD, alleged in the Motion represent breaches of its fiduciary duties of care or loyalty against the Estate or the Shareholders,

f.   Whether the MOD, as approved or adjusted for the alleged actions and omissions determined to be factual, represent a viable reorganization or liquidation plan,

g.   Whether alternate strategies to those presented by the Debtor would adequately protect creditors to the maximum extent allowed by the Bankruptcy Code and preserve value for its equity holders.

3.   The Examiner shall (a) have unfettered access to review all documents and information, including materials that may be confidential or subject to a privilege or protection held by the Debtor, officers, directors, affiliates, and subsidiaries, provided that all privileges and protections applicable to any materials provided to the Examiner shall remain in full force and effect and not be deemed to have been waived by providing such materials to the Examiner, and (b) include all such information (including confidential or privileged materials) in the Examiner's report submitted to this Court, to the extent such inclusion is determined by the Examiner appropriate under the circumstances, provided, that the Examiner shall have the authority, within his or her business judgment, either to (x) waive any privileges or protections with respect to such materials included in the Examiner's report or (y) to the extent any party in interest claimed privilege or confidentiality as to any materials contained in the report, submit an unredacted report to the Court under seal and file and transmit to parties in interest a redacted copy on the public docket, in which case all privileges and protections included in the unredacted report shall remain in full force and effect and not be deemed to have been waived by such inclusion.

4.   The Examiner, parties in interest, the Debtors, any official committee appointed pursuant to Bankruptcy Code section 1102 ("Committee") or the United States Trustee shall have the right to petition the Court to further expand the scope of the Investigation, if during such

Investigation other relevant matters are revealed which the Examiner, parties in interest, the Debtors, any Committee, or the United States Trustee believe should be brought to the attention of the Court.

5.     The Debtors and the Debtors' direct and indirect officers, directors, affiliates and subsidiaries, and their respective professionals, are directed to fully coordinate and cooperate with the Examiner and its professionals and other parties in interest  in conjunction with the performance of any of the Examiner's duties and the Investigation, including producing to the Examiner, as promptly as practicable, all documents and information relevant to the Investigation that the Examiner requests, and exercising their respective best efforts to avoid any unnecessary interference with, or duplication of, the Investigation.

6.     The Examiner shall file his or her report on the Investigation as soon as practicable.

7.     The Examiner may retain counsel and other professionals, if he or she determines that such retention is necessary to discharge his or her duties, with such retention to be subject to Court approval under standards equivalent to those set forth in 11 U.S.C. § 327.

8.     The Examiner and any professionals retained by the Examiner pursuant to any order of this Court shall be compensated and reimbursed for the expenses pursuant to any procedures for interim compensation and reimbursement of expenses of professionals that are established in these Cases. Compensation and reimbursement of the Examiner shall be determined pursuant to Bankruptcy Code Section 330, and compensation and reimbursement of the Examiner's professionals shall be determined pursuant to standards equivalent to those set forth in Bankruptcy Code Section 330.

9.     The Examiner shall have the standing of a "party-in-interest" with respect to the matters that are within the scope of the Investigation and shall be entitled to appear and be heard at any and all hearings in this case. Nothing in this Order shall impede the right of the United States Trustee or any other party to request any other lawful relief, including but not limited to the appointment

of a trustee.

II.        Appoint legal counsel to represent the Debtor's U.S. equity holders (the "Shareholders") under § 105(a) of the Bankruptcy Code, supplemented by CCAA § 42 and R.C.P 10.01, to provide the Shareholders adequate legal protection for their interest in the Estate; and the Court having further concluded that, to the extent that the Shareholders may be entitled to a recovery, which shall be determined by the Examiner's investigation, and if so determined, the charge of the Legal Counsel's cost and expense against the Estate's residual property is appropriate,

## IT IS HEREBY ORDERED THAT:

1.        The selection and the appointment of the Legal Counsel shall be undertaken by the Shareholders' lead representative(s) and after review and approval by this Court.

