11-14074 LSS

**IN THE UNITED STATES BANKRUPTCY COURT** FILED
**FOR THE DISTRICT OF DELAWARE**

2021 AUG 17  AM 10: 52

CLERK
US BANKRUPTCY COURT
DISTRICT OF DELAWARE

---------------------------------------------------------------- X -----------------------------------------------------------

In re                                                                    :    Chapter 15

**CRYSTALLEX INTERNATIONAL CORP.**            :

Debtor in a Foreign Proceeding.            :    **Hearing Date: August 20, 2021, at 10:00 a.m. (EST)**

                                                                          :    **Ref. Docket No. 328, 339**

---------------------------------------------------------------- X -----------------------------------------------------------

## REPLY TO THE FOREIGN REPRESENTATIVE'S OPPOSITION TO THE MOTION TO APPOINT AN EXAMINER AND LEGAL COUNSEL FOR THE SHAREHOLDERS

Adelso Adrianza ("<u>Movant</u>"), a shareholder of the debtor ("Debtor"), Pro Se and on behalf

of similarly situated U.S. shareholders ("Shareholders") in the above-captioned chapter 15 case,

respectfully submit this reply (the "Reply") to the objection (the "Objection") filed by the Debtor

at D.I. No. 339 to the Movant's Motion to appoint an Examiner and Independent Legal Counsel

for the Shareholders (D.I. No. 328). The Objection seeks, among other things, to:

A.  Make this Court rubber-stamp the decisions of the CCAA Court,

B.  Pigeonhole this Court's authority and responsibility to enforce the U.S. Bankruptcy Code,

C.  Misrepresent facts and misguide this Court as to the Debtor's CCAA proceedings.

The Foreign Representative's expansively subjective views on the roles and authority of the U.S.

Bankruptcy and the CCAA Courts, the statutory requirements of the Bankruptcy Code, the scope

and reach of the Canadian proceedings and the facts in this case need the reality check that follows.

## <u>REPLY</u>

---

[1] All capitalized terms used but not defined herein have the meanings given to them in the Motion for An Order Directing the Appointment of An Examiner and Independent Counsel for The Shareholders (DEBCC D.I. No. 328).

## A. **The U.S. Court's Authority and Responsibility**

1. According to the Foreign Representative's Objection:

   a) "*The Motion should be denied because it seeks unnecessary relief that is outside the statutory authority and scope of Chapter 15 of the Bankruptcy Code and antithetical to its underlying and fundamental principles.*" (para. 1),

   b) "*First, there is no statutory authority in Chapter 15 for the appointment of an examiner, except at the request of a foreign representative.*" (para. 2),

   c) *Second, assuming authority exists under the Bankruptcy Code to grant the Motion, it should nonetheless be denied because it conflicts with fundamental principles of Chapter 15, namely "international comity and respect for the laws and judgments of other nations."* (para. 3).

   In this regard, it appears necessary to reiterate Congress' purpose and objectives with the

   enactment of Chapter 15 and the Bankruptcy Code in general, as well as the role and authority

   it assigned to the U.S. Bankruptcy Courts to carry them out.

2. Section 1501 of the Bankruptcy Code sets forth the purpose and scope of Chapter 15 as follows:

   ### §1501. Purpose and scope of application

   (a) The purpose of this chapter is to incorporate the Model Law on Cross-Border Insolvency so as to provide effective mechanisms for dealing with cases of cross-border insolvency with the objectives of—

   (1) cooperation between—

   (A) courts of the United States, United States trustees, trustees, examiners, debtors, and debtors in possession; and

   (B) the courts and other competent authorities of foreign countries involved in cross-border insolvency cases;

   (2) greater legal certainty for trade and investment;

   (3) fair and efficient administration of cross-border insolvencies that protects the interests of all creditors, and other interested entities, including the debtor;

   (4) protection and maximization of the value of the debtor's assets; and

   (5) facilitation of the rescue of financially troubled businesses, thereby protecting investment and preserving employment.

3. To enable the U.S. Courts to carry out the purpose and objectives, Congress granted them authority and charged them with the responsibility to enforce the Bankruptcy Code's statutory requirements as a condition sine qua non to protect the rights and interests of the debtor, its stakeholders and the public interest. The faithful enforcement of the Code's statutory rules and procedures is the backbone of its integrity. In this regard, the Code in General and Chapter 15 in particular, not only provide the Bankruptcy Courts with the authority to carry out their purpose and objectives, but also were not enacted to be subservient to foreign law.

4. The U.S. Court's authority to decide when it is appropriate to endorse the decisions of a court overseeing a foreign main proceeding is predicated on those decisions not being contrary to the Code's statutory rules and requirements and controlling and persuasive caselaw. The expansively subjective reading of the U.S. Courts' role and authority in a Chapter 15 case is best demonstrated by the following facts regarding comity.

5. Two Chapter 15 court decisions that dealt with the role and authority of U.S. Courts are In *In re Vitro S.A.B. de CV (*701 F.3d 1031, 5th Cir. 2012) and *Cozumel Caribe, S.A. de C.V.* (508 B.R. 330, 337, Bankr. S.D.N.Y. 2014). The Courts' analyses and conclusions are consequential:

   a) ***In Vitro***

      2. Chapter 15's Framework for Granting Relief

      *"As already discussed, "[a] central tenet of Chapter 15 is the importance of comity in cross-border insolvency proceedings."* In re Cozumel Caribe, S.A. de C.V., — – B.R. ——, 2012 WL 5508303 (Bankr.S.D.N.Y. Nov. 14, 2012). "The extent to which the law of one nation, as put in force within its territory, whether by executive order, by legislative act, or by judicial decree, shall be allowed to operate within the dominion of another nation, depends upon what our greatest jurists have been content to call the comity of nations.'" Hilton, 159 U.S. at 164. *In applying the principles of comity, we "take [ ] into account the interests of the United States, the interests of the foreign state or states involved, and the mutual interests of the family of nations in just and efficiently functioning rules of international law."* In re Artimm, S.r.L., 335 B.R. 149, 161 (Bankr.C.D.Cal.2005). Accordingly, Chapter 15 provides courts with broad, flexible rules to fashion relief appropriate for effectuating its objectives in accordance with comity…"

*"Nevertheless, Chapter 15 does impose certain requirements and considerations that act as a brake or limitation on comity, and preclude granting the relief requested by a foreign representative."*

(See p. 36).

