11-14074-155

**ADELSO A. ADRIANZA**

4 Repton Cir. Unit 4210, Watertown, MA 02472
M: (859) 803-2279 | aaadrianza@gmail.com

September 6, 2023

The Honorable
Judge Leonard Stark
U.S. Judge For The Third Circuit Court of Appeals
c/o Office of the Clerk
United States District Court
844 North King St., 4th. Floor
Wilmington, DE 19801-3570



Dear Judge Stark,

This letter is in reference to Crystallex International Corporation, Case 1:17-mc-00151-LPS) and regarding the pending execution of its collection judgment against Venezuela and in reference to its response to the Special Master's request for information on the outstanding amount of the judgement to be collected (D.I. 680). The company's response compelled me to write this letter as an effort to protect the legal and equitable interests of its bankruptcy estate and the shareholders, its residual owners. It has a specific objective: to expand on the reasons why the undersigned asserts the company is abandoning legal and equitable rights by not pursuing full payment of the ICSID Award and the costs and expenses consequential to the Republic's failure to honor it.

The undersigned listed and discussed the remedies the company is entitled to in a previous communication to the Court (D.I. 556). These include:

I. the post-award interest set forth by the ICSID arbitration panel, the Delaware code or the contractual rate in the second settlement contract;
II. payment in full of the Award via effectively realizable and freely transferable funds,
III. restitution of the costs and expenses incurred in enforcing the collection of the Award, giving the Republic's failure to comply with the "final and binding" terms of the Canada – Venezuela bilateral investment treaty (BIT) and the ICSID convention regulations and rules, the Delaware code, and the second settlement contract,
IV. the gifting and transfer of estate property for less than its fair value.

The present communication deals only with the first three items above, given that the fourth item can be best dealt with in the Chapter 15 proceeding.

Two key facts need to be made clear from the outset. First, in their response to the Special Master's request, all the judgement creditors claimed post-judgement interest pursuant to 28 U.S.C. § 1961; i.e., the weekly average one-year constant maturity nominal Treasury yield, a.k.a., the federal Judgement interest rate (FJIR). Separately, Rusoro Mining indicated in a press release that it intends to pursue in an appropriate jurisdiction any difference in value between the U.S. Judgement and the Award as a result of the different interest rates. None of the judgement creditors claimed in their response the right and intent to recover the legal costs and expenses incurred in the protracted collection process. Second, the undersigned is not a legal practitioner and is acting pro se. As such, the assertions below are made with the greatest due respect to the

learned judges and legal counsel that have pondered over this matter long and hard. In this context, the undersigned believes that the court rulings disallowing the post-award interest granted in awards under the ICSID and the New York conventions result from the misapprehension of their scope and reach, and the role and responsibilities of the contracting states that accede to these treaties.

## I.   THE LEGAL FRAMEWORK

## A.   The ICSID Convention Treaty

## 1.   Scope and Reach

The U.S. ratified the ICSID Convention treaty in October 1966 and Congress enacted 22 U.S.C. § 1650 as its enabling statute; thus, making it part of the "supreme laws of the land".[1] In enacting the statute, Congress chose to mirror the tenor, resoluteness, and finality of the ICSID Convention treaty:

> (a) Treaty rights; enforcement; full faith and credit; nonapplication of Federal Arbitration Act
>
> An award of an arbitral tribunal rendered pursuant to chapter IV of the convention _shall_ create a right arising under a treaty of the United States. The pecuniary obligations imposed by such an award _shall_ be enforced and _shall be given the same full faith and credit_ as if the award were a final judgment of a court of general jurisdiction of one of the several States. The Federal Arbitration Act (9 U.S.C. 1 et seq.) shall not apply to enforcement of awards rendered pursuant to the convention.
> [Emphasis added.]

## 2.   Full Faith and Credit

Article IV of the U.S. Constitution provides that:

> "Acts, records and judicial proceedings shall have the same full faith and credit in every court within the United States and its Territories and possessions as they have by law or usage in the courts of such State, Territory, or Possession from which they are taken."[2]

Congress extended that obligation to federal courts by statute (28 U.S. Code § 1738), requiring them to grant full faith and credit to state court judgments. As a consequence:

> If Article 54 binds courts to recognize judgments of ICSID tribunals, Article 53 binds litigants to ICSID awards, obligating them to respect and honor the decision. As one noted commentator has put it, "Article 53 thus establishes a complete parallelism between the obligation to comply with the award and the possibility of enforcement of that obligation through domestic courts". In fact, Article 53 goes further than Article 54 in that the former

---

[1] U.S. Constitution, _Article VI_ (the "supremacy clause"). Three items are listed as _the supreme law of the land_: the Constitution; laws of the national government (when consistent with the Constitution); and treaties.

[2] 28 U.S. Code, Section 1738.

renders an award res judicata as to all its provisions, while the forcible execution in the latter is limited to the pecuniary obligations.[3]

Article 53 thus establishes the doctrine of res judicata for ICSID tribunal awards. The binding nature of these awards on the parties is a component of the full faith and credit obligation. To paraphrase the Supreme Court, by the provision for full faith and credit, the local doctrine of res judicata becomes part of international jurisprudence.

Taken together, Articles 53 and 54 require, at a minimum, that the parties and the enforcing national court give res judicata effect to the ICSID award. Having litigated and lost a question in one competent tribunal, the party cannot re-litigate the same question in another forum.

The award is binding on the same parties, both in that international forum and any national signatory forum.[4]

[Emphasis added.]

## B.  The Federal Arbitration Act (9 U.S.C. §§ 1-16)

The Federal Arbitration Act (the "FAA") statute was enacted in 1925 to provide basic legal principles applicable to arbitration in the U.S. Its core principle is that arbitration agreements involving interstate or foreign commerce must be considered:
- Valid.
- Irrevocable.
- Enforceable, except on legal or equitable grounds for the revocation of a contract.

Under the FAA, an arbitrator's decision binds the parties unless the arbitration or the arbitrator was fundamentally unfair. All fifty U.S. states and the District of Columbia have enacted arbitration laws of their own to address issues that the FAA does not address. The FAA consists of three chapters. Chapter 1 of the FAA (9 U.S.C. §§ 1-16) contains the general principles applicable to all arbitrations that fall under the FAA; provided that it is not in conflict with the other chapters. It provides that the FAA applies to any arbitration agreement that:
- Is in writing.
- Relates to a maritime transaction or a transaction involving interstate or foreign commerce.

An arbitration award is deemed valid and enforceable save for the grounds listed in the statute for its annulment or modification:

§11. Same; modification or correction; grounds; order
In either of the following cases the United States court in and for the district wherein the award was made may make an order modifying or correcting the award upon the application of any party to the arbitration—
(a) Where there was an evident material miscalculation of figures or an evident material mistake in the description of any person, thing, or property referred to in the award.

---

[3] Roger P. Alford, Federal Courts, International Tribunals, and the Continuum of Deference, 43 Va. J. Int'l L. 675 (2003), p. 692.

[4] Id., p. 693.

(b) Where the arbitrators have awarded upon a matter not submitted to them, unless it is a matter not affecting the merits of the decision upon the matter submitted.

(c) Where the award is imperfect in matter of form not affecting the merits of the controversy.

<u>The order may modify and correct the award, so as to affect the intent thereof and promote justice between the parties</u>.

## C.  The New York Convention

## 1.  Scope And Reach Of The Convention

The United States acceded to the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards in 1970 and incorporated its enabling statute to the FAA as Chapter 2 (9 U.S.C. §§ 201-208). The recognition and enforcement of foreign / non-domestic arbitration awards is controlled by Article III of the Convention:

> Each Contracting State shall recognize arbitral awards as binding and enforce them in accordance with the rules of procedure of the territory where the award is relied upon, under the conditions laid down in the following articles. There shall not be imposed substantially more onerous conditions or higher fees or charges on the recognition or enforcement of arbitral awards to which this Convention applies than are imposed on the recognition or enforcement of domestic arbitral awards.

U.S. courts have ruled that arbitral awards under the NY Convention have res judicata effect. Although the convention does not expressly speak to the res judicata effect of an international arbitral award, it reflects the principle that until it is successfully challenged, an arbitral award presumptively establishes the rights and liabilities of the parties to the arbitration. Specifically, the convention provides that subject to its enforcement provisions, "[e]ach Contracting State shall recognize arbitral awards as binding and enforce them in accordance with the rules of procedure of the territory where the award is relied upon." N.Y. Conv. art. 3.[5] (internal citation omitted).

> In fact, the Convention acknowledges that foreign awards can serve as res judicata in secondary jurisdictions, and accordingly provides for the "recognition" of an award, in addition to the more commonly invoked enforcement. See Convention, arts. III-V. Recognition typically occurs "in a court action between the same parties on the same subject matter as decided in the foreign award." VAN DEN BERG, supra, at 244. In such a case, "the defendant requests the recognition of the award by invoking its effect of res judicata . . ."[6]

Article VII (a.k.a. "the most favorable provision") enables the recognition and enforcement of foreign arbitral awards by indicating that that contracting states will not breach the convention by enforcing arbitral awards pursuant to more favorable provisions enacted in the domestic laws:

---

[5] *American Express Bank Ltd. v. Banco Español De Crédito, S.A.*, 597 F. Supp. 2d 394 (S.D.N.Y. 2009)

[6] *Gulf Petro v. Nigerian Nat*, 512 F.3d 742 (5th Cir. 2008), at 745. Citing Albert Jan Van Den Berg, The New York Arbitration Convention Of 1958: Towards A Uniform Judicial Interpretation 350 (1981)

The provisions of the present Convention shall not affect the validity of multilateral or bilateral agreements concerning the recognition and enforcement of arbitral awards entered into by the Contracting States nor deprive any interested party of any right he may have to avail himself of an arbitral award in the manner and to the extent allowed by the law or the treaties of the country where such award is sought to be relied upon.

[Emphasis added.]

Per § 307- Application, Chapter 1 (Domestic Arbitration) applies to actions and proceedings brought under Chapter 2 (the New York Convention) to the extent that the former is not in conflict with the latter.