2.        The Legal Counsel shall be compensated and reimbursed for the expenses pursuant to any procedures for interim compensation and reimbursement of expenses of professionals that are established in this case. Compensation and reimbursement of the Legal Counsel shall be determined pursuant to Bankruptcy Code Section 330,

### III.    Jurisdiction

1.        This Court shall retain jurisdiction with respect to any matters related to or arising from the implementation of this Order.

Dated: _____, 2021      _____

THE HONORABLE LAURIE SELBER SILVERSTEIN
UNITED STATES BANKRUPTCY JUDGE

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------------------- x --------------------------------------------------------------

| | | |
|---|---|---|
| In re | : | Chapter 15 |
| | : | |
| **CRYSTALLEX INTERNATIONAL CORP.** | : | **Case No. 11-14074 (LSS)** |
| | : | |
| | : | Hearing date: Aug. 20, 2021 |
| Debtor in a Foreign Proceeding. | : | |
| | : | Objections due by: 4:00 PM EDT |
| | : | on Aug.13, 2021 |

-------------------------------------------------------------------------- x --------------------------------------------------------------

### NOTICE OF MOTION FOR AN ORDER DIRECTING THE APPOINTMENT OF AN EXAMINER AND INDEPENDENT COUNSEL FOR THE SHAREHOLDERS

**PLEASE TAKE NOTIC**E that Adelso Adrianza, a shareholder of the above captioned debtor (the "Debtor"), Pro Se and on behalf of similarly situated U.S. shareholders (the "Shareholders"), has filed the attached Motion for An Order Directing the Appointment of An Examiner and Independent Counsel for The Shareholders (the "Motion") with the United States Bankruptcy Court for the District of Delaware (the "Court").

**PLEASE TAKE FURTHER NOTICE** that objections and responses, if any, to the relief requested in the Motion shall be filed by on or before **4:00 p.m. (ET) on Aug. ____, 2021** (the "Objection Deadline") with the Court at 824 North Market Street, 3rd Floor, Wilmington, Delaware 19801. At the same time, you must serve a copy of any objection or response upon: (a) the undersigned party, Adelso Adrianza, 113 Washington Street, Newton, MA 02458, to be received on or before the Objection Deadline.

**PLEASE TAKE FURTHER NOTICE that a hearing to consider the Motion to Seal will be held on August 20, 2021, at 10:00 a.m. (EDT) before the Honorable Laurie Selber Silverstein in the Court, 824 North Market Street, 6th. Floor, Courtroom No. 2, Wilmington, Delaware 19801.**

**PLEASE TAKE FURTHER NOTICE** THAT, IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THEN THE COURT MAY GRANT THE RELIEF REQUESTED IN THE MOTION TO SEAL WITHOUT FURTHER NOTICE OR A HEARING.

Dated:  July 24, 2021,
Newton, Massachusetts

Adelso Adrianza, Pro Se
113 Washington Street
Newton, MA 02458
(859) 803-2279

## CERTIFICATE OF SERVICE

I, Adelso Adrianza, hereby certify that on this 22nd day of July 2021 I caused copies of the *Motion for An Order Directing The Appointment Of An Examiner And Independent Counsel For The Shareholders* Pursuant to Sections 11 U.S.C. §§ 105(a), 1104(a), 1129, 1501(a)(4), 1505, 1522(c), 1526 and 1527, supplemented by CCAA §§ 42, 44(d), 52(1), 52(3)(a) and 61(1)-(2), and 11 U.S.C. §§ 105(a), supplemented by R.C.P. Rule 10.01, respectively, to be served on the parties listed below by courier or otherwise indicated:

United States Trustee
844 King Street, Room 2207
Lockbox # 35
Wilmington, DE 19899-0035

Matthew Barry Lunn, Esq.
Young, Conaway, Stargatt &
Taylor1000 West Street, Fl. 17
PO Box 391
Wilmington, DE 19899

Alex W. Cannon, Esq.
Willkie Farr & Gallagher, LLP
787 Seventh Avenue # 2
New York, NY 10019

Mr. Christopher P. Simon, Esq.
Cross & Simon, LLC
1105 North Market Street, Ste. 901
Wilmington, DE 19801

Adelso A. Adrianza