"A court determining whether to provide additional assistance under § 1507 considers the factors listed under subsection (b), 26 which provides that:

(b) *In determining whether to provide additional assistance under this title or under other laws of the United States, the court shall consider whether such additional assistance, consistent with principles of comity, will reasonably assure*

1) *just treatment of all holders of claims against or interests in the debtor's property;*

2) *protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;*

3) *prevention of preferential or fraudulent dispositions of property of the debtor;*

4) *distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by this title; and*

5) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.

11 U.S.C. § 1507(b).27"

(See p. 36).

"Finally, we note that the bankruptcy court's decision was proper under § 1522, which requires that the relief contemplated under § 1521 balance the interests of the creditors and debtors. See In re Tri–Cont'l Exch. Ltd., 349 B.R. at 637 *(analysis of § 1522 "emphasize[s] the need to tailor relief and conditions so as to balance the relief granted to the foreign representative and the interests of those affected by such relief, without unduly favoring one group of creditors over another"). Because the bankruptcy court also found that the Concurso plan did not provide for an appropriate balance among the interests of Vitro, its creditors, and the Guarantors under § 1521 and § 1522, we observe that even were we to agree that the requested relief is provided for under § 1521, the bankruptcy court did not abuse its discretion in denying it."*

(See p. 43).

"Section 1506 provides that *"[n]othing in [Chapter 15] prevents the court from refusing to take an action governed by this chapter if the action would be manifestly contrary to the public policy of the United States."* 11 U.S.C. § 1506. *The narrow public policy exception contained in § 1506 "is intended to be invoked only under exceptional circumstances concerning matters of fundamental importance*

*for the United States." In re Ran, 607 F.3d at 1021. "The key determination required by this Court is whether the procedures used in [the foreign proceeding] meet our fundamental standards of fairness." Metcalfe, 421 B.R. at 697."*

(See p. 59).

[Emphasis added.]

### b) *Cozumel Caribe*

"Chapter 15 of the Bankruptcy Code, like the Model Law on Cross–Border Insolvency, is intended to facilitate cross-border cooperation in insolvency proceedings. *One of the purposes of chapter 15 is the "fair and efficient administration of cross-border insolvencies that protects the interests of all creditors, and other interested entities, including the debtor...." 11 U.S.C. § 1501(a)(3). Other sections of chapter 15 provide for relief "only if the interests of the creditors and other interested entities, including the debtor, are sufficiently protected."* 11 U.S.C. § 1522(a), *and allow additional assistance when necessary to "reasonably assure ... protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in [a] foreign proceeding."* id. § 1507(b)(2). *The Code, however, does not describe what a U.S. court should do when, after granting recognition to a foreign proceeding, the conduct of the foreign representative, or other parties in interest, flout the purposes of chapter 15."*

(See p. 1)

*"Granting comity to orders of a foreign court is not an all or nothing exercise—some orders or judgments*[337] *in the same case or proceeding may merit comity while others may not.* Cozumel Caribe, 482 B.R. at 110 ("*Granting comity to a foreign representative by providing access to courts in the United States is very different from granting the request by the foreign representative to extend comity to a foreign law, court order or judgment.*")."

(See p. 6)

"*Neither the Recognition Order nor the Stay Decision in this case compels the District Court or any other court to extend comity to any decision or order in the* *[338] Concurso Proceeding.* See Cozumel Caribe, 482 B.R. at 108–11 (*holding that a grant of recognition does not mandate the extension of comity to a foreign law, court order, or judgment)*."

(See p. 7)

[Emphasis added.]

6. As articulated by *In Vitro and Cozumel Caribe* Courts, granting comity, or deference and recognition, to judgments of foreign courts or the provision of their orders is appropriate as long as U.S. parties are provided the same fundamental protections that litigants in the United States would receive. And while the treatment afforded to the U.S. parties need not be identical

to what they would be afforded in a U.S. Court, there are statutory rules and public policy requirements that limit the Courts' authority to extend comity to a Foreign Representative.

7. The instant case is one that does not meet these requirements and must, therefore, be denied additional assistance under § 1507 or terminate the relief granted based on § 1522(c) if the Debtor does not redress harm the Estate and the Shareholders through the acts and omissions in violation of local statutory rules and public policy enumerated in the Motion. Namely,

   a. Fraudulent Transfer of Tax Benefits,

   b. Misappropriation, Misuse and Waste of Estate Property,

   c. Illegal Post-petition Interest Payment on Unsecured Debt,

   d. Breach of The Loyalty and Care Duties by a Self-interested BOD,

   e. Fraudulent Misrepresentations.

   f. Distributing the Estate's property using the MOD, which is in essence a structured dismissal that is not permissible as settled by precedential U.S. case law (*See Czyzewski v. Jevic Holding Corp.*, No. 15-649, S. Ct., 2017 WL 1066259) and the Model Law.

8. The requirement that a controlling creditor not be allowed to impose a plan of arrangement or liquidation on the Estate's stakeholders and that local priorities and statutory exceptions be preeminent in the distribution of the Estate's property is made clear by the Model Law. Per the *UNCITRAL Model Law on Cross-Border Insolvency with Guide to Enactment and Interpretation*:

   69. For a proceeding to qualify for relief under the Model Law, it must be a collective proceeding because the Model Law is intended to provide a tool for achieving a coordinated, global solution for all stakeholders of an insolvency proceeding. *It is not intended that the Model Law be used merely as a collection device for a particular creditor or group of creditors who might have initiated a collection proceeding in another State*.

   70. *In evaluating whether a given proceeding is collective for the purpose of the Model Law, a key consideration is whether substantially all of the assets and*

*liabilities of the debtor are dealt with in the proceeding, **subject to local priorities and statutory exceptions**, and to local exclusions relating to the rights of secured creditors.*

## B. The Attempt to Pigeonhole This Court's Authority and Responsibility to Enforce the U.S. Bankruptcy Code

9. The Foreign Representative's attempt to pigeonhole the Court's authority to enforce the Codes

statutory requirements is disingenuous. Per § 105(a):

> *The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.*

First, the only limitation to the Court's authority to redress bankruptcy issues under §105(a) is

that equitable principles may not be used to negate express terms of the Bankruptcy Code, or

to create rights and remedies beyond those created by the statute. While the Foreign

Representative argues this Court's lack of authority to grant the relief requested in the Motion

by citing *Law v. Siegel: "… section 105(a) "confers authority to 'carry out' the provisions of

the Code, but it is quite impossible to do that by taking action that the Code prohibits.",* it

neglects to indicate the equitable relief in question and what provisions of the Code would be

negated by the Court's approval of the relief requested.