## 2. The UNICITRAL's Understanding of the Scope and Reach of the Convention

Excerpts from the UNCITRAL Secretariat Guide on the Convention on the Recognition and Enforcement of Foreign Arbitral Awards:

Introduction

The New York Convention sets a maximum level of control at the recognition and enforcement stage.[7]

5. The conditions for recognition and enforcement in the Convention establish a "ceiling", or maximum level of control, which Contracting States may exert over arbitral awards and arbitration agreements. On the other hand, Contracting States are free to apply more liberal rules than those set forth in the Convention. The Convention's aim is not to limit the pre-existing freedom of the Contracting States to treat foreign arbitral awards or arbitration agreements as favourably as they please, but rather to facilitate their recognition and enforcement to the greatest extent possible.

6. The New York Convention's pro-enforcement policy is enshrined at article VII (1), which is considered to be one of its cornerstones.[5] Known as the "more favourable-right" provision, article VII(1) provides that, in addition to the Convention, a party seeking recognition and enforcement shall not be deprived of the right to rely on a more favourable domestic law or treaty. In accordance with article VII (1), a Contracting State will not be in breach of the Convention by enforcing arbitral awards and arbitration agreements pursuant to more liberal regimes than the Convention itself.

Article III - Introduction[8]

4. The first principle is that, while the recognition and enforcement of foreign arbitral awards under the Convention shall be conducted "in accordance with the rules of procedure of the territory where the award is relied upon", the "conditions" under which recognition and enforcement

---

[7] UNCITRAL Guide on the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (New York 1958), 2016 Edition, p.2.

[8] Id., p. 78.

of foreign awards can be granted are exclusively governed by the Convention.

5. The second principle is that the national rules of procedure governing the recognition and enforcement of foreign arbitral awards in each Contracting State shall not impose "substantially more onerous conditions or higher fees or charges on the recognition or enforcement of arbitral awards to which this Convention applies than are imposed on the recognition or enforcement of domestic arbitral awards."

General principle

a. Obligation to recognize arbitral awards as binding and [to] enforce them.[9]

12. Although article III does not expressly provide that arbitral awards have res judicata effect, a number of national courts have ruled that it has such as consequence in practice. For example, a United States court ruled that "[t]hough the convention does not expressly speak to the res judicata effect of an international arbitral award [...] it reflects the principle that until it is successfully challenged, an arbitral award presumptively establishes the rights and liabilities of the parties to the arbitration."[380] This view is equally shared in commentary on the New York Convention.[381]

[Emphasis added.]

## 3. The Merger Doctrine

The merger doctrine is a common law doctrine that is purported to apply to all money judgments recovered in a federal district court. In civil procedure, the doctrine of merger is the notion that a final judgment for the plaintiff brings together all parties' claims involved in the lawsuit. As a result, the judgement creditor can only enforce the judgment awarded and cannot bring any of the claims again regardless of whether it deems it inadequate or has a new legal theory. The defendant, in turn, is prevented from putting forward any counterclaims or defenses. The resulting effect of a final judgment is called merger. U.S. federal courts often predicate decisions on the recognition and enforcement of arbitral awards on the merger doctrine to set the applicable post-judgement interest rate, which they deem to abrogate the res judicata effect of the foreign / non-domestic arbitration panel's award decisions.

The U.S. Courts generally set interest rates on both domestic and non-domestic arbitration awards based on 28 U.S.C. 1961 - the post-judgment interest rate:

### OI European Grp. B.V. v. Venezuela[10]

The language of § 1961 is "mandatory" and "[i]ts terms do not permit the exercise of judicial discretion in its application." However, the "parties may contract to, and agree upon, a post-judgment interest [rate] other than that specified in § 1961." To do so, they must express their intent to

---

[9] Id., pp. 80-81.

[10] OI European Grp. B.V. v. Bolivarian Republic of Venez., Civil Action No. 16-1533 (ABJ) (D.D.C. May. 21, 2019), p. 12.

replace the federal interest rate through "clear, unambiguous and unequivocal language."

Plaintiff argues that the cases cited above do not apply in this case because the precedent "originates in Federal Arbitration Act cases," and the FAA does not apply to ICSID awards. But the merger doctrine and whether or not § 1961 applies does not find authority in the FAA – it is a common law doctrine that applies to all money judgments recovered in a federal district court. And the ICSID Convention provides that "courts shall treat the award as if it were a final judgment of the courts of a constituent state." If the award were simply self-executing as written, then plaintiff would not have had to come into court and request that a judgment be entered.

*But see...*

### Mobil Cerro Negro, Ltd. V. Venezuela

In a separate motion, Venezuela asked the District Court to "clarify" the interest rate imposed by the ex parte judgment, which had incorporated the 3.25% post-judgment interest rate provided for by the Award. The court denied the motion, concluding that any change to the post-judgment interest rate would constitute a substantive revision to the Award and that such revisions are contrary to the ICSID Convention and Section 1650a. (Internal citations omitted).[11]

### D. Post Judgement Interest

Section 1961 of Title 28 - Judiciary and Judicial Procedure, sets forth the interest rate to be levied on "judgements recovered in the courts of the State" based on the weekly average one-year constant maturity Treasury yield published by the Federal Reserve System (post-judgement interest rate or PJIR):

> (a) Interest shall be allowed on any money judgment in a civil case recovered in a district court. Execution therefor may be levied by the marshal, in any case where, by the law of the State in which such court is held, execution may be levied for interest on judgments recovered in the courts of the State. Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment. The Director of the Administrative Office of the United States Courts shall distribute notice of that rate and any changes in it to all Federal judges.

### G. The Bilateral Investment Treaty (BIT)

---

[11] *Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venez.*, 863 F.3d 96 (2d Cir. 2017), p. 28.

The central purpose of a BIT is to "remove [investor] claims from the inter-State plane and to ensure that investors could assert rights directly against a host State."[12]

In Crystallex' case, the arbitration award was issued in compliance of the Canada – Venezuela BIT under the ICSID Additional Facility Rules, which established the bases for the arbitration panel's decision:

Article VII: Expropriation

1. Investments or returns of investors of either Contracting Party shall not be nationalized, expropriated or subjected to measures having an effect equivalent to nationalization or expropriation (hereinafter referred to as "expropriation") in the territory of the other Contracting Party, except for a public purpose, under due process of law, in a non-discriminatory manner and against prompt, adequate and effective compensation. Such compensation shall be based on the genuine value of the investment or returns expropriated immediately before the expropriation or at the time the proposed expropriation became public knowledge, whichever is the earlier, shall be payable from the date of expropriation with interest at a normal commercial rate, shall be paid without delay and shall be effectively realizable and freely transferable.

Article XII: Settlement of Disputes between an Investor and the Host Contracting Party

4. The dispute may, by the investor concerned, be submitted to arbitration under:

(a) The International Centre for the Settlement of Investment Disputes (ICSID), established pursuant to the Convention on the Settlement of Investment Disputes between States and Nationals of other States, opened for signature at Washington 18 March, 1965 (ICSID Convention), provided that both the disputing Contracting Party and the Contracting Party of the investor are parties to the ICSID Convention; or

(b) The Additional Facility Rules of ICSID, provide that either the disputing Contracting Party or the Contracting Party of the investor, but not both, is a party to the ICSID Convention; or Additional Facility Rules of ICSID, provided that either the disputing Contracting Party or the Contracting Party of the investor, but not both, is a party to the ICSID Convention; or

In case neither of the procedures mentioned above is available, the investor may submit the dispute to an international arbitrator or ad hoc arbitration tribunal established under the Arbitration Rules of the United Nations Commission on International Trade Law (UNCITRAL).

7. A tribunal established under this Article shall decide the issues in dispute in accordance with this Agreement and applicable rules of international law. An interpretation of this Agreement to which both Contracting Parties have agreed shall be binding upon the tribunal.

---

[12] Corn Products International, inc. v. the United Mexican States, ICSID Case No. arb (af)/04/05, Decision on Responsibility (2008), para. 161,

9. <u>A tribunal may award, separately or in combination, only:</u>
<u>(a) Monetary damages and any applicable interest;</u>

(b) <u>Restitution of property, in which case the award shall provide that the</u> <u>disputing Contracting Party may pay monetary damages and any</u> <u>applicable interest in lieu of restitution.</u>

<u>A tribunal may also award costs in accordance with the applicable</u> <u>arbitration rules.</u>

10. <u>An award of arbitration shall be final and binding. Each Contracting</u> <u>Party shall provide for the enforcement of an award in its territory</u>.

[Emphasis added.]

## H. The ICSID Convention And The Additional Facility Rules

Per the ICSID Convention Rules and Regulations:

The ICSID Additional Facility offers arbitration and conciliation for certain disputes that fall outside the scope of the ICSID Convention. Specifically, arbitration or conciliation of investment disputes is available in situations where one—or neither—of the parties is an ICSID Member State or a national of an ICSID Member State. As such, the Additional Facility differs from arbitration and conciliation under the ICSID Convention—which requires that the parties are an ICSID Member State and a national of one.

In January 2012, Venezuela issued a written notice of denunciation of the ICSID Convention and renounce it after the two-year sunset period. The Crystallex arbitration proceedings took place under the Additional Facility Rules (AFRs), which are applicable to disputes between non-member states and private investors. Recognition and enforcement of arbitration awards under the AFRs are governed by Chapter 2 of the FAA - Recognition And Enforcement Of Foreign Arbitral Awards.

## I. Applicable Law

The ICSID Convention (Art. 42(1)) stipulates that the arbitration tribunal shall apply "the law of the Contracting State party to the dispute (including its rules on the conflict of laws)", while the ICSID Convention Additional Facility Rules (Art. 54(1)) states that it shall apply the "law determined by the conflict of laws rules which it considers applicable". In addition, both indicate that tribunal shall also apply "such rules of international law as may be applicable."