10. The relief requested is in pursuit is legal remedies, not equitable remedies. After all, the

gratuitous harm caused to the Estate and the Shareholders arise from the statutory breaches

discussed at length in the Motion and listed in 7.  hereinabove. The Foreign Representative

also neglects to address core issues that negate the continued recognition of and further

assistance to Foreign Representative under the Code and the Model Law, also discussed at

length in the Motion, and that this Court needs to obtain to fulfill its fact-finding requirements.

Namely:

a. The MOD being in form and essence a structured dismissal and against the precepts of the Code and the Model Law,

b. The abuse of the Insolvency proceedings to advance the interested of self-interested fiduciaries,

c. The misappropriation, misuse and waste of Estate property that deprives the Estate of the opportunity to emerge from bankruptcy as a going-concern, and the Shareholders of their rights and interests as residual owners of the Estate.

11. The Foreign Representative would rather have the Court miss the forest for the trees. Thus, it purports to tell the Court it does not have authority to grant the relief requested in the Motion by pointing out the limitations of individual sections of the Code but obviating a) the overarching purpose and objectives of the Code and the authority Congress vested on the U.S. Bankruptcy Courts to enforce them and b) that comity is not a one-way street.  The very purpose of the Model Law is for courts to cooperate to reach an effective solution. Requesting relief in an ancillary proceeding while obviating the issues not dealt with by the main proceeding is anathema to the purpose of the Model Law. The following will make this clear. The Motion referred to the following sections as statutory predicates for the relief requested:

> 14.    This Court has the authority to appoint the:
>
> A.    Examiner under 11 U.S.C. §§ 105(a), 1104(a), 1104(c), 1129, 1501(a)(4), 1505, 1522(c), 1526 and 1527, and Bankruptcy Rule 2007.1; supplemented by CCAA Sections 42, 44(d), 52(1), 52(3)(a) and 61(1)-(2), and CJA Section 101.
> B.    Legal Counsel under 11 U.S.C. § 105(a), supplemented CCAA § 42 and R.C.P. Rule 10.01.

12. What <u>IS</u> in the sections that give the U.S. and the CCAA Court the authority to grant the requested relief:

a) Section 105(a): *The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title*, provided that it does to negate

express terms of the Bankruptcy Code or create rights and remedies beyond those

created by the statute.

b) Sections 1104(a) and (c):

(a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee—

(1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or

(2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

(c) If the court does not order the appointment of a trustee under this section, then at any time before the confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of an examiner to conduct such an investigation of the debtor as is appropriate, including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor, if—

(1) such appointment is in the interests of creditors, any equity security holders, and other interests of the estate; or

(2) the debtor's fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000.

c) Sections 522. Protection of creditors and other interested persons:

(*a) The court may grant relief under section 1519 or 1521 or may modify or terminate relief under subsection (c), only if the interests of the creditors and other interested entities, including the debtor, are sufficiently protected*.

(b) *The court may subject relief granted under section 1519 or 1521, or the operation of the debtor's business under section 1520(a)(3), to conditions it considers appropriate, including the giving of security or the filing of a bond*.

(c) *The court may, at the request of the foreign representative or an entity affected by relief granted under section 1519 or 1521, or at its own motion, modify or terminate such relief.*

(d) *Section 1104(d) shall apply to the appointment of an examiner under this chapter*. Any examiner shall comply with the qualification requirements imposed on a trustee by section 322.

d) Sections 1526 - Cooperation and direct communication between the trustee and foreign courts or foreign representatives:

   (a) Consistent with section 1501, the trustee or other person, including an examiner, authorized by the court, shall, subject to the supervision of the court, cooperate to the maximum extent possible with a foreign court or a foreign representative.

   (b) Section 1527 - Forms of cooperation:

   *Cooperation referred to in sections 1525 and* 1526 may be implemented by any appropriate means, including—

   (1) *appointment of a person or body, including an examiner, to act at the direction of the court;*

f) CCAA § 42: *The provisions of this Act may be applied together with the provisions of any Act of Parliament*, or of the legislature of any province, that authorizes or makes provision for the sanction of compromises or arrangements between a company and its shareholders or any class of them

g) f)CCAA §44(d): *The purpose of this Part is to provide mechanisms for dealing with cases of cross-border insolvencies and to promote*:

   *(a) cooperation between the courts and other competent authorities in Canada with those of foreign jurisdictions in cases of cross-border insolvencies*;

   (b) greater legal certainty for trade and investment;

   (*c) the fair and efficient administration of cross-border insolvencies that protects the interests of creditors and other interested persons, and those of debtor companies;*

   *(d) the protection and the maximization of the value of debtor company's property; and*

   (e) the rescue of financially troubled businesses to protect investment and preserve employment.

h) CCAA 52 (1): *If an order recognizing a foreign proceeding is made, the court shall cooperate, to the maximum extent possible, with the foreign representative and the foreign court involved in the foreign proceeding.*

i) CCAA 52(3)(a): Forms of cooperation

(3) *For the purpose of this section, cooperation may be provided by any appropriate means, including*

(a) *the appointment of a person to act at the direction of the court;*

j)  CCAA 61(1)-(2): Court not prevented from applying certain rules

61 (1) *Nothing in this Part prevents the court, on the application of a foreign representative or any other interested person, from applying any legal or equitable rules governing the recognition of foreign insolvency orders and assistance to foreign representatives that are not inconsistent with the provisions of this Act.*

Public policy exception

(2) *Nothing in this Part prevents the court from refusing to do something that would be contrary to public policy.*

**N.B.** Note the exclusion of the qualifier **"manifestly"** from the Canadian public policy exclusion section.

k)  CJA Section 101. Injunctions and receivers

101 (1) *In the Superior Court of Justice, an interlocutory injunction or mandatory order may be granted or a receiver or receiver and manager may be appointed by an interlocutory order, where it appears to a judge of the court to be just or convenient to do so.*

13. What IS NOT in the sections that give the Court the authority to grant the requested relief:

Any provision that negates express terms of the Code or creates rights and remedies beyond those already created by the statute that would limit the Court's inherent powers to issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of the Code.