## 1. The Full Reparation Principle

The principle under customary international law of full reparation enunciated in the Chorzów Factory decision by the Permanent Court of International Justice (PCIJ) applies to the assessment of damages for unlawful expropriation and other breaches of investment treaties; the most important being the breach of the fair and equitable treatment (FET) standard. The Chorzów Factory case in 1928 established that under customary international law a state should provide "full reparation" to investors for harm caused by internationally wrongful facts. The PCIJ articulated what is now defined as the full reparation standard as follows:

> "The essential principle contained in the actual notion of an illegal act – a principle which seems to [be] established by international practice and in particular by the decisions of arbitral tribunals – is that reparation must, as far as possible, wipe out all the consequences of the illegal act and re-establish the situation which would, in all probability, have existed if that act had not been committed. Restitution in kind, or, if this is not possible, payment of a sum corresponding to the value which a restitution in kind would bear; the award, if need be, of damages for loss sustained which would not be covered by restitution in kind or payment in place of it."[13]

In Siemens v. Argentina, the ICSID Arbitration Tribunal distinguished the application of the principle on legal versus illegal acts under international law and held that:

> "The key difference between compensation under the Draft Articles and the Factory at Chorzów case formula, and Article 4(2) of the Treaty is that under the former, compensation must take into account "all financially assessable damage" or "wipe out all the consequences of the illegal act" as opposed to compensation "equivalent to the value of the expropriated investment" under the Treaty. Under customary international law, Siemens is entitled not just to the value of its enterprise as of May 18, 2001, the date of expropriation, but also to any greater value that enterprise has gained up to the date of this Award, plus any consequential damages."[14]

## 2. Pacta Sunt Servanda

Pacta sunt servanda ("agreements must be kept") is arguably the oldest principle of international law. Without such a rule, no international agreement would be binding or enforceable.

> Vienna Convention On The Law Of Treaties
> Observance Of Treaties Article 126. "PACTA SUNT SERVANDA"
> Every treaty in force is binding upon the parties to it and must be performed by them in good faith. A party may not invoke the provisions of its internal law as justification for its failure to perform a treaty.
>
> [Emphasis added.]
>
> "Where fairly possible, a United States statute is to be construed so as not to conflict with international law or with an international agreement of the United States."[15]
>
> "If an action is brought in a U.S. district court to enforce the final judgment of a State court, it is, of course, given full faith and credit in the Federal court. Section 1650(a) would give the same status to an arbitral award".[16]

---

[13] Factory at Chorzow (Germany v Poland), Merits, 1928 PCIJ (Ser.A) No.17 (13 Sept. 1928), at 125.

[14] Siemens AG v Argentine Republic, ICSID Case No. ARB/02/8, Award (6 Feb. 2007), at 355.

[15] Restatement (Third) of Foreign Relations Law § 114 (1987).

[16] S. REP. No. 89-137(1966), reprinted in 1966 U.S.C.C.A.N. 2617, Statement of Fred B. Smith, Department of the Treasury, Before the Senate Foreign Relations Comm.

## II.  LEGAL ARGUMENT

Arbitration panel decisions under the ICSID and the New York Conventions follow the international law foundational principle of reparation set forth by the Chorzów Factory decision by the PCIJ. Under this principle, pre-judgment interest serves two purposes: 1) it compensates the judgement creditor for the loss of the use of the money owed, a.k.a. the time-value of money, and 2) requires the restitution of the benefit that the judgement debtor has obtained by retaining the Judgement creditor's money until final payment. Post-judgment interest is awarded to compensate a judgement creditor for having been deprived of the time-value of the money owed starting from the judgment date until the judgement creditor is actually paid. Hence, pre-judgment and post-judgment interest serve exactly the same purpose: to make the judgement creditor whole for having been deprived of the time-value of the money owed.

The parties in an arbitration under the ICSID Convention and the Additional Facility Rules delegate all arbitrability questions to the arbitration tribunal, whose decision is manifestly "final and binding," which the parties agree to abide by. The Canada – Venezuela BIT, which is still in force, stipulates:

> 9. A tribunal may award, separately or in combination, only:
> (a) Monetary damages and any applicable interest;

The Supreme Court held in *Henry Schein, Inc. v. Archer & White Sales, Inc.* that

> We must interpret the [FAA] Act as written, and the Act in turn requires that we interpret the contract as written. When the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract. In those circumstances, a court possesses no power to decide the arbitrability issue.[17]

> But if a valid [arbitration] agreement exists, and if the agreement delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue.[18]

The application of § 1961(a) to arbitration award enforcements under the New York and ICSID Conventions is a misapprehension of the intent and commitments made by the U.S. in acceding to treaties and enacting them into law, and the scope and reach of the authority vested in the federal courts. First, it ignores the *pact sunt servanda* principle of international law that governs treaties. And second, Congress did not vest federal district courts with the authority to alter substantive matters decided by the arbitrators under the agreement and rules agreed to by the contracting parties to settle their dispute. It is well-settled that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."[19] Upon its validation and registration by the District Court, an arbitration award is perfected and enforceable according to the decision of the arbitration panel

---

[17] Henry Schein, Inc. v. Archer & White Sales, Inc., 586 U.S. (2019), p. 5.

[18] *Id., p. 6.*

[19] *Scherk v. Alberto-Culver Co.* 417 U.S. 506 (1974), at 507. Citing The Bremen v. Zapata Off-Shore Co., 407 U. S. 1, 407 U. S. 9. P. 417 U. S., at 520.

under the terms of the arbitration agreement. Per the U.S. Supreme Court in *Clearfield Trust Co. v. United States*:

> "[T]he right to recover is a quasi-contractual right, resting upon the doctrine that one who confers a benefit in mis-reliance upon a right or duty is entitled to restitution."[20]

Applying § 1961(a) in the enforcement of non-domestic arbitration awards under the New York and ICSID conventions is impermissible on several levels. First, the arbitrator's decision on pecuniary awards is a substantive matter decided on the merits and the agreement between the parties. In the Crystallex case, the parties agreed to settle their private investment dispute based on the Canada – Venezuela BIT, which controls the venue, procedure, scope and reach of the arbitrator's authority to settle the dispute. Having established the framework under which to settle their dispute, submitting it to arbitrators for resolution, and exhausting all available recourse to annul or change the decision of the arbitration tribunal, the decision is binding and "... is valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."[21] The defendant's failure to abide by the arbitration tribunal's decision gives the plaintiff the right to enforce it under the governing law and treaty. Once the award is reviewed and registered by the District Court, its enforcement takes a procedural scope under the applicable statute.

Second, a courts' application of the merger doctrine and § 1961(a) on treaty-based judgement collections in federal courts is an overreach of its authority. This is the case for several reasons: a) Congress did not explicitly incorporate the applicability of § 1961 to judgements under the ICSID and New York conventions treaties. Congress' incorporation of an explicit proviso in a statue enabling an international treaty, or lack thereof, circumscribes the federal court's authority. Supreme Court precedent and well-establish cannons of statutory construction underscore this limitation:

- The fundamental objective in statutory construction is to determine and carry out the intent of the Legislature;
- Courts will give effect to a statute's plain meaning and assume the Legislature means exactly what it says;
- If statutes are in conflict, the more specific statute will prevail over the general statute unless there is legislative intent for the general statute to control;
- Statutes are construed to avoid absurd results.

Several Circuit Courts have held that once a federal court confirms an arbitral award, the award merges into the judgment, and the federal rate of post-judgment interest presumptively applies, based on the common law doctrine of merger.[22] The language of § 1961 is "mandatory" and "[i]ts terms do not permit the exercise of judicial discretion in its application."[23] However, the "parties may contract to, and agree upon, a post-judgment interest [rate] other than that specified

---

[20] *Clearfield Trust Co. v. United States*, 318 U.S. 363 (1943), *at 369.*

[21] *Scherk v. Alberto-Culver, supra* note 18, *at 507.*

[22] See, e.g., *Tricon Energy Ltd. v. Vinmar Int'l, Ltd.*, 718 F.3d 448, 456–60 (5th Cir. 2013); *Newmont U.S.A. Ltd. v. Ins. Co. of N. Am.*, 615 F.3d 1268, 1275–77 (10th Cir. 2010); Fid. Fed. Bank, FSB v. Durga Ma Corp., 387 F.3d 1021, 1023–24 (9th Cir. 2004).

[23] *Carte Blanche (Sing.) Pte., Ltd. v. Carte Blanche Int'l, Ltd.,* 888 F.2d 260, 268–70 (2d Cir. 1989)

in § 1961."[24]  To do so, they must express their intent to replace the federal interest rate through "clear, unambiguous and unequivocal language."[25] For this to be the case, according to the courts, the arbitration panel's award decision must explicitly indicate the  applicable "post-judgement" rate; failing this, § 1961 applies. Customarily, arbitration tribunals set post-award interest rates by writing "[t]he Respondent is ordered to pay post-award interest on the [award amounts listed] above at the rate of…, calculated from the date of the Award until full payment," which is deemed to fail the courts' explicitness requirement. Hence, although the award is binding and final, and parties agree to abide by it, how the arbitration panel labels it presumptively makes it unenforceable by a federal court reviewing its validity.

In *NEWMONT USA v. Insurance Co. of North America*, the 10th. Circuit concluded that …

> While [§ 1961] employs mandatory language, . . . this is aimed mainly at precluding district courts from exercising discretion over the rate of interest or adopting an interest rate set by arbitrators, not at limiting the ability of private parties to set their own rates through contract.[26]

The courts' conclusion that the merger doctrine and § 1961 apply to non-domestic arbitration judgements absent a specific agreement on the applicable "post-judgement" interest rate is not supported by the letter and spirit of the conventions, the controlling arbitration agreement, or the intent of the parties. First, it assumes that the court has the authority to alter the substantive decisions of the arbitration panel. As discussed above, the arbitration panel's authority is grounded in the consent of the parties to resolve their differences through arbitration that is final and binding on the parties. On a question of arbitrability, the Supreme Court concluded that just as the arbitrability of the merits of a dispute depends upon whether a party agrees to arbitration, the question of who has the primary power to decide arbitrability "turns upon what the parties had agreed about that matter."[27] Thus, arbitrability is governed by the rules of the agreed upon arbitration agreement. The enabling statute of the ICSID convention provides that "[t]he pecuniary obligations imposed by such an award shall be enforced and shall be given the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several States." The Second Circuit concurred with this reading in *Mobil Cerro Negro,* noting that ICSID "determinations are final" and national courts "may review such awards solely to confirm their authenticity."[28]

Arbitration under the New York Convention, in turn, is understood to have res judicata effect once recognized by the District Court. In *GE Energy Power Conversion France SAS Corp. v. Outokumpu Stainless USA,* a Supreme Court unanimous decision, the Court concluded that "Nevertheless, courts applying domestic non-signatory doctrines to enforce arbitration agreements under the Convention must strictly adhere to "the foundational FAA principle that arbitration is a matter of consent."[29] The Court reached two other important conclusions regarding arbitration enforcement under the FAA. First, "[t]he Convention is simply silent on the issue of non-

---

[24] *Soc'y of Lloyd's v. Reinhart*, 402 F.3d 982, 1004 (10th Cir. 2005).