## C. **The Attempt to Misrepresent Facts and Misguide This Court**

14. The Foreign Representatives expansively subjective views on the scope of the Canadian Court decisions find expressions beyond reality. The most relevant to the issues at hand are:

   a.  3. "…*The Motion is, at bottom, an effort to re-litigate issues already decided by the Canadian Court (and recognized by this Court),* most prominently, the CCAA Financing Order and various amendments to the DIP Credit Agreement."

   b.  4. Relatedly, the requested relief is unnecessary. *The Canadian Proceeding is moving forward under the oversight of the Canadian Court and with the*

> *active participation of the Monitor – a statutory appointee and an officer of the Canadian Court charged with many of the same duties any examiner appointed by this Court would presumably undertake (among others)*.

c. *"In addition, there is, in fact, already an ad hoc committee of equity security holders that has been active in the Canadian Proceeding with the assistance of counsel.* There is no basis or need to duplicate these efforts or to incur the attendant costs."

d. 33. *"Of course, bankruptcy courts in Chapter 15 cases need not merely accept any judgment or order entered in a foreign main proceeding and, as Movant notes, may refuse to recognize and enforce orders under certain circumstances. See Objection, ¶ 64. But, those circumstances are not present here*…

   "… First, this Court has already recognized nearly all of the orders Movant takes issue within the Motion. *Moreover, the cases cited by Movant concern orders or judgments described as "repugnant to public policy," "prejudicial to the interests of the United States," and "manifestly contrary to the public policy of the United States," none of which are remotely close to describing the relief that has been granted in the Canadian Proceeding*…

   "… *And even assuming any orders of the Canadian Court granted relief unavailable in the United States (and Movant has not demonstrated as such)*, as noted by the court in Vitro, "[g]iven Chapter 15's heavy emphasis on comity, it is not necessary, nor to be expected, that the relief requested by a foreign representative be identical to, or available under, United States law.""

e. "Stated differently, *Movant is requesting the Court override (or at least second-guess) the judgment of the Canadian Court and the Monitor regarding issues that, as Movant admits, have already been raised and in some cases litigated before the Canadian Court,* as well as re-visit its own orders recognizing nearly all of those rulings."

15. The Motion IS NOT an effort to re-litigate issues already decided by the Canadian Court.

   The issues address in the Motion do not relate in any way to the legal actions undertaken by the Shareholders' Committee or the Noteholders in Canada. The issues raised in the Motion relate to:

   a. Fraudulent Transfer of Tax Benefits,

   b. Misappropriation, Misuse and Waste of Estate Property,

   c. Illegal Post-petition Interest Payment on Unsecured Debt,

d.  Breach of The Loyalty and Care Duties by a Self-interested BOD,

e.  Fraudulent Misrepresentations,

f.  Distributing the Estate's property using the MOD, which is in essence a structured dismissal that is not permissible under precedential U.S. case law (See Czyzewski v. Jevic Holding Corp., No. 15-649, S. Ct., 2017 WL 1066259) and the Model Law.

NONE of these issues has ever been litigated in the Canadian Courts because of the insurmountable limitations faced by me and similarly situated Shareholders described in the Motion. Also, the CCAA Monitor has been made aware of all these issues over the last few years but has not addressed them, and the CCAA Court has not raised these issues sua sponte for the obvious reasons.

16. The Monitor IS NOT an Examiner, does not take and adversarial position and is not a neutral participant in the proceedings as a result of the CCAA initial order. Per *The Role of The Monitor and Its Impact on U.S. Restructurings*, LEXPERT, December 2014 (www.lexpert.ca), pp 39-40

> "Lastly, the monitors are primarily officers of the court and as such have been described as the "eyes and ears" of the court. In this role, the monitor is an independent officer of the court that essentially implements the court's commercial oversight of the restructuring proceedings. *In this regard, the monitor is not an adversary in the restructuring proceedings and generally avoids taking adversarial positions directly against any party. Rather, the monitor generally restricts itself to providing the court with its views on the commercial consequences of the positions of the parties.* Therefore, the representations, suggestions and conclusions of the monitors are given substantial weight, and the courts give them considerable deference and, in most instances, are guided by their advice."

I wrote to the Office of the Superintendent of Bankruptcies (OSB) to report violations of the Monitors Code of Ethics in the KRY CCAA proceedings by the Monitor by aiding and abating the Applicant's efforts to avoid the disclosure of actions and omissions detrimental to the stakeholders. The OBS' response to my complaint stated:

> "*The CCAA Initial Order specifically address the disclosure of information in the Crystal/ex CCAA Proceedings. Paragraph 29 of the Initial Order " ... In the case*

*that of information that the Monitor has been advised by the Applicant is confidential, the Monitor shall not provide such information to creditors or any other person unless otherwise directed by this Court or on such terms as the Monitor and the Applicant may Agree.*

*After careful analysis of this issue, we are unable to conclude that the Monitor prevented the disclosure of information to the detriment of Crystallex's stakeholders."*

Ergo, the Code of Ethics issued by the regulatory body whose main duty and responsibility is to protect the integrity of the bankruptcy proceedings is nullified by the decisions of the leading participants in the proceedings said regulatory body is required to regulate.

17. There IS NOT a Shareholders Committee with legal representation in the CCAA proceedings. A group of shareholders tried to get the CCAA Court to approve the appointment of such a committed but the Debtor, the DIP Lender, the Monitor and the CCCA Court objected to it. As a result, the same group of shareholders obtained contingent legal representation that pursued to redress issues not addressed in the Motion and abandoned the case in January 2019, once it realized the futility of pursuing these remedies in the Canadian Courts. (*See* Exhibit A). The Foreign Representative is fully aware of this fact. I, for one, wrote to the CCAA Court, the Monitor and the DIP/BOD after I learned about Gowling's resignation. (*See* Exhibit B). With Gowling's departure from the case and the inability to find a replacement on a contingent basis, the Shareholders' Committee and the shareholders that join it on an opt-in basis have not had adequate legal representation, much the same as the individual Shareholders.

18. The Foreign Representative has a different standard when it comes to measuring the repugnancy of acts and omissions by the DIP/BOD discussed in the Motion and the use and abuse of the bankruptcy courts to advance their self-interests at the expense of the Estate and its Shareholders. The issues raised in the Motion related to:

   a. Fraudulent Transfer of Tax Benefits,

    b.  Misappropriation, Misuse and Waste of Estate Property,

    c.  Illegal Post-petition Interest Payment on Unsecured Debt,

    d.  Breach of The Loyalty and Care Duties by a Self-interested BOD,

    e.  Fraudulent Misrepresentations,

    f.  Distributing the Estate's property using the MOD, which is in essence a structured dismissal that is not permissible under precedential U.S. case law (See Czyzewski v. Jevic Holding Corp., No. 15-649, S. Ct., 2017 WL 1066259) and the Model Law.