[25] *Westinghouse Credit Corp. v. D'Urso*, 371 F.3d 96, 102 (2d Cir. 2004), at 102.

[26] *NEWMONT USA v. Insurance Co. of North America*, 615 F.3d 1268 (10th Cir. 2010), at 1277.

[27] *First Options of Chicago, Inc. v. Kaplan*, 115 S. Ct. 1920, 1923.

[28] *Mobil Cerro Negro*, *supra* note 11, p. 10.

[29] *GE Energy Power Conversion France SAS v. Outokumpu Stainless USA, LLC*, 590 U.S. (2020), Pp. 1-2. Citing *Stolt-Nielsen*, 559 U. S., at 684. (Sotomayor J. concurring Opinion).

signatory enforcement, and in general, "a matter not covered is to be treated as not covered"—a principle "so obvious that it seems absurd to recite it".[30] "[t]hus, nothing in the text of the Convention "conflict[s] with" the application of domestic equitable estoppel doctrines permitted under Chapter 1 of the FAA. 9 U. S. C. §208." In the Introductory part for the petition for a writ of certiorari, GE Energy had stated that "[t]he New York Convention did not conflict with the doctrine of equitable estoppel and that it should not have been worse off simply because it is a foreign corporation." in the concurring opinion by Justice Sotomayor, Her Honor added:

> I note, however, that the application of such domestic doctrines is subject to an important limitation: Any applicable domestic doctrines must be rooted in the principle of consent to arbitrate. This limitation is part and parcel of the Federal Arbitration Act (FAA) itself. It is a "basic precept," *Stolt-Nielsen S. A. v. Animal Feeds Int'l Corp.*, 559 U. S. 662, 681 (2010), that "[a]rbitration under the [FAA] is a matter of consent, not coercion," *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.*, 489 U. S. 468, 479 (1989). [31]

Article VII of the Canada - Venezuela BIT, the framework the parties agreed to regulate and resolve their private investment disputes, stipulates that compensation for expropriations "shall be payable from the date of expropriation with interest at a normal commercial rate, shall be paid without delay and shall be effectively realizable and freely transferable." A Federal Reserve (FED) interest rate on U.S. government securities is not a commercial interest rate by definition. First, the FED uses its interest rates as a monetary tool to achieve the Government's and its policy objectives, which makes it a non-arms-length interest rate. Second, commerce-facing financial institutions use the FED's interest rates as the basis to set their interest rates based on the risk profile of their customers. U.S. Government securities are presumed to be risk-free, while commercial financial activity is definitely not. Third, these securities are not insulated from the impact of the time-value of money. Thus, overtime, the face value of these securities move up or down to account for inflation. In contrast, § 1961(a) fixes the FJIR to the rate in effect at the judgement date. Therefore, interest rates set based on U.S. Government securities, without more, are inadequate for commercial financial purposes. Commercial interest rates represent both the actual incremental cost of funds for debtors and the economic opportunity cost of funds for creditors. This explains why states such as Delaware and New York set their judgement interest rate as a combination of a government security rate plus a premium (e.g., 5% over the Federal Reserve discount rate p.a.) or a fixed commercial interest rate (e.g., 9% p.a.)

Applying the PJIR to arbitration awards produces an inequitable and absurd result. This is the case because, on one hand, some judgement creditors are forced to borrow money at interest rates that are a multiple of the PJIR to fund their pursuit of the collection of an award from a recalcitrant judgement debtor. And, on the other hand, the judgement debtor has withheld funds that would otherwise cost it a multiple of the interest rate set by the arbitration panel. This absurd result runs counter to primary objectives of arbitration, a final, speedier and economical resolution of disputes; and the purpose for which the U.S. acceded to the Conventions:

---

[30] *Id.*, p. 6. Citing A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 93 (2012).

[31] *Id.*, Sotomayor J. concurring Opinion, p. 1.

p. 6. Citing A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 93 (2012).

While Congress was no doubt aware that the Act would encourage the expeditious resolution of disputes, its passage "was motivated, first and foremost, by a congressional desire to enforce agreements into which parties had entered."[32]

*Mobil Cerro Negro* is the only known instance in the public record where a federal court has asked the U.S. Government for its view on the scope and reach of an U.S. arbitration treaty[33]. Based on *Medellín v. Texas* ("It is . . . well settled that the United States' interpretation of a treaty is entitled to great weight.")[34], the Second Circuit Court of Appeals requested the views of the United States through the Office of Legal Adviser at the Department of State, on three issues: (1) whether 22 U.S.C. § 1650a provides a basis for subject matter jurisdiction over an award enforcement action against a foreign sovereign, or whether the FSIA establishes the sole source of jurisdiction over such actions; (2) the lawfulness of a federal court's resort to state procedures allowing an ex parte entry of judgment on an ICSID award against a foreign sovereign; and (3) the federal court's authority to modify an interest rate imposed by an ICSID tribunal. In the response by the U.S. Department of Justice (Exhibit 1), the agency asserted that "[t]he FSIA is the sole source of a federal court's jurisdiction to recognize and enforce a valid ICSID award against a foreign state" and that "[t]he ICSID Convention's enabling statute does not permit a federal district court to modify the interest rate adopted by an ICSID arbitral panel." In line with the U.S. Government's views, the Circuit Court rejected the decision of the lower court on the first two issues, but did not reach the interest issue.

The New York Convention establishes "a 'ceiling,' or maximum level of control" that a contracting state may exert over arbitral awards and arbitration agreements, while giving them the freedom to apply more favorable rules without considering it a violation of the treaty. (*See supra* D.2.12. - The UNICITRAL's Understanding of the Scope and Reach of the Convention). As a result, a party seeking recognition and enforcement cannot be deprived of the right to rely on a more favorable domestic law or treaty. Thus...

> "<u>This provision gives a party the freedom to base his request for enforcement on the domestic law concerning the enforcement. For an award rendered in the United States which is considered nondomestic, it would mean that the enforcement can be based on Chapter One of the Federal Arbitration Act or the arbitration law of the state in which enforcement is sought.</u> If these bases are not sound, the enforcement may be based on the case law under which foreign awards are enforced outside a multilateral or bilateral treaty in the United States.[35]

[Emphasis added.]

In *Volt Information Sciences, Inc. v. Board of Trustees of Stanford University*, the U.S. Supreme Court concurred with the conclusion of the lower court that the purpose of the FAA was

---

[32] Volt Information Sciences, Inc. v. Board of Trustees of Stanford University, 489 U.S. 468 (1989). Citing *Byrd*, 470 U.S. at 470 U. S. 220.

[33] *Mobil Cerro Negro*, *supra* note 27.

[34] *Medellín v. Texas*, 552 U.S. 491, 513 (2008)

[35] Albert Jan van den Berg. When Is an Arbitral Award Nondomestic Under the New York Convention of 1958?, 6 Pace L. Rev. 25 (1985).

"'not [to] mandate the arbitration of all claims, but merely the enforcement . . . of privately negotiated arbitration agreements.;'" and that "[w]hile the FAA therefore preempts application of state laws which render arbitration agreements unenforceable, '[i]t does not follow, however, that the federal law has preclusive effect in a case where the parties have chosen in their [arbitration] agreement to abide by state rules.'"[36] In Crystallex' case, the Erie doctrine and article VII(1) of the FAA (the "more favorable-right" provision) grant it the right to enforce its judgement under the applicable state law. The instant case, a judgement under diversity jurisdiction, requires the application of Delaware law. Also, the Second Settlement agreement between the parties set the New York State law as the governing law.

## I.   CONCLUSION

The full faith and credit commitment made in the statute enabling the ICSID treaty gives international tribunal decisions co-equal status with a state court judgment. In implementing the ICSID Convention, Congress mandated that the "pecuniary obligations" of an ICSID tribunal decision "shall be enforced and shall be given the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several States." Thus, enforcement of the decisions of arbitration tribunals under the ICSID Convention is a commitment without reservation. Therefore, the tribunal's decision has res judicata effect and is reviewable by contracting state courts only to ascertain its validity. Likewise, the parties' consent to resolve their dispute through arbitration under the auspices of an arbitration tribunal, whose decision is based on the terms and rules they agreed to be final and binding, gives the tribunal's decision res judicata effect under the New York Convention.

The main basis for federal courts' decision to apply § 1961(a) to non-domestic arbitration judgements is that the parties must expressly indicate their intent to replace the FJIR through "clear, unambiguous and unequivocal language". Failing that, the federal post-judgement Interest rate is mandatory.[37] This justification is unavailing and represents a collateral attack on the arbitration panel's jurisdiction on arbitrability matters and the res judicata effect of the arbitration panel's decision under the ICSID and New York conventions, and the ICSID Additional Facility Rules.

The application of § 1961(a) in the enforcement of non-domestic arbitration awards under the NY and ICSID Conventions is not only a violation of the *pacta sunt servanda* and the full reparation international law principles. It also abridges the judgement creditor's right to compensation he bargained for, which the arbitration tribunal sought to compensate through the arbitration award. Further, one only needs to look at the disparity between the federal funds interest rate and the rate set by the arbitration panel to appreciate the significant erosion of the present value of the arbitration award due to the inadequacy of the FJIR as an instrument to maintain the time-value of money. Altogether, the abrogation of the arbitration panel's authority to decide substantive matters modifies the award and results in an inequitable and absurd outcome.

Surprisingly, no federal court has followed the lead of the Second Circuit to ask the U.S. Government its official understanding of the commitments made, and the responsibilities acquired in acceding to the ICSID and New York Conventions. The mere fact that no court or judgement creditor denied the right it bargained for has heeded the DOJ's response to the inquiry by the

---

[36] *Volt Information Sciences, Inc. v. Board of Trustees of Stanford University, supra* note 32, at 473.

[37] *Westinghouse Credit Corp. v. D'Urso, supra* note 25, at 103

Second Circuit (exhibit 1) is palpably unfitting. This is the case because it i) obviates the commitments made by the U.S. Government and its responsibility under international treaty law, ii) implies tacit acquiescence to apprehensible injustice, and iii) disregards fiduciary duties.

I thank Your Honor for your time and consideration.

Respectfully,

Adelso A. Adrianza

Enclosures: 1

cc: The Honorable Chief Judge Laurie Selber Silverstein.
    Mr. Robert B. Pincus, Special Master.
    Mr. Myron T. Steele, Potter Anderson & Corroon, LLP
    Mr. Jeffrey L. Moyer, Richards, Layton & Finger, P.A.
    Mr. Matthew B. Lunn, Richards, Layton & Finger, P.A.