If these do not represent repugnant actions on the part of the DIP/BOD, I would hate to ask what would.

19. The Foreign Representative ignores the issues discussed in the Motion; some of which the Debtor recently accepted as facts. (*See* D.I. No. 337). This is the Ostrich Defense strategy the Debtor has used and continues to use when confronted with irrefutable facts. Proof of this is its standard practice to ignore any references to or acknowledge any of the issues in the Motion by neither refuting nor accepting they exist until it has no other option. There is indeed relief granted by the CCAA Court that is unavailable in the United States under the Code. Namely:

    a.  Distribution of the Estate's assets under the MOD, which is in form and essence a structured dismissal,

    b.  Approval of post-petition interests on unsecured debt at 20% p.a. without the existence of a collective plan of arrangement or liquidation; and against settled Canadian law, which only allows post-petition interest on unsecured debt at 5% p.a. in a liquidating bankruptcy as this case is destined to end by design.

    c.  A self-interested DIP / BOD and a Controlling DIP Lender misappropriating, gifting, misusing and wasting Estate Property for the sole benefit of the self-interested DIP / BOD and a Controlling DIP Lender.

20. The Foreign Representative would also want this Court to believe that the Canadian Courts gave the debtor a blank cheque with the orders it approved. Thus, according to the DIP/BOD, the Canadian Courts:

    [1] Approved the misappropriation of the Estate's tax benefit and the mining data. This even though a) it was never made aware of these and the use the self-interested DIP/BOD decided to give them unilaterally, and b) regarding the distribution of the tax benefit to the DIP Lender, it did not have the authority to override the Canadian tax law that forbids it. This is made self-evident by the following:

**CCAA Court Initial Order Reasons Dec. 28, 2011**

[11] *The principal asset of Crystallex: is its arbitration claim of US$3.8 billion against Venezuela. In addition, Crystallex has mining equipment with a book value of approximately $10, 1 million* and cash of approximately $2 million.

**Ontario Court of Appeal Reasons - Appeal from the order of Justice Frank J.C. Newbould by the Noteholders, May 11, 2012.**

[4] *At present, Crystallex's only asset of significance is an arbitration claim for US $3.4 billion against the government of Venezuela* in relation to the cancellation of the contract. The arbitration claim is the "pot of gold" in the CCAA proceeding.

The foregoing begs a question:  Why would assets worth hundreds of millions of U.S. dollars not be reported as such in the bankruptcy filings?

    [2] Maintain their approval of the post-petition interest on unsecure debt after the ONCA confirmed in *In Re Nortel Networks Corporation*, 2015 ONCA 681 that the BIA's Interest Stops Rule is applicable to CCAA cases.

Here it is important to be aware of the following:

        i.      The CCAA Court approved the Standstill order on June 5, 2013

        ii.     The ONCA confirmed the applicability of the Interest Stops Rule in

CCAA cases on October 13, 2015

        iii.    In 2005, the SCC ruled that the Canadian Constitution allows legislation

to be applied retrospectively in civil cases (*See In British Columbia v. Imperial*

*Tobacco Canada Ltd.*, 2005 SCC 49). In reaching that conclusion, the SCC

established that:

> 69 Except for criminal law, the retrospectivity and retroactivity of which
> is limited by s. 11 (g) of the Charter, there is no requirement of legislative
> perspectivity embodied in the rule of law or in any provision of our
> Constitution. Professor P. W. Hogg sets out the state of the law accurately
> (in Constitutional Law of Canada (loose-leaf ed.), vol. 2, at p. 48-29).
>
> 71 *The absence of a general requirement of legislative prospectivity exists*
> *even though retrospective and retroactive legislation can overturn settled*
> *expectations and is sometimes perceived as unjust*: see E. Edinger,
> "Retrospectivity in Law" (1995), 29 U.B.C. L. Rev. 5, at p. 13.

        iv.    In *Century Services Inc. v. Canada (Attorney General)*, 2010 SCC 60

(CanLII), [2010] 3 SCR 379, the Supreme Court determined that, save for a short

lift of the stay, the transition from Restructuring to Liquidation under the BIA is

seamless:

> "The transition from the CCAA to the BIA may require the partial lifting
> of a stay of proceedings under the CCAA to allow commencement of BIA
> proceedings, *but no gap exists between the two statutes because they*
> *operate in tandem and creditors in both cases look to the BIA scheme of*
> *distribution to foreshadow how they will fare if the reorganization is*
> *unsuccessful.* The breadth of the court's discretion under the CCAA is
> sufficient to construct a bridge to liquidation under the BIA. Hence, the
> chambers judge's order was authorized."

The foregoing is relevant to the legality of the post-filing interest order given that:

        [1]     The Interest Stops Rule decision by the ONCA is retrospective, applicable

to the Standstill Agreement and binding on the CCAA Court,

[2]    The DIP/BOD and the Noteholders have been aware all along that a) the Debtor's liquidation had been decided and planned even before the CCAA filing was made, and b) that the Interest Stops Rule is applicable to liquidations since the BIA was enacted.

Despite the foregoing, neither the Monitor nor Gowling (assuming that it is still the Shareholders' Committee legal counsel, but we know for a fact it is not) have yet to seek to void or vary the Standstill order to comply with the law.

22. In Summary:

    a.  The Court has the authority to appoint an Examiner and Independent Legal Counsel for the Shareholders under the inherent powers it is granted by the Bankruptcy Code. There is no express or implied prohibition in the Code that prevents the Court from doing so,

    b.  On the contrary, it is the Court's responsibility to enforce the purpose and objectives of the Code by applying its statutory rules and exceptions after meeting its independent fact-finding requirements,

    c.  Comity is not an all or nothing exercise. The purpose of the Model Law and its progeny - to provide effective mechanisms for dealing with cases of cross-border insolvency, requires the Foreign Representative to adhere and comply with the local rules and exceptions. Failure to do so requires the U.S. Courts to negate further assistance or withdraw those already granted. According to the Objection, the Foreign Representative would rather have the Court adhere and comply with the CCAA rules and exceptions.

      d.  The approval of the Debtor's actions and omissions in the Canadian proceedings in violation of U.S. law and public policy will cause irreparable harm to U.S. citizens and the integrity of the Code.