**U.S. Department of Justice**

Exhibit 1.

*United States Attorney*
*Southern District of New York*

86 Chambers Street
New York, New York 10007

March 30, 2016

**By ECF**

Hon. Catherine O'Hagan Wolfe
Clerk of Court
United States Court of Appeals for the Second Circuit
500 Pearl Street
New York, New York  10007

     Re:    *Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela*, Docket No. 15-707

Dear Ms. Wolfe:

By invitation of the Court and pursuant to 28 U.S.C. § 517 and Rule 29(a) of the Federal Rules of Appellate Procedure, the United States (the "government") respectfully submits this memorandum brief as *amicus curiae*.

### Interest of the United States

The United States has strong interests in ensuring the proper interpretation and implementation of the Convention on the Settlement of Investment Disputes (the "ICSID Convention"), to which the United States is a party, including that investors with ICSID awards against foreign sovereigns be able to convert those awards into judgments without judicial review of the underlying merits, consistent with the Convention.  The government's interpretation of that treaty is "entitled to great weight." *Medellín v. Texas*, 552 U.S. 491, 513 (2008) (quotation marks omitted).  Moreover, because "[a]ctions against foreign sovereigns in our courts raise sensitive issues concerning the foreign relations of the United States," *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 493 (1983), the United States also has a

*Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela*, Docket No. 15-707
Brief for the United States as *amicus curiae*

Page 2

significant interest in the proper application of the Foreign Sovereign Immunities Act of 1976,

28 U.S.C. §§ 1330 and 1602 *et seq.* (the "FSIA"), including its provisions giving foreign

sovereigns notice and an opportunity to respond in actions against them in U.S. courts. U.S.

courts' treatment of foreign states can also have consequences for the reciprocal treatment of the

United States in foreign courts.

## Questions Presented

By letter dated January 14, 2016, this Court requested the State Department's views on

three questions:

1. Does the enabling statute for the ICSID Convention, 22 U.S.C. § 1650a, embody a grant of subject matter jurisdiction over an action to enforce an International Centre for the Settlement of Investment Disputes ("ICSID") award against a foreign sovereign that is outside the scope of the FSIA, or does the FSIA provide the sole source of subject matter jurisdiction over such an action? In other words, does the FSIA provide the sole jurisdictional "road map" that an ICSID award creditor must follow to convert a valid ICSID award against a foreign sovereign into a federal judgment, or is some other process available?

2. Does either the ICSID Convention's enabling statute or the FSIA permit a federal court to "borrow" procedural rules of the forum state, including provisions for *ex parte* proceedings, for the judicial recognition of ICSID arbitral awards?

3. Does the ICSID Convention's enabling statute permit a federal district court to modify, under 28 U.S.C. § 1961, the interest rate adopted by an ICSID arbitral panel to be paid on an ICSID award?

The government's responses, as further explained below, are as follows. (1) The FSIA is

the sole source of subject matter jurisdiction over an action to enforce an ICSID award against a

foreign sovereign and its rules must be followed. (2) Neither the ICSID Convention's enabling

statute nor the FSIA permits a federal court to "borrow" procedures from state law that permit an

*ex parte* proceeding. (3) The district court correctly held that the interest rate provided in the

ICSID award is a pecuniary obligation that must be enforced.

## Background

### A. *The ICSID Convention and implementing legislation*

The ICSID Convention, which entered into force in 1966, is a multilateral treaty that

establishes a regime for arbitrating investment disputes between sovereigns and private investors.

ICSID has jurisdiction over investment-related legal disputes between states that are party to the

Convention and nationals of other member states when both parties to the investment dispute

consent to ICSID's jurisdiction.  ICSID Convention art. 25(1).  Where an ICSID tribunal has

jurisdiction and issues an award, its determinations set forth in the award are binding on the

disputing parties and not subject to review except as provided under the ICSID Convention.  *Id.*

art. 53(1) (ICSID awards "shall be binding on the parties and shall not be subject to any appeal

or to any other remedy except those provided for in this Convention"); *see id.* arts. 50-52 (parties

may request that an award be interpreted, revised, or annulled).  The finality of ICSID awards,

under which they are subject to review only in the self-contained system set out in the ICSID

Convention, is a key benefit of ICSID arbitration.  To that end, Article 54(1) of the ICSID

Convention requires contracting states to recognize ICSID awards in their courts "as binding and

enforce the pecuniary obligations imposed by that award within its territories as if it were a final

judgment of a court in that State." *Id.* art 54(1).  "A Contracting State with a federal constitution

may enforce such an award in or through its federal courts and may provide that such courts shall

treat the award as if it were a final judgment of the courts of a constituent state." *Id.*

The ICSID Convention provides that a party seeking recognition or enforcement of the

award "shall furnish to a competent court . . . a copy of the award certified by the Secretary-

General." *Id.* art. 54(2).  "Execution of the award shall be governed by the laws concerning the

execution of judgments in force in the State in whose territories such execution is sought."

*Id.* art. 54(3). "Nothing in Article 54 shall be construed as derogating from the law in force in any Contracting State relating to immunity of that State or of any foreign State from execution." *Id.* art. 55.

In 1966, Congress enacted the Convention on the Settlement of Investment Disputes Act, Pub. L. 89-532 (the "ICSID Act"), to implement the ICSID Convention. Section 3(a) of the ICSID Act, codified at 22 U.S.C. § 1650a(a), provides: "An award of an arbitral tribunal rendered pursuant to chapter IV of the [ICSID] convention shall create a right arising under a treaty of the United States. The pecuniary obligations imposed by such an award shall be enforced and shall be given the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several States." Section 3(b), codified at 22 U.S.C. § 1650a(b), provides: "The district courts of the United States . . . shall have exclusive jurisdiction over actions and proceedings under subsection (a) of this section, regardless of the amount in controversy."

### B. Factual and procedural background

As the Court is aware, this case arises out of an investment dispute between Venezuela and subsidiaries of ExxonMobil Corporation ("Mobil"). On October 9, 2014, an ICSID arbitral tribunal issued an award in favor of Mobil. Venezuela was ordered to pay Mobil approximately $1.6 billion plus 3.25% interest, compounded annually, from June 27, 2007, until payment is made in full (the "Award"). (Joint Appendix ("JA") 162). However, the award was conditioned on Mobil's commitment and obligation to repay to Venezuela amounts that a Mobil entity had recovered under a related arbitration award entered by the International Court of Arbitration of the International Chamber of Commerce ("ICC"). (JA 77-78, 154-55, 162).

The following day, Mobil filed an *ex parte* petition in the U.S. District Court for the

Southern District of New York seeking recognition of the Award under Article 54 of the ICSID

Convention and the Convention's enabling statute. Mobil argued that "[r]ecognition of a state

court judgment is a clerical function that does not require notice until after a judgment has been

entered," and that the court should borrow the judgment registration procedure of the forum

state, Article 54 of New York's Civil Practice Law and Rules ("CPLR"), which does not require

advance notice to the debtor. (JA 16). Mobil sought entry of a federal court judgment in the

amount of $1,600,042,482 plus 3.25% interest from June 27, 2007, until the date of full payment.

(JA 20-21). Judge J. Paul Oetken, sitting in Part I, held an *ex parte* hearing on the petition,

granted it, and entered final judgment in that amount. (JA 258-59). Later that day, Mobil sent

Venezuela a letter, notifying it of the judgment and demanding payment.

On October 14, 2014, Venezuela moved to vacate the judgment as void for lack of

jurisdiction under the FSIA. (JA 260). While the motion was pending, Venezuela filed an

application with the ICSID arbitral panel, asking that the Award be reduced to account for

approximately $907 million that Venezuela's state-owned oil company had paid to satisfy the

ICC arbitration award. (JA 422).

On February 13, 2015, the district court (Paul A. Engelmayer, J.) issued a decision

denying Venezuela's motion to vacate. (JA 482-531). The district court noted that, in four prior

cases brought in the Southern District of New York to enforce an ICSID arbitral award against a

foreign sovereign, the district courts had recognized the award and entered judgment against the

foreign sovereign in *ex parte* proceedings under procedures borrowed from New York state law.

(JA 491-94). In accordance with those decisions, the district court held that ICSID's enabling

statute does not provide a procedure for recognizing ICSID awards as federal court judgments,

and that it was appropriate to fill this gap by using New York's *ex parte* registration procedure.
The district court reasoned that federal courts have "discretion to borrow from state law when
there are deficiencies in the federal statutory scheme." (JA 496 (quoting *Hardy v. N.Y. City
Health & Hosp. Corp.*, 164 F.3d 789, 793 (2d Cir. 1999))). According to the district court,
Congress's use of the term "full faith and credit" in § 1650a reveals its intent that ICSID awards
be automatically recognized rather than subjected to contested litigation. (JA 498, 525).
Because the substance of the Award could not be challenged under the Convention, the district
court reasoned that requiring Mobil to institute a plenary action was unnecessary and would
merely permit Venezuela to delay enforcement. (JA 511; *see* JA 526). The court also suggested
that Venezuela did not need advance notice of Mobil's action to enforce the Award because it
could still challenge any effort by Mobil to attach or execute against Venezuelan assets.
(JA 500-01, 528).

The district court also rejected Venezuela's arguments based on the FSIA. First, the
district court reasoned that it had subject matter jurisdiction under the FSIA because Mobil's
efforts to recognize the ICSID award came within the FSIA's exceptions to sovereign immunity
for actions to confirm arbitration awards, 28 U.S.C. § 1605(a)(6)(B), and for matters in which the
sovereign state has waived immunity, *id.* § 1605(a)(1). (JA 504-06). The court also suggested
that the "treaty exception" to the FSIA's grant of sovereign immunity might apply as well.
(JA 506-07). Section 1604 of the FSIA provides that, "[s]ubject to existing international
agreements to which the United States is a party at the time of enactment of this Act, a foreign
state shall be immune from the jurisdiction of the courts of the United States and of the States
except as provided in sections 1605 to 1607 of this chapter." The district court reasoned that the
ICSID Convention might be an "existing international agreement" within the meaning of § 1604,

*Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela*, Docket No. 15-707          Page 7
Brief for the United States as *amicus curiae*

noting that the ISCID Convention and its implementing legislation predated the FSIA by

approximately a decade. (JA 506-07). The district court construed § 1604 to evince Congress's

"intention not to disturb . . . the provisions of the ICSID Convention and enabling statute that

contemplated domestic lawsuits against foreign sovereigns to enforce arbitral awards." (JA 506;

*see* JA 507, 512).