## RESERVATION OF RIGHTS

23. Movant respectfully does not consent to the entry of final orders or judgments by the Court if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution

## CONCLUSION

For all the reasons set forth herein, the Movant respectfully requests that the Court grant the relief sought in the Motion.

Respectfully submitted,

Dated:  August 17, 2021,
Newton, Massachusetts

Adelso Adrianza, Pro Se
113 Washington Street
Newton, MA 02458
aaadrianza@gmail.com
(859) 803-2279

- 19 -

**EXIBIT A**

**Crystallex International Corporation**

**Shareholders' Ad Hoc Committee Legal Counsel Resignation Email**

**(Date April 6, 2020)**

 Gmail

**Adelso Adrianza <aaadrianza@gmail.com>**

## Crystallex
4 messages

**Kluge, Nicholas** <Nicholas.Kluge@gowlingwlg.com>　　　　　　　Mon, Apr 6, 2020 at 11:49 AM
To: "aaadrianza@gmail.com" <aaadrianza@gmail.com>
Cc: "Alam, Christopher" <Christopher.Alam@gowlingwlg.com>

Ms. Adrianza, I write in response to your correspondence to Mr. Alam, who is cc'd on this email. Our firm resigned our retainer in a meeting of the shareholder's committee that took place in January, 2019, and no longer acts for any party in any capacity in any proceedings relating to Crystallex.

Regards,

Nicholas Kluge

*Partner*

T +1 416 369 4610
nicholas.kluge@gowlingwlg.com

 GOWLING WLG

Gowling WLG (Canada) LLP
Suite 1600, 1 First Canadian Place
100 King Street West
Toronto ON  M5X 1G5
Canada



**gowlingwlg.com**

**Gowling WLG | 1,400+ legal professionals | 18 offices worldwide**

The information in this email is intended only for the named recipient and may be privileged or confidential. If you are not

the intended recipient please notify us immediately and do not copy, distribute or take action based on this email. If this email is marked 'personal' Gowling WLG is not liable in any way for its content. E-mails are susceptible to alteration. Gowling WLG shall not be liable for the message if altered, changed or falsified.

Gowling WLG (Canada) LLP is a member of Gowling WLG, an international law firm which consists of independent and autonomous entities providing services around the world. Our structure is explained in more detail at www.gowlingwlg.com/legal.

References to 'Gowling WLG' mean one or more members of Gowling WLG International Limited and/or any of their affiliated businesses as the context requires. Gowling WLG (Canada) LLP has offices in Montréal, Ottawa, Toronto, Hamilton, Waterloo Region, Calgary and Vancouver.

---

**Adelso Adrianza** <aaadrianza@gmail.com>                      Mon, Apr 6, 2020 at 12:05 PM
To: "Kluge, Nicholas" <Nicholas.Kluge@gowlingwlg.com>
Cc: "Alam, Christopher" <Christopher.Alam@gowlingwlg.com>
Bcc: Justin C Fine <jcf.enif@iswest.com>

Mrs. Kluger,

I thank you for your email.

I noticed that your firm appears as the legal Counsel representing Crytallex in the CCAA proceedings on the Service List last updated on October 29, 2019. (see the attachment)

Best regards.

Adelso A. Adrianza

[Quoted text hidden]

**EXIBIT B**

**Crystallex International Corporation**

**Letter To the CCAA Court Regarding the Shareholders' Ad Hoc Committee Legal Counsel Resignation**

**(Date April 20, 2020)**

**ADELSO ADRIANZA**

113 Washington Street – Newton, MA 02458 – U.S.A.
M: (859) 803-2279 |

### VIA USPS CERTIFIED MAIL

To: The Honorable Justice J. Hainey, Ontario Superior Court of Justice

cc: The Honorable Judge L. Selber Silverstein, U.S. District Court for the District of Delaware

### VIA E-MAIL

**cc:**   Mr. David Byers - via email (dbyers@stikeman.com)

Mr. Robert Chadwick – via email (rchadwick@goodmans.ca)

Mr. Alexander Cobb – via email (acobb@osler.com)

Mr. Brian Denega – via email (brian.m.denega@ca.ey.com)

Mr. Robert Fung – via email (rfung@crystallex.com)

Mr. Harry J. Near - via email (info@earnscliffe.ca)

Mr. Timothy Pinos – via email (tpinos@casselsbrock.com)

Mr. Clifton Prophet - via email (Clifton.Prophet@Gowlings.com)

Mr. Jay A. Swartz - via email (JSwartz@DWPV.com)

**ADELSO ADRIANZA**

113 Washington Street – Newton, MA 02458 – U.S.A.
M: (859) 803-2279 |

**VIA REGISTERED LETTER**

April 20, 2020

The Honorable Mr. Justice G. Hainey
Ontario Superior Court of Justice
361 University Avenue
Toronto, ON M5G 1T3 - Canada

Dear Justice Hainey,

This communication is in reference to Crystallex International Corporation (KRY, the Company) and is intended to bring to your attention the actions and omission that render the Companies' Creditor Arrangement Act (CCAA) Court approved Senior Secured Credit Agreement (Agreement) between the Company and Tenor Special Situation Fund I, LLC and assigns (Tenor) legally unenforceable for the reasons discussed below.

I am compelled to write this letter for two reasons: firstly, because of my long-standing concern that the Company's shareholders' rights have been and continue to be inadequately protected. The reason for this being, as disclosed in my letter to Judge Stark at the U.S. District Court of Delaware (Case 1:17-mc-00151-LPS, Document 134 Filed 02/25/19), the unprecedented conflict of interest that involves four of the five members of the Company's Board of Directors (the Interested Directors).

Secondly, this concern was recently exacerbated by a communication dated April 6, 2020 from Mr. Nicholas Kluge from Gowling WLG (Canada) LLP, as Counsel for the Shareholder's Committee, that indicated that "*Our firm resigned our retainer in a meeting of the shareholder's committee that took place in January, 2019, and no longer acts for any party in any capacity in any proceedings relating to Crystallex.*". This, together with the absence of Mr. Lou Brzezinski from Blaney McMurtry LLP, means that the Company's shareholders have no true and effective legal representation to protect their collective interests in the CCAA proceedings.