Second, the district court held that Mobil was not required to comply with the FSIA's

service or venue requirements. (JA 508-29). The district court recognized that Mobil's

noncompliance with the FSIA's service provision, 28 U.S.C. § 1608, would deprive the district

court of personal jurisdiction over Venezuela as to any claim for which the district court had

subject matter jurisdiction under the FSIA. (JA 509). The district court also recognized that

Mobil had not complied with the FSIA's venue requirements, because it had not shown any

nexus to the Southern District of New York. (JA 509); *see* 28 U.S.C. § 1391(f)(1)-(3). Again,

however, the district court reasoned that the FSIA was not intended to displace existing practice,

which the district court believed included the use of summary, uncontested procedures to

recognize and enforce ICSID awards. (JA 511-13).

In reaching this conclusion, the district court again relied on § 1604's treaty exception,

although the court recognized that it was "addressed to the existence of immunity, not the

mechanics by which an action is to be brought against a non-immune sovereign." (JA 512). The

court also suggested that the FSIA was inapplicable because its provisions presupposed contested

litigation, not "the non-substantive, mechanistic context of ICSID award recognition." (JA 512-

13). Finally, the district court relied on the history and purposes of the ICSID Convention and its

implementing legislation, which the district court believed would be furthered by permitting

recognition and enforcement in *ex parte,* summary proceedings. (JA 514-25). The district court

*Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela*, Docket No. 15-707
Brief for the United States as *amicus curiae*

Page 8

noted that the ICSID Convention substantially limited the grounds upon which award debtors

could contest recognition, unlike the broader challenges permitted under the earlier Convention

on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention").

(JA 516-21). The district court also pointed to Congress's direction to federal courts in the

implementing legislation to "give full faith and credit" to the pecuniary obligations imposed by

an ICSID award "as if the award were a final judgment of a court of general jurisdiction of one

of the several States." (JA 521-25). The district court read this text as incorporating the rule

that, when one state court's judgment is sought to be recognized in another state, there need not

be personal jurisdiction over the judgment debtor. (JA 523).

The district court accordingly concluded that it would be "deeply problematic" to require

an ICSID award creditor to bring a plenary action under the FSIA to enforce the award, and that

this "would bring the FSIA into grave tension with the objectives of the ICSID Convention and

of Congress . . . to put in place an expedited and automatic recognition procedure." (JA 524).

The district court held that "[t]he procedures applicable to the recognition process are instead

those authorized by the ICSID enabling statute," and that that statute permits ICSID award

creditors to seek recognition of an award through summary, *ex parte* procedures under state law.

(JA 529). The district court therefore denied Venezuela's motion to vacate the judgment

recognizing the award. However, the district court stayed enforcement of the judgment pending

resolution of Venezuela's application to the ICSID panel to revise the Award. (JA 530).[1]

---

[1] Venezuela's request for revision was denied in June 2015. *See Venezuela Holdings, B.V. et al. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/07/27 – Revision Proceeding, Decision on Revision (June 12, 2015). However, Venezuela also filed a request to annul the Award (JA 546-47), and enforcement of the award remains stayed pending resolution of that application, *see Venezuela Holdings, B.V. et al. v. Bolivarian Republic of Venezuela*, ICSID Case

Shortly after the district court issued its opinion, Venezuela moved to amend the

judgment to provide that the interest rate on the judgment would be the rate specified by 28

U.S.C. § 1961, which sets the post-judgment interest rate in federal civil cases, rather than the

3.25% rate specified in the Award (and incorporated into the Part I judgment). In an opinion

issued on March 4, 2015, the district court denied Venezuela's motion, ruling that the 3.25%

interest rate was one of the "pecuniary obligations" imposed by the Award that the court must

enforce under 22 U.S.C. § 1650a. (JA 729).

## ARGUMENT

## POINT I

## The FSIA Governs an Action to Recognize and Enforce a Valid ICSID Award Against a Foreign Sovereign

### A. *The FSIA is the sole source of a federal court's jurisdiction to recognize and enforce a valid ICSID award against a foreign state*

The district court erred in holding that the ICSID implementing legislation, 22 U.S.C.

§ 1650a, provides an exception to the FSIA's exclusive grant of subject matter jurisdiction. The

FSIA, enacted by Congress in 1976, "contains a comprehensive set of legal standards governing

claims of immunity in every civil action against a foreign state." *Verlinden*, 461 U.S. at 488. As

the Supreme Court has stated numerous times, the FSIA is the exclusive source of subject matter

jurisdiction for actions against foreign states. *See OBB Personenverkehr AG v. Sachs*, 136 S. Ct.

390, 393-94 (2015); *Permanent Mission of India to the United Nations v. City of New York*, 551

U.S. 193, 197 (2007); *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993); *Argentine Republic v.*

*Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989) ("[T]he text and structure of the FSIA

No. ARB/07/27 – Annulment Proceeding, Committee's Decision on Stay of Enforcement of the
Award ¶ 10 (Sept. 17, 2015).

*Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela*, Docket No. 15-707
Brief for the United States as *amicus curiae*

Page 10

demonstrate Congress' intention that the FSIA be the sole basis for obtaining jurisdiction over a

foreign state in our courts."). Accordingly, the FSIA "must be applied by the District Courts in

every action against a foreign sovereign, since subject-matter jurisdiction in any such action

depends on the existence of one of the specified exceptions to foreign sovereign immunity."

*Verlinden*, 461 U.S. at 493.

As the Supreme Court held in *Amerada Hess*, the FSIA's grant of jurisdiction supplants

earlier-enacted grants of subject-matter jurisdiction that might have applied to an action against a

foreign state. 488 U.S. at 438, 443 (holding that, following enactment of FSIA, a federal court

could not exercise jurisdiction over a foreign sovereign under the Alien Tort Statute). Thus,

although 22 U.S.C. § 1650a(b) gives federal district courts (and the U.S. Court of Federal

Claims) "exclusive jurisdiction over actions and proceedings [to enforce an ICSID award],

regardless of the amount in controversy," that grant of jurisdiction does not apply to actions

against foreign sovereigns after the passage of the FSIA. Section 1650a retains its effect "with

respect to defendants other than foreign states," *Amerada Hess*, 488 U.S. at 438, supplying a

district court's subject matter jurisdiction over actions to enforce ICSID arbitral awards against

private parties. The ICSID enabling statute provides the substantive right and the applicable

legal standard, and it also requires that all enforcement actions be brought in federal, rather than

state, courts. But following the enactment of the FSIA, the ICSID enabling statute cannot be the

basis for a federal court's exercise of jurisdiction over a foreign sovereign.[2]

---

[2] The legislative history of the ICSID enabling statute indicates that before the FSIA was
enacted—contrary to the district court's assumption that the ICSID Convention and statute
"contemplated domestic lawsuits against foreign sovereigns" without overcoming a foreign
state's immunity—Congress understood that the ICSID statute itself would not provide
jurisdiction over a foreign sovereign. (JA 506-07). As the Deputy Legal Adviser of the

*Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela*, Docket No. 15-707
Brief for the United States as *amicus curiae*

Page 11

The district court suggested that the FSIA might be inapplicable because the ICSID Convention comes within 28 U.S.C. § 1604's proviso that its grant of sovereign immunity is "[s]ubject to existing international agreements to which the United States is a party at the time of enactment of this Act." (JA 506). But the Supreme Court made clear in *Amerada Hess* that § 1604's treaty exception applies only "when international agreements expressly conflict with the *immunity* provisions of the FSIA." 488 U.S. at 442 (quotation marks and alterations omitted, emphasis added). Nothing in the ICSID Convention contradicts the FSIA's immunity rules. To the contrary, the Convention expressly notes that it has no effect on domestic law regarding the immunity of foreign states. ICSID Convention art. 55 ("Nothing in Article 54 [governing recognition or enforcement of an award] shall be construed as derogating from the law in force in any Contracting State relating to immunity of that State or of any foreign State from execution."). Thus, there is no implied exception to the FSIA's exclusivity as the source of jurisdiction over actions for recognition of an ICSID award against foreign sovereigns.

---

Department of State—which negotiated the Convention for the United States, along with the Department of the Treasury—testified:

> Basically what this convention says is that the district court shall have jurisdiction over the subject matter. As to whether it has jurisdiction over a party, there is nothing in the convention that will change the defense of sovereign immunity. If somebody wants to sue Jersey Standard in the United States, on an award, no problem. If somebody wants to sue Peru or the Peruvian Oil Institute, why it would depend on whether in the particular case that entity would or would not be entitled to sovereign immunity.

(JA 302 (*Convention on the Settlement of Investment Disputes: Hearing on H.R. 15785 Before the Subcomm. on Int'l Orgs. and Movements of the H. Comm. on Foreign Affairs*, 89th Cong. 57 (1966) (statement of Andreas F. Lowenfeld, Deputy Legal Adviser, Dep't of State))).

*Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela*, Docket No. 15-707
Brief for the United States as *amicus curiae*

Page 12

## B. *An action against a foreign sovereign to recognize and enforce an ICSID arbitral award must comply with the FSIA's service and venue requirements*

The district court also held that even if the exclusive means to bring an action to enforce an ICSID arbitral award against Venezuela is under the FSIA, Mobil was not required to comply with the FSIA's service of process or venue requirements. That too was error.

In addition to setting out the exclusive terms upon which a U.S. court can exercise subject matter jurisdiction in an action against a foreign state, the FSIA provides that a court has personal jurisdiction over a foreign state only if an exception to immunity in § 1605 applies and the plaintiff has effectuated service pursuant to § 1608. *See* 28 U.S.C. § 1330(b). Section 1608(a) specifies four methods for serving process on a foreign state: first, by "delivery of a copy of the summons and complaint in accordance with any special arrangement[s]" between the parties; or, if no special arrangements exist, by delivery "in accordance with an applicable international convention on service of judicial documents." 28 U.S.C. § 1608(a)(1), (2). If service cannot be made by either of these methods, the clerk of court may mail a copy of the summons and complaint and a notice of suit to the foreign state's foreign minister; and finally, if service cannot be made within thirty days by that method, the clerk of court may send copies of those same documents to the Department of State, which transmits them "through diplomatic channels to the foreign state." 28 U.S.C. § 1608(a)(3), (4). These procedures, which are construed strictly and applied sequentially, are the sole means for serving process on a foreign state. *Magness v. Russian Fed'n*, 247 F.3d 609, 615 (5th Cir. 2001) (citing H.R. Rep. No. 94-1487, at 24 (1976)); *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 154-55 (D.C. Cir. 1994).