### The Legally Unenforceable Senior Secured Credit Agreement
The Agreement between KRY and the Tenor is legally unenforceable for the following reasons:

### A. Relevant Elements of the Agreement
The Agreement entered by the Company and Tenor to provide DIP financing within the Company's CCAA proceedings stipulates certain conditions and requirements that define the source and the quantum of Tenor's entitlements derived from providing the DIP loan as follows:

1. *"Arbitration Entitlement"*: the amount awarded, or the amount derived through a settlement agreement, if any, in favor of the Borrower on account of its claims asserted in the Arbitration Proceeding.
2. **"Arbitration Proceeding"**: the prosecution of the Borrower's claims against the Bolivarian Republic of Venezuela in respect of its investment in the Las Cristinas mines in the arbitration proceeding currently pending before the arbitral tribunal appointed under the rules of the Additional Facility of the International Centre for Settlement of Investment Disputes seated in Washington, D.C. under reference Crystallex International Corporation v. Bolivarian Republic of Venezuela (ICSID No. ARB(AF)/11/2).

3. **"*Arbitration Proceeds*"**: all present and future proceeds paid, recovered or otherwise received by the Borrower or any of its Subsidiaries pursuant to or in respect of any settlement, award, collection, sale, disposition or any other monetization of or **relating to the Arbitration Proceeding** or any other present or future claim, action, arbitration, litigation **or other proceeding relating to the Borrower's claims against the Bolivarian Republic of Venezuela in respect of its investment in the Las Cristinas mines**.

4. **"*Additional Compensation*"**: **As additional compensation for the Loan, the Borrower shall pay to the Lender and the Lender shall be entitled to receive an amount**, subject to reduction of such amount specifically in accordance with subsection (f) below [*"Order of Application of Arbitration Proceeds"*], **equal to 35% of the Net Arbitration Proceeds** (such amount, the "Lender Additional Compensation").

5. **"*Order of Application of Arbitration Proceeds*"**: … **the Borrower shall distribute and apply all such Arbitration Proceeds received by it in the following descending order** as follows (per the Monitor's 18th Report (Amended), based on Schedule F of the Agreement):

a. First, to pay any accrued and unpaid post-filing expenses reasonably incurred by the Applicant.

b. Second, to pay any taxes payable or required to be withheld by the Applicant or by any government with respect to the Arbitration Proceeds (the amount of taxes payable cannot be determined until the realization of Arbitration Proceeds).

c. Third, to pay into the Principal Cash Collateral Account (as described and defined in the Credit Agreement) an amount so that the aggregate amount in the Principal Cash Collateral Account is equivalent to the outstanding balance of the DIP Loan, including both principal and accrued interest thereon after the date of such deposit (the "Date of Deposit") owing by the Applicant under the DIP loan, until paid in full (the date upon which the full amount is deposited therein, the "Principal Cash Collateralization Date"); and to pay directly to the DIP Lender then any unpaid interest accrued from the Date of Deposit to the Principal Cash Collateralization Date and the DIP Lender's unpaid expenses and other indemnity amounts.

d. Fourth, to pay any proven outstanding balance of the Notes and any other unsecured pre-filing claims ("Other Unsecured Claims") in accordance with the Claim Procedure Order dated November 30, 2012, including all amounts payable pursuant to the Standstill Order (defined hereinafter). Specifically:

i) **the accrued interest on the Notes** includes: 1) 9.375% per annum simple interest accrued on the Original Principal Amount (as defined in the Standstill Order) of US $104,135,273.97 from the CCAA filling date to the Standstill Trigger Date (defined as hereinafter); and 2) 9.375% per annum simple interest plus incremental interest in the aggregate of 10.625% on the Proven Principal Senior Note Amount (as defined in the Standstill Order) of US $123,383,269.90 for the Standstill Period;

ii) **the accrued interest on Other Unsecured Claim**s includes the lesser of: 1) twice the contractual rate, if any, accrued on Other Unsecured Claims; and 2) 12% per annum simple interest, in each case only from the Standstill Trigger Date to Standstill End Date (defined as hereinafter), provided that such rate shall be no less than simple interest at the rate of 5% per annum and no more than 12% per annum.

e) Fifth, to pay the DIP Lender its entitlement of the Net Arbitration Proceeds or NAP (which is the difference between the gross amount of the Arbitration Proceeds and the aggregate of the amounts referred to in sub-paragraphs 20 (a), (b) (c), (d),(i)(I) and (ii)(I)) as modified by the Override Provision of Schedule B of the DIP Credit Agreement).

f) Sixth, the [Management Incentive Plan, MIP] Key Participants' (defined hereinafter) share of up to 25% of Residual Pool (as described below).

g) Seventh, the remaining balance of the Net Arbitration Proceeds may be paid to the Applicant, subject to applicable law, and subject to payment of certain fees of the Trustee provided for in accordance with the terms of the Standstill Order.

**The Applicant shall make payments on account of Net Arbitration Proceeds** to the DIP Lender, the Key Participants and the Applicant in accordance with applicable law, **pari passu and pro rata, based on the percentage of their entitlements to the Net Arbitration Proceeds**.

[Emphasis added.]

## B.  Common Law & Statutory illegality

The Agreement is premised on a DIP loan that gives rise to Additional Compensation based on a percentage of the Net Arbitration Proceeds (NAP, defined in A.5.e. above) predicated on the success of the Company's claim against Venezuela (the Republic) in the Arbitration Proceeding. The initial NAP percentage was established at 35% and increased to 88% as a result of the DIP loan increasing from US$ 36 million to close to $US 76 million. The remaining 12% is to be shared between the MIP participants (25%) and the Company. The 75% of the residual NAP amount allocated to the Company will be used to pay trustee and other fees, and the rest, if any, is presumably the shareholders' residual value in the Company.

As set forth in the section Relevant Elements of the Agreement above (A. 1. through 5.), Tenor's Additional Compensation is conditioned on the Company receiving a) *"Arbitration Proceeds"* from b) the amount awarded (*"Arbitration Entitlement"*) through c) the *"Arbitration Proceeding"* at the ICSID on account of its claims asserted against the Republic for the expropriation of the Las Cristinas mines.

The terms of the *Order of Application of Arbitration Proceeds* (Mechanics of Distribution) require that Legacy Assets (i.e. assets not part of the Company's arbitration claim against the Republic) worth an estimated US$ 500 million be included in the NAP distribution even though these assets are not part of the ICSID Arbitration Proceeding and award and, therefore, not subject to the terms of the Agreement.

The Legacy Assets include the Las Cristinas mines mining data and the tax loss carry forward benefits. The former was owned by KRY and was in its possession when the ICSID arbitration request was filed and, therefore, not included in it, nor claimed by Venezuela. Two Canadian gold mining companies also expropriated by Venezuela and issued an arbitration award by the ICSID entered into settlement agreements which include payment for the mining data above and beyond the ICSID award amount (Gold Reserve - USD 240 million to be paid before the award amount, and Rusoro Mining – amount undisclosed).