Furthermore, 28 U.S.C. § 1391(f) imposes venue requirements for suits under the FSIA. An action (except a suit in admiralty) against a foreign state must be brought either in the district

*Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela*, Docket No. 15-707
Brief for the United States as *amicus curiae*

Page 13

court for the District of Columbia, or in a judicial district in "which a substantial part of the events or omissions giving rise to the claim occurred, or [where] a substantial part of property that is the subject of the action is situated." 28 U.S.C. § 1391(f)(1).

The district court reasoned that these requirements do not apply in actions to recognize ICSID awards. According to the court, the FSIA's treaty exception and the FSIA's use of terms that "presuppose" litigation over contested issues demonstrate that "Congress did not have ICSID award recognition in mind when it prescribed service, venue, and other requirements for lawsuits against sovereigns." (JA 512). Neither of those arguments is persuasive.

First, as noted above, the treaty exception only applies "when international agreements expressly conflict with the immunity provisions of the FSIA." *Amerada Hess*, 488 U.S. at 442 (quotation marks and alterations omitted). As the district court itself recognized, the exception is "addressed to the existence of immunity, not the mechanics by which an action is to be brought against a non-immune sovereign." (JA 512). The district court nevertheless construed § 1604 to "fairly reflect[] an intention not to revise existing law or practice in an area governed by treaty." (JA 512). But the mechanics of enforcing ICSID awards are not and never were governed by treaty. Rather, the ICSID Convention reserves the means of enforcement to member states, which enforce awards in the same way that they enforce domestic judgments. ICSID Convention art. 54(1). Article 54(1) thus clearly envisions that domestic law and procedures will apply to enforcement proceedings. In a U.S. court, actions to enforce arbitral awards against foreign sovereigns must conform to the requirements of the FSIA. The treaty exception thus provides no support for the district court's conclusion that Congress did not intend for the FSIA to apply in the ICSID award recognition context. (JA 512).

The district court further reasoned that the FSIA presupposes contested litigation, and thus does not apply to "the non-substantive, mechanistic context of ICSID award recognition." (JA 513). But the fact that the FSIA refers to certain types of contested matters (such as personal injury actions) or refers to limitations on discovery does not imply that other types of actions are excluded from the FSIA. Indeed, the FSIA expressly encompasses actions to enforce international arbitral awards, *see* 28 U.S.C. § 1605(a)(6), which typically are not fully contested litigation. In enacting that provision, Congress provided no exception to the FSIA's other requirements, including that the foreign state defendant be served in accordance with § 1608. Once again, the FSIA is the comprehensive and exclusive statutory scheme for bringing suit against a foreign state in U.S. courts. *Verlinden*, 461 U.S. at 488.

Notably, bringing an action under the FSIA to recognize an ICSID award rendered against a foreign state is not an overly burdensome process, and does not interfere with the recognition or enforcement of such awards as envisioned by the Convention. The award creditor files a complaint, serves the debtor in one of the manners permitted under § 1608, and then, after the debtor has had the opportunity to respond, seeks a judgment by filing a motion on the pleadings or a motion for summary judgment as permitted by the Federal Rules of Civil Procedure. Because an ICSID award is binding on the parties and not subject to review (except within ICSID), the award debtor may raise no substantive defenses and discovery is unnecessary. Courts may employ case management techniques as necessary to further expedite enforcement proceedings, and ensure that frivolous defenses and dilatory tactics are not allowed to unduly delay the enforcement of an ICSID award.

Finally, the district court reasoned that it was not required to have personal jurisdiction over Venezuela under 28 U.S.C. § 1330(b), and hence Mobil was not required to comply with

*Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela*, Docket No. 15-707
Brief for the United States as *amicus curiae*

Page 15

the service requirements in 28 U.S.C. § 1608, because "[p]ersonal jurisdiction ordinarily is not

required in recognition proceedings." (JA 529 n.36). But the federal requirements for exercising

jurisdiction over a foreign state in U.S. courts preempt any inconsistent state-law principles

governing personal jurisdiction over out-of-state defendants. As explained above, the service

requirements of § 1608 must be complied with in every action against a foreign sovereign and

are strictly construed. *Magness*, 247 F.3d at 615; *Transaero*, 30 F.3d at 154-55. These statutory

provisions, rather than any inconsistent procedural rules of the forum state, govern the process

for initiating an action to enforce an ICSID award against a foreign sovereign.

## POINT II

### Neither the ICSID Convention's enabling statute nor the FSIA permits a federal court to "borrow" procedural rules of the forum state that permit *ex parte* proceedings

For much the same reasons, the district court was not permitted to "borrow" state-law

procedures that permit *ex parte* proceedings to recognize an arbitral award against a foreign state

and enter a U.S. judgment against that foreign state. As explained above, *ex parte* proceedings

with no notice to the foreign state defendant conflict with the FSIA. The proper procedure for

the recognition and enforcement of an ICSID award in the United States is through the

commencement of an action that complies with the FSIA.

The district court concluded that borrowing state-law *ex parte* procedures was necessary

because requiring plenary actions would be "in tension" with the ICSID Convention and its

enabling statute.[3]  (JA 514). But there is no such tension: neither the Convention nor the statute

---

[3] The district court relied on *Siag v. Arab Republic of Egypt*, No. M-82, 2009 WL 1834562
(S.D.N.Y. June 19, 2009), which similarly enforced an ICSID award *ex parte* by applying New
York CPLR Article 54. *Siag*, in turn, relied upon *Keeton v. Hustler Magazine, Inc.*, 815 F.2d
857 (2d Cir. 1987), to conclude that it was permitted to adopt the CPLR procedure as a means of
registering the ICSID award. 2009 WL 1834562, at *2. But *Keeton* concerned an action to
register a federal (not state) court judgment in a New York court, which action was subsequently

*Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela*, Docket No. 15-707
Brief for the United States as *amicus curiae*

Page 16

requires or forbids any particular set of procedures for the enforcement of an ICSID award. To

the contrary, in providing that enforcement mechanisms may differ in contracting states

(including those with federal systems of government), the Convention recognizes that

enforcement will be a matter of domestic law. As the drafters of the ICSID Convention

explained at the time of adoption, "[b]ecause of the different legal techniques followed in

common law and civil law jurisdictions and the different judicial systems found in unitary and

federal or other non-unitary States, Article 54 does not prescribe any particular method to be

followed in its domestic implementation, but requires each Contracting State to meet the

requirements of the Article in accordance with its own legal system." *Report of the Executive

Directors on the Convention on the Settlement of Investment Disputes Between States and

Nationals of Other States* (1965) ¶ 42, *available at* https://icsid.worldbank.org/ICSID/StaticFiles/

basicdoc_en-archive/ICSID_English.pdf; *see Air France v. Saks*, 470 U.S. 392, 396, 400 (1985)

("In interpreting a treaty it is proper . . . to refer to the records of its drafting and negotiation.").

That conclusion accords with the Supreme Court's repeated observation that "absent a clear and

express statement to the contrary, the procedural rules of the forum State govern the

implementation of the treaty in that State." *Breard v. Greene*, 523 U.S. 371, 375 (1998); *accord

Medellín*, 552 U.S. at 517; *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 351 (2006).

Equally, the legislative history of the ICSID Convention's enabling statute, 28 U.S.C.

§ 1650a(a), does not support the district court's conclusion that Congress intended for ICSID

awards to be enforced through an "automatic" *ex parte* process.[4] (JA 521). As the General

---

removed to federal court. In contrast, an ICSID award must be treated as if it were a state-court
judgment, making *Keeton* inapposite and the logic of *Siag* unpersuasive.

[4] The district court relied heavily on the negotiating history of the ICSID Convention and its
differences from the earlier New York Convention in concluding that recognition of ICSID

*Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela*, Docket No. 15-707
Brief for the United States as *amicus curiae*

Page 17

Counsel of the Department of the Treasury (which, along with the Department of State,

negotiated the ICSID Convention on behalf of the United States) testified to Congress, "[t]o give

full faith and credit to an arbitral award as if it were a final judgment of a court of one of the

several States means that an action would have to be brought on the award in a U.S. district court

to enforce the final judgment of a State court." (JA 288 (*Convention on the Settlement of

Investment Disputes: Hearing on H.R. 15785 Before the Subcomm. on Int'l Orgs. and

Movements of the H. Comm. on Foreign Affairs*, 89th Cong. 43 (statement of Fred B. Smith,

General Counsel, Department of the Treasury))). The same understanding is reflected in the

House and Senate Committee Reports regarding the enabling statute. H.R. Rep. No. 89-1741, at

3-4 (1966) ("If an action is brought in a U.S. district court to enforce the final judgment of State

court, it is, of course, given full faith and credit in the Federal court. Section 3(a) would give the

same status to an arbitral award."); (JA 331, S. Rep. 89-1374, at 4 (1966) (same)). The

legislative history does not suggest that enforcement of ICSID awards in the United States must

be "automatic" or *ex parte*, which would represent a departure from what appears to have been

prevailing federal court practice with respect to the enforcement of state court judgments.[5]

---

awards is "automatic." (JA 514-21). But a court's inability to review the merits of an ICSID
award does not compel the use of an "automatic" or *ex parte* procedure for recognizing such an
award. Indeed, the Convention leaves the mechanism for recognition up to each contracting
state. Some have provided for *ex parte* registration procedures, *see, e.g.*, U.K. Civil Procedure
Rules, Part 62.21; Australia Federal Court Rule Order 68, while others have not, *see, e.g.*,
Singapore Arbitration (International Investment Disputes) Act (Chapter 11). In any event, the
history of the Convention does not detract from the conclusion that the FSIA governs and its
requirements must be followed.