Here is important to point out the following statements by Mr. Robert Fung, the Company's Chairman and CEO, in a letter dated May 23, 2016 to Mr. Eulogio Del Pino, then Venezuelan Minister of Energy and President of PDVSA. In his letter, Mr. Fung indicated...

*"The willingness of the company it represented to negotiate on terms beneficial to both parties, the assignment and transfer to PDVSA of all the information related to the design, geology, engineering and environment (Data) developed by the technical team of the Canadian mining company and by others independent firms for the execution of the Las Cristinas project."*

*"The elaboration of the Data represented a considerable investment of resources for KRY, and will greatly facilitate the capacity of PDVSA, through the operator that it designates, to make the Las Cristinas mining project a reality, in a time and at a reduced cost."*

*"Beyond setting a monetary value for the transfer of the Data", Crystallex is willing to include the transfer of the Data as an integral part of the negotiation of the terms and conditions of the issue of the Bond or Bonds contained in the previous [settlement] proposals ".*
[Emphasis added.]

The two settlement agreements signed by the Company and Venezuela in November 2017 and 2018 obviated the need to discuss the value assigned to the mining data, in line with Mr. Fung's assertion about the Company's willingness to include it as "an integral part of the negotiation". In both settlement agreements (each for approximately $US 1.2 billion) the Company forgo the value of the mining data ($US 300 million), the pre-award interest ($US 200 million) and the post-award interest ($US 130 million through December 2018).

Likewise, the tax loss carryforward benefits that accrued to the Company from the losses it incurred as a result of the expropriation by the Republic is a Legacy Asset, and, therefore, not subject to the terms of the Agreement. A long-standing tax policy in Canada is that tax loss carryforward can only be used by the taxpayer, the Company in this case, for the benefit of the shareholders that incurred the losses. The Company reported in the ICSID arbitration proceedings the total investment / loss due to the expropriation at $US 645 million. The cost of the award collection efforts and those arising from the CCAA proceedings are estimated at US$ 300 million. Hence, the total loss carry-forward is estimated at $US 945 million.

The Canadian Tax Code provides for the expiration of the tax losses once there is a change in control.[1] The Company granted Tenor the right to convert its share of the NAP into common stock, which would eliminate the tax loss carryforward benefit upon conversion. However, the Mechanics of Distribution in the Agreement effectively bundled the tax loss carryforward benefits (estimated at over $US 100 million) into the NAP, which is to be distributed to DIP Lender, the MIP participants and the shareholders on a pari passu and pro rata basis. In so doing, The Agreement pursues to bypass section 245 - General Anti-Avoidance Rule (GAAR) - of the Canadian Income Tax Act.

Further, the Mechanics of Distribution provides under 5.d.i) and ii) for payment of post-filing interest on the unsecured debt and was reaffirmed by Justice Newbould in the Standstill Order dated June 5, 2013. A year later, in Nortel, Justice Newbould determined that the Interest Stops Rule in the Business Insolvency Act (BIA) also applied to the CCAA proceedings. The Ontario Court of Appeals (ONCA) affirmed Justice Newbould's decision in 2015. In 2016, the Supreme Court of Canada (SCC) denied leave to appeal the ONCA ruling and the applicability of the Interest Stops Rule in CCAA proceedings became mandatory authority.[2]

It is axiomatic that judges do not make law; they only discover, interpret and apply it. The Interest Stops doctrine was codified in section 122(2) of the BIA since its enactment in 1985. Justice Newbould

---

[1] *See: Tax Planning with Losses in Canada, Steve Suarez, Tax Notes International, August 1, 2005, and 594710*

[2] See: Nortel Networks Corporation (Re), 2015 ONCA 681

discovered and interpreted that the Interest Stop Rule in the BIA applied to the CCAA proceedings and applied in the *Nortel* ruling in 2014. As established by the SCC British Columbia v. Imperial Tobacco Canada Ltd.[3]...

 *"[T]here is no requirement of legislative prospectivity embodied in the rule of law or in any provision of our Constitution. . .*

*The absence of a general requirement of legislative prospectivity exists despite the fact that retrospective and retroactive legislation can overturn settled expectations and is sometimes perceived as unjust."*

Hence, the Interest Stops Rule applicability in CCAA proceedings is deemed to have come into force when the BIA was enacted by Parliament in 1985. Consequently, any later adjudicatory rights granted in equity under Judicial discretion in contravention of the Interest Stops Rule are void and null ab initio. Since equity follows the law, the equitable relief provided to the unsecure noteholders in the Agreement and affirmed by the Standstill Order was in error. A court sitting in equity cannot depart from substantive rules of law when rendering a decision.

The Mechanics of Distribution is an integral and fundamental part of the Agreement and the terms set forth in it make it illegal at Common Law as misappropriation of assets regarding the mining data. In addition, Income Tax Act (ITA) policy limits tax loss carryforward benefits to those who incurred the underlying loss in the first place and makes it illegal to transfer these to third parties when such transfer circumvents the statute put in place to enforce the underlying legislative policy.

The illegality of the Agreement as a result of the breaches of Common and Statutory Law makes it unenforceable and compels the CCAA Court, the Company, Tenor, the Monitor or other interested parties to declare it void, given the basic and fundamental elements at issue and its significance to the overall Agreement.

The Agreement reflects other breaches of law whose discussion is better left for another more opportune occasion.

Sincerely,

Adelso A. Adrianza

---

[3] *See: British Columbia v. Imperial Tobacco Canada Ltd., 2005 SCC 49, at paragraphs 69 and 71, per Major J.*

cc: The Honorable Judge L. Selber Silverstein, U.S. District Court for the District of Delaware – via Certified letter

Mr. David Byers - via email (dbyers@stikeman.com)

Mr. Robert Chadwick – via email (rchadwick@goodmans.ca)

Mr. Alexander Cobb – via email (acobb@osler.com)

Mr. Robert Fung – via email (rfung@crystallex.com)

Mr. Harry J. Near - via email (info@earnscliffe.ca)

Mr. Timothy Pinos – via email (tpinos@casselsbrock.com)

Mr. Clifton Prophet - via email (Clifton.Prophet@Gowlings.com)

Mr. Jay A. Swartz - via email (JSwartz@DWPV.com)