[5] At the time of § 1650a(a)'s passage, federal court practice appears to have been to enforce state
court judgments through a civil action with notice to the judgment creditor. *See, e.g.*, *Midessa
Television Co. v. Motion Pictures for Television, Inc.*, 290 F.2d 203, 204 (5th Cir. 1961). Courts
that have addressed the issue more recently have generally concluded that a federal court can
only enforce a state court judgment through a civil action with notice to the judgment creditor.
*See, e.g.*, *Caruso v. Perlow*, 440 F. Supp. 2d 117, 119 (D. Conn. 2006); *Continental Casualty Co.*

Likewise, the district court erred in its interpretation of the "full faith and credit"
obligation in § 1650a.  Under § 1650a, the pecuniary obligations of an ICSID arbitral award
"shall be enforced and shall be given the same full faith and credit as if the award were a final
judgment of a court of general jurisdiction of one of the several States."  According to the district
court, the phrase "full faith and credit" in § 1650a means that an *ex parte* registration process can
be used.  In the district court's view, Congress's use of this term of art is significant because
"[u]nder the full faith and credit doctrine, for a sister state's judgment to be recognized, it is not
necessary that there be personal jurisdiction over the judgment debtor in the recognizing court";
instead, "a mechanistic process of interstate registration is commonly used."  (JA 521-23).  But
the district court appears to have conflated the full-faith-and-credit doctrine with the procedures
for registering and enforcing a state-court judgment in another state under the Uniform
Enforcement of Judgments Act.  The full-faith-and-credit doctrine simply requires that final
judgments rendered in one state have preclusive effect and be immune from collateral attack in
every other state.  *Baker v. General Motors Corp.*, 522 U.S. 222, 233 (1998).  It does not require
the adoption of practices as to the "time, manner, and mechanisms for enforcing judgments."  *Id.*
at 235.

In addition, contrary to the district court's view that an action under the FSIA—which
allows the defendant to respond prior to judicial recognition of the award—would serve no
purpose but delay, there are practical benefits to requiring the use of such a process.  While
district courts may be unable to substantively review ICSID awards, they can be called upon to

---

*v. Argentine Republic*, 893 F. Supp. 2d 747, 753 (E.D. Va. 2012).  *But see GE Betz, Inc. v. Zee Co.*, 718 F.3d 615, 623-25 (7th Cir. 2013) (permitting registration of state-court judgment in federal court under summary procedure of 28 U.S.C. § 1963).  The *GE Betz* court recognized that its decision was contrary to the view of many district courts and that it addressed a question not decided by any other federal court of appeals.

consider certain limited procedural issues in connection with their enforcement.[6]  And in such

situations, giving the award debtor notice of the recognition action and an opportunity to respond

before the judgment is entered is both efficient and necessary to protect the rights of foreign

governments.  In *Blue Ridge Investments, LLC v. Republic of Argentina*, 735 F.3d 72, 77-78 (2d

Cir. 2013), for example, the plaintiff did not attempt to employ *ex parte* procedures when

seeking recognition of its award, and instead provided notice to the award debtor, Argentina.

This allowed the foreign state to assert certain procedural defenses to enforcement, including that

the plaintiff, an assignee of the award creditor, lacked standing to enforce the award; that the

action on the award was barred by *res judicata*; and that the action to enforce the award was

time-barred.  Here, providing notice to Venezuela under the FSIA would have allowed the

foreign state to raise, before entry of judgment, the issue of whether it was appropriate to enforce

the face value of the arbitral award without taking into account the amounts that Mobil

---

[6] As discussed above, an ICSID award is binding on the parties and not subject to substantive
review, except through the limited avenues available within the ICSID system.  Pursuant to
Article 52 of the ICSID Convention, a specially appointed *ad hoc* committee of arbitrators may
annul an ICSID award on the following limited grounds: (a) the Tribunal was not properly
constituted, (b) the Tribunal manifestly exceeded its powers, (c) there was corruption on the part
of a member of the Tribunal, (d) there was a serious departure from a fundamental rule of
procedure, or (e) the award failed to state the reasons on which it is based.  ICSID Convention,
art. 52.  It would be inconsistent with the ICSID Convention and the ICSID Act for a district
court to inquire into the merits of the award, or review an award on the grounds set out in Article
52 of the ICSID Convention.  For instance, a court would not be able to inquire into the arbitral
tribunal's jurisdiction—a topic that is addressed in the "excess of power" provisions of Article
52 of the ICSID Convention.  Likewise, the ICSID Act precludes a court from applying the
provisions of the Federal Arbitration Act ("FAA")—including the grounds for review set out in
section 10—when enforcing an ICSID award.  *See* 22 U.S.C. §1650a(a) ("The Federal
Arbitration Act . . . shall not apply to enforcement of awards rendered pursuant to the
convention."); (JA 289 (*Convention on the Settlement of Investment Disputes: Hearing on H.R.
15785 Before the Subcomm. on Int'l Orgs. and Movements of the H. Comm. on Foreign Affairs*,
89th Cong. 43 (statement of Fred B. Smith, General Counsel, Department of the Treasury)
(testifying that the FAA "would permit courts to vacate an arbitral award on certain grounds,
such as the corruption of one of the arbitrators, which under article 52 of the convention ought to
be raised through the annulment proceedings provided for in the convention"))).

apparently received under the ICC arbitral award.  Furthermore, Venezuela could have requested

that the district court stay entry of the judgment until the ICSID tribunal ruled on Venezuela's

application to revise the award.  None of these issues relates to attachment or execution on the

award, and it is uncertain whether Venezuela would have been permitted to raise them in a future

proceeding in which Mobil sought to execute on or attach Venezuela's property.

> Finally, adhering to the FSIA's requirements and declining to allow state-law rules

inconsistent with those requirements to be borrowed in this context gains support from

Congress's desire to avoid "disparate treatment of cases involving foreign governments," as this

"may have adverse foreign relations consequences."  H.R. Rep. 94-1487, at 13 (1976) (report

accompanying FSIA).  Indeed, the United States proposed the language incorporated into Article

54(1) that permits the enforcement of an ICSID award in federal courts "in order to be able to

provide in the United States for a uniform procedure for enforcement" of ICSID awards.

(JA 331, S. Rep. 89-1374, at 4 (1966)).  Congress followed suit by giving federal district courts

exclusive jurisdiction over actions to enforce ICSID awards, *see* 22 U.S.C. § 1650a(b), and

requiring that they be treated like state court judgments, *id.* § 1650a(a), thus ensuring a uniform

system of enforcement.  Borrowing state-law rules to permit *ex parte* proceedings would

undermine that consistent scheme.

## POINT III

## The ICSID Convention's enabling statute does not permit a federal district court to modify the interest rate adopted by an ICSID arbitral panel

> The district court correctly rejected Venezuela's attempt to modify the interest rate that

applies to the Award.  The Award states that Venezuela must pay Mobil $1,600,042,482 plus

3.25% interest, compounded annually, from June 27, 2007, "up to the date when payment of this

sums [*sic*] has been made in full."  (JA 162 ¶ 404(h); *see* JA 159 ¶¶ 397-98 ("Post-award interest

will accrue from the date of the Award and until compensation has been paid in full.")). The

ICSID Convention and the ICSID enabling statute both require that courts enforce the

"pecuniary obligations" imposed by ICSID awards. ICSID Convention art. 54(1); 22 U.S.C.

§ 1650a(a). The enabling statute also provides that ICSID awards "create a right arising under a

treaty of the United States." 22 U.S.C. § 1650a(a). The rate of interest applied to the principal

of the Award is "pecuniary" as it translates directly into an amount of money Venezuela must

pay. Indeed, the modification of that rate could lessen the total amount of the Award by millions

of dollars.

Venezuela argues that, under the "merger doctrine," obligations owed under an arbitral

award merge into the judgment at the time it is entered and that, from that time on, the

mandatory interest rate provided in 28 U.S.C. § 1961 (currently much lower than 3.25%) must

apply. According to Venezuela, § 1650a's requirement that courts enforce the "pecuniary

obligations" of an ICSID award is not contrary to this approach because the Award did not

distinguish between post-award interest and post-judgment interest.

Venezuela's arguments should be rejected because its interpretation of § 1961 and the

merger doctrine conflicts with the United States' treaty obligations. Modification of the

"pecuniary obligations imposed by [the] award" is beyond the authority granted to district courts

by the ICSID enabling statute. "Where fairly possible, a United States statute is to be construed

so as not to conflict with international law or with an international agreement of the United

States." Restatement (Third) of Foreign Relations Law § 114 (1987). Furthermore, the ICSID

enabling statute expressly excludes application of the FAA, *see* 22 U.S.C. § 1650a(a), providing

another reason that the merger doctrine applied under the FAA should not apply to judgments

based on ICSID awards. The district court, like many other courts enforcing ICSID awards,

*Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela*, Docket No. 15-707
Brief for the United States as *amicus curiae*

Page 22

correctly applied the rate dictated by the arbitral tribunal, and not the § 1961 rate. *See, e.g.*,

*Liberian Eastern Timber Corp. v. Republic of Liberia*, 650 F. Supp. 73, 75 (S.D.N.Y. 1986);

*Grenada v. Grynberg*, No. 11 Misc. 45 (DAB) (S.D.N.Y. Apr. 29, 2011) (reproduced at JA 614).

To do otherwise would permit an ICSID award that specifies the post-award rate of interest to be

valued differently depending on the country in which the award creditor seeks to have it

recognized. Applying only the interest rate provided for by the arbitral tribunal avoids this

undesirable outcome.

**Conclusion**

The Court should adopt the interpretation of the FSIA and the ICSID enabling statute as

described above.

Dated:    New York, New York
           March 30, 2016

                     Respectfully submitted,

                     PREET BHARARA
                     *United States Attorney for the*
                     *Southern District of New York,*
                     *Attorney for Amicus Curiae*
                         *United States of America*

          By:    */s/ Jennifer Jude*
                     JENNIFER JUDE
                     BENJAMIN H. TORRANCE
                     CHRISTOPHER CONNOLLY
                     *Assistant United States Attorneys,*
                         *Of Counsel*

BENJAMIN C. MIZER
*Principal Deputy Assistant Attorney General*
SHARON SWINGLE
*Attorney, Appellate Staff*
*Civil Division, Department of Justice*

BRIAN EGAN
*Legal Adviser, Department of State*

Adelso A. Adrianza
4 Repton Cir, Unit 4210
Watertown, MA 02472

The Honorable
Chief Judge Laurie S. Silverstein
c/o Office of the Clerk
U.S. Bankruptcy Court
District of Delaware
824 North Market Street, 3rd. Floor
Wilmington, DE 19801