**<u>EXHIBIT A-1</u>**

**Affidavit of Robert Fund Dated April 9, 2014 [Docket No. 131-1]**

## CONFIDENTIAL

Court File No. CV-11-9532-00CL

### ONTARIO
### SUPERIOR COURT OF JUSTICE
### COMMERCIAL LIST

BETWEEN:

### IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, 1985, C.c-36 AS AMENDED

### AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF CRYSTALLEX INTERNATIONAL CORPORATION

### AFFIDAVIT OF ROBERT FUNG
### SWORN APRIL 9, 2014

I, Robert Fung, of the City of Toronto, in the Province of Ontario, **MAKE**

**OATH AND SAY:**

1.         I am the Chairman and CEO of Crystallex International Corporation

("**Crystallex**" or the "**Company**"). I have also been a director of Crystallex since 1996,

Chairman of the Board of Directors of Crystallex since 1998 and CEO since June 2008.

As such, I have knowledge of the matters to which I hereinafter depose, which

knowledge is either personal to me, obtained from a review of the documents to which I

refer, or, where indicated, based on information and belief, in which case I verily believe

such information to be true.

### I.    BACKGROUND AND SUMMARY

2.         On December 23, 2011, an order (the "**Initial Order**") was made granting

Crystallex protection from its creditors under the *Companies' Creditors Arrangement Act*

(the "**CCAA Proceeding**") and Ernst & Young Inc. was appointed as the monitor (the

"**Monitor**"). On December 28, 2011 Crystallex obtained an order of the United States

Bankruptcy Court for the District of Delaware recognizing the CCAA Proceeding as a foreign main proceeding (the **"Chapter 15 Proceeding"** and together with the CCAA Proceeding the **"Restructuring Proceedings"**).

3.　　　Crystallex previously engaged in the business of exploring and developing the Las Cristinas gold project in Venezuela.   Crystallex had the right to mine Las Cristinas through a mining operation contract (the **"MOC"**) with Corporacion Venzolana de Guayana.  In 2011, the Venezuelan government expropriated the Las Cristinas mine and purported to terminate the MOC.  The Company is currently arbitrating the matter (the **"Arbitration Proceeding"**) before the Additional Facility of International Centre for the Settlement of Investment Disputes (the **"Tribunal"**) against Venezeula and is seeking, among other things, compensation of US$3.8 billion for the loss in value of its investment (the **"Arbitration Claim"**).  Oral arguments in the Arbitration Proceeding are now complete and written responses to questions from the Tribunal and post-closing briefs are due May 5, 2014.  The Arbitration Claim is the Company's principal asset.

4.　　　In order to pursue the Arbitration Claim, the Company must rely on a series of professional advisors, including Freshfields Bruckhaus Deringer US, LLP (**"Freshfields"**) as arbitration counsel, Compass Lexecon, Crystallex's valuation expert in the arbitration, Venezuelan counsel and various other expert witnesses (collectively the **"Arbitration Professionals"**).

5.　　　As more particularly described below, the costs associated with the realization of the Arbitration Claim, including the Arbitration Professionals have exceeded the Company's initial projections.  As a result, Crystallex requires a further

amendment to the DIP Credit Agreement (as defined below) to continue to fund the Arbitration Proceeding and related matters and to continue the Restructuring Proceedings for the benefit of all of its stakeholders.

6.        Accordingly, this Affidavit is sworn in support of a motion by Crystallex for an order (the "**Third** DIP **Amendment Order**"), among other things,:

(a)     granting Crystallex leave pursuant to paragraph 7 of the stay extension and standstill order (the "**Standstill Order**") made by the Honourable Mr. Justice Newbould on June 5, 2013 to bring this motion;

(b)     approving the terms of the Third DIP Amendment to the DIP Credit Agreement (each, as defined below) and authorizing Crystallex to enter into any documents necessary to give effect to the transactions contemplated thereby;

(c)     that the DIP Charge (as defined below) and the Lender Additional Compensation Charge (as defined below) shall secure all obligations under the DIP Credit Agreement, as amended by the Third DIP Amendment; and

(d)     sealing the motion materials and facta filed in connection with this motion that have been labelled as "Confidential" (collectively, the "**Confidential Materials**").

## II.  BACKGROUND TO THE DEBTOR-IN-POSSESSION FINANCING

### A.   The DIP Credit Agreement

7.         As described above, Crystallex's principal asset is the Arbitration Claim. Consequently, the only way for Crystallex to provide value to its stakeholders in the CCAA Proceeding is to pursue the Arbitration Proceeding. In the first quarter of 2012, it was apparent that Crystallex did not have sufficient cash on hand to finance the Arbitration Proceeding and therefore it was determined that Crystailex should pursue additional financing.

8.         Following an auction to raise financing, Crystallex entered into a senior secured credit agreement (the "**DIP Credit Agreement**") pursuant to which Tenor Special Situation Fund I, LLC made available the aggregate principal amount of US$36,000,000 (the "**Initial DIP Loan**"). The DIP Credit Agreement was subsequently finalized and assigned to Tenor Kry Cooperatief U.A. (the "**DIP Lender**") on April 23, 2012. It was agreed that the proceeds of the loan would be used for working capital and other general corporate purposes of Crystallex, including the payment of costs associated with the Arbitration Proceeding. The Initial DIP Loan was made available in four parts of: (a) US$9,000,000 (the "**Initial Loan**"), (b) US$12,000,000 (the "**Final Order Loan**"), (c) US$10,000,000 (the "**Incremental Loan**") and (d) US$5,000,000 (the "**Supplemental Loan**"). The DIP Credit Agreement was subsequently amended on May 15, 2012 (the "**First DIP Amendment**") to, among other things, increase the availability of the Initial Loan to US$13,000,000 and decrease the availability of the Final Order Loan to US$8,000,000.

9.        As consideration for the DIP Lender entering into the DIP Credit Agreement, the Company agreed to pay the DIP Lender a commitment fee in the amount of US$2,000,000 and an amount (the "**Initial Compensation**") equal to 35% of the Net Arbitration Proceeds (as defined below), subject to the priority scheme for the application and distribution of such proceeds set out in the DIP Credit Agreement (which priority scheme was amended by the Second DIP Amendment (as defined and described below)). The Initial Compensation was to be fully earned upon satisfaction of the conditions precedent to the advance of the Final Order Loan. The conditions to the advance of the Final Order Loan were satisfied by June 25, 2012 and the DIP Lender earned the Initial Compensation on such date.

10.       On April 16, 2012, the Honourable Mr. Justice Newbould made an order (the "**CCAA Financing Order**") approving the DIP Credit Agreement and granting (a) a charge on the property of Crystallex to secure all obligations outstanding under the DIP Credit Agreement and related documents, except for the obligation to pay the Initial Compensation (the "**DIP Charge**"), and (b) a charge on the property of Crystallex to secure the obligation of Crystallex to pay the Initial Compensation (the "**Lender Additional Compensation Charge**"). The DIP Charge ranks second in priority behind the Administration Charge (as defined in the Initial Order). The Lender Additional Compensation Charge ranks sixth in the order of priority on a *pari passu* basis with the MIP Charge (as defined in the Initial Order) and behind the Administration Charge, the DIP Charge, any future charge granted to secure supplemental loans by a lender (other than the DIP Lender), the Director's Charge and the Prefiling Unsecured Creditors' Charge (each, as defined in the Initial Order).

**B.     The 2013 Acknowledgement and Second DIP Amendment**

11.         As at January 31, 2013, the amount of US$21,000,000 had been advanced to Crystallex under the Initial DIP Loan (being the full amount of the Initial Loan and the Final Order Loan).   Due however, to certain unforeseen costs and expenses, lower than expected recoveries from sales of the Company's non-material assets and increased restructuring costs, Crystallex was unable to comply with its obligations under the DIP Credit Agreement regarding budgeted expenditures and on March 7 and 8, 2013, Crystallex acknowledged that it was in default of the DIP Credit Agreement.

12.         On March 11, 2013, Crystailex and the DIP Lender entered into an acknowledgement and agreement (the "**2013 Acknowledgement**") whereby the DIP Lender agreed to partially advance the Incremental Loan in the amount of US$3,296,672.46 notwithstanding the events of default, leaving the remaining balance of the Incremental Loan in the amount of US$6,703,327.54 and the Supplemental Loan unadvanced.

13.         As described in the tenth report of the Monitor dated June 4, 2013 (the "**Tenth Report**") and my affidavit sworn on June 3, 2013 ("**June 2013 Affidavit**"), the Monitor and the Company understood that the DIP Lender would advance the remaining portion of the Incremental Loan in the amount of US$6,703,327.54 and the Supplemental Loan if the Company secured financing (whether from the DIP Lender or otherwise) for the additional funds it required.

14.          On June 5, 2013, Crystallex and the DIP Lender entered into the second amendment agreement (the **"Second** DIP **Amendment"**) to the DIP Credit Agreement. Pursuant to the Second DIP Amendment, the DIP Lender agreed to, among other things, waive the existing events of default and increase the total principal amount of the Initial DIP Loan by US$11,100,000 (the "**Second** DIP **Amount**" and together with the Initial DIP Loan, the "DIP **Loan**"), for an aggregate DIP Loan of US$47,100,000.

15.          Pursuant to the Second DIP Amendment, the remaining balance of the Incremental Loan and the Second DIP Amount were to be advanced in three separate tranches (collectively, the **"Second** DIP **Loan"**):   (a) tranche A, being the amount of US$3,296,672.46 that was advanced on or about March 11, 2013 pursuant to the 2013 Acknowledgement, (b) tranche B in the amount of US$11,100,000, being the Second DIP Amount, and (c) tranche C in the amount of US$6,703,327.54, being the remaining unadvanced portion of the Incremental Loan.   It was agreed that the full principal amount of the Second DIP Loan would be advanced prior to the advance of the Supplemental Loan.

16.          The Second DIP Amendment also amended the DIP Credit Agreement to revise the events of default to, among other things, provide more flexibility to Crystallex surrounding budget-based defaults.

17.          As consideration for the DIP Lender agreeing to lend the Second DIP Amount, the Company agreed to pay the DIP Lender an amount equal to 14.874% of the Net Arbitration Proceeds (calculated on the basis of 1.34% of the Net Arbitration Proceeds for each US$1 million principal amount advanced) (the "**Second DIP**

Compensation" and together with the Initial Compensation, the "**Lender Additional Compensation**"). The Second DIP Compensation was to be fully earned at the time the Second DIP Amount was advanced to Crystallex by the DIP Lender. The Second DIP Amount was advanced on June 6, 2013 and therefore the DIP Lender earned the Second DIP Compensation at such time.

18.        Pursuant to the terms of the Second DIP Amendment, the "**Net Arbitration Proceeds**" is the amount left over from the proceeds of an award or settlement recovered in the Arbitration Proceeding after deducting unpaid post-filing expenses of Crystallex, including those in respect of the Arbitration Proceeding, taxes payable on the award or settlement recovered in the Arbitration Proceeding, unpaid principal and interest on the DIP Loan and all of the proven and allowed unsecured claims against Crystallex (each a "**Prior Ranking Amount**"). Thereafter, the Net Arbitration Proceeds are divided on account of the Lender Additional Compensation, the amounts provided for in the management incentive plan of Crystallex which was approved by the Court in April 2012 (the "**MIP**") and the Company's retained portion to be paid *pari passu* and *pro rata* based on the percentages of the Net Arbitration Proceeds applicable to such payments.

19.        To determine the appropriate amounts payable as Lender Additional Compensation and MIP compensation, the calculation of the Net Arbitration Proceeds include a reduction from the gross arbitration proceeds: (a) for the principal amount of the notes (the "**Senior Notes**") issued by Crystallex pursuant to the trust indenture dated December 23, 2004 between, among others, Crystallex and Computershare Trust

Company of Canada as trustee, in the amount of US$104,135,273.97, plus interest permitted to accrue thereon, including interest accruing in accordance with the Standstill Order, and (b) the principal amount of any other unsecured pre-filing claim unrelated to the Senior Notes that is determined to be a proven claim in accordance with the Claims Procedure Order dated November 30, 2012, plus any interest permitted thereon, in each case on account of the total amount of all of the proven and allowed unsecured claims against Crystallex.

20.         As a result of the Second DIP Amendment, the DIP Lender is to receive 49.874% of the Net Arbitration Proceeds on account of the Initial Compensation and the Second DIP Compensation after the Prior Ranking Amounts are satisfied and subject to certain adjustments.

III.    **THE THIRD DIP LOAN**

A.    **The Financial Situation of Crystailex**

21.         At March 31, 2014, Crystallex had approximately US$265,000 of available cash to fund its general overhead costs, the continuation of the CCAA Proceeding and the pursuit of the Arbitration Claim. In addition, the Supplemental Loan remains undrawn for the reasons described below.

22.         As described in the Tenth Report and my June 2013 Affidavit, Crystailex prepared a projection (the "DIP **Projection**") to determine the amount of financing it would require pursuant to the Second DIP Amendment. As indicated by the Monitor in the Tenth Report, at that time the costs associated with the realization of the Arbitration

Claim were uncertain and material variances could significantly affect the financing required to continue the Arbitration Proceeding.

23.      The actual overhead costs of the Company have been reduced since the filing of the DIP Projection, including reductions in office rent, IT, transfer agent fees, and phone and internet charges.  However, the amounts required to compensate the Arbitration Professionals and the costs associated with the Arbitration Proceeding were significantly higher than the estimates by Crystallex in the DIP Projection.  These costs of the Arbitration Proceeding were higher than projected for three principal reasons: (a) after the Arbitration Proceeding commenced in November 2013, Venezuela challenged one of the arbitrators that had been appointed, which led to additional expense and an unanticipated suspension of the hearing until February 2014, (b) the decision made by the Company and the Arbitration Professionals to present additional expert evidence at the Arbitration Proceeding, and (c) the decision to spend extra time preparing witnesses for the hearing.   These additional costs were partially offset by the reduction in overhead described above.  However, the Company has exceeded the DIP Projection by approximately US$4,800,000 and therefore has a substantial shortfall in its funding requirements.

24.      The accounts payable balance for the Arbitration Professionals (including fees owed to the Tribunal) is approximately US$6,256,000 (the "Payable") as of the date of my Affidavit. Crystallex anticipates expenditures of approximately US$5,171,000 in the month of April and US$1,713,000 in the month of May on account of accrued and

ongoing costs in connection with the Arbitration Proceeding and does not presently have the funds to satisfy those costs.

25.        As described in paragraph 3 above, final submissions are due in the Arbitration Proceeding on May 5, 2014.  Freshfields has advised Crystailex that if US$4,770,982 of the Payable (which represents a part of the amount of the Payable owing to Freshfields (another part amounting to US$615,870 has been deferred) is not paid in full by May 5, 2014 and if the Supplemental Fund (as defined below) is not established by such date, then they will not be in a position to submit the post hearing brief in the Arbitration Proceeding until paid.  If there is a delay in submitting the final submissions it could prejudice the Company's Arbitration Claim as it would make Crystallex's financial position known, which would in turn, give Venezuela leverage in future proceedings and negotiations.

26.        Furthermore, Crystailex does not have sufficient funds to pay its directors and officer's insurance, which will lapse at the end of April.

27.        Crystallex has used substantially all of the proceeds of the Second DIP Loan.  Certain condition precedents to the Supplemental Loan have not been satisfied, due in part to the fact that the costs of the Arbitration Proceeding are greater than anticipated and the requirement that the Company had sufficient funds to complete the Arbitration Proceeding.  In any event, Crystallex will need financing substantially greater than the Supplemental Loan to provide adequate liquidity to advance the Arbitration Proceeding through to completion.

28.        On February 28, 2014, Crystallex and the DIP Lender entered into an acknowledgement and agreement (the "2014 **Acknowledgement**") in respect of the Supplemental Loan.   The 2014 Acknowledgement is filed separately with this Court. Pursuant to the 2014 Acknowledgement, Crystallex and the DIP Lender agreed to a revised budget (the "**Revised Budget**") and the DIP Lender agreed to waive any budget-based defaults have occurred as a result of the previous budget and that Crystallex would be entitled to draw the Supplemental Loan on or after April 15, 2014 if Crystallex receives a written financing commitment satisfactory to the DIP Lender sufficient to meet the Company's cash requirements as set out in the Revised Budget and such financing commitment has been approved by this Court and all applicable appeal periods have expired.

29.        I anticipate that Crystallex will run out of funds imminently unless it receives additional financing.

30.        The only way for Crystallex to pay its stakeholders is to prosecute the Arbitration Claim to a successful settlement or award.   The Arbitration Claim is the only significant asset of Crystallex and therefore there will be no material recovery for its creditors until the Arbitration Proceeding is either settled or resolved through an award. Crystallex therefore requires additional financing to pursue the Arbitration Claim and enhance the prospects of recoveries for its stakeholders.

**B.    The Budget**

31.        Recognizing that previous cost estimates associated with the Arbitration Proceeding have been historically too low, Crystallex, with the oversight of the Monitor,

has prepared a cash flow budget (the "**Budget**") to demonstrate the funding that will be required to continue to pursue the Arbitration Proceeding and fund its general overhead costs and the continuance of the Restructuring Proceedings for the period of January 2014 through December 2015 (the "**Additional Financing Period**"). The Budget is being filed separately with this Court. The Budget is based on the assumption that there are no disputes with the holders of the Senior Notes (the "**Noteholders**") or any other stakeholders of the Company and no new material issues or additional hearings arise out of the Arbitration Proceeding.

32.     Filed separately with this Court is a description of the remaining steps in the Arbitration Proceeding. Crystallex has worked with Freshfields to develop a budget for the Arbitration Proceeding and they have estimated various costs that could arise in connection therewith. The Additional Financing Period was selected based on the likely timing of the completion of the Arbitration Proceeding, the enforcement of any damages award in favour of Crystallex and assuming Venezuela does not appeal or attempt to nullify any award made by the Tribunal.

33.     Furthermore, Crystallex intends to further reduce its corporate overhead, including reducing headcount and reducing its rent, which should help to reduce costs during the Additional Financing Period.

34.     Based on the overhead costs of the Company, our analysis of the historical professional fees incurred to date, detailed conversations with Freshfields concerning the remaining work anticipated in connection with the Arbitration Proceeding and my experience gained in the Restructuring Proceedings, I believe the Budget is

reasonable and sufficiently anticipates Crystallex's financing needs for the Additional Financing Period.

### C.    The Third DIP Amendment and Standby Facility

35.         Given the current financial situation of Crystallex and the terms of the 2014 Acknowledgement, Crystallex carefully considered potential paths to obtain the necessary financing, which included engaging in discussions with the DIP Lender about the possibility of securing additional financing.  For the reasons described herein, the Company was of the view that it was most appropriate in the circumstances to secure financing from the DIP Lender.

36.         On March 12, 2014, the DIP Lender provided Crystailex with a proposed term sheet (as subsequently amended, the **"Term Sheet"**) setting out the terms pursuant to which the DIP Lender and Crystailex would amend the DIP Credit Agreement (the **"Third DIP Amendment"**).  Over the course of the last three weeks, Crystallex and Tenor have been engaged in negotiations over the terms of the proposed financing, including the possibility of committing to include a standby facility for additional funding.   Crystailex has involved the Monitor in those discussions and negotiations, including discussions regarding the appropriate size of the facility increase.  Crystallex has also continued to keep the principal stakeholders apprised of the developments in relation to their efforts to obtain financing and proposed terms. Specifically, the Company provided the Noteholders and Mr. Reyes an indication of the

terms of the Third DIP Amendment on or about March 20, 2104 and a draft of the Term Sheet, when it was available.

37.        On March 31, 2014, the DIP Lender provided Crystallex with a draft commitment letter (as subsequently amended, the **"Commitment Letter"**) in respect of the Third DIP Loan (as defined and described below).  Crystallex and the DIP Lender subsequently engaged in negotiations in respect of the Commitment Letter terms and following discussions with the Monitor, on April 8, 2014 Crystallex signed the Commitment Letter.  An executed copy of the Commitment Letter (attached to which as an exhibit is the Term Sheet) is filed separately with this Court.

38.        Pursuant to the Commitment Letter, the DIP Lender has committed to increase the total principal amount of funding available to Crystallex by up to an additional US$14,883,333.33 (collectively, the **"Third DIP Loan"**) to be made available in two separate tranches:  (a) a tranche in the principal amount of US$11,550,000 (the **"Third DIP Amount"**), and (b) a separate standby tranche in the principal amount of US$3,333,333.33 (the **"Standby Facility"**).  Pursuant to the terms of the Commitment Letter, the existing unadvanced US$5,000,000 Supplemental Loan continues to be available (subject to certain conditions and only after the advancement of the Third DIP Amount).  The proceeds of the Third DIP Amount and the Standby Facility are to be used to, among other things, pay Freshfields' past due legal fees and disbursements as provided for in the Budget and pay the costs of the Arbitration Proceeding and other uses in accordance with the Budget.

39.          The interest, maturity and priority of the Third DIP Loan are consistent with the provisions currently in place with respect to the DIP Loan. Specifically, any amounts advanced under the Third DIP Amendment bear interest at the rate of 10% compounded semi-annually until paid. If an event of default occurs and is continuing, the amounts owing to the DIP Lender under the Third Amendment will bear interest at a rate of 12% per annum. The Third DIP Loan matures at the same time as the DIP Loan being December 31, 2016. Finally, as part of this motion, Crystailex is requesting this Court to make an order that the DIP Charge and the Lender Additional Compensation will secure the Third DIP Loan and the Third DIP Compensation Amount (as defined below), respectively. If this order is made, the Third DIP Loan and the Third DIP Compensation Amount will have the same priority as the DIP Loan and the Lender Additional Compensation.

40.          The terms of borrowing that are specific to each of the Third DIP Amount, the Standby Facility and the Supplemental Loan are discussed below.

*The Third DIP Amount*

41.          The Third DIP Amount is available by way of a single draw on the expiry or waiver of the applicable appeal period in respect of the Third DIP Amendment Order. If approved, Crystallex will draw the full Third DIP Amount immediately following the expiration or waiver of such appeal period.

42.          There is a US$1,050,000 commitment fee earned upon entry of the Third DIP Amendment Order and paid concurrently with the advance and from the proceeds of the Third DIP Amount. As a result, the net proceeds to be received from the advance

of the Third DIP Loan will be US$10,500,000.  The DIP Lender will also earn 15.477%
of the Net Arbitration Proceeds (calculated on the basis of 1.34% of the Net Arbitration
Proceeds for each US$1,000,000 principal amount advanced) upon entry of the Third
DIP Amendment Order and the advance of the Third DIP Amount (the **"Third
Amendment Share"**).

*The Standby Facility*

43.        The Standby Facility can be advanced at any time after the advance of the
Third DIP Amount, but subject to sole and unfettered the discretion of each of the DIP
Lender and Crystallex.  It is intended that the Standby Facility will be used primarily to
cover unbudgeted fees and costs arising in connection with the Restructuring
Proceedings and other unforeseeable contingencies at the discretion of the board of
directors of Crystallex.

44.        There is a 10% commitment fee payable on advances under the Standby
Facility when such amounts are advanced.  The DIP Lender is also entitled to 4.466% of
the Net Arbitration Proceeds (calculated on the basis of 1.34% of the Net Arbitration
Proceeds for each US$1,000,000 principal amount advanced) earned on a *pro rata*
basis on amounts advanced when such amounts are advanced (such share of the Net
Arbitration Proceeds when taken together with the Third Amendment Share, the **"Third
DIP Compensation Amount"**).

*Supplemental Loan*

45.         The Supplemental Loan can be advanced at any time after the advance of the Third DIP Amount provided that the conditions to the availability to the loan set out in the DIP Credit Agreement (as amended by the Third DIP Amendment) are satisfied. The proceeds of the Supplemental Loan can only be drawn to satisfy budgeted professional fees, including the fees and expenses of the Arbitration Professionals (such portion of the Supplemental Loan that is used to satisfy the fees and expenses of the Arbitration Professionals being the **"Supplemental Fund"**), budgeted corporate overhead expenses and certain contingencies. The Arbitration Professionals have agreed to defer the payment of a portion of the Payable and the accrual of interest on such amount on the condition that the Supplemental Fund was established by May 5, 2014.

46.         The existing defaults under the DIP Credit Agreement have been waived and I expect that Crystallex will be able to draw on the Supplemental Loan for the purposes contemplated under the Third DIP Amendment.

47.         The DIP Lender has agreed that it will not charge interest on the Supplemental Loan for the period between the date that such loan is fully advanced and December 1, 2014, provided that there is no event of default.

48.         There are no fees or additional compensation payable under the Third DIP Amendment in connection with the Supplemental Loan. This is because the fees and compensation payable in connection with the Supplemental Loan were paid or earned on June 25, 2012 as part of the compensation payable to the DIP Lender in consideration for the availability of the Initial DIP Loan.

## D.     Effect of the Third DIP Amendment on the Company's Stakeholders

49.          As consideration for the advances to be provided by the DIP Lender under the Third DIP Amendment, the DIP Lender shall have earned 65.35% of the Net Arbitration Proceeds (and up to 69.817% if the Company draws the maximum amount of the Standby Facility).

## E.     Alternatives to the Third DIP Amendment

50.          The board of Crystallex explored various financing options in the last ten months. These options have included both debt and equity financings. In respect of an equity financing, the Company is prohibited by the terms of the DIP Credit Agreement from issuing any shares or other equity interest for cash consideration unless the equity financing does not dilute the interests of the DIP Lender in Crystallex. Moreover, the Company is subject to a cease trading order which limits its ability to sell securities. In order to have the cease trade order removed, Crystallex would have to update its public filings for the last four years, which would be very costly and time consuming. Crystallex was also delisted from the Toronto Stock Exchange and the American Stock Exchange and is not currently listed on any exchange.

51.          In November 2013, I was approached by an investment banker who had been contacted by a prospective investor on a confidential basis. I was advised that the investor might be interested in providing Crystallex up to US$5,000,000 in financing on a subordinated basis. Unfortunately, the investor was unwilling or unable to offer funding in excess of this amount and as a result, a financing deal never materialized.

52.         Management of the Company was also approached by a group of shareholders who indicated that they would be willing to provide additional financing to Crystallex.    However, it was proposed that the funding would be provided from numerous sources and, in total, would be in the range of US$3,000,000 to US$5,000,000, which is insufficient to meet Crystallex's current financial needs.  As a result, this option was not pursued by the Company.

53.         I also had recent discussions with an individual who is both a Noteholder (but not a member of the *ad hoc* committee of Noteholders) and a shareholder who indicated an interest in providing financing to Crystallex.   To date, this individual has been unable to commit funds.

54.         Other than the discussions described above, the Company did not engage in another formal process to solicit additional financing from alternative sources because there are certain structural impediments to financing for the reasons that follow.  First, the DIP Credit Agreement requires Crystallex to obtain the consent of the DIP Lender before incurring any additional indebtedness (other than subordinated indebtedness) or allowing any liens or encumbrances to be created on its property. Second, the DIP Lender has the benefit of the DIP Charge and the Lender Additional Compensation Charge and it is entitled to the Lender Additional Compensation.  Third, while Crystallex is permitted to incur debt that is subordinated to DIP Loan, the Company is first required to give the DIP Lender the opportunity to provide financing, any such indebtedness needs to be explicitly subordinated to the obligations of the Company to the DIP Lender and if the proceeds of any such subordinated indebtedness

exceed US$10,000,000, 50% of the proceeds in excess of US$10,000,000 shall be paid to the benefit of the DIP Lender. All of the foregoing terms of the DIP Credit Agreement were the result of lengthy and arduous negotiations between Crystallex and the DIP Lender and I understand are terms upon which the DIP Lender made (and continues to make) its credit decisions in respect of advances to Crystallex.

55.        We believe that in light of the foregoing it is unlikely that Crystallex would be successful finding a lender who would agree to loan funds in the amounts required by the Company in a position that is subordinate to the DIP Lender. Crystallex conducted an auction in 2012 to source financing which ultimately resulted in the DIP Lender being named as the successful lender. If Crystallex canvassed the market to explore financing alternatives, it would be costly and potentially time-consuming process. Even assuming Crystallex had the money and time (neither of which it does) to canvass the market, there is simply no evidence to suggest that Crystallex would be successful. Furthermore, it would be highly irresponsible of Crystallex to subject its stakeholders to the risk that a formal process would pose to the Arbitration Proceeding. Specifically, the Company does not want to make it publicly known that it is experiencing difficulty financing the Arbitration Proceeding because it could affect the quantum of any settlement that is reached with Venezuela. Also, there is a fear that this information could result in Venezuela delaying the process and taking steps to drive up costs in the Arbitration Proceeding.

56.        For all the foregoing reasons, I believe that in the circumstances, the financing made available pursuant to the Third DIP Amendment is proper, fair and

reasonable in the circumstances and is the best option to preserve the main asset of Crystallex for the benefit of all stakeholders.

## IV.    REQUEST FOR SEALING

57.        As part of this Motion, Crystallex is requesting that the Confidential Materials describing the costs of the Arbitration Professionals and detailing terms of the Third DIP Amendment and the Budget be sealed.   The terms of the financing and details of Budget could be detrimental to the Company's position in the Arbitration Proceeding.   It is critical that the Venezuelan government not be given access to information concerning the Company's finances and its professional fees and expenses relating to the Arbitration Claim.

SWORN BEFORE ME at the City of Toronto, in the Province of Ontario on April 9, 2014.

_____
Commissioner for taking affidavits
Natalie Renner

_____
Robert Fung

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, 1985, C.c-36 AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF CRYSTALLEX INTERNATIONAL CORPORATION

Court File No.  CV-11-9532-00CL

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

Proceeding commenced at Toronto

### AFFIDAVIT OF ROBERT FUNG
### (Sworn April 9, 2014)

**Davies Ward Phillips & Vineberg llp**
155 Wellington Street West
Toronto, ON  M5V 3J7

Jay Swartz (LSUC #15417L)
Natalie Renner (LSUC #55954A)
Tel:    416.863.0900
Fax:    416.863.0871

Lawyers for Crystallex International Corporation

## EXHIBIT A-2

**Eleventh Report of the Monitor [Docket No. 131-3]**

Court File No.: CV-11-9532-00CL

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS***
***ARRANGEMENT ACT,* R.S.C. 1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR**
**ARRANGEMENT OF CRYSTALLEX INTERNATIONAL CORPORATION**

**ELEVENTH REPORT OF THE MONITOR**

**April 12, 2014**

**INTRODUCTION**

1.      On December 23, 2011, Crystallex International Corporation ("**Crystallex**" or the "**Applicant**") filed for and obtained protection from its creditors under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "**CCAA**") pursuant to the Order of this Court dated December 23, 2011 (the "**Initial Order**"). Pursuant to the Initial Order, Ernst & Young Inc. ("**EYI**") was appointed as the monitor of the Applicant (the "**Monitor**") in these CCAA proceedings.

2.      In order to provide the necessary financing for its CCAA proceeding (the "**CCAA Proceeding**"), Crystallex has obtained debtor in possession financing (after the assignment of the loan from the original lender, Tenor Special Situation Fund I, LLC) from Tenor Capital Coöperatif U.A. ("**Tenor**").

**PURPOSE**

3.      The Monitor is filing this Eleventh Report (the "**Eleventh Report**") to provide the Court with an update on the following issues:

        (a)      The status of the Applicant's arbitration proceedings in respect of its appropriated

mine site in Venezuela;

(b)  The Applicant's cash flows since the date of the Tenth Report of the Monitor dated June 4, 2013 (the "**Tenth Report**");

(c)  The Applicant's need for additional financing;

(d)  The Applicant's motion to approve the Third DIP Loan (as defined herein);

(e)  The Applicant's motion to extend the stay period to December 31, 2015;

(f)  The Applicant's motion to extend the standstill agreement (the "**Standstill Agreement**") with its noteholders (as defined herein) to December 31, 2015;

(g)  The Applicant's change in counsel;

(h)  Crystallex's request to seal Appendices "A", "B", "D" and "F" (the "**Confidential Appendices**") of this Eleventh Report given the confidential nature of their contents; and

(i)  The Monitor's views and recommendations in respect of the above.

**DISCLAIMER**

4.  In preparing this Eleventh Report and making the comments herein, the Monitor has been provided with, and has relied upon, unaudited financial information, books and records prepared by Crystallex, and discussions with management of the Applicant ("**Management**") (collectively, the "**Information**").   Except as described in this Eleventh Report in respect of the Applicant's cash flow statement:

(a)  the Monitor has reviewed the Information for reasonableness, internal consistency and use in the context in which it was provided.  However, the Monitor has not audited or otherwise attempted to verify the accuracy or completeness of the Information in a manner that would wholly or partially comply with Generally Accepted Assurance Standards ("**GAAS**") pursuant to the Chartered Professional Accountants Canada Handbook and, accordingly, the Monitor expresses no opinion

or other form of assurance contemplated under GAAS in respect of the Information; and

(b)    Some of the information referred to in this Eleventh Report consists of forecasts and projections. An examination or review of the financial forecast and projections, as outlined in the Chartered Professional Accountants Canada Handbook, has not been performed.

5.    Future oriented financial information referred to in this Eleventh Report was prepared based on Management's estimates and assumptions. Readers are cautioned that since projections are based upon assumptions about future events and conditions that may not be ascertainable, the actual results will vary from the projections, even if the assumptions materialize, and the variations could be significant.

6.    Capitalized terms not defined in this Eleventh Report are as defined in previous reports of the Monitor. Unless otherwise stated all monetary amounts contained herein are expressed in U.S. Dollars.

7.    This Eleventh Report should be read in conjunction with the Affidavits of Robert Fung sworn April 8 and April 11, 2014 in support of this motion (collectively, the "**Fung Affidavits**")

**UPDATE ON ARBITRATION**

8.    Attached as confidential Appendix "A" to this Eleventh Report is a summary of the Applicant's arbitration proceedings.

**UPDATE ON CCAA PROCEEDINGS SINCE JUNE 2013**

9.    In its Tenth Report, the Monitor reported that, subject to the Court's approval of an injection of additional financing, the Revised DIP Projection (which was the forecast on which the financing was based) indicated that the Applicant would have sufficient liquidity to operate through to December 31, 2014. This Court approved the injection of additional financing on June 5, 2013 and contemporaneously ordered an extension of the stay period until December 31, 2014 (the "**Stay Period**").

10.  In the months leading up to the commencement of the Arbitration hearing in November 2013, total costs of preparing for the hearing exceeded the amount projected in the Revised DIP Projection.  In addition and for reasons more fully described in the Fung Affidavits and the confidential Appendices, Crystallex was required to incur additional costs associated with the Arbitration Claim.

11.  The remainder of the update on the CCAA Proceedings can be found in confidential Appendix "B" to this Eleventh Report.

**ACTUAL CASH FLOWS SINCE JUNE 2013**

12.  Appendix "C" to this Eleventh Report sets out the actual cash flows of Crystallex, on a monthly basis, since June 1, 2013.  The Tenth Report of the Monitor dated June 4, 2013 included details of the Applicant's cash flows up to and including May 17, 2013.  Cash flows from May 18 to May 31, 2013 reflected a use of cash in the amount of approximately $261,000 due to payment of payroll (approximately $112,000), rent (approximately $14,000) and general office expenses for the remainder.

13.  The following summarizes some of the larger variances from the forecast that was filed with the Court in June 2013:

(a)  *Opening cash* as at June 1, 2014 is approximately $150,000 less than forecast due to the fact that the opening cash balance was a forecast amount that was estimated in mid-May 2013;

(b)  *Net DIP Loan Proceeds* are approximately $5 million less than forecast.  As set out below, the Applicant did not submit a draw request to Tenor in December 2013 as contemplated in the forecast;

(c)  *Equipment proceeds* realized a positive variance of approximately $227,000 due to the fact that proceeds were received in late March, 2014.  Such proceeds were not forecast by Crystallex.

(d)  *HST refunds* were approximately $607,000 higher than forecast;

(e)   *Consultants and general legal* disbursements were approximately $126,000 less than forecast due to cash management efforts of management and lower than forecast expenses related to this line item;

(f)   *Arbitration* disbursements were $315,000 higher than forecast due to the increased activity of the arbitration professionals as discussed elsewhere in this Eleventh Report. In addition to this amount, the Applicant has certain post-filing accounts payable that are described in greater detail in confidential Appendix "D" (the bulk of which is related to the Arbitration Claim) as at the date of this Eleventh Report. The delay in the proceedings had direct negative implications for the professional costs incurred. In addition, during the delay resulting from Venezuela's motion, the Applicant and its counsel determined that they would spend additional time preparing witnesses for their respective testimony related to the Arbitration Claim. As such, significant additional unbudgeted costs were incurred;

(g)   Disbursements related to *Restructuring – CCAA* were approximately $270,000 lower than forecast as a result of the Applicant deferring payment to its professionals. However, the Applicant has outstanding accounts payable to various parties related to the CCAA Proceeding which, if paid, would eliminate this positive variance;

(h)   A positive variance of approximately $216,000 has been realized with respect to *Insurance* due to a delay in a forecast payment. This payment is now reflected in the Budget (as defined herein);

(i)   Crystallex realized *Foreign exchange* gains of approximately $120,000 due to the decrease of the value of the Canadian dollar relative to the U.S. dollar; and

(j)   Costs related to the *Caracas Office G&A* were approximately $73,000 lower than forecast due to a decrease in activity in that office and a favourable exchange rate.

## CRYSTALLEX'S CURRENT LIQUIDITY POSITION

14.     An update on the Applicant's currently liquidity position can be found in confidential Appendix "D" to this Eleventh Report.

## THIRD DIP LOAN

15.     As a result of the issues set out above and in the Confidential Appendices, the Applicant has undertaken efforts to find additional sources of funding to allow it to pursue the Arbitration Claim.  After assessing its various options (as described in greater detail in the Fung Affidavits), Crystallex has negotiated a term sheet (the "**2014 Term Sheet**") with its existing lender, Tenor and signed a Commitment Letter (as defined in the Fung Affidavits) after consultation with the Monitor.  Furthermore, an amending agreement, the "**Third DIP Amending Agreement**", has been negotiated between the parties.

16.     Significant details with respect to the 2014 Term Sheet and Third DIP Amending Agreement are summarized below:

(a)     Two new tranches of financing will be made available to Crystallex.  These include $11.55 million to be issued as a single draw (the "**Third DIP Amount**") and a further $3.333 million (the "**Standby Facility**").  The Third DIP Amount and the Standby Facility are, together, the "**Third DIP Loan**";

(b)     The regular and default rates of interest will remain at 10% and 12%, respectively and the Third DIP Loan, unless it is extended, will mature December 31, 2016;

(c)     Tenor has waived any known existing defaults and agreed to release the $5 million that was undrawn during the last round of financing (i.e. the Supplemental Loan) subject to certain conditions including that funds advanced pursuant to the Supplemental Loan shall only be used to fund the activities that are set out in the Budget (i.e. cannot be used for any cost overruns unless in respect of Arbitration costs and certain additional specified costs).  The Monitor notes that Tenor has already earned entitlement to 6.7% of the Net Arbitration Proceeds on this Supplemental Loan;

(d)    As with prior rounds of financing, Tenor will be entitled to additional compensation in addition to its 10% interest charge.  On Court approval of the Third DIP Amount, Tenor will be entitled to 1.34% of the Net Arbitration Proceeds (as they are defined in Fung Affidavits) for each $1 million of financing that is approved for total additional compensation of 15.477% of the Net Arbitration Proceeds.  Similar compensation will be payable on the Standby Facility (i.e., another 4.47% of the Net Arbitration Proceeds), but such compensation will not be earned until such time as funds are drawn.  If all available amounts of the Third DIP Loan are drawn by Crystallex, Tenor will be entitled to a total of 69.817% of the Net Arbitration Proceeds;

(e)    Provided that an Event of Default (as such term in defined in the various credit agreements) has not occurred and the Standby Facility is fully drawn, the Company will be entitled to draw the full Supplemental Loan and no interest will accrue on the Supplemental Loan until December 1, 2014, regardless of when it is drawn.  If such an Event of Default does occur, interest will be payable in the normal course pursuant to the credit documents;

(f)    If Crystallex submits a draw request pursuant to the Standby Facility and such request is not agreed to by Tenor, Crystallex shall have the ability to make disbursements from cash on hand without triggering a default under the various covenants and the failure to obtain the Standby Facility will not trigger an Event of Default with respect to any draw on the Supplemental Loan.  However, other budget-based covenants will remain in place and an Event of Default may otherwise arise;

(g)    Tenor will be entitled to a commitment fee of $1.05 million in respect of the funding of the Third DIP Amount.  A fee of $333,333 (i.e. 10%) will be earned by Tenor when the Standby Facility is drawn.  Should less than the full amount be drawn, the commitment fee will be calculated on a *pro rata* basis;

(h)    Tenor has agreed to advance the full amount of the Supplemental Loan no later than concurrently with the final draw of the Standby Facility (if it is drawn in multiple

tranches) or concurrently with the full draw of the Standby Facility.  However, the Standby Facility may only be drawn with the approval of both Tenor and Crystallex subject to Tenor's complete discretion as to whether it will advance the Standby Facility;

(i)    The Third DIP Amendment Agreement has amended certain covenants to which Crystallex was subject.  These include the following:

    i.    Historically Crystallex was allowed an overage of 10% of forecast disbursements on a rolling 6 month basis.  The Third DIP Amendment Agreement has increased this variance to 15%.  A further change with respect to this covenant is to remove certain line items from the calculation.  Such line items are primarily related to the Arbitration costs and costs related to the Monitor and its counsel.  This covenant will be first calculated in June 2014 or July 2015, depending on the timing of the first advance of the Third DIP Amount;

    ii.    Crystallex is currently permitted a one-time variance of 20% on the rolling 6 month covenant calculation set out above.  The Third DIP Amending Agreement has increased this threshold to 30%; and

    iii.    All other budget-based covenants remain the same as the last credit agreement.

(j)    The Third DIP Amending Agreement contains certain provisions amending the current corporate governance of Crystallex.  In the event that the independent director (who is the "**Special Managing Director**") of Crystallex leaves the Board of Directors, board approval shall require three of the remaining four directors voting the same way.  Similarly, if another member joins the board, a majority shall require four out of the five members.  If the board increases beyond 5 members, board approval shall be by simple majority but will require at least one Series 1 Nominee (i.e. a representative from Tenor) in order to be successful.  The Series 1 Nominees include two representatives from Tenor who are members of the Board

of Directors.  This process is the "**Supermajority Threshold**";

(k)    The Supermajority Threshold provisions shall remain in force until such time as a new Special Managing Director is appointed and a vote of confidence in such Special Managing Director occurs.  In order to achieve such vote of confidence, four out of the five directors must vote in favour.   If this threshold is reached, a simple majority will be all that is required for future votes.   If not, the Supermajority Threshold shall remain in effect until such time as the necessary votes are achieved in a future vote.  Such votes may be held at a maximum once every four weeks.

(l)    The Third DIP Amending Agreement places restrictions on the Applicant's ability to accept certain claims of its creditors without Tenor's consent.  The Court issued the "**Claims Procedure Order**" on November 30, 2012 and such order requires the Monitor to obtain the Applicant's consent or approval of the Court to accept any claim in excess of $100,000.  The Third DIP Amending Agreement prevents Crystallex from accepting or providing its consent to the Monitor to accept any Noteholder Claim as defined in the Claims Procedure Order without Tenor's consent or approval of the Court.

## MONITOR'S VIEWS WITH RESPECT TO THE THIRD DIP LOAN

17.    As described in greater detail below, one of the factors that this Court is to consider when considering approval of interim financing is the Monitor's report referred to in paragraph 23(1) (b) of the CCAA.  Subject to this Court approving the Third DIP Loan in the amount of 14.9 million, the Budget projects that Crystallex will have sufficient liquidity to operate during the proposed Period.

18.    The Monitor's duties with respect to its review of the Budget pursuant to section 23(1)(b) of the CCAA require the Monitor to review it as to its reasonableness and to file a report with this Court on the Monitor's findings.  The Canadian Association of Insolvency and Restructuring Professionals standards of professional practice include a standard for monitors fulfilling their statutory responsibilities under the CCAA in respect of a

Monitor's Report on a Cash-Flow Statement.   A copy of Standard 09-1 Cash Flow Statement is attached hereto as Appendix "E".

19.    Pursuant to this standard, the Monitor's review of the Budget consisted of inquiries, analytical procedures and discussion related to information supplied to the Monitor by certain of the management and employees of Crystallex. Since hypothetical assumptions need not be supported, the Monitor's procedures with respect to them were limited to evaluating whether they were consistent with the purpose of the Budget. The Monitor also reviewed the support provided by management of Crystallex for the probable assumptions of the Budget.

20.    Based on the Monitor's review, nothing has come to its attention that causes it to believe that, in all material respects:

    i.      the hypothetical assumptions are not consistent with the purpose of the Budget;

    ii.     as at the date of this Eleventh Report, the probable assumptions developed by management are not suitably supported and consistent with the plans of Crystallex or do not provide a reasonable basis for the Budget, given the hypothetical assumptions; or

    iii.    the Budget does not reflect the probable and hypothetical assumptions.

21.    In considering the proposed Third DIP Loan, the Monitor reviewed the factors set out in Section 11.2(4) of the CCAA which provides a non-exhaustive list of factors which this Court is to consider when deciding whether to approve the Applicant's proposed Third DIP Loan.  The Monitor's comments with respect to these factors are set out below.

*11.2 (4) (a) - the period during which the company is expected to be subject to proceedings under the CCAA*

22.    As part of its process to obtain additional financing, Crystallex has prepared a monthly budget through the end of 2015 (the "**Budget**").  The Budget is presented on a monthly basis during the period as defined therein and represents management's estimate of the projected cash flow through 2015 (the "**Period**") given anticipated activity levels and

required levels of security required by the Applicant.  Given the nature of Crystallex's operations at present, the projected cash flows consist of draws under the Third DIP Loan and payments to multiple employees, professionals and, to a lesser degree, other service providers.  As discussed herein, the costs and timing associated with the realization of the Arbitration Claim remain uncertain.  While management has consulted with the professionals involved to obtain their input on anticipated costs going forward, there remain significant risks around these assumptions.  Material variances could significantly affect the timing of the Applicant requiring additional financing to continue pursuit and collection of the Arbitration Claim.

23. The Period was selected by management based on Crystallex's assessment of the likely timing of a decision from the Tribunal after consultation with Freshfields.  Collection of any award and other delays may require additional time and funding before receiving any funds from the Arbitration following the end of the Period.

24. Given the timelines, as described to the Monitor and Crystallex, the need for financing could extend for a number of months post-arbitration hearings and it is appropriate in the Monitor's view that the funding continue to be available to Crystallex for the rest of 2014 and 2015.

25. The Budget assumes and provides for no extended disputes or significant involvement of professionals in the CCAA Proceedings, including in respect of the current Third DIP Loan negotiations and approval process; however, it does provide for limited contingency funds in case of deviation from the Budget.  It is possible that additional funding, including that contemplated by the Standby Facility, will be required.  The fees associated with negotiating and implementing the Third DIP Loan will very likely exceed what is assumed for professional fees for this period in the Budget and will create additional risk around variances, budget-based defaults and funding for these types of expenses during the Period.  The Monitor notes that the negotiations relating to the Third DIP Loan should constitute Contentious Proceedings under section 8.1(n)(iii), which interpretation is necessary to address the default provisions relating to Restructuring expenses in the Budget.

*11.2 (4) (b) – how the company's business and financial affairs are to be managed during the proceedings*

26.     The Applicant contemplates keeping existing senior management in place through the Arbitration Proceedings and employing appropriate Arbitration consultants for the prosecution of the Arbitration Claim.  Crystallex states all the knowledge necessary to advance the Arbitration Proceedings rests with the existing senior management and the Arbitration consultants.

27.     Furthermore, Company is attempting to reduce its overhead costs (including headcount reductions and senior management salary deferrals) in an attempt to minimize cash outflows.

*11.2 (4) (c) – whether the company's management has the confidence of its major creditors*

28.     The Monitor is not aware of any stakeholder requesting that the Company's management be replaced.

*11.2 (4) (d) – whether the loan would enhance the prospects of a viable compromise or arrangement being made in respect of the company*

29.     Crystallex requires additional financing to pay its expenses and continue to pursue the Arbitration Claim.  As such, the Third DIP Loan will enhance the viability of a CCAA Plan by preserving the main asset of the company for the benefit of all stakeholders. Absent additional financing, it is not possible to pursue the Arbitration Claim

*11.2 (4) (e) – the nature and value of the company's property*

30.     Crystallex has no assets or operations to provide recovery to its stakeholders other than the pursuit of the Arbitration Claim.

31.     Accordingly, the only avenue to present value for its stakeholders is to prosecute the Arbitration Claim for which the additional financing is required.

*11.2 (4) (f) – whether any creditor would be materially prejudiced as a result of the security charge*

32.    The Monitor has had discussions with Tony Reyes ("**Reyes**"), a shareholder of the Applicant, and the only individual shareholder who has been active in contacting the Monitor, to advise him of the principal terms of the Third DIP Loan and the Budget. Reyes advises that he supports the proposed financing.

33.    The Applicant is continuing discussions with the Noteholders in respect of the Third DIP Loan and the Standstill/Stay Period extension.

34.    The ability of the Applicant to continue to operate and pursue the Arbitration Claim is beneficial to all of the Applicant's stakeholders.

*11.2 (4) (g) – the monitor's report referred to in paragraph 23(1)(b), if any.*

35.    The discussion of the Monitor's report referred in 23(1)(b) is found in paragraphs 22 to 34 of this Eleventh Report.

36.    The Budget has been prepared by management of Crystallex using probable and hypothetical assumptions set out in notes 1 to 12 of the Budget.  A copy of the budget can be found in confidential Appendix "F" to this Eleventh Report.

37.    As described in the Disclaimer above, since the Budget is based on assumptions regarding future events, actual results will vary from the information presented even if the hypothetical assumptions occur, and the variations may be material. Accordingly, the Monitor expresses no assurance as to whether the Budget will be achieved and the Monitor refers readers to the Disclaimer section above.

*Additional Considerations*

38.    The Third DIP Loan is consistent with other rounds of financing with respect to the fees and interest rates charged and the additional compensation (i.e. the Lender's Additional Compensation).  The Monitor notes, however, that the Supplemental Loan, on which Lender's Additional Compensation has already been earned, is to be advanced after the

Third DIP Amount and, at the latest, contemporaneously with the Standby Facility. Tenor has confirmed to the Monitor that it expects that the Supplemental Loan will be drawn in 2014 in accordance with the Budget, or earlier.

39.    Given the extent of uncertainty regarding the Arbitration Claim, it is not certain that the full quantum of the new funding will ever be required.  As such, it is possible that Tenor may earn a share of the Net Arbitration Proceeds for advancing funds that are never used by Crystallex in the prosecution of the Arbitration Claim.  However, such funds would ultimately paid to Crystallex's various creditors in accordance with their legal priorities.

40.    For the reasons described in greater detail in the Fung Affidavits, Crystallex was unable to locate any sources of financing other than Tenor.  Due to time, financial constraints and restrictions on other financings contained in the existing DIP and concern regarding the impact of widespread disclosure of the Company's financial condition on the Arbitration Proceedings, Crystallex felt unable to run a more comprehensive process at this time.

41.    Accordingly, the Third DIP Loan appears to be the only viable option available to Crystallex to obtain the financing necessary to continue its prosecution of the Arbitration Claim for the benefit of all stakeholders.

**ANY FUTURE FINANCING FOLLOWING THE THIRD DIP LOAN**

42.    To date, only Tenor has provided post-filing financing to Crystallex.

43.    If and when future financing becomes necessary (the "**Future Financing**"), Tenor has advised the Monitor that it will permit either existing equity holders or Noteholders (collectively the "**Participants**") to subscribe to any such financing arrangement where additional funds are provided to Crystallex.  Such subscription will be limited to 49.99% of the total financing provided (the "**Future Participation Amount**").

44.    The following would apply to such Future Financing:

(a)    The Participants shall have 5 days to commit to providing their share of the Future Financing once notified of such financing being sought by Crystallex.  All funds to

be provided shall be paid to the Monitor to be held in escrow;

(b)     If participating, the Participants shall be required to support the Future Financing and shall remain "silent partners" with Tenor;

(c)     An intercreditor agreement shall be reached between the various lenders; and

(d)     A minimum of 50% of the Future Participation Amount must be subscribed or the ability to participate in the Future Financing shall be cancelled unless certain provisions are waived by Tenor.

## EXTENSION OF THE STAY PERIOD

45.     In its motion materials, the Applicant is requesting the Court to extend the stay period from December 31, 2014 to December 31, 2015.

46.     Given the uncertainty surrounding the time necessary to pursue the Arbitration Claim and the fact that financing will be available to the Applicant through the end of December 2015, the Monitor is supportive of the extension of the stay period.

## EXTENSION OF THE STANDSTILL AGREEMENT

47.     On June 5, 2014, the Court issued an Order approving an agreement between Crystallex and an ad hoc committee of holders (the "**Noteholders**") of its 9.375% interest notes (the "**Standstill Agreement**").  The purpose of the Standstill Agreement was to settle certain disputes between the Noteholders and to provide Crystallex with certainty of creditor support as it pursued the Arbitration Claim.  The Standstill Agreement was to run through December 31, 2014.

48.     Given that the uncertainty in respect of the time necessary to pursue the Arbitration Claim, the Noteholders and the Company are holding discussions to extend the period of the Standstill Agreement by one year to December 31, 2015 to remain consistent with the timeline contemplated by the Budget.

49.     Given the certainty the Standstill Agreement provides, the Monitor is supportive of the

extension of the Standstill Agreement to December 31, 2015, provided the parties reach an agreement and the terms remain consistent with those currently in effect.

## CHANGE OF THE COMPANY'S SOLICITORS

50.    Effective February 25, 2014, certain lawyers within Dentons Canada LLP with carriage of the matter representing Tenor in this proceeding transitioned their practices to Cassels Brock & Blackwell LLP who were counsel to the Applicant at the time.  The former Dentons Canada LLP lawyers will continue their representation of Tenor in these proceedings with the consent of Crystallex.  Accordingly, Crystallex retained Davies Ward Phillips & Vineberg LLP as new counsel and served a Notice of Change of Lawyers upon the service list to provide formal notification that it has retained Davies as its counsel for the purposed of the CCAA proceedings.

51.    The Monitor received correspondence from the managing partner of Cassels Brock & Blackwell LLP dated February 25, 2014 confirming that appropriate procedures were put in place within their offices to ensure that no confidential information pertaining to their representation of Crystallex can be available to any lawyers within their offices representing Tenor.  The Monitor will provide a copy of such correspondence to any stakeholder on request.

## SEALING OF THE ELEVENTH REPORT

52.    The Applicant requests that Appendices "A", "B", "D" and "F" of this Eleventh Report be sealed to allow the Applicant to continue its pursuit of the Arbitration Claim.  The Monitor agrees that it is critical that the Venezuelan government not be given any undue advantage by having access to information to which it would, outside of the CCAA proceedings, not be entitled. This would include critical information regarding the liquidity of Crystallex.

## THE MONITOR'S RECOMMENDATIONS

53.     A key objective of the Applicant in the CCAA Proceeding was and remains obtaining sufficient financing to allow it to prosecute the Arbitration Claim to a favourable judgment and settlement or enforcement for the benefit of all of its stakeholders.

54.     The Third DIP Loan provides the Applicant with $13.5 million of new financing and unlocks the outstanding $5 million of un-advanced funds from the previous round of financing (subject to certain conditions described above) and is intended to permit the Applicant to achieve its goal of prosecuting the Arbitration Claim.  In this context, it is beneficial to all of the Applicant's stakeholders.

55.     The Applicant, with the involvement of the Monitor, has consulted with counsel to the Noteholders as well as with Reyes, a shareholder who provides an equity perspective on the Applicant's intended course of action.  Reyes supports the approval of the Third DIP Loan and the Noteholders are still providing their feedback to Crystallex.

56.     Accordingly, and for the reasons set out above, the Monitor supports the Applicant's request for an Order approving the Third DIP Loan.

57.     For the reasons set out above, the Monitor also supports the sealing of Appendices "A", "B", "D" and "F" of the Monitor's Eleventh Report.

58.     Also, given the factors raised elsewhere in this Eleventh Report, the Monitor is supportive of the extension of both the Stay Period and the Standstill Agreement to December 31, 2015.

59.     The Monitor also respectfully requests that this Court approve the Monitor's Eleventh Report and the Monitor's activities as set out therein.

All of which is respectfully submitted this 12th day of April, 2014.

**ERNST & YOUNG INC.**
In its capacity as Court-appointed Monitor of
Crystallex International Corporation

Per:

Brian M. Denega
Senior Vice President

Todd Ambachtsheer
Vice President

**Appendix "A"**
**Summary of Arbitration Proceedings**

1.  As discussed in previous reports of the Monitor, the only potential for Crystallex to provide value to stakeholders is to continue to pursue its arbitration claim against Venezuela before the Additional Facility of the International Centre for Settlement of Investment Disputes ("**ICSID**" and the "**Tribunal**"), a unit of the World Bank, in Washington, D.C. (the "**Arbitration Claim**") while attempting to negotiate a consensual resolution of all claims with the stakeholders.

2.  The hearing of the Arbitration Claim began, as scheduled, on November 11, 2013.

3.  On November 18, 2013, after six days of the hearing, Venezuela filed a proposal for disqualification of one of the arbitrators, namely the arbitrator originally nominated by Venezuela. As a result, the proceeding was immediately suspended in accordance with Article 15(7) of the Arbitration (Additional Facility) Rules.

4.  Following an exchange of pleadings regarding the merits of the proposal for disqualification, the challenged arbitrator resigned and Venezuela appointed a replacement arbitrator. The Tribunal was reconstituted and the proceeding was resumed pursuant to Article 18 of the ICSID Arbitration (Additional Facility) Rules. The oral hearing resumed on February 16, 2014 for a period of four days, ending on February 19, 2014.

5.  As a result of the three month suspension of the hearing, it was necessary for the Applicant and its counsel to spend additional time and money re-preparing witnesses for their testimony. As a result of having to respond to Venezuela's proposal to disqualify one of the arbitrators, conduct research on the newly appointed arbitrator and the additional preparation of witnesses, significant additional and unanticipated costs were incurred.

6.  As noted elsewhere in this Eleventh Report, the Applicant recently completed its submissions in respect of the Arbitration Claim. In order to provide the Court with an update on the Arbitration process, the Monitor held discussions with the Applicant and a

representative of Freshfields Bruckhaus Deringer US LLP ("**Freshfields**"), the Applicant's Arbitration counsel, for the purpose understanding the remaining steps and potential costs to be incurred in pursuit of the Arbitration Claim.  Solely as a result of these discussions, the Monitor understands the following (which is being reported on with no intention or effect of waiving any privileges that may apply):

(a)    Since the completion of the oral hearing in Washington, D.C. on February 19, 2014, Crystallex has been preparing its post-hearing written submission to the Tribunal analyzing the testimony proffered at the hearing. This post-hearing brief will also address the written questions that the Tribunal submitted to the Parties on March 4, 2014 for consideration in their post-hearing submissions. Such questions seek to address matters discussed at the oral hearing;

(b)    Crystallex and Venezuela will submit their post-hearing briefs to the Tribunal simultaneously on May 5, 2014;

(c)    It is possible (though not currently contemplated in the procedural calendar) that one or both of the Parties will make an application to the Tribunal to seek permission to submit an additional brief responding to certain portions of the Post-Hearing Brief filed by the other party on May 5, 2014.  If so, this would increase the costs of Arbitration;

(d)    Following the submission of the parties' post-hearing briefs, the panel will deliberate and render its decision.  There is no fixed timeline to deliver a decision. In similar cases, the average time to receive a decision has been approximately 14 months from completion of the hearing.  However, deliberation time depends upon numerous factors specific to each case (including the complexity of the case and the availability of the arbitrators) and Freshfields estimates a period of 9 to 18 months following submission of post-hearing briefs for the tribunal to deliver its decision (known as an "award") in the Arbitration;

(e)    Once a final award has been rendered in respect of the Arbitration Claim, it is immediately enforceable;

(f)     Should the tribunal render a decision in the Applicant's favour, and if Venezuela does not pay the award voluntarily, Crystallex would be entitled to seek to have the award enforced before the competent courts of any of the member States to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards where Venezuela has attachable assets. Venezuela could object to the enforcement of the award on the basis of certain narrow grounds set out in the aforementioned Convention (e.g. on the basis that there was a lack of due process, that the tribunal was improperly constituted, etc). Venezuela could also object to the execution of the award against certain of its assets on the basis of sovereign immunity of execution; and

(g)     Venezuela could also seek to have an award favourable to Crystallex set aside before the Federal Courts in Washington DC on one of the grounds set out in the applicable arbitration legislation which include the following:

   i.   The decision was obtained by improper means (e.g. corruption, fraud or undue means);

   ii.  The arbitrators were not impartial or were corrupt;

   iii. Lack of due process; or

   iv.  The arbitrators misused their powers or exercised them in a manner so as to taint the decision;

(h)     If Venezuela applies to have the award set aside, the procedure before the court of first instance could take between twelve to 24 months. The procedure could take longer if the first instance decision was appealed.  This could have the effect of increasing the Applicant's cash requirements significantly although the application to have the award set aside would not prevent the Applicant from seeking to enforce the award unless Venezuela were to obtain a stay of execution.

(i)    It is apparently uncommon for sovereign nations to simply default on investment treaty awards without taking steps to challenge them, as such an action would be in violation of one or more bilateral/international treaties;

(a)    In other cases of a similar nature, award creditors have been able to sell their awards to third parties in a limited market which may be an option available to Crystallex should it obtain a favourable award.

**Appendix "B"**
**Further Update on the CCAA Proceedings**

1.    The Monitor notes that the Revised DIP Projection did not contemplate the delays in the Arbitration, the increased costs to deal with the unexpected motion by Venezuela as set out above and other factors related to the Arbitration.

2.    As a result of exceeding its projected costs of pursuing the Arbitration Claim, Crystallex sought and obtained agreements from Tenor dated December 31, 2013, January 9, 2014, January 15, 2014, and January 31, 2014 whereby Tenor agreed in email correspondence that Crystallex:

> *"will have the right until 5:00 p.m. on February 14, 2014 to use any and all cash on hand and available funds in order to pay payables that, as at December 31, 2013 or January 31, 2014, exceeded the maximum aggregate amount of payables then permitted to avoid an Event of Default under subsection 8.1(n)(ii) of the Credit Agreement (and to maintain compliance with any budget related covenants that would otherwise have been breached by such excess payables as at December 31, 2013 or January 31, 2014), and such excess payables paid prior to 5:00 p.m. on February 14, 2014 shall be deemed to have been paid as at December 31, 2013 or January 31, 2014 as applicable, without any fee, penalty, default or negative impact.  The foregoing shall have no impact on, and will not prejudice, any other rights or obligations of the Borrower and/or Tenor under or pursuant to the Credit Agreement and the existence of such excess payables as at December 31, 2013 or January 31, 2014 that were paid prior to 5:00 p.m. on February 14, 2014 shall not constitute an Event of Default pursuant to the Credit Agreement".*

This waiver was ultimately extended to April 17, 2014.

3.    At the time the Revised DIP Projection was finalized, the Applicant also anticipated making the following draws on the revised DIP Loan:

(a)   $11.1 million as the Additional Principal Amount;

(b)   $6.7 million as the Original Incremental Loan; and

(c)   $5 million as the Supplemental Loan.

4.   The Applicant made its draws on the Additional Principal Amount and the Original Incremental Loan, totalling $17.8 million.  According to the Revised DIP Projection, the Applicant was to make its final draw on the Supplemental Loan in January 2014, which draw was projected to provide sufficient liquidity to satisfy post-filing liabilities in full and permit Crystallex to operate through the Stay Period.

5.   However, in late January 2014, Tenor advised the Company that it was not prepared to advance the remaining $5 million pursuant to the Supplemental Loan facility as it was Tenor's position that the Company had exceeded its budget and needed to have additional funding before Tenor was prepared to advance the final $5 million.  Therefore, Crystallex did not request or receive the final $5 million draw under the Supplemental Loan.

**Appendix "C"**
**Actual Receipts and Disbursements**

**CRYSTALLEX INTERNATIONAL CORPORATION**
**Actual Receipts and Disbursements**
**For the Period from June 1, 2013 to March 31, 2014**
**For the Month Ending**
US ($000's)

| | | | | | | Actual | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Jun-13** | **Jul-13** | **Aug-13** | **Sep-13** | **Oct-13** | **Nov-13** | **Dec-13** | **Jan-14** | **Feb-14** | **Mar-14** | **Total** |
| **OPENING CASH BALANCE** | **353** | **4,794** | **1,794** | **572** | **90** | **3,362** | **1,981** | **1,717** | **998** | **649** | **353** |
| *CASH RECEIPTS* | | | | | | | | | | | |
| DIP Loan Proceeds | 10,000 | - | - | - | 6,700 | - | - | - | - | - | **16,700** |
| Equipment Proceeds | - | - | - | - | - | - | - | - | - | 227 | **227** |
| HST Refunds | 159 | - | - | - | - | 448 | - | - | - | - | **607** |
| *Total Cash Receipts* | **10,159** | **-** | **-** | **-** | **6,700** | **448** | **-** | **-** | **-** | **227** | **17,534** |
| *CASH DISBURSEMENTS* | | | | | | | | | | | |
| Payroll and Benefits | (294) | (326) | (183) | (181) | (369) | (241) | (176) | (175) | (171) | (171) | **(2,288)** |
| Consultants & General Legal | (176) | (6) | (2) | (13) | - | (1) | - | - | - | - | **(198)** |
| Arbitration | (1,664) | (1,608) | (949) | (136) | (2,567) | (1,486) | (40) | (490) | (173) | (174) | **(9,286)** |
| Restructuring - CCAA | (3,288) | (921) | 51 | (38) | (393) | (18) | (16) | (36) | - | - | **(4,659)** |
| Insurance | - | (12) | - | - | - | - | - | - | - | (151) | **(163)** |
| Regulatory & Accounting | (97) | (139) | (2) | (7) | (2) | (4) | (2) | (6) | (1) | (4) | **(264)** |
| Administration | (96) | 20 | (28) | (46) | (31) | (36) | (33) | (24) | (10) | 86 | **(197)** |
| Equipment | (38) | (32) | (24) | - | (19) | (22) | (5) | - | - | - | **(141)** |
| Foreign exchange | - | 44 | 5 | 4 | 18 | 10 | 8 | 13 | 6 | 11 | **120** |
| **Total Corporate** | **(5,653)** | **(2,980)** | **(1,132)** | **(417)** | **(3,362)** | **(1,798)** | **(264)** | **(718)** | **(349)** | **(403)** | **(16,673)** |
| **Venezuelan Expenditures** | | | | | | | | | | | |
| Caracas Office G&A | (65) | (20) | (90) | (65) | (65) | (31) | - | - | - | - | **(338)** |
| **Total Expenditures** | **(5,718)** | **(3,000)** | **(1,222)** | **(482)** | **(3,428)** | **(1,829)** | **(264)** | **(718)** | **(349)** | **(403)** | **(17,414)** |
| **Net Cash Outflow** | **4,441** | **(3,000)** | **(1,222)** | **(482)** | **3,272** | **(1,381)** | **(264)** | **(718)** | **(349)** | **(176)** | **120** |
| **ENDING CASH BALANCE** | **4,794** | **1,794** | **572** | **90** | **3,362** | **1,981** | **1,717** | **998** | **649** | **473** | **473** |

**CRYSTALLEX INTERNATIONAL CORPORATION**
**Actual Receipts and Disbursements**
**For the Period from June 1, 2013 to March 31, 2014**
**For the Month Ending**
US ($000's)

| | | | | | | Forecast | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Jun-13** | **Jul-13** | **Aug-13** | **Sep-13** | **Oct-13** | **Nov-13** | **Dec-13** | **Jan-14** | **Feb-14** | **Mar-14** | **Total** |
| **OPENING CASH BALANCE** | 504 | 4,579 | 1,665 | 126 | 5,630 | 4,235 | 2,846 | 1,592 | 5,333 | 4,588 | 504 |
| *CASH RECEIPTS* | | | | | | | | | | | |
| DIP Loan Proceeds | 10,000 | - | - | 6,700 | - | - | - | 5,000 | - | - | **21,700** |
| Equipment Proceeds | - | - | - | - | - | - | - | - | - | - | **-** |
| HST Refunds | - | - | - | - | - | - | - | - | - | - | **-** |
| *Total Cash Receipts* | **10,000** | **-** | **-** | **6,700** | **-** | **-** | **-** | **5,000** | **-** | **-** | **21,700** |
| *CASH DISBURSEMENTS* | | | | | | | | | | | |
| Payroll and Benefits | (276) | (324) | (183) | (182) | (323) | (182) | (182) | (282) | (182) | (182) | **(2,297)** |
| Consultants & General Legal | (224) | (5) | (5) | (5) | (5) | (30) | (5) | (35) | (5) | (5) | **(324)** |
| Arbitration | (1,899) | (1,284) | (855) | (839) | (934) | (1,019) | (944) | (516) | (416) | (266) | **(8,971)** |
| Restructuring - CCAA | (3,369) | (1,160) | (250) | - | (35) | (10) | (35) | - | (10) | (60) | **(4,929)** |
| Insurance | - | (10) | - | - | - | (9) | - | (350) | - | (10) | **(379)** |
| Regulatory & Accounting | (32) | (2) | (98) | (92) | (12) | (2) | (2) | (2) | (62) | (63) | **(367)** |
| Administration | (39) | (39) | (36) | (37) | (36) | (34) | (37) | (33) | (31) | (34) | **(358)** |
| Equipment | (35) | (40) | - | - | - | - | - | - | - | - | **(75)** |
| Foreign exchange | - | - | - | - | - | - | - | - | - | - | **-** |
| **Total Corporate** | **(5,874)** | **(2,864)** | **(1,427)** | **(1,155)** | **(1,345)** | **(1,286)** | **(1,205)** | **(1,218)** | **(706)** | **(620)** | **(17,701)** |
| **Venezuelan Expenditures** | | | | | | | | | | | |
| Caracas Office G&A | (50) | (50) | (50) | (40) | (50) | (40) | (50) | (40) | (40) | (40) | **(450)** |
| **Total Expenditures** | **(5,924)** | **(2,914)** | **(1,540)** | **(1,195)** | **(1,395)** | **(1,389)** | **(1,255)** | **(1,258)** | **(746)** | **(660)** | **(18,276)** |
| **Net Cash Outflow** | **4,076** | **(2,914)** | **(1,540)** | **5,505** | **(1,395)** | **(1,389)** | **(1,255)** | **3,742** | **(746)** | **(660)** | **3,424** |
| **ENDING CASH BALANCE** | **4,579** | **1,665** | **126** | **5,630** | **4,235** | **2,846** | **1,592** | **5,333** | **4,588** | **3,927** | **3,927** |

**CRYSTALLEX INTERNATIONAL CORPORATION**
**Actual Receipts and Disbursements**
**For the Period from June 1, 2013 to March 31, 2014**
**For the Month Ending**
US ($000's)

|  | | Jun-13 | Jul-13 | Aug-13 | Sep-13 | Oct-13 | Nov-13 | Dec-13 | Jan-14 | Feb-14 | Mar-14 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **OPENING CASH BALANCE** | | **(150)** | **215** | **128** | **446** | **(5,541)** | **(873)** | **(866)** | **125** | **(4,335)** | **(3,938)** | **(150)** |
| *CASH RECEIPTS* | | | | | | | | | | | | |
| DIP Loan Proceeds | | - | - | - | (6,700) | 6,700 | - | - | (5,000) | - | - | **(5,000)** |
| Equipment Proceeds | | - | - | - | - | - | - | - | - | - | 227 | **227** |
| HST Refunds | | 159 | - | - | - | - | 448 | - | - | - | - | **607** |
| *Total Cash Receipts* | | **159** | **-** | **-** | **(6,700)** | **6,700** | **448** | **-** | **(5,000)** | **-** | **227** | **(4,166)** |
| **CASH DISBURSEMENTS** | | | | | | | | | | | | |
| Payroll and Benefits | | (18) | (1) | (0) | 1 | (46) | (60) | 6 | 106 | 11 | 11 | **10** |
| Consultants & General Legal | | 48 | (1) | 3 | (8) | 5 | 29 | 5 | 35 | 5 | 5 | **126** |
| Arbitration | | 235 | (324) | (94) | 703 | (1,633) | (467) | 904 | 26 | 242 | 92 | **(315)** |
| Restructuring - CCAA | | 81 | 239 | 301 | (38) | (358) | (8) | 19 | (36) | 10 | 60 | **270** |
| Insurance | | - | (2) | - | - | - | 9 | - | 350 | - | (141) | **216** |
| Regulatory & Accounting | | (65) | (137) | 96 | 85 | 10 | (2) | 0 | (4) | 61 | 59 | **103** |
| Administration | | (57) | 59 | (9) | 5 | (2) | 4 | 10 | 21 | 120 | | **161** |
| Equipment | | (3) | 8 | (24) | - | (19) | (22) | (5) | - | - | - | **(66)** |
| Foreign exchange | | - | 44 | 5 | 4 | 18 | 10 | 8 | 13 | 6 | 11 | **120** |
| **Total Corporate** | | **221** | **(116)** | **295** | **739** | **(2,017)** | **(512)** | **941** | **500** | **357** | **217** | **625** |
| **Venezuelan Expenditures** | | | | | | | | | | | | |
| Caracas Office G&A | | (15) | 30 | (40) | (25) | (15) | 9 | 50 | 40 | 40 | 40 | **112** |
| **Total Expenditures** | | **(206)** | **86** | **(317)** | **(713)** | **2,033** | **440** | **(991)** | **(540)** | **(397)** | **(257)** | **862** |
| **Net Cash Outflow** | | **(365)** | **86** | **(317)** | **5,987** | **(4,667)** | **(8)** | **(991)** | **4,460** | **(397)** | **(484)** | **(3,304)** |
| **ENDING CASH BALANCE** | | **215** | **128** | **446** | **(5,541)** | **(873)** | **(866)** | **125** | **(4,335)** | **(3,938)** | **(3,454)** | **(3,454)** |

Variance

**Appendix "D"**
**Update on the Applicant's Liquidity Position**

1.      As of April 4, 2014, the Monitor understands that Crystallex has total remaining cash on hand of approximately $177,000 and has received post filing invoices for services rendered in the amount of approximately $7.7 million, which includes amounts that have been either discounted or deferred until a later date.

2.      The Monitor understands that Crystallex has entered into a deferral arrangement with Freshfields (who is owed approximately $5.6 million, excluding any unbilled work in process) to defer payment of a portion of the amount due until such time as additional financing (as described below) is advanced or May 5, 2014.   Freshfields has indicated that if all of their $4,770,982 in outstanding invoices rendered to date (excluding those fees which have been deferred) are not paid by May 5, 2014 and the Supplemental Fund is not established by such date, then they will not be in a position to submit the final written post-hearing brief in the Arbitration Proceeding until paid.

3.      Crystallex has further advised the Monitor that it is attempting to arrange similar deferrals with other of its Arbitration consultants.  The aim of such negotiations is to defer the payment of certain Arbitration related fees until such time as there is an award of damages collected by Crystallex.  Certain other deferrals are only until such time as new financing can be obtained by the Applicant.  Such negotiations are ongoing.

4.      As of the date of this report, Crystallex, barring further deferral of fees or other accommodations, does not have sufficient liquidity to operate through the Stay Period even in the event that the $5 million Supplemental Loan is advanced by Tenor.

**Appendix "E"**
**Cash Flow Standard**

**CANADIAN ASSOCIATION OF INSOLVENCY AND RESTRUCTURING PROFESSIONALS**
ASSOCIATION CANADIENNE DES PROFESSIONNELS DE L'INSOLVABILITÉ ET DE LA RÉORGANISATION

Standards of Professional Practice

## No. 09-1
## CASH-FLOW STATEMENT

*In this Standard, words importing the singular number or the masculine gender only include more persons, parties or things of the same kind than one, and females as well as males and the converse.*

## 1.00   SCOPE AND PURPOSE

1.01   The purpose of this Standard is to provide guidance to a Monitor fulfilling its statutory responsibilities under the **Companies' Creditors Arrangement Act (CCAA), R.S.C. 1985, c. C-36, as amended**, in respect of a Monitor's Report on a Cash-Flow Statement. This Standard only addresses the Monitor's obligations with respect to the cash-flow forecast filed in support of the initial application.  If appropriate, the Monitor **should** file similar reports in respect of subsequent or revised cash-flow forecasts, notwithstanding that there is no statutory obligation to file such reports.

1.02   The Monitor's duties and obligations in respect of a particular **CCAA** proceeding **shall** be governed by the **Act**, the applicable orders issued by the court, and this Standard where applicable.  To the extent that this Standard conflicts with any order issued by the court, the Monitor **shall** be governed by the order.

## 2.00   DEFINITIONS

2.01   In this Standard:

"**May**" means the Standard is simply intended to be helpful and the Monitor has full discretion to follow it or not.

"**Should**" means it is appropriate to do so in most circumstances.  Where a Monitor judges it appropriate to do otherwise, the Monitor should consider the advisability of documenting the reasons for its decision.

"**Shall**" means the Standard is mandatory and the Monitor must follow it.

CANADIAN ASSOCIATION OF INSOLVENCY AND RESTRUCTURING PROFESSIONALS
ASSOCIATION CANADIENNE DES PROFESSIONNELS DE L'INSOLVABILITÉ ET DE LA RÉORGANISATION

Standards of Professional Practice

## No. 09-1
## CASH-FLOW STATEMENT

2.02    In this standard:

**"Act"** means the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as amended;

**"Association"** means Canadian Association of Insolvency and Restructuring Professionals / Association canadienne des professionnels de l'insolvabilité et de la réorganisation;

**"Assumptions"** means the Hypothetical Assumptions and Probable Assumptions developed by the Company;

**"Cash-Flow Statement"** in respect of a Company, means a statement indicating, on a weekly basis (or such other basis as is appropriate in the circumstances), the projected cash-flow of the Company as defined in section 2(1) of the **Act** based on Probable and Hypothetical Assumptions that reflect the Company's planned course of action for the period covered;

**"Company"** means a debtor company, as defined in Section 2 of the **Act**, that intends to commence or has commenced, as the case may be, a proceeding under the **Act** or in respect of whom a proceeding under the **Act** has been commenced;

**"Hypothetical Assumptions"** means assumptions with respect to a set of economic conditions or courses of action that are not necessarily the most probable in the Company's judgment, but are consistent with the purpose of the Cash-Flow Statement;

**"Material"** means that it is probable that a change in an item or an aggregate of items would influence or change a decision;

**"Material Adverse Change"** means a change that, in the Monitor's opinion, materially and negatively impairs, or is reasonably expected to materially and negatively impair, the Company's cash-flow, financial circumstances or likelihood of success of a plan of arrangement.  Examples would include, but not be limited to a change that:

- has a significant adverse effect on the expected cash-flows compared to the Cash-Flow Statement; or

- impairs the ability of the Company to carry on operations; or

- significantly prejudices the rights or interests of one or more classes of creditors.

CANADIAN ASSOCIATION OF INSOLVENCY AND RESTRUCTURING PROFESSIONALS
ASSOCIATION CANADIENNE DES PROFESSIONNELS DE L'INSOLVABILITÉ ET DE LA RÉORGANISATION

Standards of Professional Practice

## No. 09-1
## CASH-FLOW STATEMENT

**"Monitor"** in respect of a Company, means the person appointed by the court pursuant to Section 11.7 of the **Act** to monitor the business and financial affairs of the Company;

**"Monitor's Report"** means a report on the Cash-Flow Statement issued by the Monitor in accordance with Section 23(1)(b) of the **Act**;

**"Probable Assumptions"** means assumptions that: (i) the Company believes reflect the most probable set of economic conditions and planned courses of action, suitably supported that are consistent with the plans of the Company; and (ii) provide a reasonable basis for the Cash-Flow Statement;

**"Review for Reasonableness"** means the review conducted by the Monitor pursuant to Section 23(1)(b) of the **Act**; and

**"Suitably Supported"** means that the Assumptions are based on either one or more of the following factors: the past performance of the Company, the performance of other industry / market participants engaged in similar activities as the Company, feasibility studies, marketing studies or any other reliable source of information that provides objective corroboration of the reasonableness of the Assumptions. The extent of detailed information supporting each Assumption, and an assessment as to the reasonableness of each Assumption, will vary according to circumstances and will be influenced by factors such as the significance of the Assumption and the availability and quality of the supporting information.

## 3.00    ASSISTING THE COMPANY

3.01    The Monitor **may** assist the Company in the preparation of the Cash-Flow Statement.

3.02    The Monitor **shall** remind the Company that the Cash-Flow Statement and the Assumptions on which it is based, are the responsibility of the Company.

3.03    The Monitor **shall** remind the Company that the Monitor has the statutory duty to file a report with respect to the Cash-Flow Statement.

3.04    The Monitor **should** advise the Company that any information given by the Company to the Monitor may be disclosed to the court and the creditors.

CANADIAN ASSOCIATION OF INSOLVENCY AND RESTRUCTURING PROFESSIONALS
ASSOCIATION CANADIENNE DES PROFESSIONNELS DE L'INSOLVABILITÉ ET DE LA RÉORGANISATION

Standards of Professional Practice

## No. 09-1
## CASH-FLOW STATEMENT

3.05     The Monitor **should** document the foregoing in a letter to the debtor, a sample of which is attached as Appendix A to this standard.

## 4.00    DOCUMENTATION

4.01     The review performed by the Monitor in accordance with this Standard **shall** be documented.

4.02     The Monitor **should** obtain written confirmation (a sample letter is attached as Appendix B to this standard) from an authorized officer or director of the Company that:

   a)  the Cash-Flow Statement and the Assumptions on which it is based, are the responsibility of the Company; and

   b)  the Company's responsibility extends beyond ensuring that individual Assumptions used in the preparation of the Cash-Flow Statement are appropriate in the circumstances, and includes the responsibility to ensure that such Assumptions as a whole are appropriate in the circumstances.

## 5.00    MONITOR'S REVIEW

5.01     The Monitor **shall** perform a Review for Reasonableness.

5.02     The review **shall** be performed by an individual or individuals having, when considered as a whole, adequate technical training and proficiency, with due care and with an objective state of mind.

5.03     The review **shall** be adequately planned and properly executed and if assistants are employed, they **shall** be properly supervised.

5.04     The Monitor **should**, as soon as practicable, acquire knowledge of the Company and an understanding of the practices and particulars of the industry within which the Company operates, sufficient to enable it to perform the Review for Reasonableness.

5.05     The Review for Reasonableness **shall** consist of enquiry, analytical procedures and discussions with the Company to determine whether there is anything that causes the Monitor to believe that, in all material respects:

CANADIAN ASSOCIATION OF INSOLVENCY AND RESTRUCTURING PROFESSIONALS
ASSOCIATION CANADIENNE DES PROFESSIONNELS DE L'INSOLVABILITÉ ET DE LA RÉORGANISATION

Standards of Professional Practice

## No. 09-1
## CASH-FLOW STATEMENT

a)  the Hypothetical Assumptions are not consistent with the purpose of the Cash-Flow Statement;

b)  as at the date of the Monitor's Report, the Probable Assumptions developed by the Company are not Suitably Supported and consistent with the plans of the Company or do not provide a reasonable basis for the Cash-Flow Statement, given the Hypothetical Assumptions; or

c)  the Cash-Flow Statement does not reflect the Probable and Hypothetical Assumptions.

5.06    The Monitor **should** satisfy itself that the computations contained in or made in preparing the Cash-Flow Statement are consistent with the Assumptions and materially accurate.

5.07    Where practicable, the Monitor **should** reconcile the Cash-Flow Statement to the appropriate actual cash and loan balances in the financial records of the Company, as at the start date of the Cash-Flow Statement, and a description of such reconciliation process may be included in the Monitor's Report.

5.08    The Monitor **shall** periodically compare actual cash-flow results to those reflected in the Cash-Flow Statement and obtain reasonable explanations for significant variances. The Monitor **should** report the results of such comparisons and reviews to the court. Where the results of such comparisons and reviews indicate a Material Adverse Change in the Company's projected cash-flow or financial circumstances, the Monitor **shall** report the results of such comparisons and reviews to the court without delay.

## 6.00    MONITOR'S REPORT

6.01    After completing its Review for Reasonableness, the Monitor **shall** consider whether anything material has come to its attention that causes it to believe that:

a)  The Hypothetical Assumptions are not consistent with the purpose of the Cash-Flow Statement; or

b)  As at the date of the report, the Probable Assumptions developed by the Company are not Suitably Supported and consistent with the plans of the Company or do not provide a reasonable basis for the Cash-Flow Statement, given the Hypothetical Assumptions; or

CANADIAN ASSOCIATION OF INSOLVENCY AND RESTRUCTURING PROFESSIONALS
ASSOCIATION CANADIENNE DES PROFESSIONNELS DE L'INSOLVABILITÉ ET DE LA RÉORGANISATION

Standards of Professional Practice

# No. 09-1
# CASH-FLOW STATEMENT

c) The Cash-Flow Statement does not reflect the Probable and Hypothetical Assumptions.

6.02    The Monitor **should** file the Monitor's Report with the court within 10 days of the granting of the Initial Order or at such other time as may be ordered by the court.

6.03    The Monitor's Report **shall** include an overview and review of the Cash-Flow Statement and a summary of its determinations as required by Section 5.05 of this Standard.

6.04    The Monitor **should** ensure that all material Assumptions are disclosed in the notes and **shall** include in the Monitor's Report a statement to this effect.

6.05    The Monitor **shall** prepare, sign and file the Monitor's Report with the court.

6.06    The Monitor **should** date the Monitor's Report as of the date of the completion of his Review for Reasonableness.

6.07    The form of the Monitor's Report **shall** be substantially as follows:

*The <attached> statement of projected cash-flow <attached as appendix ___ of this report/the debtors application material> (the "Cash-Flow Statement") of _____ (name of Company),(the "Company") as of the _____ day of _____ ____, consisting of _____ (describe, including relevant dates), has been prepared by the management of the Company for the purpose described in Note _____, using the Probable and Hypothetical Assumptions set out in Notes _____.*

*Our review consisted of inquiries, analytical procedures and discussion related to information supplied to us by certain of the management and employees of the Company. Since Hypothetical Assumptions need not be supported, our procedures with respect to them were limited to evaluating whether they were consistent with the purpose of the Cash-Flow Statement. We have also reviewed the support provided by management of the Company for the Probable Assumptions, and the preparation and presentation of the Cash-Flow Statement.*

*Based on our review, nothing has come to our attention that causes us to believe that, in all material respects:*

a)    *the Hypothetical Assumptions are not consistent with the purpose of the Cash-Flow Statement;*

**CANADIAN ASSOCIATION OF INSOLVENCY AND RESTRUCTURING PROFESSIONALS**
**ASSOCIATION CANADIENNE DES PROFESSIONNELS DE L'INSOLVABILITÉ ET DE LA RÉORGANISATION**

Standards of Professional Practice

## No. 09-1
## CASH-FLOW STATEMENT

b)   *as at the date of this report, the Probable Assumptions developed by management are not Suitably Supported and consistent with the plans of the Company or do not provide a reasonable basis for the Cash-Flow Statement, given the Hypothetical Assumptions; or*

c)   *the Cash-Flow Statement does not reflect the Probable and Hypothetical Assumptions.*

*Since the Cash-Flow Statement is based on Assumptions regarding future events, actual results will vary from the information presented even if the Hypothetical Assumptions occur, and the variations may be material. Accordingly, we express no assurance as to whether the Cash-Flow Statement will be achieved. We express no opinion or other form of assurance with respect to the accuracy of any financial information presented in this report, or relied upon by us in preparing this report.*

*The Cash-Flow Statement has been prepared solely for the purpose described in Note ____/on the face of the Cash-Flow Statement, and readers are cautioned that it may not be appropriate for other purposes.*

*Optional paragraph if the Monitor's report is to be included as part of another report:*

*Note: Date and signature of Monitor should be excluded if this report is included within another report prepared by the Monitor.*

*<Dated at _____, this _____ day of _____ _____.*

_____

*Monitor>.*

6.08   The Monitor's Report **should** be augmented with such additional comments as deemed appropriate by the Monitor in the circumstances.

**CANADIAN ASSOCIATION OF INSOLVENCY AND RESTRUCTURING PROFESSIONALS**
**ASSOCIATION CANADIENNE DES PROFESSIONNELS DE L'INSOLVABILITÉ ET DE LA RÉORGANISATION**

Standards of Professional Practice

## No. 09-1
## CASH-FLOW STATEMENT

6.09    Where the Monitor concludes it is unable to issue the Monitor's Report in the form set out above, in accordance with the timeline detailed in paragraph 6.02, the Monitor:

a)  **Shall** advise the Company of the Assumptions and/or other matters that prevent the Monitor from issuing the Monitor's Report and **should** consider advising the Company of same in writing; and

b)  **Shall** file a report with the court in accordance with the timeline detailed in paragraph 6.02 setting out the reasons therefore.

**Appendix "F"**
**Budget**

**Crystallex International Corporation**
**Cash Flow Forecast**
**April 2014 through December 2015**
**US$000s**

| | Apr-14 | May-14 | Jun-14 | Jul-14 | Aug-14 | Sep-14 | Oct-14 | Nov-14 | Dec-14 | Jan-15 | Feb-15 | Mar-15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Opening cash | 473 | 5,593 | 3,099 | 2,652 | 1,981 | 1,615 | 1,116 | 726 | 5,378 | 4,935 | 4,576 | 4,244 |
| **Receipts** | | | | | | | | | | | | |
| DIP receipts | 10,500 | - | - | - | - | - | - | 5,000 | - | - | - | - |
| **Disbursemetns** | | | | | | | | | | | | |
| Payroll and benefits | (164) | (123) | (123) | (117) | (112) | (112) | (42) | (42) | (42) | (42) | (42) | (42) |
| Administration | (17) | (16) | (19) | (16) | (15) | (18) | (16) | (15) | (18) | (19) | (9) | (9) |
| Insurance | (10) | (267) | - | (12) | - | - | - | - | - | - | - | (277) |
| Regulatory and accounting | (3) | (5) | (1) | (3) | (8) | (1) | (3) | (1) | (1) | (3) | (1) | (1) |
| Arbitration | (5,171) | (1,713) | (225) | (455) | (225) | (330) | (325) | (280) | (275) | (225) | (275) | (275) |
| CCAA costs | - | (355) | (75) | (63) | - | (33) | - | (5) | (103) | (65) | - | - |
| Venezuela costs | (15) | (15) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) |
| Total disbursements | (5,380) | (2,494) | (448) | (671) | (366) | (499) | (391) | (348) | (443) | (359) | (331) | (608) |
| Net cash flow | 5,120 | (2,494) | (448) | (671) | (366) | (499) | (391) | 4,652 | (443) | (359) | (331) | (608) |
| **Closing cash** | **5,593** | **3,099** | **2,652** | **1,981** | **1,615** | **1,116** | **726** | **5,378** | **4,935** | **4,576** | **4,244** | **3,636** |

**Crystallex International Corporation**
**Cash Flow Forecast**
**April 2014 through December 2015**
**US$000s**

| | Apr-15 | May-15 | Jun-15 | Jul-15 | Aug-15 | Sep-15 | Oct-15 | Nov-15 | Dec-15 | Grand Total | Total 2014 | Total 2015 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Opening cash | 3,636 | 3,332 | 2,872 | 2,565 | 2,149 | 1,785 | 1,504 | 900 | 568 | 473 | 473 | 4,935 |
| **Receipts** | | | | | | | | | | | | |
| DIP receipts | - | - | - | - | - | - | - | - | - | 15,500 | 15,500 | - |
| **Disbursemetns** | | | | | | | | | | | | |
| Payroll and benefits | (42) | (42) | (42) | (42) | (42) | (42) | (42) | (42) | (42) | (1,374) | (875) | (499) |
| Administration | (10) | (9) | (9) | (10) | (9) | (9) | (10) | (9) | (9) | (268) | (150) | (118) |
| Insurance | - | - | - | (12) | - | - | - | - | - | (576) | (288) | (288) |
| Regulatory and accounting | (3) | (5) | (1) | (3) | (8) | (1) | (3) | (1) | (1) | (61) | (28) | (33) |
| Arbitration | (225) | (275) | (225) | (325) | (225) | (225) | (525) | (275) | (225) | (12,299) | (8,999) | (3,300) |
| CCAA costs | (20) | (125) | (25) | (20) | (75) | - | (20) | - | - | (983) | (633) | (350) |
| Venezuela costs | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (125) | (65) | (60) |
| Total disbursements | (304) | (460) | (306) | (416) | (363) | (281) | (604) | (331) | (281) | (15,686) | (11,038) | (4,648) |
| Net cash flow | (304) | (460) | (306) | (416) | (363) | (281) | (604) | (331) | (281) | (186) | 4,462 | (4,648) |
| **Closing cash** | **3,332** | **2,872** | **2,565** | **2,149** | **1,785** | **1,504** | **900** | **568** | **287** | **287** | **4,935** | **287** |

## NOTES TO THE BUDGET

1. The monthly cash flow projection (the **"Budget"**) has been prepared solely for the purpose of determining the necessity of the additional debtor in possession (**"DIP"**) financing required by Crystallex International Corporation (**"Crystallex"** or the **"Company"**) and the Company's ability to fund the business activities of the Company as set out herein.

   The Budget represents Management's reasonable estimates at present. This is not a projection or forecast as contemplated in the Chartered Professional Accountants Canada Handbook. The actual timing and amount of the receipts and disbursements may fluctuate from the estimates shown herein and these fluctuations may be material.

   A key assumption included in the Revised DIP Projection is that the Company, Tenor and certain of its creditors remain in a standstill agreement (the **"Standstill Agreement"**). The Standstill Agreement has been approved by the Court. In addition, the Company has obtained a stay of proceedings until December 31, 2014 and the Budget assumes that this stay remains in place through the end of 2015. The Budget assumes that the Court approves an extension to the Standstill Agreement, the extension of the Stay of Proceedings and the Third DIP Loan.

   Readers are cautioned that the Budget may not be appropriate for their purposes.

2. The Budget is presented on a monthly basis from April 1, 2014 to December 31, 2015 (the **"Period"**) and represents Management's reasonable estimate of the projected results and operations during that time. The Period was selected based on Crystallex's arbitration counsel's assessment of the likely timing of a decision from the International Center for the Settlement of Investment Disputes (**"ICSID"**) tribunal which is currently unknown. Collection of an award on the successful decision, if any, may require additional time following the end of the Period.

3. The Budget is presented in thousands of U.S. Dollars and assumes that any foreign currency transactions are made based on the Canadian and U.S. Dollar being at par value. Actual disbursements will reflect the foreign exchange rate in effect on the date of the transaction.

4.  The Opening Cash Balance includes Crystallex's cash on hand net of outstanding cheques as of March 31, 2014.

5.  DIP receipts represents the forecast tranches of the proposed Third DIP Loan.  Additional funds, pursuant to the Standby Facility, may be made available by Tenor but are not included in the Budget.

6.  Payroll and benefits represents salaries and benefits amounts payable to its employees.  The Budget contemplates that certain headcount reductions will occur during the Period.

7.  Costs related to Administration represent general office expenses of Crystallex (rent, travel, information technology costs etc.).

8.  Regulatory and accounting costs are those related to the Company's ongoing statutory filings.

9.  Insurance represents certain payments to the Company's insurers for its various policies, including directors and officers insurance.

10. Arbitration Costs include projected post filing disbursements to the Company's U.S. and Venezuelan counsel, valuation consultants and various technical, environmental and legal experts working on pursuing the Company's Arbitration Claim. The Company is currently unable to predict the level of activity with any certainty given the nature of the Arbitration Claim proceedings.
████████████████████████████████████████████████████████
████████████████████████████████████████████████████

11. CCAA costs consist of the estimated fees and disbursements of the CCAA Monitor and its legal counsel during the Period, assuming a minimum level of monitoring activity and reporting after the Court approves the Third DIP Loan.

12. Venezuela costs include the disbursements by the Company's Caracas office. Such costs include items such as local payroll and benefit costs, facility costs, and other miscellaneous disbursements.

The Las Cristinas, La Victoria and Tomi costs have not been included in the DIP Projection.

## EXHIBIT A-3

**Thirteenth Report of the Monitor [Docket No. 151-3]**

Court File No.: CV-11-9532-00CL

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS*
*ARRANGEMENT ACT,* R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR
ARRANGEMENT OF CRYSTALLEX INTERNATIONAL CORPORATION

THIRTEENTH REPORT OF THE MONITOR

December 14, 2014

**INTRODUCTION**

1.      On December 23, 2011, Crystallex International Corporation ("**Crystallex**" or the
"**Applicant**") filed for and obtained protection from its creditors under the *Companies'*
*Creditors Arrangement Act,* R.S.C. 1985, c. C-36, as amended (the "**CCAA**") pursuant to
the Order of this Court dated December 23, 2011 (the "**Initial Order**"). Pursuant to the
Initial Order, Ernst & Young Inc. ("**EY**") was appointed as the monitor of the Applicant
(the "**Monitor**") in these CCAA proceedings.

2.      In order to provide the necessary financing for its CCAA proceeding (the "**CCAA**
**Proceeding**") and to pursue the Arbitration Claim (as defined herein), Crystallex has
obtained debtor in possession financing from Tenor Kry Coöperatief U.A. ("**Tenor**" or
the "**DIP Lender**").

**PURPOSE**

3.      The Monitor is filing this Thirteenth Report (the "**Thirteenth Report**") to provide the
Court with an update on:

(a) The status of Crystallex's pursuit of the claim (the "**Arbitration Claim**") against
the Bolivarian Republic of Venezuela ("**Venezuela**") for its expropriated mine

site;

(b) The actual receipts and disbursements of Crystallex for the period from April 1, 2014 through November 30, 2014 (the "**Reporting Period**");

(c) the Applicant's revised cash flow forecast through December 31, 2015 (the "**Revised Forecast**");

(d) the status of Crystallex's current debtor-in-possession borrowings;

(e) The status of discussions between the Applicant, the DIP Lender and the *ad hoc* committee of beneficial holders of the 9.375% senior notes (the "**Ad Hoc Committee**") ;

(f) the additional funding currently being sought by Crystallex pursuant to the Fourth DIP Loan (as defined herein);

(g) the Applicant's motion to approve the terms of an agreement among Crystallex, the DIP Lender, Robert Fung and Marc Oppenheimer relating to the payment of a share of the DIP Lender's entitlement to a share of the Net Arbitration Proceeds (as defined in the Affidavit of Harry Near sworn December 14, 2014, (the "**Near Affidavit**")) payable pursuant to the Fourth DIP Amendment, to Robert Fung and Marc Oppenheimer;

(h) the Applicant's request for leave pursuant to the Order of the Court dated June 5, 2013 (the "**Standstill Order**") to bring its motion for approval to enter into revised financing arrangements with the DIP Lender;

(i) Crystallex's request to redact and seal certain commercially sensitive information related to the Fourth DIP Loan (as defined herein); and

(j) the Monitor's observations and recommendations on the issues set out above.

**DISCLAIMER**

4.    In preparing this Thirteenth Report and making the comments herein, the Monitor has

been provided with, and has relied upon, unaudited financial information, books and records prepared by Crystallex, and discussions with management of the Applicant ("**Management**") (collectively, the "**Information**").

5. The Monitor has reviewed the Information for reasonableness, internal consistency and use in the context in which it was provided. However, the Monitor has not audited or otherwise attempted to verify the accuracy or completeness of the Information in a manner that would wholly or partially comply with Generally Accepted Assurance Standards ("**GAAS**") pursuant to the *Chartered Professional Accountants Canada Handbook* and, accordingly, the Monitor expresses no opinion or other form of assurance contemplated under GAAS in respect of the Information.

6. Capitalized terms not defined in this Thirteenth Report are as defined in previous reports of the Monitor. Unless otherwise stated all monetary amounts contained herein are expressed in U.S. Dollars.

## STATUS OF THE ARBITRATION CLAIM

7. A summary of the status of the Applicant's pursuit of its Arbitration Claim is attached as confidential Appendix "A" to this Thirteenth Report. Given the sensitivity regarding the Arbitration Claim, it has been filed with the Court in a sealed envelope. Additional information in respect of the Arbitration Claim can be found in the Near Affidavit.

## ACTUAL RECEIPTS AND DISBURSEMENTS

8. Attached as confidential Appendix "B" is a summary of the Applicant's actual receipts and disbursements during the Reporting Period. While this type of information was not treated as confidential in earlier Monitor Reports, given the sensitivity regarding the Applicant's liquidity position, it has been filed with the Court in a sealed envelope at the request of the Applicant.

9. As further set out in Appendix "B", the Applicant's cash balance is approximately $2.8 million higher than forecast in the Eleventh Report. This variance is a timing difference and is principally due to the Applicant drawing additional funding (approximately $3

million) pursuant to the Standby Facility (as described in the Eleventh Report and Twelfth Report) which had not been included in the forecast, offset partially by higher than forecast arbitration costs.

**REVISED CASH FLOW FORECAST**

10.    Attached as confidential Appendix "C" to this Thirteenth Report is the Applicant's Revised Forecast.  Given the sensitivity regarding the Applicant's liquidity position, it has been filed with the Court in a sealed envelope.

**CURRENT STATUS OF BORROWINGS**

11.    As set out in the Twelfth Report of the Monitor dated July 8, 2014 (the "**Twelfth Report**"), Crystallex received approximately $8.333 million from the DIP Lender on or about June 27, 2014.  Of this amount, approximately $333,333 was paid to the DIP Lender as a commitment fee.  Such advances were received pursuant to the Third Credit Agreement Amendment Agreement with the DIP Lender (the "**Third DIP Loan Agreement**") and the Credit Agreement.

12.    As a result of these advances, the DIP Lender has earned approximately 70.554% of the Net Arbitration Award.  The total quantum of borrowings pursuant to the Applicant's debtor-in-possession financing is approximately $62.5 million.

**STATUS OF DISCUSSIONS BETWEEN THE APPLICANT, DIP LENDER AND THE AD HOC COMMITTEE**

13.    Over the last several months, the Applicant, the DIP Lender, one of the larger shareholders and the Ad Hoc Committee have been discussing issues related to the MIP and the Applicant's liquidity and financing.  The Monitor has been involved in a number of these discussions.

14.    The Ad Hoc Committee has raised concerns with respect to certain issues related to Crystallex's latest proposed financing.  No resolution has yet been reached between the parties. The Monitor has encouraged the parties to continue negotiating.

**THE FOURTH DIP LOAN**

15.   Since the date of the Twelfth Report, Crystallex has continued to pursue its Arbitration Claim against Venezuela for the expropriation of its Las Cristinas mine site.  The pursuit of the Arbitration Claim has been advanced in proceedings before the Additional Facility of International Centre for the Settlement of Investment Disputes (the "**Tribunal**") since the date of the Twelfth Report.

16.   As set out in the Monitor's Eleventh Report dated April 12, 2014 (the "**Eleventh Report**"), Crystallex obtained additional financing pursuant to the Third DIP Loan Agreement in the approximate amount of $14.9 million.  The purpose of such funds was to pursue Crystallex's Arbitration Claim against Venezuela and fund these CCAA proceedings.

17.   Since the date of the Twelfth Report, Crystallex, its arbitration counsel and expert witnesses have prepared for and attended hearings before the Tribunal, which were not anticipated at the time the Third DIP Loan was obtained.

18.   As set out in its motion materials, Crystallex has agreed to the terms of additional financing to be received from the DIP Lender (the "**Fourth DIP Loan**").  Some important terms of the Fourth DIP Loan are summarized below:

19.   The Monitor notes the following points in respect of the Fourth DIP Loan:

   (a)   It is currently contemplated that the amount borrowed pursuant to the Fourth DIP Loan will be drawn in a single tranche of $13.2 million;

   (b)   Interest shall accrue at 10%, provided that there is no event of default (as defined in the Fourth DIP Loan).  An additional 2% shall accrue if such an Event of Default occurs;

   (c)   The maturity date of the Fourth DIP Loan is December 31, 2016;

   (d)   The DIP Lender has waived any defaults that may now exist;

(e)    Amounts advanced shall be used to fund activities contemplated in the forecast attached hereto as Appendix "C";

(f)    As additional consideration for advancing the Fourth DIP Loan, the DIP Lender shall earn 1.34% of the Net Arbitration Award for each $1 million of funds advanced to Crystallex. Such compensation is consistent with recent rounds of financing;

(g)    The DIP Lender will earn a commitment fee of $1.2 million of the $13.2 million advanced pursuant to the Fourth DIP Loan;

(h)    Crystallex is required to abide by certain cash flow covenants which are materially consistent with other rounds of financing obtained; and

(i)    Crystallex, the DIP Lender, Robert Fung and Marc Oppenheimer will enter into an agreement transferring a share of the DIP Lender's portion of the Net Arbitration Award to Robert Fung and Marc Oppenheimer as further described herein.

*The Monitor's views regarding the Fourth DIP Loan*

20.    As described in greater detail below, one of the factors that this Court is to consider when considering approval of interim financing is the Monitor's report referred to in paragraph 23(1)(b) of the CCAA. Subject to this Court approving the Fourth DIP Loan in the amount of $13.2 million, the Revised Forecast projects that Crystallex will have sufficient liquidity to operate through 2015.

21.    If the Court does not approve the Fourth DIP Loan, then the Applicant is no longer projected to have sufficient liquidity to the end of the stay period unless alternative financing can be arranged. To date, no alternative funding option has been tabled by the Applicant or any other stakeholder. It is anticipated that without additional funding the Applicant will run out of funds in February, 2015.

22.    The Monitor's duties with respect to its review of the Revised Forecast pursuant to section 23(1)(b) of the CCAA require the Monitor to review it as to its reasonableness and to file a report with this Court on the Monitor's findings. The Canadian Association

of Insolvency and Restructuring Professionals standards of professional practice include a standard for monitors fulfilling their statutory responsibilities under the CCAA in respect of a Monitor's Report on a Cash-Flow Statement. A copy of Standard 09-1 Cash Flow Statement is attached hereto as Appendix "D".

23.    Pursuant to this standard, the Monitor's review of the Revised Forecast consisted of inquiries, analytical procedures and discussion related to information supplied to the Monitor by certain of the management and employees of Crystallex. Since hypothetical assumptions need not be supported, the Monitor's procedures with respect to them were limited to evaluating whether they were consistent with the purpose of the Revised Forecast. The Monitor also reviewed the support provided by management of Crystallex for the probable assumptions of the Revised Forecast.

24.    Based on the Monitor's review, nothing has come to its attention that causes it to believe that, in all material respects:

(a)    the hypothetical assumptions are not consistent with the purpose of the Budget;

(b)    as at the date of this Eleventh Report, the probable assumptions developed by management are not suitably supported and consistent with the plans of Crystallex or do not provide a reasonable basis for the Budget, given the hypothetical assumptions; or

(c)    the Revised Forecast does not reflect the probable and hypothetical assumptions.

25.    In considering the proposed Fourth DIP Loan, the Monitor reviewed the factors set out in Section 11.2(4) of the CCAA which provides a non-exhaustive list of factors which this Court is to consider when deciding whether to approve the Applicant's proposed Fourth DIP Loan. The Monitor's comments with respect to these factors are set out below.

*11.2 (4) (a) - the period during which the company is expected to be subject to proceedings under the CCAA*

26.    As part of its process to obtain additional financing, Crystallex has prepared the Revised Forecast. The Revised Forecast is presented on a monthly basis during the period as

defined therein and represents management's estimate of the projected cash flow through 2015 (the "**Period**") given anticipated activity levels and required levels of security required by the Applicant. Given the nature of Crystallex's operations at present, the projected cash flows consist of draws under the Fourth DIP Loan and payments to multiple employees, professionals and, to a lesser degree, other service providers. As discussed herein, the costs and timing associated with the realization of the Arbitration Claim remain uncertain. While management has consulted with the professionals involved to obtain their input on anticipated costs going forward, there remain significant risks around these assumptions. Material variances could significantly affect the timing of the Applicant requiring additional financing to continue pursuit and collection of the Arbitration Claim.

27. The Period was selected by management based on Crystallex's assessment of the likely timing of a decision from the Tribunal after consultation with its arbitration counsel. Collection of any award and other delays may require additional time and funding before receiving any funds from the Arbitration following the end of the Period.

28. Given the timelines, as described to the Monitor and Crystallex, the need for financing could extend for a number of months post-arbitration hearings and it is appropriate in the Monitor's view that the funding continue to be available to Crystallex for the rest of 2014 and 2015.

29. The Revised Forecast assumes and provides for no extended disputes or significant involvement of professionals in the CCAA Proceedings, including in respect of the current Fourth DIP Loan negotiations and approval process; however, it does provide for limited contingency funds in case of deviation from the Revised Forecast. It is possible that additional funding will be required.

*11.2 (4) (b) – how the company's business and financial affairs are to be managed during the proceedings*

30. The Applicant contemplates keeping existing senior management and consultants in place through the arbitration proceedings and employing appropriate arbitration consultants for

-8-

the prosecution of the Arbitration Claim. Crystallex states all the knowledge necessary to advance the arbitration proceedings rests with the existing senior management and consultants and the arbitration consultants.

*11.2 (4) (c) – whether the company's management has the confidence of its major creditors*

31.     The Monitor is not aware of any stakeholder requesting that the Applicant's management be replaced.

*11.2 (4) (d) – whether the loan would enhance the prospects of a viable compromise or arrangement being made in respect of the company*

32.     Crystallex requires additional financing to pay its expenses and continue to pursue the Arbitration Claim. As such, the Fourth DIP Loan will enhance the viability of a CCAA Plan by preserving the main asset of the company for the benefit of all stakeholders. Absent additional financing, it is not possible to pursue the Arbitration Claim.

*11.2 (4) (e) – the nature and value of the company's property*

33.     Crystallex has no assets or operations to provide recovery to its stakeholders other than the pursuit of the Arbitration Claim.

34.     Accordingly, the only avenue to present value for its stakeholders is to prosecute the Arbitration Claim for which the additional financing is required.

*11.2 (4) (f) – whether any creditor would be materially prejudiced as a result of the security charge*

35.     The ability of the Applicant to continue to operate and pursue the Arbitration Claim is beneficial to all of the Applicant's stakeholders.

*11.2 (4) (g) – the monitor's report referred to in paragraph 23(1)(b), if any.*

36.     The discussion of the Monitor's report referred in 23(1)(b) is found in paragraphs 26 to 35 of this Thirteenth Report.

37.     The Revised Forecast has been prepared by management of Crystallex using probable and hypothetical assumptions set out in notes 1 to 12 of the Revised Forecast.

38.     As described in the Disclaimer above, since the Budget is based on assumptions regarding future events, actual results will vary from the information presented even if the hypothetical assumptions occur, and the variations may be material. Accordingly, the Monitor expresses no assurance as to whether the Revised Forecast will be achieved and the Monitor refers readers to the Disclaimer section above.

*Additional Considerations*

39.     The Fourth DIP Loan is consistent with recent rounds of financing with respect to the fees and interest rates charged and the additional compensation (i.e. the Lender's Additional Compensation).

40.     Given the extent of uncertainty regarding the Arbitration Claim, it is not certain that the full quantum of the new funding will ever be required.  As such, it is possible that the DIP Lender may earn a share of the Net Arbitration Proceeds for advancing funds that are never used by Crystallex in the prosecution of the Arbitration Claim.  However, such funds would ultimately paid to Crystallex's various creditors in accordance with their legal priorities, as the cash would remain as an asset of the Applicant.

## REQEUST FOR LEAVE PURSUANT TO THE STANDSTILL ORDER

41.     Pursuant to the Standstill Order, motions not relating to the fees and expenses of the Monitor during these CCAA proceedings cannot be brought without first obtaining leave of the Court.

42.     Given the nature of the Applicant's motion, it is required to first obtain leave of the Court in order to bring its motion seeking to have the Fourth DIP Loan approved.

43.     Absent additional funding, the Applicant is forecast to exhaust its current liquidity in February of 2015.

**TRANSFER OF LENDER ADDITIONAL COMPENSATION TO MANAGEMENT**

44.    As set out in its motion materials, the Applicant is currently seeking an Order from the Court approving the terms of an agreement among Crystallex, the DIP Lender, Robert Fung and Marc Oppenheimer relating to the payment by Crystallex of a share of the DIP Lender's entitlement to a share of the Net Arbitration Proceeds (as defined in the Near Affidavit) payable pursuant to the Fourth DIP Loan, to Robert Fung and Marc Oppenheimer. The beneficiary of such proceeds would otherwise be the DIP Lender. As such, the creditors of Crystallex, other than the DIP Lender, are unaffected by this reallocation. It is to be noted that Robert Fung and Marc Oppenheimer are the only potential participants in the MIP who are parties to this agreement with the DIP Lender.

45.    Discussions regarding the reallocation of the Net Arbitration Award began prior to the Third DIP Loan being approved, as certain provisions of the Management Incentive Program (the "**MIP**") would have capped Managements' ability to receive the full value of the Net Arbitration Award that would have otherwise been paid to them. This is due to the fact that Management is only allowed to receive a maximum of the lesser of 10% of the Net Arbitration Award and 25% of the amount that would be available once all claims were paid. Given that the DIP Lender has already earned approximately 70.554% of the Net Arbitration Award, Management is now capped at 25% of the remainder, or approximately 7.4%, rather than the previous 10% maximum to which it was entitled. If the Fourth DIP Loan is approved the share of the Net Arbitration Award available to shareholders and MIP participants will decline further.

46.    Rather than seek to have the MIP modified at the expenses of other stakeholders, the DIP Lender has come to an agreement with Management such that it will offer the Fourth DIP Loan (along with the incremental share of the Net Arbitration Award) and allow Management to be paid from the share of the Net Arbitration Award to which the DIP Lender would otherwise be entitled.

47.    This offer from the DIP Lender was coincident with Crystallex reassessing its liquidity position in context of the pursuit of its Arbitration Claim. Based on a review of its liquidity, Crystallex was of the view that entering into the Fourth DIP Loan Amendment

was prudent in the circumstances.

## SEALING OF COMMERCIALLY SENSITIVE INFORMATION

48.     The Applicant requests that Appendices "A", "B" and "C" of this Thirteenth Report be sealed to allow the Applicant to continue its pursuit of the Arbitration Claim and that only the redacted version of this Thirteenth Report be made available to parties who have not signed a confidentiality agreement. The Monitor agrees that it is critical that the Venezuelan government not be given any undue advantage by having access to information to which it would, outside of the CCAA proceedings, not be entitled. This would include critical information regarding the liquidity of Crystallex.

## THE MONITOR'S CONCLUSIONS AND RECOMMENDATIONS

49.     A key objective of the Applicant in the CCAA proceeding was and remains obtaining sufficient financing to allow it to prosecute the Arbitration Claim to a favourable outcome for the benefit of all of its stakeholders.

50.     The Monitor is of the view that the Applicant is continuing to pursue this objective in good faith and with due diligence.

51.     The Revised Cash Flow Forecast indicates that, without additional financing, the Applicant is estimated to have depleted its currently available liquidity in the first quarter of 2015. The DIP Lender has offered and negotiated the terms of the Fourth DIP Loan in order to provide the Applicant with the funding necessary to continue the prosecution and collection of the Arbitration Claim. The Applicant advises that it has not secured any alternative sources of this necessary funding.

52.     In order to bring its motion seeking approval of the financing pursuant to the Fourth DIP Loan, the Applicant requires leave of the Court pursuant to the Standstill Order. In light of the factors and observations noted in the preceding paragraphs, the Monitor is supportive of the Applicant's motion to obtain leave.

53.   The Fourth DIP Loan provides the Applicant with $13.2 million of new financing to permit it to continue its prosecution of the Arbitration Claim.   In this context, it is beneficial to all of the Applicant's stakeholders.

54.   Given their importance to the pursuit of the Arbitration Claim, the Monitor is also supportive of the agreement permitting the transfer a portion of the DIP Lender's share of the Net Arbitration Proceeds being paid to Robert Fung and Marc Oppenheimer.

55.   Accordingly, and for the reasons set out above, the Monitor supports the Applicant's request for an Order approving the Fourth DIP Loan and recommends that the Court grant such an Order.

56.   For the reasons set out above, the Monitor also supports the sealing of Appendices "A" and "B" of the Monitor's Thirteenth Report and that only the reacted version of this Thirteenth Report be made available to parties who have not signed a confidentiality agreement.

All of which is respectfully submitted this 14th day of December, 2014.

**ERNST & YOUNG INC.**
In its capacity as Court-appointed Monitor of
Crystallex International Corporation

Per:

Brian M. Denega
Senior Vice President

Todd Ambachtsheer
Vice President

Appendix "A"

**Confidential Summary of Arbitration Claim**



### Summary of Arbitration Proceedings

1. As set out in the Eleventh Report and the Twelfth Report, the Applicant has been pursuing its Arbitration Claim before the Tribunal. The last series post-closing briefs were submitted in May, 2014.

2. As is its prerogative, the Tribunal has submitted a number of clarifying questions and has sought additional information to be provided by Crystallex and Venezuela. As a result, Management and Crystallex's various advisors (the "**Arbitration Professionals**") have been required to appear before the Tribunal on two occasions. Such hearings took place in Washington, D.C. and Paris, France.

3. Given that the budget that accompanied the Eleventh Report did not include allocations of funds for such additional appearances, Crystallex has exceed its budgeted expenditures and required additional financing in order to pursue the Arbitration Claim.

4. In preparation for an eventual award, Management has determined that it should engage certain other professionals to assist in identifying assets of Venezuela that may be monetized in the event of a successful award in favour of Crystallex. The process with respect to enforcing an award was included as Appendix "A" to the Eleventh Report.

-15-

Appendix "B"

**Actual Cash Flows**



**Crystallex International Corporation**
**Cash Flow Forecast**
**April 2014 through December 2015**
**US$000s**

| | | | | | Actual | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Apr-14 | May-14 | Jun-14 | Jul-14 | Aug-14 | Sep-14 | Oct-14 | Nov-14 | Total |
| Opening cash | 473 | 5,460 | 4,515 | 12,283 | 11,297 | 9,355 | 9,122 | 9,087 | 473 |
| | | | | | | | | | |
| **Receipts** | | | | | | | | | |
| DIP receipts | 10,495 | - | 7,899 | - | - | - | - | - | 18,394 |
| Other receipts | - | 81 | - | - | 45 | - | 241 | - | 367 |
| Total Receipts | 10,495 | 81 | 7,899 | - | 45 | - | 241 | - | 18,761 |
| | | | | | | | | | |
| **Disbursemetns** | | | | | | | | | |
| Payroll and benefits | (216) | (5) | (111) | (130) | (148) | (103) | (55) | (150) | (918) |
| Administration | (28) | (16) | (6) | (20) | (7) | (16) | (18) | (5) | (117) |
| Insurance | (116) | - | - | - | - | (6) | - | - | (122) |
| Regulatory and accounting | - | (16) | (7) | (2) | (3) | - | (1) | (4) | (32) |
| Arbitration | (5,087) | (585) | (8) | (833) | (1,768) | (109) | (19) | (731) | (9,139) |
| CCAA costs | (61) | (404) | - | - | (61) | - | (140) | - | (666) |
| Venezuela costs | - | - | - | - | - | - | (42) | - | (42) |
| Total disbursements | (5,507) | (1,027) | (131) | (986) | (1,987) | (234) | (276) | (890) | (11,036) |
| | | | | | | | | | |
| Net cash flow | 4,988 | (945) | 7,768 | (986) | (1,942) | (234) | (35) | (890) | 7,725 |
| | | | | | | | | | |
| Closing cash | 5,460 | 4,515 | 12,283 | 11,297 | 9,355 | 9,122 | 9,087 | 8,197 | 8,197 |

CONFIDENTIAL COPY #5

**Crystallex International Corporation**
**Cash Flow Forecast**
**April 2014 through December 2015**
**US$000s**

| | | | | | Forecast | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Apr-14 | May-14 | Jun-14 | Jul-14 | Aug-14 | Sep-14 | Oct-14 | Nov-14 | Total |
| Opening cash | 473 | 5,593 | 3,099 | 2,652 | 1,981 | 1,615 | 1,116 | 726 | 473 |
| **Receipts** | | | | | | | | | |
| DIP receipts | 10,500 | - | - | - | - | - | - | 5,000 | 15,500 |
| Other receipts | | | | | | | | | |
| Total Receipts | | | | | | | | | |
| **Disbursemetns** | | | | | | | | | |
| Payroll and benefits | (164) | (123) | (123) | (117) | (112) | (112) | (42) | (42) | (834) |
| Administration | (17) | (16) | (19) | (16) | (15) | (18) | (16) | (15) | (132) |
| Insurance | (10) | (267) | (12) | - | - | - | - | - | (288) |
| Regulatory and accounting | (3) | (5) | (1) | (3) | (8) | (1) | (3) | (1) | (26) |
| Arbitration | (5,171) | (1,713) | (225) | (455) | (225) | (330) | (325) | (280) | (8,724) |
| CCAA costs | | (355) | (75) | (63) | | (33) | - | (5) | (531) |
| Venezuela costs | (15) | (15) | (5) | (5) | (5) | (5) | (5) | (5) | (60) |
| Total disbursements | (5,380) | (2,494) | (448) | (671) | (366) | (499) | (391) | (348) | (10,595) |
| Net cash flow | 5,120 | (2,494) | (448) | (671) | (366) | (499) | (391) | 4,652 | 4,905 |
| Closing cash | 5,593 | 3,099 | 2,652 | 1,981 | 1,615 | 1,116 | 726 | 5,378 | 5,378 |

CONFIDENTIAL COPY #5

**Crystallex International Corporation**
**Cash Flow Forecast**
**April 2014 through December 2015**
**US$000s**

| | Apr-14 | May-14 | Jun-14 | Jul-14 | Aug-14 | Sep-14 | Oct-14 | Nov-14 | Total |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | Variance | | | | |
| Opening cash | - | 133 | 1,416 | 9,631 | 9,316 | 7,740 | 8,005 | 8,361 | - |
| **Receipts** | | | | | | | | | |
| DIP receipts | 5 | | 7,899 | - | - | - | - | 5,000 | 2,894 |
| Other receipts | - | 81 | - | - | 45 | - | 241 | - | 367 |
| Total Receipts | 10,495 | 81 | 7,899 | - | 45 | - | 241 | - | 18,761 |
| **Disbursemetns** | | | | | | | | | |
| Payroll and benefits | (52) | 117 | 12 | (13) | (36) | 10 | (13) | (108) | (84) |
| Administration | (10) | 0 | 13 | (4) | 8 | 1 | (2) | 10 | 15 |
| Insurance | (106) | 267 | 12 | - | - | (6) | - | - | 166 |
| Regulatory and accounting | 3 | (11) | (6) | 1 | 6 | 1 | 2 | (3) | (6) |
| Arbitration | 84 | 1,128 | 217 | (378) | (1,543) | 221 | 306 | (451) | (415) |
| CCAA costs | (61) | (49) | 75 | 63 | (61) | 33 | (140) | 5 | (136) |
| Venezuela costs | 15 | 15 | 5 | 5 | 5 | 5 | (37) | 5 | 18 |
| Total disbursements | (127) | 1,467 | 316 | (315) | (1,621) | 265 | 115 | (542) | (441) |
| Net cash flow | (132) | 1,548 | 8,215 | (315) | (1,576) | 265 | 356 | (5,542) | 2,820 |
| Closing cash | (133) | 1,416 | 9,631 | 9,316 | 7,740 | 8,005 | 8,361 | 2,820 | 2,820 |

CONFIDENTIAL COPY #5

**Appendix "C"**

**Revised Forecast**



Crystallex International Corporation
Monthly Cash Flow Forecast
December 1, 2014 Through December 31, 2015
USD$000

| | Dec-14 | Jan-15 | Feb-15 | Mar-15 | Apr-15 | May-15 | Jun-15 | Jul-15 | Aug-15 | Sep-15 | Oct-15 | Nov-15 | Dec-15 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Opening cash | 8,197 | 4,085 | 12,184 | 9,698 | 8,047 | 6,376 | 5,510 | 5,087 | 4,503 | 3,785 | 3,336 | 2,614 | 1,878 | 8,197 |
| **Receipts** | | | | | | | | | | | | | | |
| DIP receipts | | 12,000 | - | - | - | - | - | - | - | - | - | - | - | 12,000 |
| Other | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total receipts | - | 12,000 | - | - | - | - | - | - | - | - | - | - | - | 12,000 |
| **Disbursements** | | | | | | | | | | | | | | |
| Payroll and benefits | (111) | (111) | (111) | (111) | (111) | (111) | (111) | (111) | (111) | (111) | (111) | (111) | (111) | (1,438) |
| Administration | (18) | (24) | (13) | (13) | (14) | (13) | (13) | (14) | (13) | (13) | (14) | (13) | (13) | (190) |
| Insurance | - | - | - | (277) | - | - | - | (12) | - | - | - | - | - | (288) |
| Regulatory and accounting | (1) | (3) | (1) | (1) | (3) | (5) | (1) | (3) | (8) | (1) | (3) | (1) | (1) | (34) |
| Arbitration | (2,825) | (2,300) | (2,188) | (1,200) | (1,475) | (438) | (225) | (375) | (338) | (275) | (525) | (438) | (225) | (12,825) |
| CCAA costs | (1,153) | (1,459) | (44) | (44) | (64) | (169) | (69) | (64) | (119) | (44) | (64) | (44) | (44) | (3,378) |
| Venezuela costs | (5) | (5) | (130) | (5) | (5) | (130) | (5) | (5) | (130) | (5) | (5) | (130) | (5) | (565) |
| Total disbursements | (4,112) | (3,901) | (2,486) | (1,650) | (1,672) | (865) | (424) | (584) | (718) | (449) | (722) | (736) | (399) | (18,718) |
| Net cash flow | (4,112) | 8,099 | (2,486) | (1,650) | (1,672) | (865) | (424) | (584) | (718) | (449) | (722) | (736) | (399) | (6,718) |
| Closing cash | 4,085 | 12,184 | 9,698 | 8,047 | 6,376 | 5,510 | 5,087 | 4,503 | 3,785 | 3,336 | 2,614 | 1,878 | 1,479 | 1,479 |

CONFIDENTIAL #2 COPY

## NOTES TO THE REVISED FORECAST

1. The monthly cash flow projection (the **"Revised Forecast"**) has been prepared solely for the purpose of determining the necessity of the additional debtor in possession (**"DIP"**) financing required by Crystallex International Corporation (**"Crystallex"** or the **"Company"**) and the Company's ability to fund the business activities of the Company as set out herein.

   The Revised Forecast represents Management's reasonable estimates at present. This is not a projection or forecast as contemplated in the Chartered Professional Accountants Canada Handbook. The actual timing and amount of the receipts and disbursements may fluctuate from the estimates shown herein and these fluctuations may be material.

   A key assumption included in the Revised DIP Projection is that the Company, Tenor and certain of its creditors remain in a standstill agreement (the **"Standstill Agreement"**). The Standstill Agreement has been approved by the Court. In addition, the Company has obtained a stay of proceedings until December 31, 2015 and the Revised Forecast assumes that this stay remains in place through the end of 2015. The Revised Forecast assumes that the Court approves the Fourth DIP Loan.

   Readers are cautioned that the Revised Forecast may not be appropriate for their purposes.

2. The Revised Forecast is presented on a monthly basis from December 1, 2014 to December 31, 2015 (the **"Period"**) and represents Management's reasonable estimate of the projected results and operations during that time. The Period was selected based on Crystallex's arbitration counsel's assessment of the likely timing of a decision from the International Center for the Settlement of Investment Disputes (**"ICSID"**) tribunal which is currently unknown. Collection of an award on the successful decision, if any, may require additional time following the end of the Period.

3. The Revised Forecast is presented in thousands of U.S. Dollars and assumes that any foreign currency transactions are made based on the Canadian and U.S. Dollar being at par value. Actual disbursements will reflect the foreign exchange rate in effect on the date of the transaction.

4. The Opening Cash Balance includes Crystallex's cash on hand net of outstanding cheques as of November 30, 2014.

5. DIP receipts represents the forecast tranches of the proposed Fourth DIP Loan.

6. Payroll and benefits represents salaries and benefits amounts payable to its employees.

7. Costs related to Administration represent general office expenses of Crystallex (rent, travel, information technology costs etc.).

8. Regulatory and accounting costs are those related to the Company's ongoing statutory filings.

9. Insurance represents certain payments to the Company's insurers for its various policies, including directors and officers insurance.

10. Arbitration Costs include projected post filing disbursements to the Company's U.S. and Venezuelan counsel, valuation consultants and various technical, environmental and legal experts working on pursuing the Company's Arbitration Claim. The Company is currently unable to predict the level of activity with any certainty given the nature of the Arbitration Claim proceedings.

11. CCAA costs consist of the estimated fees and disbursements of the CCAA Monitor and its legal counsel during the Period, assuming a minimum level of monitoring activity and reporting after the Court approves the Fourth DIP Loan.

12. Venezuela costs include the disbursements by the Company's Caracas office. Such costs include items such as local payroll and benefit costs, facility costs, and other miscellaneous disbursements.

The Las Cristinas, La Victoria and Tomi costs have not been included in the DIP Projection.

**<u>EXHIBIT A-4</u>**

**Affidavit of Harry Near Dated December 15, 2014 [Docket No. 151-4]**

CONFIDENTIAL

**Court File No. CV-11-9532-00CL**

*ONTARIO*
**SUPERIOR COURT OF JUSTICE
COMMERCIAL LIST**

**BETWEEN:**

**IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT
ACT, 1985, c.C-36 AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR
ARRANGEMENT OF CRYSTALLEX INTERNATIONAL CORPORATION**

**AFFIDAVIT OF HARRY NEAR
SWORN DECEMBER 15, 2014**

I, Harry Near, of the City of Ottawa, in the Province of Ontario, **MAKE**

**OATH AND SAY:**

1.        I am a director of Crystallex International Corporation ("**Crystallex**" or the

"**Company**").   I am also the chair of an independent committee formed to deal with

incentive compensation to the Company's management.  As such, I have knowledge of

the matters to which I hereinafter depose, which knowledge is either personal to me,

obtained from a review of the documents to which I refer, or, where indicated, based on

information and belief, in which case I verily believe such information to be true.

**I.        BACKGROUND AND SUMMARY**

2.        On December 23, 2011, an order (the "**Initial Order**") was made granting

Crystallex protection from its creditors under the *Companies' Creditors Arrangement Act*

(the "**CCAA Proceeding**") and Ernst & Young Inc. was appointed as the monitor (the

"**Monitor**").  On December 28, 2011 Crystallex obtained an order of the United States

Bankruptcy Court for the District of Delaware recognizing the CCAA Proceeding as a

- 2 -

foreign main proceeding (the "**Chapter 15 Proceeding**" and together with the CCAA Proceeding the "**Restructuring Proceedings**").

3.　　　　Crystallex previously engaged in the business of exploring and developing the Las Cristinas gold project in Venezuela.　Crystallex had the right to mine Las Cristinas through a mining operation contract (the "**MOC**") with Corporacion Venzolana de Guayana.　In 2011, the Venezuelan government expropriated the Las Cristinas mine and purported to terminate the MOC.　The Company is currently arbitrating the matter (the "**Arbitration Proceeding**") before the Additional Facility of International Centre for the Settlement of Investment Disputes (the "**Tribunal**") against Venezuela and is seeking, among other things, compensation of US$3.8 billion for the loss in value of its investment (the "**Arbitration Claim**").　The Arbitration Claim is the Company's principal asset.

4.　　　　The oral hearing in the Arbitration Proceeding was held in November 2013, and following a brief suspension (resulting from Venezuela's challenge to the arbitrator that it had appointed), the hearing resumed and was completed in February 2014.　Post-closing briefs were submitted in the Arbitration Proceeding on May 12, 2014.　Crystallex fully expected at that time that its participation in the Arbitration Proceedings (and attendant costs) was substantially complete.

5.　　　　Subsequent to the submission of the post-closing briefs, however, the Tribunal requested additional documentation and briefing submissions on at least two separate occasions from Crystallex and held an impromptu hearing in November, 2014. These additional steps by the Tribunal created significant additional costs to Crystallex

that were either unexpected or, in some cases, far less certain at the time of the Third DIP Amendment (as defined below).

6.        Based on Venezuela's behaviour in dealing with awards against it in similar recent arbitration proceedings (as described in detail below), including against Gold Reserve, the company whose property was adjacent to Crystallex's property in Venezuela, Crystallex now anticipates that it will incur even further additional professional costs to stop an award from being annulled by Venezuela, as well as to enforce and collect any award granted to it by the Tribunal.

7.        In order to effectively pursue the Arbitration Claim, the Company must rely on a series of professional advisors, including Freshfields Bruckhaus Deringer US, LLP ("**Freshfields**") as arbitration counsel, Compass Lexecon, Crystallex's valuation expert in the arbitration, Venezuelan counsel and various other expert witnesses (collectively the "**Arbitration Professionals**").

8.        As more particularly described below, as a result of recent, unanticipated actions by the Tribunal, the costs associated with the pursuit and realization of the Arbitration Claim, including the Arbitration Professionals have significantly exceeded the Company's projections.  As a result, Crystallex requires a further amendment to the DIP Credit Agreement (as defined below) to increase the funding available to it to continue the Arbitration Proceeding and related matters and to continue to pursue the realization of the Arbitration Claim and the Restructuring Proceedings for the benefit of all of its stakeholders.

- 4 -

9.　　　Accordingly, this Affidavit is sworn in support of a motion by Crystallex for an order (the "**Fourth DIP Amendment Order**"), among other things,:

(a)　granting Crystallex leave pursuant to paragraph 7 of the stay extension and standstill order (the "**Standstill Order**") made by the Honourable Mr. Justice Newbould on June 5, 2013 to bring this motion;

(b)　approving the terms of the Fourth DIP Amendment to the DIP Credit Agreement (each, as defined below) and authorizing Crystallex to enter into any documents necessary to give effect to the transactions contemplated thereby;

(c)　that the DIP Charge (as defined below) and the Lender Additional Compensation Charge (as defined below) shall secure all obligations under the DIP Credit Agreement, as amended by the Fourth DIP Amendment;

(d)　approving the Tenor Directed CVR Agreement (as described below); and

(e)　sealing the motion materials and facta filed in connection with this motion that have been labelled as "Confidential" (collectively, the "**Confidential Materials**").

10.　　　Attached as Schedule "A" to this affidavit are certain necessary terms of the order approving the Fourth DIP Amendment sought by the Company on this motion (the "**Confidential Terms**").　The existence and nature of the Confidential Terms are extremely commercially sensitive for reasons discussed in more detail below.

## II.    BACKGROUND TO THE DEBTOR-IN-POSSESSION FINANCING

### A.    The DIP Credit Agreement

11.        As described above, Crystallex's principal asset is the Arbitration Claim. Consequently, the only way for Crystallex to provide value to its stakeholders in the CCAA Proceeding is to pursue the realization of that claim through the Arbitration Proceeding.  In the first quarter of 2012, it was apparent that Crystallex did not have sufficient cash on hand to finance the Arbitration Proceeding and therefore it was determined that Crystallex should pursue additional financing.

12.        Following an auction to raise financing, Crystallex entered into a senior secured credit agreement (the "**DIP Credit Agreement**") pursuant to which Tenor Special Situation Fund I, LLC made available the aggregate principal amount of US$36,000,000 (the "**Initial DIP Loan**").  The DIP Credit Agreement was subsequently finalized and assigned to Tenor Kry Cooperatief U.A. (the "**DIP Lender**") on April 23, 2012.  It was agreed that the proceeds of the loan would be used for working capital and other general corporate purposes of Crystallex, including the payment of costs associated with the Arbitration Proceeding.  The Initial DIP Loan was made available in four parts of: (a) US$9,000,000 (the "**Initial Loan**"), (b) US$12,000,000 (the "**Final Order Loan**"), (c) US$10,000,000 (the "**Incremental Loan**") and (d) US$5,000,000 (the "**Supplemental Loan**").  The DIP Credit Agreement was subsequently amended on May 15, 2012 (the "**First DIP Amendment**") to, among other things, increase the availability of the Initial Loan to US$13,000,000 and decrease the availability of the Final Order Loan to US$8,000,000.

- 6 -

13.        As consideration for the DIP Lender entering into the DIP Credit Agreement, the Company agreed to pay the DIP Lender a commitment fee in the amount of US$2,000,000 and an amount equal to 35% of the Net Arbitration Proceeds (as defined below) (the "**Initial Compensation**"), subject to the priority scheme for the application and distribution of such proceeds set out in the DIP Credit Agreement (which priority scheme was amended by the Second DIP Amendment (as defined and described below)).   The conditions to the advance of the Final Order Loan were satisfied by June 25, 2012 and the DIP Lender earned the Initial Compensation on such date.

14.        On April 16, 2012, the Honourable Mr. Justice Newbould made an order (the "**CCAA Financing Order**") approving the DIP Credit Agreement and granting a (a) charge on the property of Crystallex to secure all obligations outstanding under the DIP Credit Agreement and related documents, except for the obligation to pay the Initial Compensation (the "**DIP Charge**"), and (b) charge on the property of Crystallex to secure the obligation of Crystallex to pay the Initial Compensation (the "**Lender Additional Compensation Charge**").   The DIP Charge ranks second in priority behind the Administration Charge (as defined in the Initial Order).   The Lender Additional Compensation Charge ranks sixth in the order of priority on a *pari passu* basis with the MIP Charge (as defined in the Initial Order) and behind the Administration Charge, the DIP Charge, any future charge granted to secure supplemental loans by a lender (other than the DIP Lender), the Director's Charge and the Prefiling Unsecured Creditors' Charge (each, as defined in the Initial Order).

- 7 -

15.        Pursuant to the terms of the DIP Credit Agreement (as amended), the **"Net Arbitration Proceeds"** is the amount left over from the proceeds of an award or settlement recovered in the Arbitration Proceeding after deducting unpaid post-filing expenses of Crystallex, including those in respect of the Arbitration Proceeding, taxes payable on the award or settlement recovered in the Arbitration Proceeding, unpaid principal and interest on the DIP Loan and all of the proven and allowed unsecured claims against Crystallex (each a **"Prior Ranking Amount"**).    Thereafter, the Net Arbitration Proceeds are divided on account of the Lender Additional Compensation (as defined below), the amounts provided for in the management incentive plan of Crystallex which was approved by the Court in April 2012 (the **"MIP"**) and the Company's retained portion to be paid *pari passu* and *pro rata* based on the percentages of the Net Arbitration Proceeds applicable to such payments.

16.        To determine the appropriate amounts payable as Lender Additional Compensation and MIP compensation, the calculation of the Net Arbitration Proceeds include a reduction from the gross arbitration proceeds: (a) for the principal amount of the notes (the **"Senior Notes"**) issued by Crystallex pursuant to the trust indenture dated December 23, 2004 between, among others, Crystallex and Computershare Trust Company of Canada as trustee, in the amount of US$104,135,273.97, plus interest permitted to accrue thereon, including interest accruing in accordance with the Standstill Order as amended, and (b) the principal amount of any other unsecured pre-filing claim unrelated to the Senior Notes that is determined to be a proven claim in accordance with the Claims Procedure Order dated November 30, 2012, plus any interest permitted

thereon, in each case on account of the total amount of all of the proven and allowed unsecured claims against Crystallex.

**B.      The 2013 Acknowledgement and Second DIP Amendment**

17.          As at January 31, 2013, the amount of US$21,000,000 had been advanced to Crystallex under the Initial DIP Loan (being the full amount of the Initial Loan and the Final Order Loan).    Due however, to certain unforeseen costs and expenses, lower than expected recoveries from sales of the Company's non-material assets and increased restructuring costs, Crystallex was unable to comply with certain of its obligations under the DIP Credit Agreement regarding budgeted expenditures.

18.          On March 11, 2013, Crystallex and the DIP Lender entered into an acknowledgement and agreement (the "**2013 Acknowledgement**") whereby the DIP Lender agreed to partially advance the Incremental Loan in the amount of US$3,296,672.46, leaving the remaining balance of the Incremental Loan in the amount of US$6,703,327.54 and the Supplemental Loan unadvanced.

19.          At that time, the Company understood that the DIP Lender would advance the remaining portion of the Incremental Loan in the amount of US$6,703,327.54 and the Supplemental Loan if the Company secured financing (whether from the DIP Lender or otherwise) for the additional funds it required.

20.          On June 5, 2013, Crystallex and the DIP Lender entered into the second amendment agreement (the "**Second DIP Amendment**") to the DIP Credit Agreement. Pursuant to the Second DIP Amendment, the DIP Lender agreed, among other things,

to increase the total principal amount of the Initial DIP Loan by US$11,100,000 (the "**Second DIP Amount**"), for an aggregate DIP Loan of US$47,100,000.

21.         Pursuant to the Second DIP Amendment, the remaining balance of the Incremental Loan and the Second DIP Amount were to be advanced in three separate tranches (collectively, the "**Second DIP Loan**"):  (a) tranche A, being the amount of US$3,296,672.46 that was advanced on or about March 11, 2013 pursuant to the 2013 Acknowledgement, (b) tranche B in the amount of US$11,100,000, being the Second DIP Amount, and (c) tranche C in the amount of US$6,703,327.54, being the remaining unadvanced portion of the Incremental Loan.  It was agreed that the full principal amount of the Second DIP Loan would be advanced prior to the advance of the Supplemental Loan.

22.         The Second DIP Amendment also amended the DIP Credit Agreement to revise the events of default to, among other things, provide more flexibility to Crystallex surrounding deviations from its budget.

23.         As consideration for the DIP Lender agreeing to lend the Second DIP Amount, the Company agreed to pay the DIP Lender an amount equal to 14.874% of the Net Arbitration Proceeds (calculated on the basis of 1.34% of the Net Arbitration Proceeds for each US$1 million principal amount advanced) (the "**Second DIP Compensation**").  The Second DIP Amount was advanced on June 6, 2013 and therefore the DIP Lender earned the Second DIP Compensation at such time.

24.          As a result of the Second DIP Amendment, the DIP Lender was entitled to and earned 49.874% of the Net Arbitration Proceeds on account of the Initial Compensation and the Second DIP Compensation.

**C.    The Third DIP Amendment**

25.          To continue to finance costs associated with the pursuit of the realization of the Arbitration Claim, including costs of the Arbitration Proceeding and costs of the Restructuring Proceedings, the Company entered into a third credit agreement amendment agreement dated as of April 16, 2014 (the "**Third DIP Amendment**") pursuant to which the DIP Lender agreed, subject to the terms and conditions set out therein, to increase the principal amount of the DIP Loan by up to US$15,433,333.33 (the "**Third DIP Loan**" and together with the Initial DIP Loan and the Second DIP Loan, the "**DIP Loan**") from US$47,100,000 to US$62,533,333.33.

26.          Under the terms of the Third DIP Amendment, when all available amounts of the Third DIP Loan were drawn by Crystallex, the DIP Lender was entitled to an additional 20.68% of the Net Arbitration Proceeds (again, calculated on the basis of 1.34% of the Net Arbitration Proceeds for each US$1 million principal amount advanced) (the "**Third DIP Compensation**" and together with the Initial Compensation and the Second DIP Compensation, the "**Lender Additional Compensation**"). In total, the Lender Additional Compensation, therefore, amounts to 70.554% of the Net Arbitration Proceeds.  As of the date hereof, all amounts have been drawn and as such the DIP Lender has earned 70.554% of the Net Arbitration Proceeds as Lender Additional Compensation.  There was also a US$1,050,000 commitment fee earned

upon entry of the Third DIP Amendment Order and paid concurrently with the advance and from the proceeds of the Third DIP Loan.

27.     The decision to draw the full amount available was made to ensure that the Company would have sufficient funding to allow it to continue to manage the various elements of the Arbitration Proceeding and to ensure that no intervening events could adversely affect the ability to draw funds when needed.

## III.     THE FOURTH DIP LOAN

### A.     The Financial Situation of Crystallex

28.     In May 2014, Crystallex submitted its written closing briefs to the Tribunal and, at that time, expected that formal participation in the Arbitration Proceedings was substantially complete.  Subsequently, and without advance warning, the Tribunal took two additional steps.

29.     First, the Tribunal requested from Crystallex additional documentation and submissions on two distinct issues over a period of two months. The issues raised by the Tribunal were substantive and required not only substantial input from the Company, but also extensive work by outside professionals.  In order to respond to the Tribunal's requests, in each case, Crystallex was required to spend substantial amounts of time and money to prepare briefings and work with its experts to prepare the additional formal expert reports that were requested by the Tribunal.  Crystallex did not reasonably expect these additional requests or the additional costs associated therewith at the time of the budget planning for the Third DIP Loan.

30.        Second, the Tribunal scheduled an impromptu additional hearing, which was held in November 2014.  In order to effectively prepare for the hearing, Crystallex was required to spend substantial time and money preparing its own witnesses, working with counsel to prepare voluminous opening and closing statements, analyzing briefs submitted by Venezuela, and preparing detailed documents to be presented during the hearing.  In light of the adversarial nature of the hearing, including the live direct and cross examination of witnesses, the costs of preparation were considerable.  Adding to the further unexpected costs, significant expense was required to stage the hearing, at the Tribunal's request, in Paris, France – which required not only additional costs for the arbitrators (of which Crystallex must pay half), but also additional costs for transportation, accommodation, and meals for the entire team of principals and hourly professionals (including lawyers and experts) that were necessary to prepare for and conduct an extensive hearing.

31.        The Tribunal's additional documentation and briefing requests, scheduling of an impromptu hearing, and the costs attendant thereto were not reasonably expected, by Crystallex and were therefore not provided for in Crystallex's budget planning underlying the Third DIP Loan. Crystallex has received no assurances that there will not be further requests made from the Tribunal for additional pleadings, expert submissions or hearings. The Tribunal has the right to request whatever information it requires in order to reach its decision.

32.        Recently there have been awards against Venezuela in other similar arbitration proceedings, including proceedings related to Gold Reserve, the mine

adjacent to the Crystallex mine in Venezuela, and one of Exxon's oil projects that was also nationalized.  Venezuela has taken action to attempt to annul those awards and has also made it clear that it will contest the awards and make the collection of the awards difficult.  This is a change in policy for Venezuela, as it had previously been actively settling cases just before or just after an award was issued. Crystallex now anticipates that Venezuela will take an adversarial and delay-oriented approach if and when an award is issued by the Tribunal in favour of Crystallex.  Crystallex, therefore, must anticipate incurring additional professional costs not currently budgeted for to enforce and collect any award which may be granted in its favour, including costs associated with identifying assets of Venezuela in different jurisdictions in order to satisfy any award.

33.        As a result of the unexpected and substantial costs from the recent additional requests from the Tribunal and the November hearing and the attendant incremental professional costs, we anticipate that Crystallex will run out of funds in or near February 2015 unless it receives additional financing. This estimate does not include any costs related to additional requests, briefing, or reports that the Tribunal may require. We have also been told by the Arbitration Professionals that, given the Company's status as a CCAA applicant, they will not be able to render services on behalf of the Company if the Company does not have sufficient cash on its balance sheet to make the Arbitration Professionals comfortable that they will be paid in a timely manner.

34.        This is not only imperative for their respective businesses, but also for the arbitration case itself. In international arbitration, a lawyer that has a claim against or whose client is in arrears can have his or her credibility attacked by an adversary. Indeed, Venezuela received permission from the Tribunal at the November hearing to ask Crystallex's lawyers and experts whether they had been fully paid prior to the hearing, which they had been. Venezuela has now, on two separate occasions, sought to use funding concerns for strategic purposes before the Tribunal. Based upon, among other things, (i) the importance of payment of the Arbitration Professionals, (ii) the Company's prior history and dealings with Venezuela, and (iii) current events that have dramatically impacted Venezuela's ability to pay a judgement and the related challenges in financing the Arbitration Proceedings, Crystallex believes that it would be irresponsible for the Company to wait any longer to ensure that it has adequate funding or to allow Venezuela any opportunity to use funding concerns to its benefit.  Crystallex must be appropriately capitalized now to effectively pursue the Arbitration Claim.

35.        The only way for Crystallex to pay its stakeholders is to prosecute the Arbitration Claim to a successful settlement or award.  The Arbitration Claim is the only significant asset of Crystallex and, therefore, there will be no material recovery for its creditors until the Arbitration Claim is either settled or resolved through an award. Crystallex therefore requires additional financing to pursue the Arbitration Claim and enhance the prospects of recoveries for its stakeholders.

**B.    The Fourth DIP Amendment**

36.        Given its current financial situation Crystallex, after consultation with the Monitor, carefully considered potential paths to obtain the necessary financing, which

included engaging in discussions with the DIP Lender about the possibility of securing additional financing. For the reasons described herein, the Company was of the view that it was most appropriate in the circumstances to secure financing from the DIP Lender.

37.      On October 9, 2014, at the request of Crystallex, the DIP Lender provided Crystallex with a proposed term sheet (as subsequently amended, the "**Term Sheet**") setting out the terms pursuant to which the DIP Lender and Crystallex would amend the DIP Credit Agreement (the "**Fourth DIP Amendment**"). Further and final negotiation of the Fourth DIP Amendment needed to be subsequently deferred while management directed its attention to addressing the unexpected further requests of the Tribunal and preparing for the further hearing scheduled by the Tribunal. The final commitment letter and term sheet in respect of the Fourth DIP Amendment is attached as Exhibit "A" to this my Affidavit.

38.      Pursuant to the Fourth DIP Amendment, the DIP Lender has committed to increase the total principal amount of funding available to Crystallex by an additional US$13,200,000 (the "**Fourth DIP Loan**"). The proceeds of the Fourth DIP Loan are to be used to, among other things, fund the costs associated with the pursuit of the Arbitration Claim. It is currently anticipated that these funds will allow Crystallex to continue to pursue the resolution of its claim against Venezuela until the end of 2015, although, as demonstrated by past events, this estimate is dependent in part on actions of other parties to the Arbitration Proceeding including actions that may be taken by Venezuela or the Tribunal which would affect this estimate. Critically, the proposed use

of the Fourth DIP Loan does not anticipate any amounts to be used for disputes between Crystallex and its stakeholders. The amount of the Fourth DIP Amendment is based upon a budget prepared by Crystallex and reviewed by the Monitor.

39.        The interest, maturity and priority of the Fourth DIP Loan are consistent with the provisions currently in place with respect to the DIP Loan.  Specifically, any amounts advanced under the Fourth DIP Amendment bear interest at the rate of 10% compounded semi-annually until paid.  If an event of default occurs and is continuing, the amounts owing to the DIP Lender under the Fourth DIP Amendment will bear interest at a rate of 12% per annum.  The Fourth DIP Loan matures at the same time as the DIP Loan being December 31, 2016.  Finally, as part of this motion, Crystallex is requesting this Court to make an order that the DIP Charge and the Lender Additional Compensation Charge will secure the Fourth DIP Loan and the Fourth DIP Compensation Amount (as defined below), respectively.  If this order is made, the Fourth DIP Loan and the Fourth DIP Compensation Amount will have the same priority as the DIP Loan and the Lender Additional Compensation.

40.        The Fourth DIP Loan is available by way of a single draw on the expiry or waiver of the applicable appeal period in respect of the Fourth DIP Amendment Order. If approved, Crystallex will draw the full Fourth DIP Loan immediately following the expiration or waiver of such appeal period.

41.        There is a US$1,200,000 commitment fee earned upon entry of the Fourth DIP Amendment Order and paid concurrently with the advance and from the proceeds of the Fourth DIP Loan.  As a result, the net proceeds to be received from the advance

of the Fourth DIP Loan will be US$12,000,000.  The DIP Lender will also earn 17.688% of the Net Arbitration Proceeds (calculated on the basis of 1.34% of the Net Arbitration Proceeds for each US$1,000,000 principal amount advanced) upon entry of the Fourth DIP Amendment Order and the advance of the Fourth DIP Loan (the "**Fourth DIP Compensation Amount**").

**C.    Effect of the Fourth DIP Amendment on the Company's Stakeholders**

42.         As consideration for the advances to be provided by the DIP Lender under the DIP Credit Agreement as amended by the Fourth DIP Amendment, the DIP Lender shall have earned 88.242% of the Net Arbitration Proceeds.  As a result, subject to dilution from future financings (if any), only 11.758% of the Net Arbitration Proceeds will remain available to satisfy Crystallex's obligations under the MIP and to benefit Crystallex's shareholders (the "**Shareholders**").

43.         The relief sought on this motion is the product of negotiations between Crystallex, the DIP Lender, the Monitor, Computershare Trust Company of Canada in its capacity as trustee (the "**Trustee**") for the holders (the "**Noteholders**", which includes the Ad Hoc Committee of Noteholders, called the "**Ad Hoc Committee**") of 9.375% Senior Unsecured Notes of Crystallex, and Greywolf Loan Participation LLC, which is one of the largest Noteholders, a member of the Ad Hoc Committee and a significant shareholder of Crystallex.

44.         As discussed in detail below, pursuant to the Standstill Order as amended, the Senior Notes and other Proven Claims are currently accruing interest on their claims at an increased rate until December 31, 2015.  The funding proposed in the Fourth DIP

Amendment is currently contemplated, subject to additional requests of the Tribunal beyond the Company's current expectations, to provide the Company with funding for an equivalent or potentially shorter period of time.  As a result, creditors receive an increased likelihood of recovery of their claim (including accruing interest) based on the fact that the additional funds will allow the Company to continue to pursue realization of the Arbitration Claim.  The Fourth DIP Amendment is, therefore, beneficial to all creditors.

**D.    Lender Additional Compensation Directed to Certain Key Management and Consultants**

45.         Crystallex believes that certain key personnel and consultants, namely Robert Fung and Marc Oppenheimer, are vital to the success of the pursuit of the Arbitration Claim.  This is especially true given that, in order to save money, Crystallex has decreased staff to the point where Fung and Oppenheimer are the only remaining individuals at the Company that have firsthand knowledge of the facts at issue in the Arbitration Proceedings, as well as the only individuals with the historical knowledge to aid the Arbitration Professionals in answering the myriad of questions required for each filing and identifying relevant documents.  In short, due to diligent efforts to decrease expenses, without the assistance of Fung and Oppenheimer, the Company would be unable to effectively plead its case, respond to Tribunal questions, interpret a potential award, or enforce a potential award.  This view is supported by the DIP Lender.

46.         As such, Crystallex, the DIP Lender, Fung, and Oppenheimer, negotiated an agreement that would entitle Fung and Oppenheimer to a certain portion of the Fourth DIP Compensation Amount that would otherwise be payable to the DIP Lender

(the "**Tenor Directed CVR Agreement**").    No additional compensation is being provided to Fung or Oppenheimer by Crystallex under the Tenor Directed CVR Agreement.  Attached as Exhibit "B" to this my Affidavit is a copy of the Tenor Directed CVR Agreement.

*Terms of the Tenor Directed CVR Agreement*

47.        Pursuant to the Tenor Directed CVR Agreement, the DIP Lender has agreed that Fung and Oppenheimer will each be entitled to a portion of the Lender Additional Compensation that would otherwise be payable to the DIP Lender from the Fourth DIP Compensation Amount to be payable as follows: (i) ████████ to Robert Fung and (ii) ████████ to Marc Oppenheimer (in each case the "Tenor Directed CVR"). As consideration for the Tenor Directed CVR, Messrs. Oppenheimer and Fung have agreed that they will not seek to amend the MIP now or in the future.  Pursuant to the Tenor Directed CVR Agreement, the relevant Tenor Directed CVR will automatically be deemed to be transferred back to the DIP Lender if either Mr. Fung or Mr. Oppenheimer terminates his employment or consulting agreement (as applicable) voluntarily without good reason or is terminated for cause.  A further key term of the agreement provides that, if either Mr. Fung or Mr. Oppenheimer becomes deceased or disabled such that he cannot perform his duties as an employee, then the DIP Lender shall have the right to transfer some or all of the applicable Tenor Directed CVR to a new employee of Crystallex.

*The Need for the Tenor Directed CVR Agreement*

48.        The only way for Crystallex to pay its stakeholders is to prosecute the Arbitration Claim to a successful award or settlement.   The oral hearing in the Arbitration Proceeding was held in November 2013, and following a brief suspension (resulting from Venezuela's challenge to the arbitrator that it had appointed), the hearing resumed and was completed in February 2014.  Post-closing briefs were submitted in the Arbitration Proceeding on May 12, 2014.  A further unanticipated hearing was held in November, 2014.

49.        While   the   Arbitration   Proceeding   has   progressed   significantly, management of the Company is still needed to answer any questions that the Tribunal might have, participate in ongoing submissions and additional oral hearings that may be required by the Tribunal, assist with negotiating any potential settlement or make and implement   any   strategic   decisions   that   need   to   be   made   in   connection   with   the Arbitration Claim.

50.        Crystallex has taken steps to reduce its corporate overhead, including reducing headcount and additional costs.  The reduction in personnel and resources has placed an increased burden on existing management to assist with the Arbitration Proceeding.

51.        The   Arbitration   Proceeding   has   progressed   longer   than   initially anticipated.   The Company cannot afford to lose its remaining key personnel at this juncture in the proceeding.

52.        The MIP provides that Crystallex will establish a discretionary bonus pool (the "**Retention Amount Pool**") for payments to be made to the MIP participants.  The

maximum amount of the Retention Amount Pool is generally the lesser of (a) an amount equal to 10% of the Net Arbitration Proceeds (as defined in the MIP), until the Retention Amount Pool reaches $70,000,000 and thereafter 2% of any additional Net Arbitration Proceeds (as defined in the MIP), or (b) 25% of the amount that is available to the Shareholders after satisfaction of the Lender Additional Compensation (collectively, the "**Residual Pool**").  I am not a beneficiary of the MIP but am part of a group which will determine how to allocate the proceeds of the MIP among its participants based on the criteria set out therein.

53.        As noted above, under the terms of the Fourth DIP Amendment, once all available amounts of the Fourth DIP Loan are drawn by Crystallex, the DIP Lender will be entitled to receive 88.242% of the Net Arbitration Proceeds.  As discussed, the Fourth DIP Loan is necessary to ensure that the Company would have sufficient funding to allow it to continue to manage the various elements of the Arbitration Proceeding. Obtaining the Fourth DIP Loan is, as already discussed, in the best interest of the Company and all of its stakeholders, despite the adverse impact on potential payments under the MIP.

54.        As described above, the Residual Pool limits the maximum amount in the Retention Amount Pool to 25% of the amount that is available to the Shareholders after satisfaction of the Lender Additional Compensation.  The increase in Lender Additional Compensation pursuant to the Fourth DIP Amendment will result in a decrease of the Net Arbitration Proceeds available to the Shareholders and, therefore, a reduction in the

amount of the Residual Pool.  If the Fourth DIP Loan is approved, the maximum amount available for the Residual Pool would be ▮▮▮▮▮ of the Net Arbitration Proceeds.

55.        Furthermore, on June 5, 2013, the Company obtained the Standstill Order as an interim settlement of an ongoing dispute between the Company and the Noteholders.  The Standstill Order provides the Noteholders and creditors with Proven Claims with an increased rate of interest to accrue on the Senior Notes or the Proven Claims, respectively, during the Standstill Period, unless extended.  In connection with the Third DIP Amendment, the Company agreed to extend the Standstill Period until December 31, 2015 (the period through which the proposed Fourth DIP Loan is contemplated to last), and thereby, extend the accrual of the increased rate of interest under the terms of the Standstill Order during the extended Standstill Period.  The interest payable to the Noteholders and creditors with Proven Claims under the Standstill Order is also deducted from the Net Arbitration Proceeds in priority to any amounts payable to the Shareholders.  This structure has the effect of further reducing the amount of the Net Arbitration Proceeds available to the Shareholders and consequently further reducing the quantum of the Residual Pool.

56.        Therefore, in light of the reduced quantum of the Residual Pool, and after extensive negotiation with certain significant bondholders and shareholders of Crystallex, the DIP Lender has agreed that Messrs. Fung and Oppenheimer, under the terms of the Tenor Directed CVR Agreement, will be entitled to some of the compensation for the Fourth DIP Loan that would have otherwise been payable to the DIP Lender as a means to facilitate the successful resolution of the Arbitration Claim.

57.         For all of the reasons described above, I believe that the Tenor Directed CVR Agreement is proper, fair and reasonable in the circumstances and will facilitate the retention of the key personnel necessary to assist with the pursuit of the Arbitration Claim.  The DIP Lender's actions and agreement will benefit all stakeholders.

**E.     Alternatives to the Fourth DIP Amendment**

58.         Other than the above, the Company did not engage in another formal process to solicit additional financing from alternative sources because there are certain structural impediments to financing for the reasons that follow.  First, the DIP Credit Agreement requires Crystallex to obtain the consent of the DIP Lender before incurring any additional indebtedness (other than subordinated indebtedness) or allowing any liens or encumbrances to be created on its property.  Second, the DIP Lender has the benefit of the DIP Charge and the Lender Additional Compensation Charge and it is entitled to the Lender Additional Compensation.  Third, while Crystallex is permitted to incur debt that is subordinated to DIP Loan, the Company is first required to give the DIP Lender the opportunity to provide financing, any such indebtedness needs to be explicitly subordinated to the obligations of the Company to the DIP Lender and if the proceeds of any such subordinated indebtedness exceed US$10,000,000, 50% of the proceeds in excess of US$10,000,000 shall be paid to the benefit of the DIP Lender.  All of the foregoing terms of the DIP Credit Agreement were the result of lengthy and arduous negotiations between Crystallex and the DIP Lender and I understand are terms upon which the DIP Lender made (and continues to make) its credit decisions in respect of advances to Crystallex.

59.        We believe that in light of the foregoing it is unlikely that Crystallex would be successful finding a lender who would agree to loan funds in the amounts required by the Company in a position that is subordinate to the DIP Lender.  Crystallex conducted an auction in 2012 to source financing which ultimately resulted in the DIP Lender being named as the successful lender.  If Crystallex canvassed the market to explore financing alternatives, it would be costly and potentially time-consuming process.  Even assuming Crystallex had the money and time to canvass the market, there is simply no evidence to suggest that Crystallex would be successful. Furthermore, it would be highly irresponsible of Crystallex to subject its stakeholders to the risk that a formal process would pose to the Arbitration Proceeding.  Specifically, the Company does not want to make it publicly known that it is experiencing difficulty financing the Arbitration Proceeding because it could affect the quantum of any settlement that is reached with Venezuela.  Also, there is a fear that this information could result in Venezuela delaying the process and taking steps to drive up costs in the Arbitration Proceeding.

60.        We are also very concerned that the political situation in Venezuela will continue to deteriorate with the result that financing availability to Crystallex, including from Tenor, will become more difficult, if not impossible, if we delay the Fourth DIP Loan for any reason, including the solicitation of alternate financing sources.  The DIP Lender has advised that it is increasingly and significantly concerned about the current situation in Venezuela and its impact on financing decisions.  In particular, the recent decline in the price of oil which is Venezuela's principal export is having a significant adverse effect on Venezuela's economy and political environment.  Recent news publications

highlight the significantly turbulent situation in Venezuela. Attached as Exhibit "C" to this my affidavit is an article dated December 11, 2014, as an example.  The DIP Lender's offer to make the Fourth DIP Loan expires on December 18, 2014 and there is no certainty that it can be extended.  For these reasons, I am of the view that any further delay in securing financing would be harmful to the Company and its stakeholders.

61.        For all the foregoing reasons, I believe that in the circumstances, the financing made available pursuant to the Fourth DIP Amendment is proper, fair and reasonable and is the best option to preserve the main asset of Crystallex for the benefit of all stakeholders.

## IV.    REQUEST FOR SEALING

62.        As part of this Motion, Crystallex is requesting that the Confidential Materials describing the costs of the Arbitration Professionals and detailing terms of the Fourth DIP Amendment be sealed.  In particular, Crystallex is seeking to have any documents sealed that specify the amounts of the Fourth DIP Loan or the Fourth DIP Compensation Amount or that disclose why Crystallex requires the Fourth DIP Loan or that disclose the terms applicable to the distribution of the Net Arbitration Proceeds. Crystallex further proposes that the order sought on this motion not include this information except by reference to the Confidential Materials.

63.        The terms of the financing could be detrimental to the Company's position in the Arbitration Proceeding for two reasons: (i) if the Venezuelan government is aware of the amount of financing available to pay the Arbitration Professionals, it could provide it with a strategic advantage and may encourage tactics aimed at increasing expense

33

- 26 -

and delay; and (ii) if the Venezuelan government learns about the details of the terms of the Fourth DIP Loan, it may seek to assert that Crystallex and the DIP Lender do not believe the Arbitration Claim to be valued at $3.8 billion, but some lower amount. Although we do not know how it obtained confidential information, Venezuela has become aware of certain confidential information relating to previous advances to Crystallex and has tried to use such information in the Arbitration Proceedings to the detriment of Crystallex.  It is, therefore, critical that the Venezuelan government not be given access to information concerning the Company's finances and its professional fees and expenses relating to the Arbitration Claim.

SWORN BEFORE ME at the City of Toronto, in the Province of Ontario on December 15, 2014.

*OTTAWA*

_____
Commissioner for taking affidavits

**Harry Near**

# SCHEDULE "A" – Approval Order Terms

**DEFINITIONS**

    1.    **THIS COURT ORDERS** that unless otherwise defined in this Order, capitalized terms used in this Order shall have the meanings given to them in the CCAA Financing Order this Court granted in these proceedings on April 16, 2012 (the "**CCAA Financing Order**") or in the Credit Agreement, as applicable.

**INCREASED DIP FINANCING**

    2.    **THIS COURT ORDERS** that the Applicant is hereby authorized and empowered to borrow the additional principal amount (the "**Fourth Additional Principal Amount**") from the DIP Lender as set forth in the Amendment Agreement (as defined below), and to amend further the credit agreement dated as of April 23, 2012 between the Applicant and Tenor Special Situation Fund I, LLC ("**Tenor**"), which was assigned by Tenor to Tenor KRY Cooperatief U.A. on such date (together with any and all successors, assigns and transferees, each as permitted under the Credit Agreement, as applicable, the "**DIP Lender**") as previously amended by the First Credit Agreement Amending and Confirming Agreement dated as of May 15, 2012, the Second Credit Agreement Amendment Agreement dated as of June 5, 2013, and the Third Credit Agreement Amendment Agreement dated as of April 16, 2014 (collectively, the "**Credit Agreement**") pursuant to a fourth credit agreement amendment agreement (the "**Amendment Agreement**") between the DIP Lender and the Applicant in order to provide, *inter alia*, for such increase in the principal amount in order to finance, in accordance with the terms of the Credit Documents including the Budget, the Applicant's expenses, including without limitation, its expenses in connection with the Arbitration Proceeding and the Reorganization Proceedings, provided that the total principal amount borrowed under the Credit Agreement, as amended by the Amendment Agreement, shall not exceed the amount set out in the Amendment Agreement unless permitted by further Order of this Court.

    3.    **THIS COURT ORDERS** that the Amendment Agreement is approved in its entirety and the Applicant is hereby authorized and empowered to execute and deliver to the DIP Lender the Amendment Agreement substantially in the form of the draft Amendment Agreement filed with the Court and all other documents contemplated or required by the DIP Lender in connection with the Amendment Agreement or the loan of the Fourth Additional Principal Amount.

    4.    **THIS COURT ORDERS** that the provisions of the Credit Documents (including the Security Documents) contemplated by the Credit Agreement, as amended by the

Amendment Agreement, and the Loans advanced and to be advanced thereunder, are proper, fair, reasonable, appear in good faith and are hereby approved, and the Applicant is hereby authorized and directed to pay and perform all of its principal indebtedness, interest, expenses, fees, liabilities and other compensation and obligations to the DIP Lender under and pursuant to the Credit Agreement, as amended by the Amendment Agreement, and the other Credit Documents as and when the same become due and are to be performed.

5.      **THIS COURT ORDERS** that (i) the DIP Lender is entitled, in accordance with the provisions of the Amendment Agreement, to the Fourth Additional Principal Compensation Amount (as defined in the Amendment Agreement) equivalent to the percentage of the Net Arbitration Proceeds set forth in the Amendment Agreement, (ii) the Fourth Additional Principal Compensation Amount shall be fully earned by the DIP Lender immediately upon the advance of the Fourth Additional Principal Amount, (iii) the Fourth Additional Principal Compensation Amount is in addition to the Lender Additional Compensation, the Additional Principal Compensation Amount, the Second Additional Principal Compensation Amount, and the Third Additional Principal Compensation Amount, all of which are fair and reasonable compensation, (iv) all other fees, interest and compensation paid or payable under the Credit Agreement, as amended by the Amendment Agreement, in addition to the Lender Additional Compensation, the Additional Principal Compensation Amount, the Second Additional Principal Compensation Amount, the Third Additional Principal Compensation Amount, and the Fourth Additional Principal Compensation Amount are fair and reasonable compensation, and (v) the Fourth Additional Principal Compensation Amount shall be payable with the same priority and at the same time as the Lender Additional Compensation, the Additional Principal Compensation Amount, the Second Additional Principal Compensation Amount, and the Third Additional Principal Compensation Amount in accordance with the provisions of Exhibit F of the Credit Agreement as amended by the Amendment Agreement.

6.      **THIS COURT ORDERS** that:

   (a)     the DIP Charge shall secure all Obligations outstanding from time to time under the Credit Agreement, as amended by the Amendment Agreement, or under any other Credit Document (including the Fourth Additional Principal Amount, all other principal, all interest, all expenses and all fees) except for any obligation of the Applicant to pay Lender Additional Compensation, the Additional Principal Compensation Amount, the Second Additional Principal Compensation Amount,

the Third Additional Principal Compensation Amount or the Fourth Additional Principal Compensation Amount to the DIP Lender;

(b)    the Lender Additional Compensation Charge shall secure (i) the obligation of the Applicant to pay to the DIP Lender the Lender Additional Compensation, the Additional Principal Compensation Amount, the Second Additional Principal Compensation Amount, the Third Additional Principal Compensation Amount, and the Fourth Additional Principal Compensation Amount in accordance with the Credit Agreement, as amended by the Amendment Agreement, and (ii) all amounts now or hereafter owing on account thereof, in connection therewith or pursuant thereto; and

(c)    the DIP Charge and the Lender Additional Compensation Charge shall continue to have the priority set out in paragraph 17 of the CCAA Financing Order.

7.    **THIS COURT ORDERS** that the Credit Agreement, the Amendment Agreement; the other Credit Documents, the DIP Charge, and the Lender Additional Compensation Charge, any advances made in good faith by the DIP Lender under the Credit Agreement, as amended by the Amendment Agreement (including the Fourth Additional Principal Amount), and the Applicant's agreement to pay (and the payment of) Lender Additional Compensation, the Additional Principal Compensation Amount, the Second Additional Principal Compensation Amount, the Third Additional Principal Compensation Amount, and the Fourth Additional Principal Compensation Amount to the DIP Lender are fair, reasonable and appropriate and shall not be rendered invalid or unenforceable and the rights and remedies of the DIP Lender shall not otherwise be limited or impaired in any way by: (a) the pendency of these proceedings and the declarations of insolvency made herein; (b) any application(s) for bankruptcy order(s) issued pursuant to the Bankruptcy and Insolvency Act, R.S.C. 1985, C. B-3 (the "**BIA**"), or any bankruptcy order made pursuant to such applications; (c) the filing of any assignments for the general benefit of creditors made pursuant to the BIA; (d) the provisions of any federal or provincial statutes or any common law; or (e) any negative covenants, prohibitions or other similar provisions with respect to borrowings, incurring debt or the creation of encumbrances contained in any existing agreement (an "**Agreement**") which binds the Applicant and, notwithstanding any provision to the contrary in any Agreement:

(a)    none of the execution, delivery or performance of the Credit Agreement, the
Amendment Agreement or the other Credit Documents shall create nor be
deemed to constitute a breach by the Applicant of any Agreement to which it is a
party;

(b)    the Applicant shall not have any liability to any Person (as defined in the Initial
Order) whatsoever as a result of any breach of any Agreement caused by or
resulting from the execution, delivery or performance of the Credit Agreement,
the Amendment Agreement or the other Credit Documents or the agreement by
the Applicant to pay (or the payment of) the Fourth Additional Principal
Compensation Amount to the DIP Lender; and

(c)    the payments made by the Applicant pursuant to this Order, the Credit
Agreement, as amended by the Amendment Agreement, or the other Credit
Documents (including the payment by the Applicant of the Fourth Additional
Principal Compensation Amount to the DIP Lender), do not and will not constitute
preferences, fraudulent conveyances, transfers at undervalue, oppressive
conduct, or other challengeable or voidable transactions under any applicable
law including common law.

8.    **THIS COURT ORDERS** that each of the (i) CCAA Financing Order, (ii) the
Additional CCAA Financing Order issued by this Court in these proceedings on June 5, 2013
(the "**First Additional CCAA Financing Order**"), and the (iii) Second Additional CCAA
Financing Order issued by this Court in these proceedings on April 14, 2014 (the "**Second
Additional CCAA Financing Order**") shall continue in full force and effect and that all
protections and other provisions of the CCAA Financing Order, the First Additional CCAA
Financing Order, and the Second Additional CCAA Financing Order as applicable, shall apply
*mutatis mutandis* to the Fourth Additional Principal Amount, interest thereon, the Fourth
Additional Principal Compensation Amount and all other amounts owing to the DIP Lender
under the Credit Agreement, as amended by the Amendment Agreement, and the other Credit
Documents and to all charges and other security therefor.

**APPROVAL OF MONITOR'S THIRTEENTH REPORT**

9.    **THIS COURT ORDERS** that the Thirteenth Report of the Monitor and the
activities as set out therein be and are hereby approved.

**GENERAL**

10.     **THIS COURT ORDERS AND DECLARES** that this Order is subject to provisional execution and that if any of the provisions of this Order in connection with the Fourth Additional Principal Amount,  the Fourth Additional Principal Compensation Amount, the Amendment Agreement or any other document or agreement contemplated thereby, the DIP Charge or the Lender Additional Compensation Charge shall subsequently be stayed, modified, varied, amended, reversed or vacated in whole or in part (collectively a "**Variation**") whether by subsequent order of this Court or on or pending an appeal from this Order, such Variation shall not in any way impair, limit or lessen the protections, rights or remedies of the DIP Lender, whether under this Order (as made prior to the Variation), any prior order of this Court in connection with the transactions contemplated by the Credit Agreement, as amended by the Amendment Agreement, or under any of the documents or agreements delivered pursuant thereto, with respect to any advances made prior to the DIP Lender being given written notice of the Variation.

11.     **THIS COURT HEREBY REQUESTS** the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada or in the United States, including the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), to give effect to this Order and to assist the Applicant, the Monitor and their respective agents in carrying out the terms of this Order. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders, including an order of the Bankruptcy Court granting the DIP Lender the protections afforded by section 364 of title 11 of the United States Code, and to provide such assistance to the Applicant and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Applicant in any foreign proceeding, or to assist the Applicant and the Monitor and their respective agents in carrying out the terms of this Order.

| | Court File No.  CV-11-9532-00CL |
|---|---|
| IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, 1985, c.C-36 AS AMENDED<br><br>AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF CRYSTALLEX INTERNATIONAL CORPORATION | |
| | **ONTARIO<br>SUPERIOR COURT OF JUSTICE<br>(COMMERCIAL LIST)**<br><br>Proceeding commenced at Toronto |
| | **AFFIDAVIT OF HARRY NEAR**<br>**(Sworn December 15, 2014)** |
| | **Davies Ward Phillips & Vineberg LLP**<br>155 Wellington Street West<br>Toronto, ON  M5V 3J7<br><br>Jay Swartz (LSUC #15417L)<br>Bryan D. McLeese (LSUC #55607C)<br>Tel:    416.863.0900<br>Fax:    416.863.0871<br><br>Lawyers for Crystallex International Corporation |

THIS IS EXHIBIT "A" REFERRED TO IN THE AFFIDAVIT OF
HARRY NEAR SWORN THIS _13_ DAY OF DECEMBER 2014

_____
A Commissioner for Taking Affidavits

**TENOR CAPITAL MANAGEMENT COMPANY, L.P.**

December 10, 2014

Crystallex International Corporation
8 King Street East, Suite 1201
Toronto, ON  M5C 1B5
Attention:      Mr. Robert Fung, Chairman and CEO

Re:      Additional Financing Commitment

Gentlemen:

This commitment letter is being delivered by the undersigned subject to the terms and conditions set out herein and the exhibit attached hereto.

(i)      Crystallex International Corporation (the "Company"), a Canadian corporation, is currently an applicant and a debtor company in a proceeding (the "CCAA Proceeding") under the *Companies' Creditors Arrangement Act* (Canada)  (the "CCAA"), commenced on December 23, 2011 (the "CCAA Filing Date") before the Ontario Superior Court of Justice (Commercial List) (the "CCAA Court") and, simultaneously, a debtor in an ancillary proceeding under chapter 15 of the Bankruptcy Code before the United States Bankruptcy Court for the District of Delaware (the "US Bankruptcy Court") commenced on December 23, 2011 (the "US Recognition Proceeding"), and has retained possession of its assets and is authorized pursuant to the order of the CCAA Court granted on the CCAA Filing Date (as amended, the "Initial Order") and Section 1520(a)(2) of the Bankruptcy Code to continue the operation of its business;

(ii)      Pursuant to the Initial Order, the order of the CCAA Court granted on April 16, 2012 (the "CCAA Financing Order") and a credit agreement dated as of April 23, 2012 between the Company and Tenor Special Situation Fund I, LLC, which was assigned by Tenor Special Situation Fund I, LLC to Tenor KRY Coöperatief U.A. ("Tenor U.A.") on such date (as so assigned and as amended by the first credit agreement amending and confirming agreement dated as of May 15, 2012, the second credit agreement amendment agreement dated as of June 5, 2013 (the "Second Amendment Agreement"), the third credit agreement amendment

Crystallex International Corporation
December 10, 2014
Page 2

agreement dated as of April 16, 2014 (the "Third Amendment Agreement"), and as otherwise modified prior to the date hereof (collectively, the "Existing DIP Credit Agreement") and as further amended, amended and restated, supplemented, converted or otherwise modified from time to time (the "DIP Credit Agreement")), Tenor U.A. made available to the Company a debtor-in-possession term loan facility in the maximum aggregate principal amount of US$62,533,333.33;

(iii)    The Company has advised Tenor Capital Management Company, L.P. ("Tenor") that the Company has determined in good faith and after due deliberation that the Company requires to be made available to it additional financing in the aggregate principal amount of US$13,200,000 (the "Additional Principal Amount") (the "Additional Principal Amount" also sometimes herein called the "Additional Financing"), in order to pay amounts as provided for in the Budget (as defined in the Term Sheet) and in accordance with the terms of the Credit Documents, and the Company believes that Tenor is best suited and the most appropriate lender to provide such Additional Financing and has requested Tenor U.A. and/or one or more of Tenor or its affiliates in the discretion of Tenor (as applicable, the "Lender") to provide such Additional Financing in accordance with this letter and the term sheet attached hereto as Exhibit A (the "Term Sheet").

Tenor U.A. shall, subject to the provisions hereof, enter into an amendment agreement in form and substance satisfactory to Tenor U.A. and the Company (but for certainty, satisfactory to Tenor U.A. in its sole discretion) which (i) amends (x) the DIP Credit Agreement to provide for, among other things, the Additional Principal Amount to be advanced by the Lender subject to and in accordance with the provisions of this commitment letter and the Term Sheet and (y) the Budget, and (ii) provides for other clarifications and other amendments agreed to by Tenor U.A. and the Company (the "Fourth DIP Credit Amending Agreement").

Crystallex International Corporation
December 10, 2014
Page 3

**Additional DIP Facility**

   The Lender is pleased to advise you of its commitment to provide additional financing (the "<u>Additional DIP Facility</u>") consisting of a non-revolving term loan in the Additional Principal Amount, subject to the provisions of this letter and the Term Sheet, and to be comprised and advanced by way of a single draw US$13,200,000 tranche (sometimes referred to herein and in the Term Sheet as the "<u>Supplemental Loan Tranche "D"</u>"), such tranche to be advanced in accordance the terms of the applicable governing Credit Documents including all exhibits thereto. For certainty, the Additional DIP Facility is a separate and distinct facility from each of the other Loans (as that term is defined in the Existing DIP Credit Agreement) including without limitation the other tranches of the Supplemental Loan (as that term is defined in the Existing DIP Credit Agreement). The Additional DIP Facility shall be substantially on the terms and conditions set forth in this letter and the Term Sheet. The Lender's commitment to provide the Additional DIP Facility is subject in all respects to the satisfaction of the terms and conditions contained in this letter and the Term Sheet. All exhibits hereto including without limitation the Term Sheet, and each appendix, shall form part of this commitment letter.

   The obligations of the Company under the Additional DIP Facility shall be secured by liens on and security interests in all existing and after-acquired undertaking and assets of the Company (subject to Permitted Liens (as such term is defined in the Existing DIP Credit Agreement)), including, without limitation, a security interest in all present and future proceeds paid, payable, due to, recovered or otherwise received by the Company or any of its subsidiaries (the "<u>Arbitration Proceeds</u>") pursuant to or in respect of, without limitation, any agreement, settlement, judgment, collection or payment of any kind and in any form relating to the Company's claim against the Bolivarian Republic of Venezuela in respect of the Las Cristinas mines including without limitation the arbitration proceedings currently pending before the International Centre for Settlement of Investment Disputes or any other present or future claim, action, arbitration, litigation or other proceedings relating thereto (collectively, the "<u>Arbitration Proceeding</u>").

   The Lender's commitment to provide the Additional DIP Facility, or any portion thereof, is subject to:

    (i)   the Company obtaining from the CCAA Court an approval order with respect to the Additional DIP Facility and the other transactions contemplated in this letter

Crystallex International Corporation
December 10, 2014
Page 4

and the Term Sheet and a corresponding recognition order with respect thereto from the US Bankruptcy Court, each in form and substance satisfactory to the Lender and each such order providing for all amounts owing to the Lender in respect of the Additional DIP Facility (including without limitation the Supplemental Loan Tranche D Additional Lender Compensation Amount (as that term is defined in the Term Sheet)) to be secured by applicable charges with priority consistent with those charges granted in respect of the Loans previously advanced under the Existing DIP Credit Agreement, and all applicable appeal periods with respect to both orders shall have expired and the orders are not subject to an appeal or further right of appeal or any stay, and neither order shall have been reversed, vacated or, unless otherwise agreed by the Lender in writing, amended or modified in any manner (collectively, the "Additional DIP Facility Orders" and each, an "Additional DIP Facility Order");

(ii)     the execution and delivery of the Loan Documents (as defined in the Term Sheet) and any other document referred to in the Term Sheet;

(iii)    the Lender being satisfied in its sole discretion that after the date of this letter there has not occurred or become known to the Lender any material adverse event or development in respect of any one or more of the Arbitration Proceeding, the CCAA Proceeding or the political situation in Venezuela, each as determined by the Lender in its sole discretion (a "Material Adverse Development"); and

(iv)    such other conditions as are set forth in the Term Sheet and the Existing DIP Credit Agreement, to be amended by the Fourth DIP Credit Amending Agreement.

If at any time prior to the funding of the Additional DIP Facility, the Lender determines that any condition precedent (either in this letter or in the Term Sheet) has not been satisfied or that a Material Adverse Development has occurred, the Lender may terminate its funding obligations under this letter by giving notice thereof to the Company (but the Company shall, despite

Crystallex International Corporation
December 10, 2014
Page 5

such termination, pay all Expenses incurred to such date and such other amounts agreed to by the Company hereunder and such obligations of the Company shall survive such termination).

The Company represents and warrants to the Lender that:

(i)     all written information and other materials concerning the Company, its subsidiaries and the Arbitration Proceeding (other than projections, estimates, budgets or forward looking statements) (collectively, the "Information") which have been, or is hereafter, prepared by or on behalf of the Company or any of its subsidiaries and delivered to the Lender are or, when delivered, will be, when considered as a whole, complete and correct in all material respects and do not, or will not when delivered, contain any untrue statement of material fact or omit to state a material fact necessary in order to make any statement contained therein not materially misleading in light of the circumstances under which such statement has been made;

(ii)    to the extent that any such Information contains projections, estimates, budgets or forward looking statements, such projections, estimates, budgets or forward looking statements have been or will be prepared in good faith on the basis of:

A.      assumptions, methods and tests stated therein which are believed by the Company to be reasonable at the time made; and

B.      information believed by the Company to have been accurate based on the information available to the Company at the time such projections, estimates, budgets or forward looking statements were prepared and furnished to the Lender; and

(iii)   all representations and warranties made by or on behalf of the Company in the Existing DIP Credit Agreement and the other Credit Documents (as that term is defined in the Existing DIP Credit Agreement) are true and correct.

The Company agrees that if, at any time prior to the advance of the Additional DIP Facility, any of the preceding representations and warranties is or would be incorrect in any material respect if the

Crystallex International Corporation
December 10, 2014
Page 6

information, estimates or projections were being furnished or such representations and warranties were being made, at such time, then the Company will promptly supplement, or cause to be supplemented, the information, estimates and projections so that such representations and warranties will be correct in all material respects under those circumstances.

**General**

By its execution hereof and its acceptance in writing of this letter, the Company hereby agrees to indemnify and hold harmless Tenor, the Lender, and each of their respective affiliates and assignees, and each of their respective directors, officers, partners, investors, employees, agents and advisors (each an "Indemnified Party") from and against any and all losses, claims, damages, liabilities or other expenses to which such Indemnified Party may become subject, insofar as such losses, claims, damages, liabilities (or actions or other proceedings commenced or threatened in respect thereof) or other expenses arising out of or in any way relating to or resulting from, this letter or the establishment or extension of the Additional Financing or any of the fees, interest or other compensation received or earned in connection with or in any way arising from any use or intended use of this letter or the proceeds of the Additional Financing, and the Company agrees to reimburse each Indemnified Party for all actual and reasonable legal or other expenses, for which an invoice has been provided, incurred in connection with investigating, defending or participating in any such loss, claim, damage, liability or action or other proceeding (whether or not such Indemnified Party is a party to any action or proceeding out of which indemnified expenses arise), but excluding therefrom all losses, claims, damages, liabilities and expenses which are finally determined in a non-appealable decision of a court of competent jurisdiction to have resulted solely from the gross negligence or wilful misconduct of such Indemnified Party.  In the event of any litigation or dispute involving this letter or the Additional Financing, none of the Lender or any Indemnified Party shall be responsible or liable to the Company, any reorganized entity, any of their respective subsidiaries or any other person for any special, indirect, consequential, incidental or punitive damages.  In addition, the Company agrees to reimburse the Lender for all fees and expenses (collectively, the "Expenses"), including all fees and expenses of the Lender's counsel and other advisors, for which an invoice has been provided, incurred by or on behalf of the Lender in connection with or otherwise related to the negotiation, documentation and administration of the Additional Financing and the enforcement of all rights and security held by or on behalf of the Lender.  The obligations of the Company under this paragraph shall remain effective

Crystallex International Corporation
December 10, 2014
Page 7

whether or not definitive documentation is executed or any advance is made by the Lender in respect of the Additional Financing and notwithstanding any termination of the commitment by the Lender under this letter.

The Company agrees that none of this letter (including, for certainty, all exhibits (including the Term Sheet) and appendices) or any of their contents, or their existence shall be disclosed by the Company or any of its subsidiaries or advisors to any person (including without limitation any noteholder of the Company, any trustee for any noteholder or any equity holder of the Company) without the prior written consent of the Lender, except:

(i)     as may be compelled to be disclosed in a judicial or administrative proceeding or as otherwise required by law (including as may be required by either of the CCAA Court or the US Bankruptcy Court (collectively, the "Specified Courts")) or as deemed necessary by counsel to the Company, in consultation with counsel for the Lender, to be disclosed in connection with obtaining the Additional DIP Facility Order;

(ii)    to the directors, officers, employees, advisors and agents of the Company; and

(iii)   to the court appointed monitor of the Company and its counsel.

The Company agrees that unless otherwise required by orders of either of the Specified Courts, the Company will consult with, and obtain the written approval of the Lender prior to proposing or taking any step that could reasonably be expected to impact the Arbitration Proceedings.

The Company acknowledges that the Lender and its affiliates may now or hereafter provide financing or obtain other interests in other companies in respect of which the Company or any of its affiliates may be business competitors, and that the Lender and its affiliates will have no obligation to provide to the Company or any of its affiliates with any confidential information from such other companies.

Crystallex International Corporation
December 10, 2014
Page 8

The Company shall not, after the Lender delivers this letter and it is accepted by the Company, without the Lender's prior written consent (a) seek, request, encourage, discuss, negotiate or enter into any agreement or non-binding agreements of understanding or intent with other parties, (b) provide any information to a person, or (c) pay any commitment fee, arrangement fee or any other similar fee or pay any expense deposit or work fee, in each case, with respect to any debtor-in-possession or similar financing to be made available to the Company or any of its subsidiaries, except, in each case, if required to do so by order of the Specified Courts.

The offer made by the Lender in this letter shall expire, unless otherwise agreed by the Lender in writing, at 5:00 p.m. (Toronto time) on each of (i) December 11, 2014, unless accepted by the Company before that time and unless such acceptance is communicated to the Lender by delivering to the Lender a fully signed copy of this letter by that same time and date, and thereafter (ii) December 19, 2014, unless on before such time and date the Additional DIP Facility Order and the Net Arbitration Proceeds Transfer Order (as that term is defined in the Term Sheet) shall have been issued by the CCAA Court (the "CCAA Order Date"), and thereafter (iii) thirty days after the CCAA Order Date unless on or before such date (a) the US Bankruptcy Court has issued orders recognizing each of the Additional DIP Facility Order and the Net Arbitration Proceeds Transfer Order, (b) all documents required to be delivered to or entered into with the Lender have been so delivered to or entered to with the Lender and (c) the full amount of the Additional DIP Facility has been advanced by the Lender to the Company.

If the terms and conditions of the commitment contained in this letter are satisfactory to you, please indicate your acceptance by signing and delivering to the Lender an executed copy of this letter.

This letter, including the attached Term Sheet:

(i)     supersedes all prior discussions, summaries, agreements, proposals, commitments, arrangements, negotiations or understandings, whether oral or written, of the parties with respect thereto (without limiting the generality of the foregoing, the draft term sheets between the parties dated October, 2014 are superseded and replaced in their entirety by this letter and the attached Term Sheet) ;

Crystallex International Corporation
December 10, 2014
Page 9

 (ii) shall be governed by the laws of the Province of Ontario, without giving effect to the conflict of laws provisions thereof and each party submits to the exclusive jurisdiction of the courts of Ontario to adjudicate any disputes between the Company and the Lender;

 (iii) shall be binding on the parties and their respective successors and permitted assigns;

 (iv) may not be relied on or enforced by any other person; and

 (v) may be signed by two or more counterparts and delivered by facsimile or portable document format (pdf), all of which shall be deemed to be an original and all of which when taken together shall constitute one and the same agreement.

Nothing in this letter (including, for certainty, the exhibits attached hereto and any appendices attached to such exhibits) or the Term Sheet shall affect in any manner any provisions of the Existing DIP Credit Agreement or any other document referred to therein (including without limitation the Credit Documents), any of the Company's obligations thereunder, or any of Tenor U.A.'s rights thereunder. All references in this letter or the Term Sheet to Lender or Tenor U.A. shall include all of such entity's successors and assigns.

If this letter becomes the subject of a dispute, each of the parties hereto hereby waives trial by jury to the extent permitted by applicable law. This commitment letter may be amended, modified or waived only in writing signed by each of the parties hereto.

[THE REMAINDER OF THIS PAGE HAS BEEN INTENTIONALLY LEFT BLANK.]

Crystallex International Corporation
December 10, 2014
Page 10

Very truly yours,

TENOR CAPITAL MANAGEMENT COMPANY, L.P.

By: 
Name: *Daniel H. Kochav*
Title: *Partner & COO*

Agreed and accepted on this
11th day of December, 2014.

**CRYSTALLEX INTERNATIONAL CORPORATION**

By: _____
Name: Robert (Bob) Fung
Title:   Chairman and CEO

Crystallex International Corporation
December 10, 2014
Page 10

Very truly yours,

**TENOR CAPITAL MANAGEMENT COMPANY, L.P.**

By: _____
Name:
Title:

Agreed and accepted on this
11th day of December, 2014.

**CRYSTALLEX INTERNATIONAL CORPORATION**

By: _____
Name:  Robert (Bob) Fung
Title:    Chairman and CEO

Crystallex International Corporation
December 10, 2014
Page 11


**Exhibit A**

**Crystallex International Corporation**
**Term Sheet for Proposed Increase to DIP Facility**

This outline (the "Term Sheet") of the terms and conditions of an increase of the DIP financing facility (the "Facility Increase") provided by Tenor KRY Coöperatief U.A. ("Tenor U.A.") to Crystallex International Corporation (the "Company") is part of the additional financing commitment letter dated December 10, 2014 (the "Commitment Letter"), addressed to the Company from Tenor Capital Management Company, L.P. ("Tenor") and is subject in all respects to the provisions of the Commitment Letter.  Unless otherwise specified in this Term Sheet, capitalized terms used herein and not defined in this Term Sheet shall have the meanings assigned to such terms in the credit agreement dated as of April 23, 2012 between the Company and Tenor Special Situation Fund I, LLC, which was assigned by Tenor Special Situation Fund I, LLC to Tenor U.A. (as so assigned and as amended by the first credit agreement amending and confirming agreement dated as of May 15, 2012, the second credit agreement amendment agreement dated as of June 5, 2013, the third credit agreement amendment agreement dated as of April 16, 2014 and as further amended, amended and restated, supplemented, converted or otherwise modified from time to time, collectively, the "DIP Credit Agreement").


**BORROWER:**         Crystallex International Corporation

**LENDER:**            Tenor KRY Coöperatief U.A. ("Tenor U.A.") and/or one or more affiliates of Tenor in the discretion of Tenor (the "Lender")

**FACILITY INCREASE:** Up to an additional US$13,200,000 (the "Additional Principal Amount") will be loaned to the Company subject to the conditions hereof and the conditions contained in the DIP Credit Agreement as may be amended by the Fourth Amendment Agreement (as defined herein) or such other credit documents as may be required.  Amounts repaid in connection with the Additional Principal Amount may not be re-borrowed. The Additional Principal Amount will be fully committed by the Lender upon the execution of the Commitment Letter and will be advanced subject to, among other things, the execution of an amendment agreement which further amends the DIP Credit Agreement and/or such other loan documents as may be required (such amendment agreement and/or such other loan documents being referred to herein as the "Fourth Amendment Agreement"), the execution of the Fourth Amendment Agreement to occur after the issuance of the Additional DIP Facility Order (as that term is defined in the Commitment Letter) by the CCAA Court. The Facility Increase will be made available by providing for a US$13,200,000 increase in the aggregate principal amount of the Supplemental Loan by way of one new tranche in the amount of the Additional Principal Amount (the "Supplemental Loan Tranche D"), such that the aggregate principal amount of the Supplemental Loan will be increased from US$20,433,333.33 to $33,633,333.33.

Crystallex International Corporation
December 10, 2014
Page 12

All conditions precedent shall apply with respect to the advance of the Additional Principal Amount, including without limitation those contained in the DIP Credit Agreement and the Facility Increase Conditions Precedent (as that term is defined below).

**FACILITY INCREASE AVAILABILITY:**     Satisfaction of all Facility Increase Conditions Precedent (as defined below) set forth herein.

After the Facility Increase and the transactions contemplated by the Commitment Letter and this Term Sheet are approved by the CCAA Court and such CCAA Court order is recognized by the US Bankruptcy Court and all applicable appeal periods with respect to both of such court orders shall have expired and the orders are not subject to appeal or any further right of appeal or any stay, and neither order shall have been reversed, vacated or, unless otherwise agreed by the Lender in writing, amended or modified in any manner, and the Fourth Amendment Agreement is executed by the Company and the Lender, the Company may request the advance of the Additional Principal Amount upon satisfaction of the applicable Facility Increase Conditions Precedent and the conditions precedent set forth in Section 5.4 of the DIP Credit Agreement and in the Fourth Amendment Agreement.

**INTEREST, INTEREST RATE AND DEFAULT INTEREST RATE:**     Shall be the same in all material respects as in the DIP Credit Agreement.

**MATURITY DATE:**     Shall be the same in all material respects as in the DIP Credit Agreement.

**MATURITY DATE EXTENSIONS AT LENDER'S OPTION:**     Shall be the same in all material respects as in the DIP Credit Agreement.

**USE OF PROCEEDS OF SUPPLEMENTAL LOAN TRANCHE D:**     The Supplemental Loan Tranche D shall be used solely:

(a)     to pay to Tenor the Supplemental Loan Tranche D Commitment Fee (US$1,200,000);

(b)     to pay all fees and expenses of Tenor (including all legal fees and disbursements of the Lender's counsel) associated with the Additional DIP Facility (as that term is defined in the Commitment Letter) and the related transactions contemplated thereby and by the DIP Credit Agreement;

(c)     to pay the actual and documental legal fees and disbursements incurred by Canadian counsel to Greywolf Capital in connection

Crystallex International Corporation
December 10, 2014
Page 13

with the transactions contemplated by the Commitment Letter and this Term Sheet up to the maximum amount of Cdn. $100,000, provided that such fees and disbursements shall be documented by detailed accounts and reviewed by the Monitor and its counsel who shall confirm in writing to the Lender and the Company that such fees and disbursements are reasonable and relate specifically to the transactions contemplated by the Commitment Letter and this Term Sheet (for certainty and notwithstanding anything else set out in this Term Sheet or the Commitment Letter, such fees and disbursements (the "Greywolf Fees") shall only be payable by the Company if the transactions contemplated by the Commitment Letter and this Term Sheet and the Net Arbitration Proceeds Transfer Agreement are expressly supported and not opposed by Greywolf Capital, in all of its capacities in relation to the Company, at (i) the CCAA Court hearing to approve the transactions contemplated hereby and (ii) any related "9:30 a.m. attendances", and all of such transactions are approved by the Specified Courts and completed, the Additional Principal Amount is actually advanced by the Lender to the Company and the Additional DIP Facility Order and the Net Arbitration Proceeds Transfer Order become final non-appealable orders and are not subject to any stay or variation, failing which the Company shall not pay or have any obligations to pay such Grey Wolf Fees and such Grey Wolf Fees shall not create a claim against the Company in the CCAA Proceeding, the US Bankruptcy Court recognition proceeding or otherwise); and

(d)    to pay Arbitration Expenses and other expenses of the Company all in accordance with the Budget,

(collectively, the "Permitted Supplemental Loan Tranche D Expense Payments").

**COMMITMENT FEE FOR SUPPLEMENTAL LOAN TRANCHE D:**   The Company shall pay to the Lender a commitment fee in the amount of US $1,200,000 (the "Supplemental Loan Tranche D Commitment Fee") which fee shall be fully earned immediately upon the issuance by the CCAA Court of the Additional DIP Facility Order and payable by the Company concurrently with the advance and from the proceeds of Supplemental Loan Tranche D.

**SUPPLEMENTAL LOAN TRANCHE D ADDITIONAL LENDER COMPENSATION:**   As additional consideration for the Supplemental Loan Tranche D, the Company shall pay to the Lender and the Lender shall be entitled to receive an amount equivalent to 17.688% of the Net Arbitration Proceeds (the "Supplemental Loan Tranche D Additional Lender Compensation Amount"). The Supplemental Loan Tranche D Additional Lender Compensation Amount shall be paid from or in respect of the Net Arbitration Proceeds at the same time as the 70.554% of the Net Arbitration Proceeds payable by the Company to Tenor U.A. pursuant to

Crystallex International Corporation
December 10, 2014
Page 14

subsection (f) of the section of the Existing DIP Credit Agreement titled "Order of Application of Arbitration Proceeds" in Exhibit F of the Existing DIP Credit Agreement (as that term is defined in the Commitment Letter). The Lender shall fully earn the Supplemental Loan Tranche D Additional Lender Compensation Amount upon the issuance of the Additional DIP Facility Order by the CCAA Court and the advance of Supplemental Loan Tranche D.

**ORDER OF APPLICATION OF ARBITRATION PROCEEDS:**

Shall be the same in all material respects as in the DIP Credit Agreement, except that (i) the Supplemental Loan Tranche D Additional Lender Compensation Amount shall be paid pursuant to subsection (f) of the section titled "Order of Application of Arbitration Proceeds" in Exhibit F of the DIP Credit Agreement before any payment is made pursuant to subsection (h) of such section and (ii) the Fung/Oppenheimer Additional CVR (as defined below) shall be treated pari passu with such Supplemental Loan Tranche D Additional Lender Compensation Amount, and Exhibit F of the DIP Credit Agreement will be amended accordingly.

**FACILITY INCREASE CONDITIONS PRECEDENT:**

The obligation of the Lender to make any advance of the Additional Financing (or any portion thereof) shall be subject to the following conditions precedent (collectively the "Facility Increase Conditions Precedent"):

(a)    execution and delivery of all loan documents (the "Loan Documents") required by the Lender (including, without limitation, the Fourth Amendment Agreement effecting amendments to the DIP Credit Agreement required by the Lender, an amendment to the conversion and voting agreement between the Company and Tenor U.A. and/or the Lender (as applicable) to confirm, among other things, the amendments to the DIP Credit Agreement by way of the Second Amendment Agreement, the Third Amendment Agreement and the Fourth Amendment Agreement (and corresponding amendments to the articles of the Company), an amended and restated grid note, if required by the Lender agreements evidencing the Company's obligations with respect to the Additional Principal Amount, officers' certificates, directors' authorizing resolutions, incumbency certificates and legal opinions) each in form and substance satisfactory to the Lender;

(b)    the Company shall have paid to the Lender all out-of-pocket expenses (including all legal fees and disbursements of Lender's counsel) incurred by the Lender in connection with the Company, the Facility Increase or the Loan Documents;

Crystallex International Corporation
December 10, 2014
Page 15

(c)    the Supplemental Loan Tranche D Commitment Fee shall be paid to the Lender concurrently with and from the proceeds of the advance of the Supplemental Loan Tranche D;

(d)    no Material Adverse Deviation, no Material Adverse Effect and no Material Adverse Event shall have occurred after the date of the Commitment Letter;

(e)    the Company shall have obtained the Additional DIP Facility Order from the CCAA Court on or before December 19, 2014 and thereafter a US recognition order (also an Additional DIP Facility Order) with respect thereto from the US Bankruptcy Court, each in form and substance satisfactory to the Lender and, without limitation, the Additional DIP Facility Order issued by the CCAA Court shall confirm that all amounts owing to the Lender in respect of the DIP Credit Agreement as amended by the Fourth Amendment Agreement are secured by the applicable charges in the CCAA Financing Order, all applicable appeal periods with respect to both orders shall have expired and there is no appeal or no further right of appeal or any stay of either order, and neither order shall have been reversed, vacated or, unless otherwise agreed by the Lender in writing, amended or modified in any manner;

(f)    no Default or Event of Default shall exist under any of the Credit Documents or any Court order as of the date of the execution and delivery of the Fourth Amendment Agreement or the date of any proposed advance of the Additional Principal Amount;

(g)    any governmental, corporate and third party consents and approvals necessary or required by the Lender in connection with the Additional Principal Amount and the terms thereof and its effectiveness shall have been obtained (without the imposition of any conditions that are not satisfactory to the Lender) and shall remain in full force and effect, any applicable governmental filings shall have been made and any applicable waiting periods shall have expired without any action being taken by any competent authority; and no law or regulation shall be applicable in the reasonable judgment of the Lender that restrains, prevents or imposes materially adverse conditions on the Facility Increase, the transactions

Crystallex International Corporation
December 10, 2014
Page 16

contemplated thereby or any of the Lender's rights with respect thereto;

(h)    other than those claims, actions, suits, investigations or proceedings which are satisfactory to the Lender and disclosed in writing to the Lender prior to the date of the Fourth Amendment Agreement and/or the advance of any portion of the Facility Increase, there shall exist no claim, action, suit, investigation or proceeding, pending or threatened, in any Court or before any arbitrator, mediator or governmental authority which relates to the Company or the Facility Increase or which, in the reasonable opinion of the Lender, has any reasonable likelihood of having a Material Adverse Effect or a material adverse effect on the Company's prospects in the Arbitration Proceeding;

(i)    the issuance by the CCAA Court, concurrently with the issuance of the Additional DIP Facility Order, of the Net Arbitration Proceeds Transfer Order (as that term is defined below) and a recognition order with respect thereto from the US Bankruptcy Court, each in form and substance satisfactory to the Lender, and all applicable appeal periods with respect to both orders shall have expired and there is no appeal or no further right of appeal or any stay of either order, and neither order shall have been reversed, vacated or, unless otherwise agreed by the Lender in writing, amended or modified in any manner; and

(j)    the satisfaction of the conditions precedent set forth for the advance of the Supplemental Loan Tranche D in the Fourth Amending Agreement and also contained in Section 5.4 of the DIP Credit Agreement.

**LOAN DOCUMENTS:**    The Fourth Amendment Agreement and the other Loan Documents shall reflect the intention that the Supplemental Loan Tranche D Additional Lender Compensation Amount (i) is in addition to the Lender Additional Compensation, the Additional Principal Compensation Amount, the Second Additional Principal Compensation Amount and the Third Additional Principal Compensation Amount in the aggregate amount equivalent to 70.554% of the Net Arbitration Proceeds and (ii) shall be dealt with in all material respects in the same manner as the Lender Additional Compensation, the Additional Principal Compensation Amount, the Second Additional Principal Compensation Amount and the Third Additional Principal Compensation Amount. The interest and Net Arbitration Proceeds to be paid to the Lender in connection with Supplemental Loan Tranche D are in addition to and not in substitution for any other interest or Net

Crystallex International Corporation
December 10, 2014
Page 17

Arbitration Proceeds required to be paid to Tenor U.A. on account of the remainder of the Loan, and accordingly and for the sake of clarity, the interest and Net Arbitration Proceeds to be paid to the Lender in connection with Supplemental Loan Tranche D are not dilutive to the interest and Net Arbitration Proceeds to be paid to Tenor U.A. on account of the remainder of the Loan excluding Supplemental Loan Tranche D.

**REPRESENTATIONS AND WARRANTIES:** Each of the representations and warranties made in or pursuant to Article IV of the DIP Credit Agreement or which are contained in any other Credit Document, as corrected from time to time pursuant to Section 4.15 of the DIP Credit Agreement (if applicable), shall be true and correct in all material respects on and as of the date of the Fourth Amendment Agreement, and the date of any proposed advance of the Additional Principal Amount.

**ADDITIONAL AMOUNTS:** All amounts now or hereafter payable by the Company in respect of the Supplemental Loan Tranche D Additional Lender Compensation Amount shall be in addition to and not in substitution for any other amount or amounts now or hereafter payable by the Company under the DIP Credit Agreement or the other Credit Documents; without limitation to the foregoing, the Supplemental Loan Tranche D Additional Lender Compensation Amount is in addition to and not in substitution for any Lender Additional Compensation, Additional Principal Compensation Amount, Second Additional Principal Compensation Amount and/or Third Additional Principal Compensation Amount.

**SECURITY DOCUMENTS:** All Security Documents shall secure payment of all Obligations including the Additional Principal Amount, all interest thereon, and the Supplemental Loan Tranche D Additional Lender Compensation Amount.

**ALL OTHER PROVISIONS OF DIP CREDIT AGREEMENT APPLY** All provisions of the DIP Credit Agreement that apply to the Facility Increase shall, unless otherwise provided in the Fourth Amendment Agreement, apply *mutatis mutandis* to the Additional Principal Amount and the Additional DIP Facility. All provisions of the DIP Credit Agreement that apply to the Lender Additional Compensation, the Additional Principal Compensation Amount, the Second Additional Principal Compensation Amount and the Third Additional Principal Compensation Amount shall, unless otherwise provided in the Fourth Amendment Agreement, apply *mutatis mutandis* to the Supplemental Loan Tranche D Additional Lender Compensation Amount.

**NEW DEFAULTS OR EVENTS OF DEFAULT** In the event that there are any Defaults or Events of Default as of the proposed date of the execution of the Fourth Amendment Agreement, then in such case the Lender shall have the right, in its sole and unfettered discretion, to determine whether or not it will enter into the Fourth Amendment Agreement.

Crystallex International Corporation
December 10, 2014
Page 18

| | |
|---|---|
| **MANAGEMENT INCENTIVE PLAN AND FUNG/ OPPENHEIMER ADDITIONAL CVR:** | Additional conditions precedent to the entering into of the Fourth Amendment Agreement and the advance of the Supplemental Loan Tranche D by the Lender, for the sole benefit of the Lender, are the following: |

(a) Robert (Bob) Fung ("Fung"), the only member of management of the Company, and Marc Oppenheimer ("Oppenheimer"), a consultant to the Company, shall each agree in writing in favour of the Lender in an agreement in form and substance satisfactory to the Lender in its discretion (the "Net Arbitration Proceeds Transfer Agreement"), that neither Fung nor Oppenheimer will, now or in the future, seek to amend the existing management incentive plan previously approved by the CCAA Court (the "MIP"), and the Company shall have obtained (i) a CCAA Court order (the "Net Arbitration Proceeds Transfer Order"), in form and substance satisfactory to the Lender in its discretion, approving (x) the Net Arbitration Proceeds Transfer Agreement, (y) the transfer of a portion of the Supplemental Loan Tranche D Additional Lender Compensation Amount to each of Fung and Oppenheimer (individually and collectively, the "Fung/Oppenheimer Additional CVR") and (z) the other transactions contemplated thereby and (ii) a recognition order with respect thereto from the US Bankruptcy Court; provided, however, that the Net Arbitration Proceeds Transfer Agreement and the Net Arbitration Proceeds Transfer Order shall each provide that any payment to Oppenheimer and Fung provided for or made in connection with the provisions of this Term Sheet (including pursuant to the Net Arbitration Proceeds Transfer Agreement) or as may hereafter be provided by way of any other agreement or transaction shall not be deemed to be amendments to the MIP.

(b) The Net Arbitration Proceeds Transfer Agreement shall set out, among other things, (i) the terms and conditions of the transfer of the Fung/Oppenheimer Additional CVR by the Lender to Fung or Oppenheimer, as applicable, and the conditions precedent thereto, (ii) the potential subsequent transfer of the Fung/Oppenheimer Additional CVR to the Lender by Fung or Oppenheimer, as applicable, in the event that (x) Fung or Oppenheimer resigns or terminates his relationship with the Company without "good reason" or (y) the Company terminates Fung's employment or Oppenheimer's consulting contract in either case for cause (but in each case subject to the right of Fung or Oppenheimer to require arbitration if Fung or Oppenheimer is of the position that his resignation or termination of relationship was made for good reason or that he was terminated without cause) and (iii) the ability of Tenor to require the transfer of some or all of the Fung/Oppenheimer Additional CVR by Fung or Oppenheimer, as applicable, to a replacement employee if Fung or Oppenheimer, as applicable, dies or becomes disabled (but subject to the right of Fung or Oppenheimer to require arbitration if Fung or Oppenheimer takes the

Crystallex International Corporation
December 10, 2014
Page 19

position that the disability determination made by the Company regarding him was not correct or proper). The Net Arbitration Proceeds Transfer Agreement shall further provide that the foregoing provisions of clause (ii) in the immediately preceding sentence shall not be applicable in the event that either (x) all obligations owing to Tenor U.A. and/or the Lender (as applicable) under the DIP Credit Agreement as amended and any other Loan Documents have been paid in full or (y) the Company has received payment in full of the Arbitration Proceeds (as that term is defined in the DIP Credit Agreement as amended) and all of such Arbitration Proceeds have been deposited into the applicable bank accounts as contemplated and required by the terms of the DIP Credit Agreement (as amended).  The Net Arbitration Proceeds Transfer Agreement shall further provide that Fung and Oppenheimer shall not be permitted to sell, assign or transfer any of the Fung/Oppenheimer Additional CVR without the prior consent of the Lender in its sole and unfettered discretion. For certainty, the above summary of terms for the Net Arbitration Proceeds Transfer Agreement are only the principal economic terms of the Net Arbitration Proceeds Transfer Agreement, and there will be additional terms relating to the subject matter thereof and without limitation, the Net Arbitration Proceeds Transfer Agreement and the terms contained therein will be designed to minimize any and all tax consequences to the Lender as a result of the transactions related to the Fung/Oppenheimer Additional CVR or otherwise.

THIS IS EXHIBIT "B" REFERRED TO IN THE AFFIDAVIT OF
HARRY NEAR SWORN THIS ___ DAY OF DECEMBER 2014

_____
A Commissioner for Taking Affidavits

**NET ARBITRATION PROCEEDS TRANSFER AGREEMENT**

**THIS AGREEMENT** is dated as of [●], 2014.

**B E T W E E N:**

> **CRYSTALLEX INTERNATIONAL CORPORATION**
> (the "**Borrower**")
>
> -and-
>
> ●
> (the "**Lender**")
>
> -and-
>
> **ROBERT FUNG,**
> of the City of Toronto, Canada
> ("**Fung**")
>
> -and-
>
> **MARC OPPENHEIMER,**
> of the City of Aventura, Florida, U.S.A.
> ("**Oppenheimer**")

A.      **WHEREAS** the Borrower and Tenor Special Situation Fund I, LLC entered into a credit agreement dated as of April 23, 2012, which was assigned by Tenor Special Situation Fund I, LLC to Tenor KRY Cooperatief U.A. on such date (as so assigned and as amended by the first credit agreement amending and confirming agreement dated as of May 15, 2012, the second credit agreement amendment agreement dated as of June 5, 2013, the third credit agreement amendment agreement dated as of April 16, 2014 and the fourth credit agreement amendment agreement dated as of [●], 2014 (the "**Fourth Amendment Agreement**"), and as further amended, amended and restated, supplemented, converted or otherwise modified from time to time (the "**Credit Agreement**"));

B.      **WHEREAS** in connection with the Borrower's CCAA Case, the MIP was approved by the CCAA Court on April 16, 2012;

C.      **WHEREAS** the Fourth Amendment Agreement permits the parties hereto to enter into this Agreement;

**NOW THEREFORE** for good and valuable consideration (the receipt and sufficiency of which are hereby acknowledged by each of the parties hereto), each of the parties hereto covenants and agrees to and in favour of each other as follows:

1.    The parties hereto represent and warrant that recitals above are true and correct.

2.    (a)    Each of the Borrower and Fung represent and warrant, confirm and agree that (i) Fung is an employee of the Borrower and acts as a director and the Chief Executive Officer of the Borrower and is a beneficiary under the MIP, and (ii) attached as Schedule "A-1" to this Agreement is a true and complete copy of Fung's employment agreement with the Borrower (including any and all amendments and extensions) and there are no other agreements between the Borrower and Fung, oral or written, in any way relating to (x) the terms of Fung's employment with the Borrower or (y) employment income or any other form of compensation of any kind whatsoever to be paid by the Borrower to Fung on account of his employment or in connection with any other role in respect of which Fung may perform for the Borrower (including without limitation as an officer and/or director of the Borrower).

     (b)    The Borrower and Fung covenant and agree to deliver to the Selected Accountants (as defined below) all requested Tax (as defined in section 6 of this Agreement) and other information, documentation and financial and Tax reporting information to enable the Selected Accountants to determine the amount of Tax required to be withheld, remitted and paid by the Borrower to any governmental authority from time to time on account of the Transferred CVR (as defined below) transferred to Fung hereunder, including any distributions thereon, including without limiting the foregoing, the information and documents listed on Schedule "A-2". The Selected Accountants shall be directed to calculate such amounts to be withheld and to report in writing thereon to the Borrower and the Lender.

3.    (a)    Each of the Borrower and Oppenheimer represent and warrant, confirm and agree that (i) Oppenheimer is providing consulting services to the Borrower as an independent contractor and Oppenheimer acts as a director of the Borrower and is a beneficiary under the MIP, (ii) all payments to Oppenheimer are on account of his services as a consultant and not on account of his duties as a director of the Borrower (for certainty, each of the Borrower and Oppenheimer represent and warrant that the Borrower does not pay and Oppenheimer does not receive any compensation or remuneration in any form whatsoever in connection with or in respect of Oppenheimer acting as a director of the Borrower), and (iii) attached as Schedule "B" to this Agreement is a true and complete copy of Oppenheimer's independent contractor agreement with the Borrower (including any and all amendments and extensions) and there are no other agreements between the Borrower and Oppenheimer, oral or written, in any way relating to (x) the terms of Oppenheimer's relationship with the Borrower or (y) income or any other form of compensation of any kind whatsoever to be paid by the Borrower to Oppenheimer on account of his services or in connection any other role in respect of which Oppenheimer may perform for the Borrower including without limitation as a director of the Borrower

     (b)    The Borrower and Oppenheimer covenant and agree to deliver to the Selected Accountants all requested Tax and other information, documentation and financial and Tax and reporting information to enable the Selected Accountants to determine the

amount, if any, of Tax required to be withheld and remitted by the Borrower to any governmental authority from time to time on account of the Transferred CVR transferred to Oppenheimer hereunder, including any distributions thereon, including, without limiting the foregoing, the information and documents listed on Schedule "A-2". The Selected Accountants shall be directed to calculate such amounts to be withheld and to report in writing thereon to the Borrower and the Lender as described in Section 7 of this Agreement.

4.    Each of Fung and Oppenheimer (i) agrees that neither of them will seek to amend the existing MIP previously approved by the CCAA Court, now or in the future, and (ii) irrevocably consents to the CCAA Court entering an order approving this Agreement and the transactions contemplated hereby; provided, however, that the parties acknowledge and agree that the transactions contemplated hereby and provided for hereunder shall not be deemed to be amendments to the MIP and shall in no way impair or otherwise affect their respective rights and entitlements under and pursuant to the MIP. The Borrower agrees that it shall not seek to amend the MIP now or in the future except with the prior consent of the Lender in its discretion.

5.    (a)    Each of the Lender and the Borrower agrees that concurrently with the later of (x) the advance of the Loan constituting Supplemental Loan Tranche D and the Lender earning, among other things, the Fourth Additional Compensation Amount equivalent to 17.688% of the Net Arbitration Proceeds and (y) the Effective Date, the Lender does and shall be deemed to concurrently transfer an aggregate of ██████████ the Net Arbitration Proceeds as follows: (i) ████████% of the Net Arbitration Proceeds to Fung and (████████ of the Net Arbitration Proceeds to Oppenheimer (in the case of each of Fung and Oppenheimer individually, and collectively, the "**Transferred CVR**"), without any further action, approval, consent, documentation or court order required whatsoever and without any payment by Fung or Oppenheimer to the Borrower or other consideration for such transfers. For certainty, the Lender does and shall retain the balance of the Fourth Additional Compensation Amount equivalent to ████████% of the Net Arbitration Proceeds.

       (b)    Each of Fung and Oppenheimer are and shall at all times hereafter be severally responsible for and shall pay or cause to be paid when due to the appropriate governmental authority any and all present or future Taxes payable by him for, in connection with or in any way related to the transfer of any of the Transferred CVR to or by Fung or Oppenheimer, as the case may be, or any of their respective heirs, legal administrators or estates including any payment which may be received by any one or more of them in connection with the Transferred CVR, or any of the other transactions contemplated by this Agreement. In the event that either Fung or Oppenheimer is assessed any Tax or is otherwise required to pay any Tax in connection with the Transferred CVR or any of the other transactions contemplated in this Agreement, including in respect of any indemnity payments required to be paid by him to the Lender, but fails to pay any of such Tax by the date that is 30 days after date of issuance by Canada Revenue Agency or any other taxing authority of a notice of assessment or similar notice from the applicable taxing authority that such Tax is payable (the "**Payment Date**") regardless of whether Fung or Oppenheimer elects to object to or dispute the assessment of the Tax, then in such case the applicable Transferred CVR shall automatically and without any further action whatsoever be transferred and deemed to

be transferred from Fung or Oppenheimer, as the case may be, to the Lender without any further action, approval, consent, documentation or court order required whatsoever and without any payment by the Lender to Fung or Oppenheimer, as the case may be, or other consideration. Upon either Fung or Oppenheimer, as applicable, not paying any of such Tax on the Payment Date, Fung or Oppenheimer, as applicable, shall promptly deliver written notice to the Borrower and the Lender confirming the non-payment on the Payment Date of any such Tax; for certainty, the transfer of the Transferred CVR to the Lender as contemplated by this Section 5(b) shall occur and be deemed to occur immediately upon any such Tax not being paid by the Payment Date even if Fung or Oppenheimer, as applicable, does not provide such notice. Each of Fung and Oppenheimer covenants and agrees to promptly provide to the Borrower and the Lender all correspondence received by him from any taxing authority relating in any way to the assessment or potential assessment of such Taxes.

(c)     Notwithstanding anything to the contrary contained herein, in the Credit Agreement or in any other Credit Document, prior to the payment by the Borrower of any amounts pursuant to the Transferred CVR to either Fung or Oppenheimer or any Replacement Person, each of Fung, Oppenheimer, or any such Replacement Person, shall be required to deliver a declaration to each of the Borrower and the Lender swearing or affirming that such Person paid to all applicable taxing authorities when due any and all Tax payable by such Person in connection with each and every transaction contemplated by this Agreement including in respect of any indemnity payments required to be paid to the Lender.

6.    (a)     For the purposes of this Agreement, the following terms shall have the following meanings respectively:

(i)     "**Cause**" includes any of the following circumstances, past (to the extent not known by either the Borrower as of the date of this Agreement) or future:

A.     the failure of an individual to properly carry out (x) any of his duties and responsibilities under his employment or consulting agreement, as the case may be, or (y) for any reason other than Disability, any duties or responsibilities that are new duties or responsibilities assigned by the Borrower to such individual after the date of this Agreement and which such individual is capable of performing when same are initially assigned by the Borrower to him, or (z) any reasonable and lawful instruction or directive of the Board of Directors of the Borrower;

B.     the individual acting dishonestly or fraudulently or the wilful misconduct of the individual in the course of his employment or consulting services, as the case may be;

C.     the laying of any charge against the individual for any criminal offence including without limitation any offence involving fraud, theft, embezzlement, forgery, wilful misappropriation of funds or property, violation of securities legislation or other fraudulent or dishonest acts, and in respect of which any such charge a conviction may result in possible incarceration for any period of time;

D.    the failure by the individual to comply with and perform his duties as a director of the Borrower;

E.    any conduct by the individual which is unbecoming to the Borrower;

F.    any action or inaction by the individual which is against the interests of the Borrower; or

G.    any other act, event or circumstance which would constitute just cause at law for termination of Fung's employment agreement or Oppenheimer's consulting agreement.

(ii)    "**Disability**" or "**Disabled**" means the physical or mental inability of Fung or Oppenheimer, as the case may be, to perform any of his duties under his employment agreement or consulting agreement, as the case may be including without limitation any new duties or responsibilities assigned to him by the Borrower after the date of this Agreement, but for certainty "Disability" or "Disabled" shall not include the physical or mental inability of Fung or Oppenheimer to perform any of such new duties or responsibilities assigned by the Borrower to such individual (i) after the date of this Agreement and (ii) as of the date on which any of such new duties or responsibilities are first assigned by the Borrower to such individual; and for certainty, in all circumstances regardless of any definition of "disability" or "disabled" under any applicable law. "Disability Determination" means that the Borrower has made a determination that either Fung or Oppenheimer, as applicable is Disabled.

(iii)    "**Good Reason**" means the occurrence of any of the following events without the consent of Fung or Oppenheimer, as the case may be, except for action by the Borrower which is remedied by the Borrower within 60 days after receipt by the Borrower of written notice thereof given by Fung or Oppenheimer:

A.    any substantial and material breach of Fung's employment agreement or Oppenheimer's consulting agreement, as the case may be, taken by the Borrower;

B.    if the Borrower assigns new duties to Fung or Oppenheimer after the date of this Agreement (i.e. for clarity, which duties were not part of his job description or were not required to be completed by him prior to the date of this Agreement) that Fung or Oppenheimer, as applicable, cannot perform because of lack of skills or experience; or

C.    in the case of Oppenheimer only, any requirement that he (i) perform any duties on behalf of the Borrower on the Jewish Sabbath (i.e. Friday sundown to Saturday sundown where Oppenheimer is situate at such time) or a Jewish holiday listed on Schedule "B-3" or (ii) be away from his home on (x) the day on which any such holiday starts in the evening of such day or (y) the evening on which any such holiday ends.

(iv)    "**Tax**" and "**Taxes**" means all taxes, assessments, charges, dues, duties, rates, fees, imposts, levies and similar charges of any kind lawfully levied, assessed or imposed by any taxing authority (domestic or foreign), including all income taxes (including any tax on or based upon net income, gross income, income as specially defined, earnings, profits or selected items of income, earnings or profits) and all capital taxes, gross receipts taxes, environmental taxes, sales taxes, use taxes, *ad valorem* taxes, value added taxes, transfer taxes (including, without limitation, taxes relating to the transfer of interests in real property or entities holding interests therein), franchise taxes, licence taxes, withholding taxes, payroll taxes, employment taxes, Canada or Québec Pension Plan premiums, excise, severance, social security, workers' compensation, employment insurance or compensation taxes or premium, stamp taxes, occupation taxes, premium taxes, property taxes, windfall profits taxes, alternative or add-on minimum taxes, goods and services tax, customs duties or other taxes, fees, imports, assessments or charges of any kind whatsoever, together with any interest and any penalties or additional amounts imposed by any taxing authority (domestic or foreign), and any interest, penalties, additional taxes and additions to tax imposed with respect to the foregoing.

(b)    In the event that either Fung or Oppenheimer

(i)    resigns or terminates his relationship with the Borrower including by way of Oppenheimer terminating his independent contractor agreement with the Borrower except for Good Reason (in each case, referred to herein as a "**voluntary termination**" or "**voluntary terminating his employment**"), or

(ii)    is terminated for Cause by the Borrower (for certainty including the Borrower terminating for Cause the independent contractor agreement with Oppenheimer),

then in any such case the applicable Transferred CVR then held by such Person shall automatically be and be deemed to be transferred by such Person to the Lender (in each such case, the "**Returned CVR**") without any other action, approval, consent, documentation or court order required whatsoever on the date on which such employment ceases or on the date on which the Borrower makes the disability determination. For certainty, (i) no consent from Fung or Oppenheimer, as applicable, the Borrower or the Monitor, or further order of the CCAA Court or any other court or Governmental Authority is or shall be required whatsoever and (ii) no consideration, compensation or other payment of any kind is required to be paid by the Lender or the Borrower or any other Person to such Person who is transferring the Transferred CVR to the Lender. Such transfer to the Lender shall be made without any deduction or set off whatsoever for or on account of any Tax that may be or become owing to any applicable taxing authority in any jurisdiction by any such Person who is transferring the Transferred CVR to the Lender as a result of or in connection with such Person acquiring such Transferred CVR and the subsequent transfer of such Transferred CVR by such Person.

(c)    Subject to the following sentence, the transfer of the Returned CVR to the Lender pursuant to paragraph 6(b) shall be effective on the date on which:

(i)     Fung or Oppenheimer, as applicable, delivers his notice of voluntary termination to the Borrower (even if such termination will occur after the date of delivery of such notice of termination), or

(ii)    the Borrower delivers a notice of termination for Cause to Fung or Oppenheimer, as applicable (even if his last date of employment or the last date of consulting services, as applicable, will occur after the date of delivery of such notice of termination).

Notwithstanding the preceding sentence in this Section 6(c), if Fung or Oppenheimer delivers a Notice of Objection to Termination for Cause or if the Borrower delivers a Notice of Objection to Voluntary Termination for Good Reason, the Transferred CVR for Fung or Oppenheimer, as applicable, shall not automatically be transferred to the Lender and same will only be transferred to the Lender if and when there is an Arbitration Award for the Borrower (as defined and discussed below). In the event that Fung or Oppenheimer, as the case may be, delivers a Notice of Objection to Termination for Cause or the Borrower delivers a Notice of Objection to Voluntary Termination for Good Reason, then in such case, the Borrower shall not make any payments or distributions in respect of the Transferred CVR for such Person until an Arbitration Award is issued, and then only in accordance with the terms hereof as to whether the applicable Transferred CVR continues to remain owned by the applicable Person or such applicable Transferred CVR is transferred, pursuant to the terms hereof, by such Person to the Lender.

(d)     The Borrower shall deliver written notice to the Lender of any such notice of voluntary termination received by the Borrower from Fung or Oppenheimer, as applicable, or notice of termination for Cause delivered to Fung or Oppenheimer by the Borrower, as applicable, or a notice of Disability Determination delivered by the Borrower to Fung or Oppenheimer, as applicable, not later than the first Business Day immediately following (i) the date of receipt by the Borrower of the notice of voluntary termination, (ii) the date of delivery by the Borrower to Fung or Oppenheimer, as applicable, of the notice of termination for Cause or (iii) the date on which the notice of Disability Determination is delivered to Fung or Oppenheimer, as the case may be. The failure by the Borrower to deliver such notice to the Lender shall not in any way affect the automatic transfer of the Returned CVR to the Lender and the Lender's rights to the ownership of and benefits to such Returned CVR, or the right of the Lender to transfer any or all of the applicable Transferred CVR to a Replacement Person thereafter in accordance with the terms hereof.

(e)     In the event that the Borrower gives notice of termination for Cause to either Fung or Oppenheimer, then within fifteen (15) days after the date of delivery of such notice (the date of delivery of such notice being deemed to be the first day of such fifteen (15) day notice period), Fung or Oppenheimer, as the case may be, may deliver a notice of objection to the Borrower and the Lender (a "**Notice of Objection to Termination for Cause**"). If such Person does not deliver a Notice of Objection to Termination for Cause before the expiry of such fifteen (15) day period, such Person shall be deemed to have accepted and irrevocably agreed to the fact that he was terminated for Cause and such circumstance will be referred to as "No Objection to Termination for Cause".

(f)     In the event that the Borrower gives notice of a Disability Determination to either Fung or Oppenheimer, then within fifteen (15) days after date on which the Borrower delivers such notice, Fung or Oppenheimer, as the case may be, may deliver a notice of objection to the Borrower and the Lender (a "**Notice of Objection to Disability Determination**"). If Fung or Oppenheimer, as the case may be, does not deliver a Notice of Objection to Disability Determination before the expiry of such fifteen (15) day period, he shall be deemed to have accepted and irrevocably agreed to the fact that he is Disabled, and such circumstance will be referred to as "**No Objection to Disability Determination**".

(g)     In the event that Fung or Oppenheimer, as applicable, delivers a Notice of Objection to Termination for Cause or a Notice of Objection to Disability Determination within the time periods set out in clauses (e) and (f) of this Section 6, then in such case, the Borrower and Fung or Oppenheimer, as applicable, shall be deemed to have agreed to arbitrate the question as to whether Fung or Oppenheimer, as applicable, was terminated for Cause or without Cause or has become Disabled, as applicable in accordance with the provisions hereinafter set forth regarding such arbitration.

(h)     In the event that Fung voluntarily terminates his employment or Oppenheimer terminates his consulting contract on the basis that there is Good Reason for doing so, then within fifteen (15) days after the date of delivery by Fung of the notice of termination of employment for Good Reason or delivery by Oppenheimer of notice of termination of consulting contract for Good Reason, the Borrower may deliver to Fung or Oppenheimer, as the case may be, a notice of objection that such termination was made by Fung or Oppenheimer, as the case may be, for Good Reason, and such notice of objection shall be concurrently delivered by the Borrower to the Lender (a "**Notice of Objection to Voluntary Termination for Good Reason**"), provided that the failure by the Borrower to concurrently deliver the Notice of Objection to Voluntary Termination for Good Reason will shall not in any way affect the validity and effectiveness of such Notice of Objection to Voluntary Termination for Good Reason.  If the Borrower fails to deliver the Notice of Objection to Voluntary Termination for Good Reason within such fifteen (15) day period, the Borrower shall be deemed to have accepted and irrevocably agreed that the voluntary termination of employment or consulting contract, as applicable, was made for Good Reason and such circumstances will be referred to as "No Objection to Voluntary Termination for Good Reason".

(i)     In the event that the Borrower delivers a Notice of Objection to Voluntary Termination for Good Reason within the fifteen (15) business day period described in clause (h) of this Section 6 immediately above, then in such case, the Borrower and Fung or Oppenheimer, as applicable, shall be deemed to have agreed to arbitrate the issue of whether the voluntary resignation was or was not for Good Reason in accordance with the arbitration provisions contained herein.

(j)     Each of the Borrower, and Fung or Oppenheimer, as applicable, agrees to act reasonably and cooperate in good faith to have any arbitration contemplated by this Agreement completed and decided as soon as possible after Fung, Oppenheimer or the Borrower, as applicable, delivers the applicable notice requiring an arbitration pursuant to the terms hereof.  Notwithstanding the immediately preceding sentence, the arbitration must be completed and decided under all circumstances within seventy-five (75) days after the date of delivery of the applicable Notice of Objection to Termination for Cause, Notice of

Objection to Disability Determination or Notice of Objection to Voluntary Termination for Good Reason.  The Lender shall be entitled to receive copies of all communications between the parties and/or the arbitrators, listen to all phone calls between the parties and the arbitrators, attend the arbitration hearing, and receive copies of any rulings, judgments or arbitration awards made by the arbitrators.  All parties hereto irrevocably confirm and agree that the Lender is and shall be entitled to participate fully in the entire arbitration process as a party to the arbitration, and without limitation, the Lender shall be permitted to submit written arguments to the arbitration panel in advance of the arbitration hearing, examine and cross-examine witnesses, make submissions at the arbitration hearing (itself or through its counsel), and, if permitted by the rules of the arbitration, submit post-arbitration hearing submissions.    (A)   The dispute will be submitted to and finally settled by arbitration administered by ADR Chambers in Toronto, Ontario in accordance with the ADR Chambers Arbitration Rules. The place of arbitration shall be the City of Toronto in the Province of Ontario. The language of the arbitration shall be English.  There shall be an arbitration panel with three members, and each of the Borrower and Fung or Oppenheimer, as applicable, may nominate one panel member (who shall be either an arbitrator or an employment lawyer from a nationally recognized law firm or a recognized employment boutique law firm) within ten (10) days after delivery by Fung or Oppenheimer, as applicable, of the Notice Of Objection To Termination For Cause or the Notice of Objection to Disability Determination to the Lender and the Borrower or within ten (10) days after the delivery of the Notice of Objection to Voluntary Termination for Good Reason by the Borrower to Fung or Oppenheimer, as applicable and the Lender, and the chair of the arbitration panel will be selected by the two other panel members.  In the event that one or more of the parties fails to appoint a panel member or chair within the times specified, then that appointment shall be made as provided for in the ADR Chambers Arbitration Rules. There will be no appeal right from the decision of the arbitral panel on questions of fact, law, or mixed fact and law, or the final decision (and for certainty, the applicable parties shall have no right to appeal or request leave to appeal the arbitration decision to any court or other administrative or governmental body).  (B) Unless otherwise agreed by the parties or required by law (including as a result of any order or direction of the CCAA Court), the parties to the arbitration, the members of the arbitral panel, and other persons the parties reasonably direct, shall maintain the confidentiality of all documents, communications, proceedings, and awards provided, produced, or exchanged pursuant to an arbitration conducted hereunder.

(k)    A ruling by the arbitral panel that Fung or Oppenheimer, as applicable, was terminated for Cause or has become Disabled or that the voluntary termination was not for "Good Reason", as applicable is referred to as the **"Arbitration Award for the Borrower"** and a ruling by the arbitral panel that Fung or Oppenheimer, as applicable, was terminated without Cause or has not become Disabled or that voluntary termination was for Good Reason, as applicable, is referred to as the **"Arbitration Award for Fung/Oppenheimer"**. In the event of an Arbitration Award for the Borrower, Fung or Oppenheimer, as the case may be, shall be required to promptly pay and shall promptly pay all costs and expenses incurred by the Lender in connection with any arbitration hereunder including without limitation all legal fees and disbursements and the amount required to be paid shall not be based on or in any way limited by any ruling by the arbitrators in that regard.  In the event of an Arbitration Award for Fung/Oppenheimer, the Lender shall be required to

pay and shall promptly pay all costs and expenses incurred by Fung or Oppenheimer, as applicable, in connection with any arbitration hereunder including without limitation legal fees and disbursements, regardless of any ruling by the arbitral panel in that regard. The Borrower shall pay its own costs including legal fees in any such arbitration regardless of the outcome and the fees and costs of the arbitration panel members and the arbitration centre.

(l)      The jurisdiction of the arbitration panel shall be limited to determining as applicable whether (i) the Borrower had Cause to terminate Fung's employment or Oppenheimer's consulting contract, as applicable, (ii) the Borrower had a basis upon which to determine that Fung or Oppenheimer, as applicable, was Disabled, or (iii) Fung or Oppenheimer, as applicable, voluntarily terminated his employment or consulting contract with Good Reason.  For greater certainty, the arbitration panel shall have no jurisdiction to award damages of any kind in connection with the events, actions or transactions which are the subject of this Agreement or otherwise, to make an award for costs of the arbitration in favour of one or more parties, or to make any award or issue any other decision against the Borrower, Fung, Oppenheimer, or the Lender or any of the other Releasees.

(m)     Each of Fung and Oppenheimer irrevocably covenants and agrees to and in favour of the Lender as follows:

(i)      in the event of his voluntary termination without Good Reason or No Objection To Termination For Cause or No Objection to Disability Determination, he shall not bring, assert, commence or seek an injunction or any other type of claim, court action or any other proceeding whatsoever (including before any court, governmental body or tribunal) against the Lender and/or the Borrower to stop or reverse the transfer of the applicable Returned CVR from him to the Lender; and

(ii)     in the event that he wishes to assert and/or claim that (x) his employment or consulting agreement, as applicable, was terminated without Cause, (y) his voluntary termination of employment of consulting agreement, as applicable, was made for Good Reason, or (iii) the Borrower made a Disability Determination even though Fung or Oppenheimer, as applicable, was not Disabled, then in such case, he does not and shall not have any right of action or claim or right to commence any court action or other proceeding against the Lender or any of the other Releasees (as that term is defined below) and hereby releases the Lender and all of the Releasees from and against any and all Claims (as that term is defined below) in connection with same; and

(iii)    agrees that his only right of recourse in connection with or as a result of an alleged termination of employment of consulting agreement without Cause, an alleged voluntary termination of employment or consulting agreement with Good Reason or a Disability Determination alleged to have been made improperly by the Borrower and any consequences thereof whether related to this Agreement or otherwise (and including any damages suffered or incurred by him) is and shall be to commence an action against the Borrower for damages or file a proof of claim against the Borrower in the CCAA Proceeding and/or request an arbitration in accordance with the provisions hereof.

(n)    In the case of No Objection to Termination for Cause or an Arbitration Award for the Borrower arising from termination for Cause or voluntary termination without Good Reason, the Lender shall have the right at any time and from time to time in its sole discretion, but without any obligation to do so, to transfer, on terms and conditions satisfactory to the Lender including the delivery or entering into of any documents or agreements as may be required by the Lender in its discretion (including without limitation an agreement to be bound by the terms of this Agreement to the same extent as each of Fung and Oppenheimer are bound hereby), any or all of such Returned CVR to induce a qualified candidate who will be at arms-length to the Lender to replace Fung or Oppenheimer, as the case may be, as an employee of or consultant or contractor to the Borrower (in each case, a **"Replacement Person"**), such Replacement Person to be satisfactory to the Lender in its discretion.  For greater certainty, the Replacement Person will be an individual employed or retained by the Borrower who is approved by the Lender but the Lender shall have no obligation to use any portion of the Returned CVR for the benefit of the Replacement Person.

(o)    In the case of an Arbitration Award for Fung/Oppenheimer, the applicable Transferred CVR shall continue to be owned by Fung or Oppenheimer, as applicable, and the Lender shall have no right to transfer of any of such applicable Transferred CVR to any Replacement Person.  In such circumstance, Fung or Oppenheimer, as applicable, shall:

(i)    have no right for his employment or consulting agreement to be reinstated by the Borrower and shall not take any action or commence any proceeding for same;

(ii)    not commence any action or other proceeding against the Borrower or any other Person requiring that the Borrower reinstate such employment or consulting agreement; and

(iii)    be permitted to commence an action or other proceeding against the Borrower for damages or file a proof of claim against the Borrower in the CCAA Proceeding (such right to commence such an action or proceeding or file a proof of claim not constituting or being deemed to constitute an agreement or admission by the Borrower or any other Person that the occurrence of an Arbitration Award for Fung/Oppenheimer does or should result in any damages owing by the Borrower to Fung or Oppenheimer, as the case may be).

(p)    Each of Fung and Oppenheimer irrevocably covenants and agrees to and in favour of the Lender as follows:  (i) in the event the Borrower makes a Disability Determination in respect of Fung or Oppenheimer, as the case may be, then in such case, he shall not bring, assert or seek an injunction or any other type of claim, court action or any other proceeding against the Lender and (ii) in the event that he wishes to assert that he is able to perform his duties for the Borrower and therefore the Disability Determination was without merit or is not proper for any reason whatsoever, then in such case, he (A) does not and shall not have any right of action or claim against the Lender and the other Releasees and hereby releases the Lender and the Releasees from and against any and all actions or claims in connection with same and (B) agrees that his only right of recourse in connection with or as a result of such Disability Determination and any consequences thereof whether related to this Agreement or otherwise (and including any damages

suffered or incurred by him) is and shall be to issue a Notice of Objection to Disability Determination and pursue such objection by way of arbitration in accordance with the foregoing provisions of this Section 6.

(q)     In the event that either Fung or Oppenheimer becomes (i) deceased, or (ii) there is No Objection to Disability Determination, or (iii) there is an Arbitration Award for the Borrower arising from a Disability Determination, the Lender, in its discretion, and without any prior notice to or consent from the Borrower or Fung or Oppenheimer, as the case may be, shall have the right, at any time and from time to time but excluding in the circumstances of the Exclusion Sentence (as that term is defined below), to require that some or all of the applicable Transferred CVR held by such Person be transferred by or on behalf of the affected Person to a Replacement Person, if the Lender is of the view that the transfer of some or all of the applicable Transferred CVR is necessary to induce such Replacement Person to accept such a position with the Borrower.  In such case, the Lender shall be entitled to automatically transfer any portion or all of the applicable Transferred CVR to such Replacement Person by or on behalf of the affected Person.  For certainty, if such Replacement Person can be retained without some or all of the applicable Transferred CVR being transferred to the Replacement Person, in the discretion of the Lender, then in such case the applicable remaining Transferred CVR shall remain with Fung or Oppenheimer, as the case may be, or his estate, as applicable.  If a Replacement Person is hired or employed by the Borrower either directly as an employee or independent contractor or through such Replacement Person's consulting company and as part of such Replacement Person's compensation, the Lender, in consultation with the Borrower (but for certainty in the Lender's sole discretion), determines in its discretion that the transfer of some or all of the applicable Transferred CVR is necessary to induce such Replacement Person to accept employment or retainer with the Borrower, as contemplated by the foregoing provisions of this Section 6(g), then in such case the delivery of a written notice by the Lender to the Replacement Person, and the legal administrator of Fung or Oppenheimer, as the case may be, and copied to the Borrower, specifying the amount of the Transferred CVR being transferred from such Disabled Person or estate to the Replacement Person, is and shall be all that is required to complete the transfer of such portion of the Transferred CVR to the Replacement Person, and without limitation no approval or consent from Fung or Oppenheimer as applicable (or his estate), the Borrower or the Monitor and no further approval or order of the CCAA Court or any other court or Governmental Authority, or any other action or documentation, is or shall be required whatsoever.  If, for any reason, the portion of the Transferred CVR that was to be transferred to the Replacement Person is not so transferred or is forfeited by the Replacement Person, then such Transferred CVR shall be returned to or remain with the Person who was Disabled or the estate of the deceased.  The foregoing provisions of this Section 6(q) shall not be applicable (and for certainty, the Lender shall not be permitted to transfer the Transferred CVR to a Replacement Person) in the event that either (i) all Obligations owing to the Lender under the Credit Agreement and the other Credit Documents have been paid in full to the Lender or (ii) the Borrower has received payment in full of the Arbitration Proceeds and all of such Arbitration Proceeds have been deposited into the applicable bank accounts as contemplated and required by the terms of the Credit Agreement (the "**Exclusion Sentence**").  For certainty, the Lender shall have the right at any time and from time to time in its discretion, but without any obligation to do so, require that the transfer of

some or all of the applicable Transferred CVR be made on such terms as Tenor may require including the delivery or entering into of any documents or agreements as may be required by the Lender in its discretion (including without limitation an agreement by the Replacement Person to be bound by the terms of this Agreement to the same extent as each of Fung and Oppenheimer are bound hereby, provided that (i) such documents or agreements do not impose any additional financial obligations or liabilities on the Borrower, Fung, or Oppenheimer, as the case may be, for which the Borrower, Fung, or Oppenheimer, as the case may be, is not already responsible for in accordance with the terms of this Agreement, and further provided that each of the Borrower, Fung, or Oppenheimer, as the case may be, shall still be required to execute and deliver any such document even if such document does impose any additional financial obligations or liabilities for which such party is not already responsible for in accordance with the terms of this Agreement if the Lender agrees in writing in favour of such party that the Lender will promptly reimburse such party for such obligations or liabilities after any such obligations or liabilities are incurred and such party delivers to the Lender written evidence of such obligations or liabilities having been incurred.

(r)     Without limiting the generality of the other releases and indemnities contained herein, each of Fung and Oppenheimer severally

(i)     covenants and agrees to file any and all required Tax returns in all applicable jurisdictions and pay any and all Tax payable by him when due in connection his receipt of and payment of any payout on account of any Transferred CVR and/or any or all of such Transferred CVR being transferred to the Lender and/or to a Replacement Person as contemplated by this Agreement,

(ii)    releases each of the Releasees (as that term is defined below) from and against any and all present or future Claims (as that term is defined below) in connection with or in any way relating to his receipt of the Transferred CVR and/or any or all of such Transferred CVR being transferred to Tenor and/or a Replacement Person as contemplated by this Agreement, and

(iii)   covenants and agrees to indemnify and hold harmless each of the Releasees from and against any and all present or future Claims any one or more of them may have in connection with or in any way relating to the transactions contemplated by this Agreement including without limitation the transfer by the Lender of the Transferred CVR to Fung and Oppenheimer and/or any or all of such Transferred CVR being transferred back to Tenor and/or a Replacement Person as contemplated by this Agreement.  For greater certainty, nothing herein shall obligate Fung or Oppenheimer to indemnify any Releasees or any Replacement Person for any Taxes arising or becoming owing from the ownership of the Transferred CVR by Tenor or such Replacement Person or the receipt by Tenor or such Replacement Person of any Net Arbitration Proceeds.

7.      The Borrower covenants and agrees to withhold, remit and pay when due pursuant to any applicable law any and all applicable Taxes to all applicable taxing authorities (whether within or outside of Canada) for and in respect of, among other things, all Taxes required to be withheld and remitted by the Borrower in respect of any payment on account of the Transferred CVR to each of Fung and Oppenheimer, and if applicable any Replacement Person and any other Net

Arbitration Proceeds which may now or hereafter be payable to Fung and/or Oppenheimer, and if applicable any Replacement Person (collectively and individually in this Section 7, the "**Applicable CVR**"). The Borrower covenants and agrees to comply with the following process for and in respect of the payment on account of the Applicable CVR and the withholding, remittance and payment of all Taxes in connection therewith, and each of Fung and Oppenheimer agrees with such process and withholdings, remittances and payments by the Borrower and further covenants and agrees that he will not seek to take any action or commence any action or other proceeding to interfere with, challenge or prevent such process and will cooperate with the Borrower and the Selected Accountants. The parties hereto further covenant and agree as follows:

(a)     Before making a payment on account of the Applicable CVR to either Fung or Oppenheimer or, if applicable any Replacement Person (in this Section 7, individually an "**Individual**" and collectively, the "**Individuals**"), the Borrower, at its expense, shall retain KPMG, or if requested by the Borrower another internationally recognized accounting firm but only if such alternate firm is satisfactory to the Lender in its discretion failing which KPMG shall be retained or such purpose (the "**Selected Accountants**"), to commission an analysis and written opinion regarding the Taxes to be withheld, remitted and paid by the Borrower and/or the applicable Individual to applicable taxing authorities in any applicable jurisdiction for and in respect of the Applicable CVR for each applicable Individual and the applicable due dates for the payment of such Taxes, including, without limiting the foregoing, any and all employer health taxes or other payroll or similar or analogous Taxes to be paid on account of such Applicable CVR. The Borrower covenants and agrees to retain the Selected Accountants for such purpose within fifteen (15) days after the date of this Agreement.

(b)     The Borrower shall cause the Selected Accountants to prepare a separate draft Accountants' Tax Report for each applicable Individual (each, an "**Accountants' Tax Report**"), and the Borrower shall promptly deliver the draft Accountants' Tax Report to each of the Lender and the applicable Individual (collectively, the "**Recipients**"), with a copy to any other Individuals, in each case promptly after the draft Accountants' Tax Report is received by the Borrower. Any deliveries of reports shall be made in accordance with Section 12 and shall be treated as confidential.

(c)     The Borrower shall not make any payment to the applicable Individual or withhold and remit any amounts on account of Taxes in respect of such applicable Individual's Applicable CVR before the expiry of fifteen (15) days after the date of delivery of the draft Accountants' Tax Report to each of the Recipients (the "**Accountants Report Notice Period**"), except as contemplated by the immediately following sentence. If (i) each Recipient of the draft Accountants' Tax Report for an applicable Individual delivers written notice to the Borrower and each of the other Recipients that such Recipient does not object to the draft Accountants' Tax Report before the expiry of the Accountants Report Notice Period or (ii) none of the Recipients delivers a notice of objection to the draft Accountants' Tax Report to the Borrower and the other Recipients before the expiry of the Accountants Report Notice Period, then in such case the Borrower shall proceed to instruct the Selected Accountants to issue the final Accountants' Tax Report (in the same form as the draft), the Borrower shall promptly provide a copy of the executed Accountants' Tax Report to each of the Recipients, and the Borrower shall be permitted

to and shall proceed, after the executed Accountants' Tax Report is delivered to the Borrower, to withhold all applicable amounts on account of all applicable Taxes and remit such amounts to the applicable taxing authorities in all applicable jurisdictions in accordance with the Accountants' Tax Report.  In the event that any one of the Lender or the applicable Individual has any objections to the draft Accountants' Tax Report (the "**Objector**") and delivers a notice of such objection to the Borrower and the other Recipients before the expiry of the Accountants Report Notice Period, then in such case, the Objector shall, concurrently with the delivery of the notice of objection, deliver to the Borrower and the other Recipients a detailed explanation of such objections; in such case the Borrower shall not pay any amount on account of the Applicable CVR to the applicable Individual and/or remit any payments to any taxing authorities in respect of such Applicable CVR until such time as (i) the Borrower and the Recipients accept the recommendations in the draft Accountants' Tax Report and such Accountants' Tax Report is issued or (ii) the Borrower and the Recipients otherwise agree in writing to the payment of the Applicable CVR to the applicable Individual and the amounts required to be withheld and remitted to the applicable taxing authorities in respect of such Applicable CVR, in either of which cases the Borrower shall, as applicable, after the Accountants' Tax Report is issued deliver a copy of the executed Accountants' Tax Report to each of the Recipients or after an agreement is signed in writing by the Borrower and each of the Recipients, as applicable, withhold and remit and pay all applicable amounts on account of all applicable Taxes to the applicable taxing authorities in all applicable jurisdictions in accordance with such Accountants' Tax Report or written agreement executed by the Borrower and each of the Recipients.  The Borrower and the Recipients agree to meet and confer to analyze any objections of the Objector to the recommendations in the draft Accountants' Tax Report and/or meet with the Selected Accountants to assess and try to resolve any such objections.  In the event that the Recipients and the Borrower do not reach an agreement regarding the recommendations in the draft Accountants' Tax Report, then in such case, the Recipients confirm and agree that the Borrower shall be permitted to direct that the Accountants' Tax Report issued and the Borrower can and shall proceed to withhold all applicable amounts on account of all applicable Tax Amounts and remit such amounts to the applicable taxing authorities in all applicable jurisdictions in accordance with the Accountants' Tax Report.

(d)      For greater certainty, the Borrower is and shall at all times hereafter be permitted and entitled to deduct from amounts paid to Fung or Oppenheimer, as applicable, from any Applicable CVR, any and all amounts required to be paid by the Borrower on account or in respect of any and all applicable employer health taxes or other payroll or similar or analogous taxes on account of such Applicable CVR.

(e)      The parties hereto acknowledge, confirm and agree that they do not need to comply with the foregoing terms of this Section 7 if the Lender agrees in its sole discretion that the parties shall not be required to comply with the provisions of this Section 7.

(f)      Notwithstanding anything to the contrary in this Agreement, no amount shall be paid to Fung, Oppenheimer or a Replacement Person pursuant to the Transferred CVR, and neither Fung, Oppenheimer not any Replacement Person shall have any right to receive any amounts pursuant to the Transferred CVR otherwise payable, unless and until any assessment or reassessment of the Lender or Borrower by any taxing authority in respect

of any and all Taxes relating to the transfer of a Transferred CVR has been paid in full by the Borrower from the funds otherwise payable Fung, Oppenheimer, or any Replacement Person, as the case may be. For greater certainty this restriction is applicable only to assessments and reassessments received prior to the time amounts become payable pursuant to the Transferred CVR in accordance with the terms of the Credit Agreement.

8.   This Agreement is not an amendment to the Credit Agreement or any other Credit Document. The Credit Agreement and the other Credit Documents are hereby confirmed by the Borrower. Without limitation, all parties hereto acknowledge and agree that all applicable conditions precedent to the advance of Supplemental Loan Tranche D must be satisfied prior to the advance of Supplemental Loan Tranche D by the Lender unless waived by the Lender in its sole discretion. For certainty, this Agreement constitutes a Credit Document (as that term is defined in the Credit Agreement).

9.   Each of (a) the Borrower for itself and on behalf of each of its Subsidiaries and on behalf of its and their respective successors and assigns, (b) Fung and (c) Oppenheimer (each a "Releasor") hereby absolutely, unconditionally and irrevocably releases and forever discharges the Lender, Tenor Special Situation Fund I, LLC and each of their respective successors and assigns, and their respective present and former equity holders, investors, Affiliates, Subsidiaries, predecessors, directors, officers, principals, employees, attorneys, agents and other representatives in all capacities including as a director of the Borrower (the Lender and all such other Persons being hereinafter referred to collectively as the "**Releasees**" and individually as a "**Releasee**") and severally agrees to indemnify and hold harmless, each of the Releasees, from and against all past, present or future demands, actions, causes of action, suits, damages, costs, expenses, and any and all other claims, counterclaims, defenses, rights of set off, demands and liabilities whatsoever (individually, a "**Claim**" and collectively, "**Claims**") of every kind and nature, known or unknown, suspected or unsuspected, both at law and in equity, and whether as a result of any action, event or thing which occurred in the past or occurs in the future, which it or any of its Subsidiaries, he, or its or his respective successors, legal administrators, heirs or permitted assigns, may now or hereafter own, hold, have or claim to have or assert against the Releasees or any of them for, upon, or by reason of any circumstance, action, cause or thing whatsoever which arose or occurred prior to the date of this Agreement or which occurs after the date of this Agreement in any way relating to or in connection with:

   (i)    the subject matter hereof or the transactions contemplated hereby,

   (ii)   any action taken or omitted to be taken by the Lender hereunder,

   (iii)  any action taken or omitted to be taken hereunder by any one or more Releasor in connection with this Agreement or any of the transactions contemplated hereby, including (A) relating to the employment of Fung or the services of Oppenheimer or any termination of such employment or services (whether for Cause or otherwise) or any Disability Determination by the Borrower or any consequences thereof including any Transferred CVR being transferred to the Lender, and/or transferred to any Replacement Person, or

   (iv)   any and all Taxes, levies, duties or similar amounts required to be withheld, remitted and/or paid by the Lender, Fung or Oppenheimer under any applicable law to any taxing authority (but excluding Taxes payable on the income of the

Lender for and on account of amounts paid to the Lender or a Replacement Person on account of the Transferred CVR to the extent any of such Transferred CVR is transferred back to and retained by the Lender or transferred to a Replacement Person) in connection with any of the transactions contemplated in this Agreement including, without limitation, the delivery or transfer of, or any amounts paid on account of, any Transferred CVR to Fung and Oppenheimer and/or any or all of such Transferred CVR being transferred back to the Lender and/or a Replacement Person as contemplated by this Agreement.

Nothing herein shall release the Releasees from any obligation to pay costs awarded by an arbitrator pursuant hereto or to return any Transferred CVR in accordance with the terms of this Agreement and nothing will release any persons who are directors of the Borrower from any breach of their statutory or fiduciary duties. Neither Fung nor Oppenheimer shall have liability for the failure of the Borrower to remit any Taxes which the Borrower has withheld. Nothing in this Agreement requires any of the Releasors to indemnify any of the Releasees in respect of any claim asserted by any investor in Tenor or Tenor Special Situation Fund I, LLC in respect to any obligations or duties they may have to such investors.

10.    Each of (a) Fung and (b) Oppenheimer hereby absolutely, unconditionally and irrevocably releases and forever discharges the Borrower and its successors and assigns, and its present and former equity holders, Affiliates, Subsidiaries, predecessors, directors, officers, principals, employees, attorneys, agents and other representatives (the Borrower and all such other Persons being hereinafter referred to collectively as the **"Borrower Releasees"** and individually as a **"Borrower Releasee"**) and agrees to indemnify and hold harmless each of the Releasees, from and against all past, present or future demands, actions, causes of action, suits, damages, and any and all other claims, counterclaims, defenses, rights of set off, demands and liabilities whatsoever (individually, a **"Claim"** and collectively, **"Claims"**) of every kind and nature, known or unknown, suspected or unsuspected, both at law and in equity, which it or any of its Subsidiaries, he, or its or his respective successors, legal administrators, heirs or permitted assigns, may now or hereafter own, hold, have or claim to have or assert against the Borrower Releasees or any of them for, upon, or by reason of any circumstance, action, cause or thing whatsoever which arose or occurred prior to the date of this Agreement or which occurs after the date of this Agreement and in any way relating to or in connection with any action taken or omitted to be taken by the Borrower now or in the future specifically relating to (A) any Transferred CVR transferred by the Lender to Fung or Oppenheimer hereunder being transferred back to the Lender, and/or transferred to any Replacement Person and (B) any and all Taxes, levies, duties or similar amounts required to be withheld, remitted and/or paid by the Borrower, Fung or Oppenheimer under any applicable law to any taxing authority in connection with any of the transactions contemplated in this Agreement (but excluding Taxes payable on the income of the Borrower on account or in respect of the payment to and receipt by the Borrower of the Arbitration Proceeds) including, without limitation, the delivery or transfer of, or any amounts paid on account of, any Transferred CVR and/or any or all of such Transferred CVR being transferred back to the Lender and/or a Replacement Person as contemplated by this Agreement. Nothing in this Section shall release the Borrower from its failure to remit any Taxes withheld by it.

11.    None of this Agreement or any terms hereof may be amended, supplemented, waived or modified except in accordance by way of written agreement executed by each of the parties hereto.

12.    All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by facsimile or other direct electronic transmission including pdf email, if one is listed below), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered by hand or, in the case of facsimile or other direct electronic transmission, when sent, addressed as follows or to such other address as may be hereafter notified by the respective parties hereto:

The Borrower:

Crystallex International Corporation
8 King Street East, Suite 1201
Toronto, Ontario, M5C 1B5, Canada
Attn: Robert A. Fung
Email: rfung@crystallex.com

With a copy to:

Davies Ward Phillips & Vineberg LLP
155 Wellington St W, 40th floor
Toronto, ON M5V 3J7, Canada
Attn: Jay Swartz
Email: jswartz@dwpv.com

The Lender:

Tenor KRY Cooperatief U.A.
1180 Avenue of the Americas
Suite 1940
New York, N.Y. 10036
U.S.A.
Attn: David Kay
Email: dkay@tenor.com

With a copy to:

Cassels Brock & Blackwell LLP
Suite 2100, Scotia Plaza
40 King Street West
Toronto, ON M5H 3C2
Attn: Ryan C. Jacobs
Email: rjacobs@casselsbrock.com

Fung:

Robert Fung



Oppenheimer:

Marc Oppenheimer

provided that any notice, request or demand to or upon the Lender shall not be effective until received. Any notice, request or demand received by any party after 5:00 p.m. Toronto time on any Business Day or at any time on any day which is not a Business Day shall be deemed to have been received by the recipient on the next following Business Day. Any party may change its or his address for receiving notices hereunder by giving notice to the other parties.

13. No failure to exercise and no delay in exercising, on the part of the Lender, any right, remedy, power or privilege hereunder, shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

14. This Agreement shall be binding upon and inure to the benefit of the Borrower, the Lender, Fung and Oppenheimer, and each of their respective successors, legal administrators, heirs and permitted assigns. Notwithstanding the foregoing, none of the Borrower, Fung or Oppenheimer may sell, assign or transfer any of its or his rights or obligations under this Agreement without the prior written consent of the Lender and the Lender may withhold its consent in Lender's sole discretion, and any purported sale, transfer, or assignment of any rights or obligations hereunder without the prior written consent of the Lender shall be void and of no force or effect. For certainty, each of Fung and Oppenheimer can sell or assign his applicable Transferred CVR, or a portion thereof, but only with the prior written consent of the Lender in its discretion and on terms and conditions satisfactory to the Lender in its discretion including any agreements which the Lender may require from any one or more of the Borrower, Fung or Oppenheimer, as applicable, and the transferee or assignee. The Lender may sell, assign or transfer any of its rights or obligations under this Agreement without prior notice to or consent from the Borrower, Fung or Oppenheimer.

15. This Agreement and the rights and obligations of the parties under this Agreement shall be governed by, and construed and interpreted in accordance with, the laws of the Province of Ontario and the federal laws of Canada applicable therein and, to the extent applicable, the CCAA and the Bankruptcy Code.

16. This Agreement is solely for the benefit of the parties hereto and their respective successors, legal administrators, heirs and permitted assigns, and, except for any permitted assignee in

accordance with Section 14 above, no other Persons shall have any right, benefit, priority or interest under, or because of the existence of, this Agreement.

17.    (a)    Each party to this Agreement hereby irrevocably and unconditionally, but in each case subject to the agreement to submit to arbitration as contemplated by Section 6 herein:

(i)    submits for itself or himself, as applicable, and its or his property in any legal action or proceeding relating to this Agreement, or for recognition and enforcement of any judgment in respect thereof, to the non-exclusive general jurisdiction of the CCAA Court and the Bankruptcy Court, provided that the Lender shall be entitled in its sole discretion to determine whether any such legal action or proceeding shall be in any state or federal court sitting in New York County, New York or any applicable court in the City of Toronto, Ontario;

(ii)    consents that any such action or proceeding may be brought in such courts, and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(iii)    agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such party at its address set forth in Section 12 or at such other address of which any party hereto shall have notified the other parties hereto provided that in the case of notices to Oppenheimer such process shall also be emailed to him; and

(iv)    agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law or shall limit the right to sue in any other jurisdiction.

(b)    Each party hereto unconditionally waives trial by jury in any legal action or proceeding referred to in Section 17 and any counterclaim therein.

18.    To the extent that the Lender receives Returned CVR pursuant to Section 6(b) and does not transfer all of such Returned CVR to any one or more Replacement Persons, then in such case all of such Returned CVR that is not transferred to any one or more Replacement Person (or which is transferred to a Replacement Person but is subsequently transferred to the Lender as a result of the terms of any contract or agreement with the Replacement Person) shall be and be deemed to constitute part of the Fourth Additional Compensation Amount without any further action, consent, court order or other approval required whatsoever, and shall be paid to the Lender in the same manner and at the same times as contemplated by the terms of the Credit Agreement and any other applicable Credit Documents.

19.    Whenever any matter in this Agreement is required to be satisfactory to the Lender, the Lender shall (unless otherwise expressly provided) determine its satisfaction in the Lender's sole discretion.

20.    The Lender has not provided any accounting, legal, Tax or other advice to the Borrower, Fung or Oppenheimer in connection with the transactions contemplated this Agreement, the Other Credit Documents, or otherwise. Each of the Borrower, Fung and Oppenheimer forever agrees

that the Lender is not and shall not be liable for any present or future loss, claim, damage, liability or expense relating to, or resulting from, any accounting, legal or Tax advice or any other advice received by the Borrower, Fung or Oppenheimer from any Person or Persons or omitted to be obtained by the Borrower, Fung or Oppenheimer.   Each of Fung and Oppenheimer represents, acknowledges and confirms to and in favour of each of the Lender and the Borrower that (i) the Lender requested and directed that he receive independent legal advice and Tax advice before entering into this Agreement and (ii) he obtained such independent legal advice and Tax advice, and has read this Agreement and understands the terms and conditions contained herein including without limitation any Tax issues affecting him in connection with the transactions contemplated hereby.  Each of Fung and Oppenheimer represents and warrants and agrees that he is not under any duress and is entering into this Agreement by his own choice and free will.

21.     This Agreement shall become effective on the date (the "**Effective Date**") on which (i) all parties hereto shall have signed a counterpart hereof and none of such executed counterparts have been delivered or are held under any escrow conditions, (ii) the Lender has advanced the full amount of Supplemental Loan Tranche D to the Borrower and (iii) the Lender has earned the Fourth Additional Compensation Amount.

22.     In the event of any litigation or dispute involving this Agreement, the Loan, any Credit Document or any matter relating thereto, the Lender shall not be responsible or liable to the Borrower, any reorganized entity of the Borrower, any of their respective Subsidiaries, Fung or Oppenheimer or any other Person for any special, indirect, consequential, incidental or punitive damages.

23.     This Agreement supersedes all prior negotiations and correspondence (including without limitation emails), discussions, term sheets or other agreements, oral or written, relating to the subject matter hereof.  Nothing in this Agreement shall or shall be deemed to in any way (i) affect, alter, or amend the terms of the Credit Agreement and the other Credit Documents or (ii) affect, impair or prejudice in any manner the rights and remedies of the Lender under the Credit Agreement, the other Credit Documents, at law and in equity.

24.     Each of the Borrower, Fung, and Oppenheimer acknowledges that the Lender is relying on, among other things, the representations, agreements and covenants made by each of them herein in connection with the Lender's decision to advance Supplemental Loan Tranche D to the Borrower.

25.     This Agreement may be executed in counterparts and both such counterparts shall constitute one and the same agreement.  Any counterpart may be executed and circulated by fax or other method of direct electronic transmission (including pdf email) and any such counterpart so executed and circulated shall be deemed to be an original of this Agreement.

26.     Unless otherwise defined herein, all capitalized words and phrases shall have the same meanings ascribed thereto in the Credit Agreement.

27.     Each of the Borrower, Fung and Oppenheimer irrevocably covenant and agree to and in favour of the Lender that (i) the Lender is not now, has never been, and will never be or be deemed to be an employer of either Fung or Oppenheimer, under the *Employment Standards Act* (Ontario), any other legislation or under any common law or equity or otherwise, as a result of the parties

hereto entering into this Agreement or any of the transactions contemplated hereby and (ii) it/he will never (x) execute, deliver or file with any Governmental Authority (including any taxing authority) or any other Person any document or submission asserting that the Lender is or has been at any time an Employer of Fung or Oppenheimer or (y) assert such a position for any purpose whatsoever.

28. Each the parties hereto shall be responsible for all costs incurred by it or him and all fees of any advisors retained by it or him to provide any type of advice in connection with this Agreement, the negotiation of this Agreement, or the transactions contemplated hereby, except as may be expressly stated otherwise in this Agreement. For certainty, and notwithstanding the immediately preceding sentence, the Borrower shall be required to pay for all costs, expenses and fees incurred by the Lender in connection with this Agreement and all transactions contemplated hereby and for certainty including all legal and accounting fees and disbursements incurred by the Lender. Notwithstanding the first sentence of this Section 27, the Borrower agrees to pay the reasonable legal and accounting costs incurred by each of Fung and Oppenheimer in connection with the review and negotiation of this Agreement up to and including his execution of this Agreement, and for certainty, each of Fung and Oppenheimer shall be required to pay for all (and for certainty, none of the Borrower or the Lender shall be obligated in any manner whatsoever to pay for any) legal, accounting or other advisory fees or any other costs or expenses incurred by him after the date of his execution of this Agreement in connection with this Agreement of any of the transactions contemplated hereby, except for payment of costs in connection with an arbitration as contemplated hereby pursuant to Section 6(k) hereof.

29. The Borrower covenants and agrees to and in favour of the Lender that the Borrower shall arrange for a directors' liability coverage insurance policy to be issued in favour of the Borrower and its present and future directors, with coverage amounts, term of such policy and the term of the "tail" of such policy and all other terms and conditions of such policy to be satisfactory to the Lender in its direction and to be issued by a reputable insurer which is commonly used for such directors' liability insurance coverage and which insurer is satisfactory to the Lender in its discretion, and such coverage shall, among other things, provide insurance coverage for such directors for the failure to withhold and remit any Tax to any applicable taxing authority which the Borrower is required to remit and withhold under any applicable law, such insurance coverage to be in an amount or amounts satisfactory to the Lender in its discretion; and for certainty, the Borrower shall be required to pay for the cost and expense of all such insurance coverages and, if requested by the Lender, an insurance consultant to advise the Borrower and the Lender regarding potential insurers and insurance policy terms and coverages before any of such insurance policies are secured (collectively, the "**Directors' Insurance Coverage**"). For clarity, the requirements set out in this Section 29 are in addition to and not in substitution for any other requirements for the Borrower to maintain insurance coverages under any other Credit Documents including the Credit Agreement. The Borrower covenants and agrees that it shall cause the Directors' Insurance Coverages to be issued by the applicable insurer(s) prior to the advance of the Supplemental Loan Tranche D by the Lender, which requirement shall be and be deemed to be an additional condition precedent to the advance of the Supplemental Loan Tranche D as if this Section 29 was listed as a condition precedent in the Fourth Amendment Agreement.

30.     If any provision of this Agreement is or is determined by a court of competent jurisdiction to be illegal, invalid or unenforceable, any such provisions shall be severed from this Agreement to the extent of such illegality, invalidity or unenforceability and the remaining provisions hereof or thereof shall be and remain unaffected by such provision which has been so severed as if such severed provision had never been contained herein.

31.     This Agreement shall continue in full force and effect so long there are Obligations outstanding and the Credit Agreement remains in force and effect.

32.     The terms and conditions of this Agreement shall not be merged by, and shall survive, the execution and delivery of the Fourth Amendment Agreement and the advance of the Supplemental Loan Tranche D by the Lender to the Borrower thereunder.

33.     Each of the parties hereto shall, at its own expense, promptly execute and deliver to the Lender, or cause to be executed and delivered to the Lender on request by the Lender, all such other and further documents, agreements or confirmations as may be reasonably requested by the Lender to more fully confirm and implement and intent and purpose of this Agreement.

34.     Terms defined herein in the singular have the same meaning when used in the plural, and vice-versa. When used in the context of a general statement followed by a reference to one or more specific items or matters, the term "including" shall mean "including, without limitation", and the term "includes" shall mean "includes, without limitation".

35.     This Agreement, all terms and conditions contained herein, the transactions contemplated hereby and the transactions completed hereunder are and shall at all times, and for certainty after the execution of this Agreement, be confidential, and no party to this Agreement shall disclose any of the foregoing to any Person not a party hereto except (i) to their respective legal and financial advisors but only to the extent that any such advisor delivers a written agreement in favour of such party and each of the other parties hereto agreeing to maintain same as confidential, (ii) as required by a final court order of a court of competent jurisdiction which is not subject to any rights of appeal, or (iii) in connection with the motion record to be filed with the CCAA Court for approval of this Agreement subject to the redaction of this Agreement to the extent a copy of same is contained in the motion record as agreed between the parties hereto or to any stakeholders of the Borrower or their legal advisors who deliver the confidentiality undertaking prepared by the Monitor's counsel for such purpose.

*[remainder of page deliberately left blank]*

**IN WITNESS WHEREOF** the parties have executed this Agreement as of the date first above written.

CRYSTALLEX INTERNATIONAL CORPORATION

By:_____
Title:

TENOR KRY COOPERATIEF U.A.

By:_____
Title:

_____        _____
Witness                                      **ROBERT FUNG**
Name:

_____        _____
Witness                                      **MARC OPPENHEIMER**
Name:

SCHEDULE "A-1"

FUNG EMPLOYMENT AGREEMENT

**SCHEDULE "A-2"**

**FUNG TAX DOCUMENTS**

Preliminary list of documents for each of Fung for the period commencing at the beginning of the 2008 calendar year to the present:

a) All information forms, reports, summaries, slips, etc., of any type pursuant to any Tax legislation issued by the Borrower in respect of Fung's employment with the Borrower (including T 4 forms).

b) A copy of any communications between either Fung and any taxation authority in respect of amounts paid to, or taxable benefits conferred on Fung ("Taxable Amounts") by the Borrower, or between the Borrower and a taxation authority in respect of the foregoing.

c) Copies of any Tax assessments received by Fung relating in any way to Taxable Amounts.

d) Copies of any Tax-related memoranda, reports, summaries, etc., received by the Borrower relating the services provided by Fung, or memoranda, reports, summaries, etc., received by the Borrower or Fung.

SCHEDULE "B-1"

OPPENHEIMER CONSULTING AGREEMENT

## SCHEDULE "B-2"

## OPPENHEIMER TAX DOCUMENTS

Preliminary list of documents for Oppenheimer for the period commencing at the beginning of the 2008 calendar year to the present:

a)  All information forms, reports, summaries, slips, etc., of any type pursuant to any Tax legislation issued by the Borrower in respect of consulting services rendered by Oppenheimer to the Borrower.

b)  A copy of any communications between Oppenheimer and any taxation authority in respect of amounts paid to, or taxable benefits conferred on Oppenheimer ("Taxable Amounts") by the Borrower, or between the Borrower and a taxation authority in respect of the foregoing.

c)  Copies of any Tax assessments received by Oppenheimer relating in any way to Taxable Amounts.

d)  Copies of any Tax-related memoranda, reports, summaries, etc., received by the Borrower relating the services provided by Oppenheimer, or memoranda, reports, summaries, etc., received by the Borrower or Oppenheimer.

e)  Statutory declaration by Oppenheimer regarding the days spent in Canada regarding services to the Borrower for each calendar year.

**SCHEDULE "B-3"**

**JEWISH HOLIDAYS**

Fast of Teret 10

Fast of Esther

Purim

Pessach (Passover) (for certainty, the first two days and the last two days)

Shavuot

Fast of Av 9

Rosh Hashanna

Yom Kippur

Sukkot (for certainty, the first two days and the last two days)

Shemini Atzeret and Simchat Torah

THIS IS EXHIBIT "C" REFERRED TO IN THE AFFIDAVIT OF
HARRY NEAR SWORN THIS 15 DAY OF DECEMBER 2014

_____
A Commissioner for Taking Affidavits

# Bloomberg

# Venezuela Default Odds at 93% as Bonds Sink to 16-Year Low

By Katia Porzecanski - Dec 11, 2014

Swaps traders are almost certain that Venezuela will default as the rout in oil prices pressures government finances and sends bond prices to a 16-year low.

Benchmark notes due 2027 dropped to 43.75 cents on the dollar as of 11:35 a.m. in New York, the lowest since September 1998, as crude extended a bear market decline. The upfront cost of contracts to insure Venezuelan debt against non-payment for five years is at 59 percent, bringing the implied probability of default to 93 percent, the highest in the world.

This year's 38 percent plunge in oil prices has exacerbated concern that Venezuela is running out of dollars needed to pay debt, pushing bond prices to levels investors haven't seen since the 1998 Russian financial crisis spurred a selloff in emerging markets. Foreign Minister Rafael Ramirez, also the country's OPEC representative, said yesterday that the government is working constantly with other members of the energy cartel to raise oil prices to $100 a barrel.

"It's very hard to think of a new marginal buyer for Venezuelan debt," Mohammed Grimeh, head of financial markets at Standard Chartered Plc, said by phone from New York. "The hedge funds aren't buying it, and the dealers aren't taking risk."

Brent and West Texas Intermediate traded at almost the lowest price since July 2009 as Saudi Arabia questioned the need to cut output, bolstering speculation that the Organization of Petroleum Exporting Countries's biggest producer will defend market share. WTI was little changed at $60.95 a barrel in New York trading today.

## Foreign Reserves

Benchmark bonds fell 0.63 cent on the dollar today, extending the drop over the past week to 8.3 cents and pushing yields to 23 percent.

At $21.5 billion, the nation's reserves are at their lowest levels in a decade and cover only about 40 percent of total debt due over the next five years. Venezuela's Finance Ministry didn't respond to a phone call and e-mail seeking comment.

Ramirez said in an interview on the Telesur network that Venezuela expects OPEC to hold a special meeting before June to discuss oil prices.

"Our position on OPEC is that they defend the fair price of our oil," he said. "We don't believe in the free market. We must make an effort to reduce overproduction."

Venezuela, which has seen more than 1,000 of its companies nationalized since Hugo Chavez came to power 15 years ago, relies on oil for 95 percent of its export revenue. Chavez died in 2013.

## Chronic Shortages

The nation is plagued by chronic shortages of everything from milk to toilet paper amid the world's fastest inflation. The economy is expected to shrink 3 percent this year and another 1.5 percent in 2015, according to the median estimate of 15 analysts surveyed by Bloomberg.

Venezuela's average crude price fell to $61.92 a barrel in the week ended Dec. 5, the lowest since May 2010. Barring any increases in crude output or cuts in imported goods, Venezuela will need oil to average about $97 per barrel to meet its debt obligations through 2038, Daniel Chodos, an analyst at Credit Suisse Group AG, wrote in a Nov. 19 report.

The drop in oil will cause the nation's trade balance to fall into a deficit of 2 percent of gross domestic product next year, according to Moody's Analytics.

That will "make the country even more reliant on scarce capital inflows to cover the deficit and maintain its ability to service foreign-currency debt," Moody's wrote in a Dec. 8 report. Venezuela is rated seven levels below investment grade at Caa1 by Moody's Investors Service.

Maduro said in a televised speech Dec. 8 that credit-rating companies had imposed a "financial blockade" on Venezuela to prevent it from borrowing abroad.

"The bus is going downhill, and it doesn't have brakes," Ray Zucaro, who helps oversee about $450 million at SW Asset Management LLC, said in a telephone interview from Miami.

To contact the reporter on this story: Katia Porzecanski in New York at kporzecanski1@bloomberg.net

To contact the editors responsible for this story: Brendan Walsh at bwalsh8@bloomberg.net Bradley Keoun

®2014 BLOOMBERG L.P. ALL RIGHTS RESERVED.

## EXHIBIT A-5

**Affidavit of Robert Fung Dated October 23, 2018 [Docket No. 263-5]**

CONFIDENTIAL  11

Court File No. CV-11-9532-00CL

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(Commercial List)**

**IN THE MATTER OF** the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c.C36 as amended

**AND IN THE MATTER OF** a Plan of Compromise or Arrangement of Crystallex International Corporation

**CRYSTALLEX INTERNATIONAL CORPORATION**

Applicant

**AFFIDAVIT OF ROBERT FUNG**
**Sworn October 23, 2018**

I, Robert Fung, of the City of Toronto, in the Province of Ontario, **MAKE OATH AND SAY:**

1.　　　　I am the Chairman and CEO of Crystallex International Corporation ("**Crystallex**" or the "**Company**").  I have also been a director of Crystallex since 1996, Chairman of the Board of Directors of Crystallex since 1998 and CEO since June 2008. As such, I have knowledge of the matters to which I hereinafter depose, which knowledge is either personal to me, obtained from a review of the documents to which I refer, or, where indicated, based on information and belief, in which case I verily believe such information to be true.

**A.　　Overview and Background**

2.　　　　This Affidavit is sworn in support of a motion by Crystallex for an Order, among other things:

(a)     extending the Stay Period as defined in the Initial Order until May 6, 2019;

(b)     approving Crystallex entering into the Tenth Credit Agreement Amendment (as defined below) and approving the terms of such agreement including the extension of the maturity of Crystallex's obligations under the DIP Credit Agreement (as defined below);

(c)     that the DIP Charge (as defined below) and the Lender Additional Compensation Charge (as defined below) shall secure all obligations under the DIP Credit Agreement as amended by the Tenth Credit Agreement Amendment;

(d)     appointing a claims officer in respect of the Claims Procedure (as defined below) in these proceedings; and

(e)     that certain un-redacted materials in connection with this motion be filed under a protective order and not form any part of the public record in this proceeding.

3.     On December 23, 2011, an order (the "**Initial Order**") was made granting Crystallex protection from its creditors under the *Companies' Creditors Arrangement Act* (the "**CCAA Proceeding**").  Pursuant to the Initial Order, Ernst & Young Inc. was appointed as the monitor (the "**Monitor**").  Crystallex subsequently obtained an order of the United States Bankruptcy Court (the "**US Bankruptcy Court**") for the District of Delaware on December 28, 2011, recognizing this CCAA Proceeding as a foreign main proceeding.

4.       The Initial Order granted a stay of proceedings against Crystallex and its directors and officers during the Stay Period, which was most recently extended by Order of the Court on May 9, 2018 until October 31, 2018.

5.       Crystallex previously engaged in the business of exploring and developing the Las Cristinas gold project in Venezuela until 2011 when the Venezuelan government expropriated the mine and purported to terminate the mining operation contract that gave rise to the Company's rights.

6.       The Company arbitrated the matter before an arbitral tribunal under the Additional Facility of International Centre for the Settlement of Investment Disputes of the World Bank (the "**ICSID**") against Venezuela.  On April 4, 2016, after five years of arbitration, the tribunal released its decision and final award, ruling that Venezuela was obliged to pay damages to Crystallex in the amount of US$1.202 billion, plus interest (the "**Award**").  The Award was the single largest ICSID award ever issued at the time, and is the Company's principal asset.

**B.    Update Regarding Crystallex's Efforts with Respect to the Award**

7.       As described in previous Affidavits in this CCAA Proceeding and in the reports of the Monitor, Crystallex, with the assistance of the Monitor, developed and implemented a dual-track strategy for enforcement in respect of the Award, while concurrently pursuing a negotiated resolution of the Award with Venezuela.

8.       As part of its enforcement strategy, Crystallex commenced the following actions:

(a)    In November 2015, Crystallex initiated an action in the United States District Court for the District of Delaware (the "**Delaware Court**") against Venezuela's national oil company Petroleos de Venezuela, S.A. ("**PDVSA**") and its U.S. subsidiaries PDV Holding, Inc. ("**PDVH**") and CITGO Holding, Inc. ("**CITGO**") asserting (among other things) claims under the Delaware Uniform Fraudulent Conveyance Act ("**DUFTA**"). Crystallex claimed that PDVSA and its U.S. subsidiaries were intentionally moving funds out of the US to Venezuela in order to avoid paying the Award;

(b)    In October 2016, Crystallex commenced a second fraudulent transfer action in the Delaware Court against PDVH in relation to its agreement to place a lien against 50.1% of its shares in its most significant asset, CITGO (which ultimately owns CITGO Petroleum Corporation), in support of PDVSA's then recent debt restructuring. In that action, Crystallex claims that PDVH again agreed to transfer its assets, without consideration, to avoid paying Crystallex; and

(c)    On March 25, 2017, the United States Federal Court for the District of Columbia (the "**D.C. Court**") confirmed the Award and on April 7, 2017 a formal judgment was entered in Crystallex's favour in the amount of approximately U.S.$1.4 billion (the "**Judgment**").   In June 2017, Crystallex filed a motion in the Delaware Court against PDVSA and Venezuela seeking to execute the Judgment on PDVSA's 100%

shareholding in PDVH on the grounds that PDVSA is the alter ego of Venezuela, and as such the shares in question ought to be treated as assets of Venezuela (the "**Alter Ego Claim**").

9.          In November 2017, Crystallex concluded a settlement agreement with Venezuela (the "**Settlement Agreement**") which, among other things, provided that: (i) Venezuela would make a series of payments to Crystallex over a number of years; (ii) Crystallex would suspend enforcement proceedings and activities against Venezuela in respect of the Award once Crystallex received certain specified initial payments; and (iii) if Venezuela breached any of its payment obligations under the Settlement Agreement, Crystallex would be entitled to re-commence all of its enforcement activities suspended by the settlement, as well as pursue and initiate new enforcement and collection efforts for the full amount of the Award. The Settlement Agreement was approved by Order of this Court on November 24, 2017.

10.          Venezuela was unable to make certain payments according to the terms of the Settlement Agreement entitling Crystallex to continue its enforcement activities.

11.          On August 9, 2018, the Delaware Court issued an order in the Alter Ego Claim authorizing the attachment of the shares of PDVH (the "**Writ of Attachment**") with respect to the enforcement of the Judgment in an action styled Crystallex International Corp. v. Bolivarian Republic of Venezuela, C.A. No. 17-151-LPS (D. Del.) (the "**Delaware Order**"). The Writ of Attachment was served on August 24, 2018. The Delaware Order and the public version of the written reasons in connection therewith

are attached as Appendix A to the Twenty-Sixth Report of the Monitor dated August 27, 2018.

**C.    The Amended Settlement Agreement**

12.        Following the release of the Delaware Order, Venezuela engaged Crystallex in an effort to negotiate a settlement which would stay execution upon the Writ of Attachment.

13.        The negotiations resulted in the parties entering into an amendment to the Settlement Agreement (the "**Amended Settlement Agreement**") dated as of September 10, 2018.

14.        On September 17, 2018, Crystallex brought a motion to this Court seeking approval of the Amended Settlement Agreement and the sealing of the Amended Settlement Agreement and other material filed in connection with the motion, including the Monitor's Twenty-Seventh Report. Prior to the motion, the Amended Settlement Agreement was made available on a confidential basis to the DIP Lender (defined below), counsel for the trustee of the Company's Senior 9.375% Unsecured Notes due December 23, 2011 (the "**Trustee**") and to the ad hoc noteholder committee (the "**Noteholder Committee**") and counsel for the ad hoc committee of the shareholders of Crystallex (the "**Ad Hoc Equity Committee**").

15.        Pursuant to the terms of the Order approving the Amended Settlement Agreement, such Order will remain sealed until the Monitor files with the Court a certificate (the "**Certificate**") confirming that the Applicant has received the full amount of the Initial Payment (defined below) under the Amended Settlement Agreement.

16.       The principal terms of the Amended Settlement Agreement can be summarized as follows:

(a)   Venezuela agreed to make an up-front payment to Crystallex in the amount of US$425 million in either cash and/or liquid securities with a market value equal to such amount (the "**Initial Payment**");

(b)   Crystallex agreed that, following receipt of the Initial Payment, to suspend all affirmative efforts to execute upon the Writ of Attachment and any other efforts to enforce the Judgment for 120 days from the date of the Amended Settlement Agreement (the "**Temporary Stay Period**"), but such suspension shall not require Crystallex to take any steps to remove or lift the Writ of Attachment;

(c)   Crystallex may not apply the Initial Payment against the remaining amount payable on the Award until the commencement of the Temporary Stay Period █████████████████████████████████████ ██████████████████████;

(d)   Within 120 days of the date of the Amended Settlement Agreement, Venezuela shall provide Crystallex with a secured promissory note (the "**Settlement Note**") and related documentation, which:

(i)   will evidence its obligations with respect to payment of the remaining balance of the Award after application of the Initial Payment (the "**Deferred Settlement Amount**"); and

(ii)    which will provide for payment of the Deferred Settlement Amount in installments over two and a half years, commencing in February 2019;

(e)  █████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████

(f)  █████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████

(g)  █████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████



(i)   if Venezuela fails to make a payment of the Deferred Settlement Amount, it will have a period of 30 consecutive days to remedy the situation, provided that Venezuela may only use one remediation period per calendar year.  Any other Deferred Settlement Amount payment delay that occurs within the same calendar year will be considered an event of default.

## D.   Payments Received by Crystallex

*Payments under the Settlement Agreement*

17.     As of the date of this Affidavit, Venezuela has made payments under the Settlement Agreement, in the approximate amount of US$74 million.

*Payments Under the Amended Settlement Agreement*

18.     As at the date of this Affidavit, the Company has received cash and liquid securities (the "**Initial Payment Securities**") with an agreed aggregate initial market value of approximately ███████ million on account of the Initial Payment.  A significant portion of the amount received to date is comprised of the Initial Payment Securities,

which are valued based on information provided from a Schedule I Canadian bank. Approximately ███ million of the Initial Payment remains to be paid, which Crystallex anticipates to receive in the near term.  As the full amount of the Initial Payment has not been received, the Monitor has not delivered the Certificate and the Order approving the Amended Settlement Agreement remains under seal.

**E.    Implementation**

19.        Until the full amount of the Initial Payment has been received, the Amended Settlement Agreement is not effective.

20.      ██ ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████ █ ████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████A
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████

21.        Prior to the end of the Temporary Stay Period, Venezuela is required to

████████████████████████████████████████████████

**F.     Application of Arbitration Proceeds Statements**

22.        Pursuant to the DIP Credit Agreement and related orders of this Court, prior to distribution or application of arbitration proceeds, the Company is required to submit a statement (the "**AAP Statement**") setting out its calculation and determination of how such arbitration proceeds are to be applied pursuant to the waterfall set out in Exhibit F to the DIP Credit Agreement (the "**Waterfall**") for approval by the DIP Lender and Monitor.  Pursuant to the endorsement of Mr. Justice Hainey issued on May 9, 2018, Crystallex will also provide the AAP Statement to the Trustee and Noteholder Committee at the same time that it is provided to the Monitor and DIP Lender.

23.        On August 8, 2018, Crystallex provided the Monitor, the DIP Lender and counsel for the Trustee and Noteholder Committee with an AAP Statement for the period ending May 22, 2018 (the "**May AAP Statement**").  As at such date, the Company had received approximately US$45 million on account of the payments under the Settlement Agreement.

24.        The balance of the payments under the Settlement Agreement in the approximate amount of US$29 million, was subsequently paid by Venezuela after the Company delivered the May AAP Statement.  The Company is in the process of preparing an AAP Statement in respect of the US$29 million payment.  The Company expects to deliver this statement to the DIP Lender, the Monitor, the Trustee and the Noteholder Committee shortly.

**G.    Creditor Distributions**

25.        There are a number of threshold matters that must first be addressed to ultimately allow for distributions to the Company's creditors in accordance with the Waterfall.  These include:

(a)    Receipt of the full Initial Payment under the Amended Settlement Agreement and commencement of the Temporary Stay Period;

(b)    Receipt of the analyses, opinions and reports required under the DIP Credit Agreement with respect to the amount of taxes which must be paid or withheld in respect of the Award and in accordance with the Waterfall (the "**Tax Reports**"), and which Tax Reports will include appropriate advice and recommendations to Crystallex on the necessary steps to mitigate tax liability. Since the last extension of the Stay Period, engagements with each of KPMG, Thorsteinssons LLP and Venezuelan tax counsel have been finalized and those professional firms are actively engaged working to prepare the required Tax Reports and advise on tax mitigation strategies as it relates to the Amended Settlement Agreement;

(c)     Obtain the appropriate clearances or sufficient assurances from the relevant tax authorities, or otherwise, in respect of the taxes that may be owing to ensure compliance with the Waterfall; and

(d)     

26.     Consistent with its successful approach to the Arbitration Claim, the Company is working diligently, in consultation with the Monitor, to address all of these issues in a manner that maximizes value while also concurrently complying with its obligations under the Amended Settlement Agreement.  Crystallex has and will continue to keep the Monitor apprised of its work and progress on each of these key items.

27.     The Company has and will continue to provide key case updates to its stakeholders and their counsel, as appropriate.  On September 4, 2018, Crystallex held in-person restricted (confidential) and unrestricted (public) meetings with counsel to the Noteholder Committee, certain members of the Noteholder Committee and Ad Hoc Equity Committee for the purpose of updating them on, among other things, the receipt and application of payments under the Settlement Agreement, the Company's dual-track strategy of pursuing enforcement of the Award, and the Alter Ego Claim and Writ of Attachment.  Members of the Noteholder Committee were invited to participate in the

restricted portions of the meetings subject only to signing a confidentiality agreement with Crystallex, but declined to do so.  Crystallex has reached out to counsel to the Noteholder Committee and the Ad Hoc Equity Committee to schedule further restricted and unrestricted meetings in November to provide an update on the Amended Settlement Agreement and to discuss the threshold matters identified in paragraph 25 and their impact on timing for ultimate creditor distributions.

28.        These threshold issues also impact the Company's ability to deliver an AAP Statement in respect of the Initial Payment, once it is fully received and the Temporary Stay Period has commenced. The Waterfall contemplates that after Crystallex pays accrued and unpaid post-filing expenses, the Company shall pay any taxes, payable or required to be withheld by the Company in respect of settlement or collection of the Award.  Crystallex cannot determine which amounts are available to creditors until the Tax Reports  have been finalized and the appropriate clearance certificates or assurances have been received.

## H.    Extension of the Stay

29.        As described above, the current Stay Period expires on October 31, 2018. Crystallex seeks an extension of the Stay Period until May 6, 2019 in order to allow Venezuela to fulfill its obligations under the Amended Settlement Agreement and to permit Crystallex sufficient time to materially advance the matters set out above in paragraph 25.

30.        Crystallex believes that a six month Stay Period is reasonable in the circumstances as the Company has made significant progress with Venezuela but still

has a number of important threshold matters that must be addressed. After discussions with the Monitor the Company has decided to seek an extension of the Stay Period entirely consistent with the last Stay Period of six months. The Company understands that the Monitor supports the requested Stay Period and intends to provide such reports as it deems appropriate to the Service List during the term of the Stay Period to provide updates, as appropriate, in respect of these proceedings and, in particular, the status of the Initial Payment, the Temporary Stay Period, and other terms of the Amended Settlement Agreement.

31.     The requested extension of the Stay Period is a condition precedent to the effectiveness of the Tenth Credit Agreement Amendment (defined below) which agreement, among other things, extends the maturity date of the obligations owing thereunder, and will facilitate the Company's primary goal of maximizing recovery for all of its stakeholders.

32.     I believe that Crystallex has acted, and continues to act, in good faith and with due diligence and will continue to do so during the proposed Stay Period extension, if such extension is granted by the Court.

33.     In the circumstances, Crystallex requests that the Stay Period be extended to May 6, 2019 and does not believe that any stakeholder would be materially prejudiced if the Stay Period was so extended.

I.    **DIP Credit Agreement Maturity Extension and Amendment**

34.        Crystallex is party to a financing agreement dated as of April 23, 2012 (as amended, the "**DIP Credit Agreement**") with Luxembourg Investment Company 31 S.à.r.l. (the "**DIP Lender**").

35.        On April 16, 2012, Mr. Justice Newbould made an Order granting: (i) a charge on the property of Crystallex to secure all obligations under the DIP Credit Agreement and related documents (the "**DIP Charge**"); and (ii) a charge on the property of Crystallex to secure certain compensation payable to the DIP Lender under the DIP Credit Agreement (the "**Lender Additional Compensation Charge**").

36.        The DIP Credit Agreement provides that the DIP Lender may unilaterally extend the Maturity Date (as defined therein) in its sole discretion.

37.        The Maturity Date under the DIP Credit Agreement is currently October 31, 2018, or the expiry of the Stay Period, if earlier.

38.        In light of the impending Maturity Date under the DIP Credit Agreement, the parties intend to enter into an agreement, subject to Court approval, on the terms of a further extension and amendment to the DIP Credit Agreement (called the "**Tenth Credit Agreement Amendment**"), which will provide Crystallex with an extension of the Maturity Date until May 6, 2019 or the expiry of the Stay Period, if earlier, in substantially the form of agreement attached as **Exhibit "A"** to my Affidavit.

39.        The effectiveness of the Tenth Credit Agreement Amendment is conditional upon, among other things: (i) the entry of an order: (a) extending the Stay

Period to May 6, 2019, without any conditions to such approval; and (b) approving the Tenth Credit Agreement Amendment and authorizing Crystallex to enter into the Tenth Credit Agreement Amendment and perform all of its obligations thereunder; and (ii) no motion, action, application or any other form of court process seeking an order has been filed, threatened in writing or pending that could be reasonably expected to, among other things: (a) adversely impair the DIP Lender's rights under the DIP Credit Agreement, orders made in connection therewith, or any other order or endorsement of this Court or the US Bankruptcy Court; or (b) interfere with Crystallex's efforts to monetize the Award or collect under the Amended Settlement Agreement.

40.      Crystallex believes the terms of the Tenth Credit Agreement Amendment are fair, reasonable, and appropriate. The Tenth Credit Agreement Amendment and the extension of the Maturity Date and continued availability of the DIP facility will allow Crystallex, with the continued support of the DIP Lender, to implement the Amended Settlement Agreement and to properly address each of the threshold matters described herein.

41.      Further, the DIP Lender has agreed to again extend the impending Maturity Date without requiring the payment of any extension or amendment fee, which Crystallex believes is a material concession that will benefit all stakeholders.

**J.      Appointment of Claims Officer**

42.      On November 30, 2012, this Court made a claims procedure order (the "**Claims Procedure Order**") in respect of this matter, which is attached as **Exhibit "B"** to my Affidavit.  The Claims Procedure Order establishes a claim procedure for, among

other things, pre-filing claims against the Company and its directors and officers (the **"Claims Procedure"**). The claims of the holders of the Notes are explicitly excluded from the Claims Procedure. Instead, the claims of the holders of the Notes are dealt with in the Stay Extension and Standstill Order made June 5, 2013 and amendments thereto.

43.        The Claims Procedure Order at paragraph 35, authorizes Crystallex, with the consent of the Monitor and an order of the Court to appoint a claims officer. Crystallex has selected, and the Honourable Frank Newbould has agreed, to act as the claims officer in respect of the Claims Procedure. The Monitor has agreed with this selection.

44.        The Company will not commence the adjudication of any disputed unsecured claims unless it is apparent that there will be a distribution to unsecured creditors. The Company will be in a better position to assess this as further payments under the Amended Settlement Agreement are received and the Tax Reports and related clearances and assurances described above have been completed and obtained.

**K.    Update on Motion by Ad Hoc Equity Committee to Lift Stay and Motion to Dismiss**

45.        On March 28, 2018, this Court dismissed a motion by the Ad Hoc Equity Committee for an order lifting the stay of proceedings to, among other things, commence an action that alleged oppression and breach of the criminal interest rate provisions of the *Criminal Code*. The Ad Hoc Equity Committee also sought to vary a number of DIP financing orders that had been approved by this Court. Attached as

**Exhibit "C"** is the endorsement of Mr. Justice Hainey made May 22, 2018 dismissing the motion of the Ad Hoc Equity Committee.

46.        The Ad Hoc Equity Committee sought leave to the Ontario Court of Appeal to appeal the May 22, 2018 decision of Mr. Justice Hainey.  On September 25, 2018, the Ontario Court of Appeal dismissed the Ad Hoc Equity Committee's motion for leave to appeal.

**L.      Crystallex's Cash Flow Forecasts**

47.        The Company's cash flow forecasts in connection with this motion have been filed separately and will be subject to the protective order, if granted. The Company's disbursements during the proposed Stay Period relate almost entirely to professional fees, including for the Company's efforts to implement the Amended Settlement Agreement and related enforcement initiatives, and to address the threshold matters described in paragraph 25.

**M.      Request for a Protective Order**

48.        As part of this Motion, Crystallex is requesting that the following materials be filed under a protective order:

> (a)      the unredacted motion record of the Company, including the unredacted version of this Affidavit and the unredacted version of the notice of motion; and

> (b)      the unredacted version of the Monitor's Twenty-Eighth Report.

49.      The Amended Settlement Agreement contains strict confidentiality requirements. These include restrictions on disclosure of the negotiations that led to the Amended Settlement Agreement as well as the terms of settlement themselves. ███

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████ As described above, the Amended Settlement Agreement has been filed under seal and

██████████████████████████████████████████████████████████████████

██████████████████████████████████

50.      Pursuant to the Order of the Court approving the Amended Settlement Agreement, once the Initial Payment has been received in full, the Monitor will issue the Certificate to that effect, along with a further or supplementary Monitor's Report disclosing the fact of the Amended Settlement Agreement and describing those provisions of the agreement that can be made public without the potential for any adverse impact on the Company or the Amended Settlement Agreement.

51.      This Affidavit, the notice of motion and the redacted portions of the Monitor's Twenty-Eighth Report also set out certain key information regarding the Company's financial position.  The disclosure of details of the Company's banking information, expenses and budgets could be detrimental to its ability to ensure the terms of the Amended Settlement Agreement are fulfilled. In addition, if it becomes necessary

for Crystallex to revisit its enforcement and recovery strategies in relation to the Award, public knowledge of the Company's financial circumstances could undermine its enforcement efforts. It remains critical that the Venezuelan government and any party that may have a competing claim against the Venezuelan government or interests adverse to Crystallex as it relates to Venezuela, not be given access to information concerning the Company's ███████████████████████████████████ or relating to Crystallex's realization and enforcement efforts as it relates to the Award and Amended Settlement Agreement.

52.      Crystallex continues to remain concerned that if Venezuela or such other third parties have access to this information, they might use it for strategic purposes to the detriment of Crystallex and its stakeholders.

SWORN BEFORE ME at the City of        )
Toronto, in the Province of Ontario,   )
this     day of October, 2018.         )
                                       )
                                       )     ROBERT FUNG
Commissioner for taking Affidavits

Megan Anne Moniz, a Commissioner, etc.,
Province of Ontario, while a Student-at-Law.
Expires March 22, 2019.

IN THE MATTER OF  a Plan of Compromise or Arrangement of Crystallex International Corporation

| Crystallex International Corporation | Applicant | Commercial List File No: CV-11-9532-00CL |

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(Commercial List)**

Proceeding commenced at Toronto

**AFFIDAVIT OF ROBERT FUNG**
**(Sworn October 23, 2018)**

DAVIES WARD PHILLIPS & VINEBERG LLP
155 Wellington Street West
Toronto, ON   M5V 3J7

Robin B. Schwill (LSO #38452I)
    Tel:    416.863.5502
            rschwill@dwpv.com

Natalie Renner  (LSO #55954A)
    Tel:    416.367.7489
            nrenner@dwpv.com

Fax:    416.863.0871

Lawyers for the Applicant

## EXHIBIT A-6

**Affidavit of Robert Fung Dated April 23, 2019 [Docket No. 283-5]**

CONFIDENTIAL

Court File No. CV-11-9532-00CL

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### (Commercial List)

**IN THE MATTER OF** the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C- 36 as amended

**AND IN THE MATTER OF** a Plan of Compromise or Arrangement of Crystallex International Corporation

### CRYSTALLEX INTERNATIONAL CORPORATION

Applicant

### AFFIDAVIT OF ROBERT FUNG
### Sworn April 23, 2019

I, Robert Fung, of the City of Toronto, in the Province of Ontario, **MAKE OATH AND SAY:**

1.          I am the Chairman and CEO of Crystallex International Corporation ("**Crystallex**" or the "**Company**").  I have also been a director of Crystallex since 1996, Chairman of the Board of Directors of Crystallex since 1998 and CEO since June 2008.  As such, I have knowledge of the matters to which I hereinafter depose, which knowledge is either personal to me, obtained from a review of the documents to which I refer, or, where indicated, based on information and belief, in which case I verily believe such information to be true.

## A.      Overview and Background

2.          This Affidavit is sworn in support of a motion by Crystallex for an Order, among other things:

- 2 -

(a)    extending the Stay Period as defined in the Initial Order (as defined below) until November 6, 2019;

(b)    approving Crystallex entering into the Eleventh Credit Agreement Amendment (as defined below) and approving the terms of such agreement including the extension of the maturity of Crystallex's obligations under the DIP Credit Agreement (as defined below);

(c)    that the DIP Charge (as defined below) and the Lender Additional Compensation Charge (as defined below) shall secure all obligations under the DIP Credit Agreement as amended by the Eleventh Credit Agreement Amendment; and

(d)    that certain un-redacted materials in connection with this motion be filed under a protective order and not form any part of the public record in this proceeding.

3.        On December 23, 2011, an order (the "**Initial Order**") was made granting Crystallex protection from its creditors under the *Companies' Creditors Arrangement Act* (the "**CCAA Proceeding**").  Pursuant to the Initial Order, Ernst & Young Inc. was appointed as the monitor (the "**Monitor**").  Crystallex subsequently obtained an order of the United States Bankruptcy Court (the "**US Bankruptcy Court**") for the District of Delaware on December 28, 2011, recognizing this CCAA Proceeding as a foreign main proceeding.

4.        The Initial Order granted a stay of proceedings against Crystallex and its directors and officers during the Stay Period, which was most recently extended by Order of the Court on October 29, 2018 until May 6, 2019.

5.        Crystallex previously engaged in the business of exploring and developing the Las Cristinas gold project in Venezuela until 2011 when the Venezuelan government

expropriated the mine and purported to terminate the mining operation contract that gave rise to the Company's rights.

6.         The Company arbitrated the matter before an arbitral tribunal under the Additional Facility of International Centre for the Settlement of Investment Disputes of the World Bank (the "**ICSID**") against Venezuela.   On April 4, 2016, after five years of arbitration, the tribunal released its decision and final award, ruling that Venezuela was obliged to pay damages to Crystallex in the amount of US$1.202 billion, plus interest (the "**Award**").   The Award was the single largest ICSID award ever issued at the time.

**B.    Crystallex's Efforts with Respect to the Award**

7.         As described in previous Affidavits filed in this CCAA Proceeding and in the reports of the Monitor, Crystallex, with the assistance of the Monitor, developed and implemented a dual-track strategy for enforcement of the Award, while concurrently pursuing a negotiated resolution with Venezuela.   This section summarizes the status of the three primary initiatives in this regard:

> (i)      the pursuit of recognition and enforcement of the Award against Venezuela in the United States;

> (ii)     the extension of enforcement efforts against Venezuela to its national oil company, Petroleos de Venezuela, S.A. ("**PDVSA**"); and

> (iii)    the pursuit of a negotiated settlement with Venezuela.

- 4 -

### (i)    Recognition and Enforcement of the Award

8.        On March 25, 2017, the United States Federal Court for the District of Columbia (the "**D.C. Court**") confirmed the Award and on April 7, 2017 a formal judgment was entered in Crystallex's favour in the amount of approximately U.S.$1.4 billion (the "**Judgment**").

9.        Venezuela appealed the Judgment to the District of Columbia Circuit Court of Appeal (the "**D.C. Circuit**").  On February 14, 2019, the D.C. Circuit denied Venezuela's appeal, and the Judgment remains in full force and effect.  As of the date of the swearing of this Affidavit, Venezuela has taken no steps to request a further appeal to the United States Supreme Court, although those rights have not yet expired, and may be extended.

### (ii)    Enforcement of Judgment against PDVSA

10.        In June 2017, Crystallex registered the Judgment in the United States District Court for the District of Delaware (the "**Delaware Court**") and thereafter brought a motion seeking to execute the Judgment against PDVSA's shares in its U.S. subsidiary PDV Holding, Inc. ("**PDVH**"), which in turn holds the shares in the holding company, CITGO Holding Inc. ("**CITGO Holding**"), which in turn owns 100% of the American oil company, CITGO Petroleum Corp. ("**CITGO**").  The motion was brought on the grounds that PDVSA is the alter ego of Venezuela, and as such its shares in PDVH ought to be treated as assets of Venezuela (the "**Alter Ego Claim**").

11.        Venezuela did not respond to the motion, although PDVSA was permitted to intervene and opposed any finding that it was the alter ego of Venezuela.

12.        After substantial further proceedings, on August 9 and 23, 2018, the Delaware Court issued orders (collectively, the "**Delaware Order**") in the Alter Ego Claim authorizing the attachment of the shares of PDVH (the "**Writ of Attachment**") pursuant to the Judgment.

- 5 -

13.        PDVSA filed three appeals of the Delaware Order and the Writ of Attachment with the United States Court of Appeals for the Third Circuit (the "**Third Circuit**", and the "**Third Circuit Appeal**").

14.        Venezuela, by counsel acting on instructions from the Guaido Government (as described below), was granted leave to intervene in the Third Circuit Appeal, and sought a 120 day stay of proceedings.

15.        The Third Circuit Appeal was argued before the Third Circuit on April 15, 2019. At the time of the swearing of this Affidavit, the Third Circuit's decision remains under reserve. I understand that the decision will not likely be delivered for several months. Regardless of the decision, it is open to the losing party to seek a rehearing in the Third Circuit, or take steps to apply for leave to appeal to the United States Supreme Court.

**(iii)    Settlement with Venezuela**

16.        As described in my previous Affidavits filed in this CCAA Proceeding, in November 2017, Crystallex concluded a settlement agreement with Venezuela (the "**Settlement Agreement**") of all of the outstanding issues between the parties, which Settlement Agreement was approved by Order of this Court on November 24, 2017. While Crystallex received certain payments under the Settlement Agreement, the terms of that agreement were not fulfilled by Venezuela.

17.        As a result of Crystallex's success in enforcement initiatives, which included the Writ of Attachment described above, the Company and Venezuela engaged in further efforts to negotiate an amendment to the Settlement Agreement. As a result of these efforts, the parties reached an Amended and Restated Settlement Agreement dated September 10, 2018 (the

"**Amended Settlement Agreement**"), which was approved by this Court on September 17, 2018.

18.        Pursuant to the Amended Settlement Agreement, Venezuela agreed to make an initial payment in cash or securities with a market value equal to $425,000,000 (the "**Initial Payment**"). The Initial Payment was received over the course of September through November 2018, and was finally received in full by November 23, 2018. No further payments under the Amended Settlement Agreement have been received.

19.        Under the Amended Settlement Agreement, following the making of the Initial Payment, and by January 10, 2019, Venezuela was required to, among other things:

(a)        provide Crystallex with a secured promissory note (the "**Settlement Note**") and related documentation, which were to:

(i)        evidence its obligations with respect to payment of the remaining balance of the Award after application of the Initial Payment (the "**Deferred Settlement Amount**"); and

(ii)        provide for payment of the Deferred Settlement Amount in installments over two and a half years, commencing in February 2019; and

(b)        provide Crystallex with first-priority perfected liens (the "**Liens**") on acceptable liquid collateral having a market value of 120% of the Deferred Settlement Amount to secure the payment of the obligations as evidenced by the Settlement Note.

20.        Venezuela failed to provide the Settlement Note and Liens and remains in breach of those, and other, terms of the Amended Settlement Agreement. Accordingly, Crystallex has

continued to take steps in furtherance of the enforcement of the Writ of Attachment and other remedies, including moving to expedite arguments of the Third Circuit Appeal.

21.         Pursuant to the terms of the Order approving the Amended Settlement Agreement (the "**Approval Order**"), the Amended Settlement Agreement was filed under a protective order with the Court and the Approval Order remained sealed until the Monitor filed with the Court a certificate (the "**Certificate**") confirming that the Applicant has received the full amount of the Initial Payment under the Amended Settlement Agreement.  I am advised by my counsel, Davies Ward Phillips & Vineberg LLP ("**Davies**"), that the Certificate was filed on or about November 23, 2018 and the service list was provided with a copy of the Approval Order on November 27, 2018.  The Amended Settlement Agreement remained under the protective order.

22.         Subsequently, however, in December 2018, without notice to or the consent of the Company, PDVSA filed materials with the Third Circuit in the public file that included an unredacted copy of a version of the Amended Settlement Agreement.  As a result, on January 14, 2019, on application by the Monitor, the Court made an Order lifting the protective order with respect to the Amended Settlement Agreement.  I am advised by the Monitor that the Amended Settlement Agreement has been published and available on the Monitor's website since January 15, 2019.

**C.    Recent Events Relevant to the Company and the Award**

23.         Since the approval of the Amended Settlement Agreement and the receipt of the Initial Payment, there have been a number of events which have created significant uncertainty and may impact the ability of Crystallex to monetize the Award.  These include:

(a)    PDVSA refused to agree to stay the Third Circuit Appeal, as required by the Amended Settlement Agreement following the making of the Initial Payment; as described above, in response, Crystallex continued its enforcement efforts;

(b)    As noted above on January 10, 2019, Venezuela failed to deliver the Settlement Note and the Liens as required under the Amended Settlement Agreement;

(c)    PDVSA and Venezuela have asserted that the Amended Settlement Agreement approved by this Court was not the operative version of the agreement, raised questions about the effectiveness and enforceability of the Court-approved version of that agreement and reserved their rights with respect to the Initial Payment.   Under the terms of the Amended Settlement Agreement, if these questions are ultimately litigated, they may only be resolved by the courts of New York;

(d)    On January 23, 2019, Juan Guaido, President of the National Assembly of Venezuela, declared himself the acting president of Venezuela (the "**Guaido Government**") in a direct challenge to the power of President Nicolas Maduro, who had been sworn into a second six-year term in office in the beginning of January 2019 (the "**Maduro Government**").  This raises a continuing question of who constitutes the legitimate government of that country and who may act on behalf of Venezuela;

(e)    Commencing January 2019, the United States Department of Treasury and the Office of Foreign Assets Control ("**OFAC**") expanded the existing sanctions against Venezuela (the "**Sanctions**"). ███ ████████

████████████████████████████████████████

████████████████████████████████████

(f)     PDVSA has taken the position that the Sanctions affect the ability of the Company to continue with its execution against Venezuelan assets, and in particular, the shares of PDVH pursuant to the Writ of Attachment;

(g)     On February 13, 2019, the Guaido Government announced replacements to the Boards of PDVSA, PDVH, CITGO, and CITGO Petroleum Corp., immediately creating uncertainty as to who was able to act and give instructions on behalf of those entities; and

(h)     As described above, the Company is awaiting a decision of the Third Circuit on the Third Circuit Appeal.  Until the appeal and any subsequent proceedings in the Delaware Court have dispensed with, Crystallex cannot execute on the Writ of Attachment.

24.        Notwithstanding these impediments to monetization, in continuing pursuit of the previously-described dual-track strategy with respect to the Award, Crystallex continues to pursue the possibility ███████████████████████████████████████ ████████████████████

**D.      Priorities and Necessary Next Steps**

**(i)       Immediate Priorities**

25.        Since the last stay extension in this matter, and as described above, there have been numerous developments which have created significant risk and uncertainty for the Company.  Crystallex must remain completely focused on continuing with its enforcement

strategy to retain and maximize stakeholder value, while concurrently pursuing the possibility of a negotiated settlement. It would be an understatement to say that responding to these various developments while maintaining the dual-track strategy has been all-consuming for the Company and its advisors. In this current environment, Crystallex has identified the priorities which it will be pursuing during the requested extension of the Stay Period. These are summarized in the following paragraphs.

26.         First, the Judgment must be maintained. While the D.C. Circuit denied the appeal of Venezuela with respect to the Judgment, as described above, the possibility of a further appeal to the United States Supreme Court has not yet been foreclosed. The Judgment underpins the Writ of Attachment and all of the Company's enforcement efforts in the United States.

27.         Second, the Writ of Attachment must also be upheld. The decision of the Third Circuit on the appeal of the Writ of Attachment is under reserve. The decision, when rendered, could be subject to further rehearing or appeal proceedings. ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████

28.         Third, any adverse impacts of the Sanctions against Venezuela on Crystallex' ability to enforce and monetize the Award must be addressed. I ██████████████████

████████████████████████████████████████████

████████████████████████████████████. I am further advised by counsel that Venezuela and PDVSA have taken the position that not only do the Sanctions currently impair the ability to monetize the securities received from Venezuela as part of the Initial Payment, ████████████████████████████



29.        Finally, ███████████████████████████████████████
████████████████████████████████████d, the Company must undertake the monetization of the Initial Payment and further undertake and maximize the monetization of PDVSA's interest in CITGO.  Each of these may be extremely complicated processes but will generate significant returns for Crystallex and its stakeholders.

   **(ii)    Waterfall and Taxes**

30.        Given the above, and absent resolution of those issues, no distributions to creditors is currently possible.  Despite this, Crystallex has been working on threshold issues specifically relating to distributions in the anticipation that it will be able to resolve these matters.

31.        As described in my Affidavit sworn April 4, 2019 ("**April 4 Affidavit**"), under the waterfall (the "**Waterfall**") provisions approved by the Court in the credit agreement (as amended, the "**DIP Credit Agreement**") dated as of April 23, 2012 between Crystallex and Tenor Special Situation Fund I, LLC and ultimately assigned to Luxembourg Investment Company 31 S.à.r.l. (the "**DIP Lender**"), Crystallex is required to apply and distribute any proceeds received from or on account of the Award in a specified sequence.

32.        The second distribution step in the Waterfall requires Crystallex "to pay any taxes, payable or required to be withheld by the Borrower or by any government in respect of the settlement, judgment or collection in relation to the Arbitration Proceeding...".  The steps that the Company is taking to address this distribution step are summarized in paragraphs 14 through 17 of my April 4 Affidavit.

33.        As described in my April 4 Affidavit, Crystallex has engaged highly qualified tax professionals to prepare certain tax reports pursuant to the DIP Credit Agreement (the "**Tax Reports**"), and, as well, the information and documentation underlying and supporting the preparation of the Tax Reports.  That work is ongoing.  Completion of that work has been delayed by the uncertainties respecting enforcement and monetization of the Award described herein, which may affect the treatment of any proceeds for tax purposes.

### E.    Update on Stakeholder Matters

34.        In my Affidavit sworn October 23, 2018, I described the steps Crystallex had taken and would be taking to provide key case updates to key stakeholders and their counsel, as appropriate.  The Company has continued to update its key stakeholders and their counsel, as appropriate, as more particularly described below.

35.        On November 19, 2018, prior to receipt of the full Initial Payment, Crystallex held in-person restricted (confidential) and unrestricted (public) meetings with counsel for the DIP Lender, counsel for the trustee (the "**Trustee**") of the Company's Senior 9.375% Unsecured Notes due December 23, 2011 and to the ad hoc noteholder committee (the "**Noteholder Committee**") and counsel for the ad hoc committee of the shareholders of Crystallex (the "**Ad Hoc Equity Committee**") for the purpose of providing them an update on the Amended Settlement Agreement and the threshold matters that needed to be addressed to allow for distributions to the Company's creditors.

36.        On two separate occasions in January and February 2019, the Company arranged for its U.S. enforcement and sanctions counsel to provide updates to counsel to the DIP Lender and counsel to the Trustee and Noteholder Committee.  The calls provided updates on, among other things, the status of the Third Circuit Appeal, the DC Circuit Appeal, and the Sanctions.

37.        Further, counsel to the Company, DIP Lender and Monitor, separately and together have engaged with counsel to the Trustee and Noteholder Committee on a number of occasions to discuss issues relating to this CCAA Proceeding.  The Monitor has proposed a mediation (the **"Mediation"**) among the Company and these stakeholders to address such issues.  As of the date of this Affidavit, steps are being taken co-operatively, led by the Monitor, to plan for and schedule the Mediation.  It is anticipated that the Mediation will take place before the Honourable Robert Blair over the course of May and June 2019.

## F.    Extension of the Stay

38.        As described above, the current Stay Period expires on May 6, 2019.  Crystallex seeks an extension of the Stay Period until November 6, 2019 to allow the Company to focus on its enforcement and negotiation efforts while also dealing with an uncertain and volatile situation in Venezuela.

39.        The Company has made significant progress to date monetizing the Award but there are still critical matters that remain unresolved.  Given the significant political upheaval in Venezuela, it is critical that the Company's dual-track strategy of enforcement and negotiation continues unabated for the benefit of all of the Company's stakeholders.

40.         Crystallex believes that a six month Stay Period is reasonable in the circumstances as it will provide the Company with time to continue to pursue the enforcement and monetization of the Award, allow for the political situation in Venezuela to unfold, and address the issues summarized above.  After discussions with the Monitor the Company has decided to seek an extension of the Stay Period entirely consistent with the last extension of the Stay Period of six months.

41.         The Company will continue to work with the Monitor and its principal stakeholder groups during the Stay Period to respond to information requests or provide updates, as may be appropriate, during the requested Stay Period.

42.         The requested extension of the Stay Period is a condition precedent to the effectiveness of the Eleventh Credit Agreement Amendment (defined below) which agreement, among other things, extends the maturity date of the obligations owing thereunder, and will facilitate the Company's primary goal of maximizing recovery for all of its stakeholders.

43.         I believe that Crystallex has acted, and continues to act, in good faith and with due diligence and will continue to do so during the proposed Stay Period extension, if such extension is granted by the Court.

44.         In the circumstances, Crystallex requests that the Stay Period be extended to November 6, 2019 and does not believe that any stakeholder would be materially prejudiced if the Stay Period was so extended.

**G.    DIP Credit Agreement Maturity Extension and Amendment**

45.         As mentioned above, Crystallex is party to the DIP Credit Agreement.

46.         On April 16, 2012, Mr. Justice Newbould made an Order granting: (i) a charge on the property of Crystallex to secure all obligations under the DIP Credit Agreement and related documents (the "**DIP Charge**"); and (ii) a charge on the property of Crystallex to secure certain compensation payable to the DIP Lender under the DIP Credit Agreement (the "**Lender Additional Compensation Charge**").

47.         The DIP Credit Agreement provides that the DIP Lender may unilaterally extend the Maturity Date (as defined therein) in its sole discretion.

48.         The Maturity Date under the DIP Credit Agreement is currently May 6, 2019, or the expiry of the Stay Period, if earlier.

49.         In light of the impending Maturity Date under the DIP Credit Agreement, the parties intend to enter into an agreement, subject to Court approval, on the terms of a further extension and amendment to the DIP Credit Agreement (called the "**Eleventh Credit Agreement Amendment**"), in substantially the form of agreement attached as **Exhibit "A"** to my Affidavit.  The material terms of the Eleventh Credit Agreement Amendment include:

(a)      extension of the Maturity Date until November 6, 2019 or the expiry of the Stay Period, if earlier;

(b)      revising the affirmative covenants to reflect the importance of the Company following the advice of its sanctions counsel to avoid any potential liabilities;

(c)      adding an event of default in the case of a loss of legal privilege by the Company that would adversely affect the DIP Lender; and

(d)      waiver by the DIP Lender of any extension or amendment fees.

50.          The effectiveness of the Eleventh Credit Agreement Amendment is conditional upon, among other things: (i) the entry of an order: (a) extending the Stay Period to November 6, 2019, without any conditions to such approval; and (b) approving the Eleventh Credit Agreement Amendment and authorizing Crystallex to enter into the Eleventh Credit Agreement Amendment and perform all of its obligations thereunder; and (ii) no motion, action, application or any other form of court process seeking an order has been filed, threatened in writing or pending that could be reasonably expected to, among other things: (a) adversely impair the DIP Lender's rights under the DIP Credit Agreement, orders made in connection therewith, or any other order or endorsement of this Court or the US Bankruptcy Court; or (b) interfere with Crystallex's efforts to monetize the Award or collect under the Amended Settlement Agreement.

51.          Crystallex believes the terms of the Eleventh Credit Agreement Amendment are fair, reasonable, and appropriate.  The Eleventh Credit Agreement Amendment and the extension of the Maturity Date and continued availability of the DIP facility will allow Crystallex, with the continued support of the DIP Lender, to continue to monetize the Award via its dual-track strategy and to properly address each of the threshold matters described herein.

52.          Further, the DIP Lender has agreed to again extend the impending Maturity Date without requiring the payment of any extension or amendment fee, which Crystallex believes is a material concession that will benefit all stakeholders.

## H.    Crystallex's Cash Flow Forecasts

53.          The Company's cash flow forecasts in connection with this motion have been filed separately and will be subject to a protective order, if granted.  The cash flow forecasts show that the Company will have sufficient funds to meet its projected liquidity requirements throughout the requested Stay Period Extension.  The Company's disbursements during the proposed Stay Period relate almost entirely to professional fees, including for the Company's

strategic initiatives related to asset preservation and enforcement and collection strategies in connection with the Award and its monetization and enforcement, and to address the threshold tax matters described above.

**I.    Request for a Protective Order**

54.        As part of this Motion, Crystallex is requesting that the following materials be filed under a protective order:

(a)    the unredacted motion record of the Company, including the unredacted version of this Affidavit and the unredacted version of the notice of motion; and

(b)    the unredacted version of the Monitor's Thirty-First Report,

(collectively, the "**Confidential Materials**").

55.        The Confidential Materials disclose certain key information regarding the Company's enforcement and monetization strategy.  For instance, the amount and nature of the securities provided by Venezuela as part of the Initial Payment is not publicly known. ████

56.          The Confidential Materials also set out key information regarding the Company's financial position.  The disclosure of details of the Company's banking information, expenses and budgets could be detrimental to its ability to pursue its enforcement and recovery strategies in relation to the. Award because public knowledge of the Company's financial circumstances could undermine its enforcement efforts.  It remains critical that the Venezuelan government and any party that may have a competing claim against the Venezuelan government or interests adverse to Crystallex as it relates to Venezuela, not be given access to information concerning the Company's ███████████ or ███████████ and expenses or relating to Crystallex's realization and enforcement efforts as it relates to the Award.  Crystallex continues to remain concerned that if Venezuela or such other third parties have access to the Confidential Information, they might use it for strategic purposes to the detriment of Crystallex and its stakeholders.

SWORN BEFORE ME at the City of        )
Toronto, in the Province of Ontario,   )
this 23 day of April, 2019.            )
                                       )
                                       )
~~~~~~~~~~~~~~~~~~
Commissioner for taking Affidavits

Natalie Renner

ROBERT FUNG

## <u>EXHIBIT A-7</u>

**Affidavit of Robert Fung Dated October 25, 2019 [Docket No. 298-5]**

|Court File No. CV-11-9532-00CL

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### (Commercial List)

**IN THE MATTER OF** the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C- 36 as amended

**AND IN THE MATTER OF** a Plan of Compromise or Arrangement of Crystallex International Corporation

### CRYSTALLEX INTERNATIONAL CORPORATION

Applicant

### AFFIDAVIT OF ROBERT FUNG
### Sworn October 25, 2019

I, Robert Fung, of the City of Toronto, in the Province of Ontario, **MAKE OATH AND SAY:**

1.          I am the Chairman and CEO of Crystallex International Corporation ("**Crystallex**" or the "**Company**").  I have also been a director of Crystallex since 1996, Chairman of the Board of Directors of Crystallex since 1998 and CEO since June 2008. As such, I have knowledge of the matters to which I hereinafter depose, which knowledge is either personal to me, obtained from a review of the documents to which I refer, or, where indicated, based on information and belief, in which case I verily believe such information to be true.

**A.    Overview**

2.        This Affidavit is sworn in support of a motion by Crystallex for an Order, among other things:

(a)    extending the Stay Period as defined in the Initial Order (as defined below) until May 6, 2020;

(b)    approving Crystallex entering into the Twelfth Credit Agreement Amendment (as defined below) and approving the terms of such agreement including the extension of the maturity of Crystallex's obligations under the DIP Credit Agreement (as defined below);

(c)    that the DIP Charge (as defined below) and the Lender Additional Compensation Charge (as defined below) shall secure all obligations under the DIP Credit Agreement as amended by the Twelfth Credit Agreement Amendment; and

(d)    that certain un-redacted materials in connection with this motion be filed under a protective order and not form any part of the public record in this proceeding.

3.        On December 23, 2011, an order (the "**Initial Order**") was made granting Crystallex protection from its creditors under the *Companies' Creditors Arrangement Act* (the "**CCAA Proceeding**").    Pursuant to the Initial Order, Ernst & Young Inc. was appointed as the monitor (the "**Monitor**").  Crystallex subsequently obtained an order of the United States Bankruptcy Court (the "**US Bankruptcy Court**") for the District of

Delaware on December 28, 2011, recognizing this CCAA Proceeding as a foreign main proceeding.

4.       The Initial Order granted a stay of proceedings against Crystallex and its directors and officers during the Stay Period, which was most recently extended by Order of the Court on May 3, 2019 until November 6, 2019.

5.       Crystallex has been operating in good faith and with all due diligence to monetize the Award (as defined below) and to resolve various stakeholder issues through a court-approved mediation.  With all of the progress and the ongoing efforts that are detailed below, it is appropriate to grant the requested extension of the Stay Period, and accompanying relief.

6.       Crystallex previously engaged in the business of exploring and developing the Las Cristinas gold project in Venezuela until 2011 when the Venezuelan government expropriated the mine and purported to terminate the mining operation contract that gave rise to the Company's rights.

7.       The Company arbitrated the matter before an arbitral tribunal under the Additional Facility of International Centre for the Settlement of Investment Disputes of the World Bank (the "**ICSID**") against Venezuela.  On April 4, 2016, after five years of arbitration, the tribunal released its decision and final award, ruling that Venezuela was obliged to pay damages to Crystallex in the amount of US$1.202 billion, plus interest (the "**Award**").  The Award was the single largest ICSID award ever issued at the time.

- 4 -

**B.**    **Crystallex's Efforts with Respect to the Award**

8.        As described in previous Affidavits filed in this CCAA Proceeding and in the reports of the Monitor, Crystallex, with the assistance of the Monitor, developed and implemented a dual-track strategy for enforcement of the Award, while concurrently pursuing a negotiated resolution with Venezuela.  This section will provide an update on the three primary initiatives in this regard:

(i)    the pursuit of recognition and enforcement of the Award against Venezuela in the United States;

(ii)    the extension of enforcement efforts against Venezuela to its national oil company, Petroleos de Venezuela, S.A. ("**PDVSA**"); and

(iii)    the settlement with Venezuela.

**(i)**    **Recognition and Enforcement of the Award**

9.        On March 25, 2017, the United States Federal Court for the District of Columbia (the "**D.C. Court**") confirmed the Award and on April 7, 2017 a formal judgment was entered in Crystallex's favour in the amount of approximately U.S.$1.4 billion (the "**Judgment**").

10.        Venezuela appealed the Judgment to the District of Columbia Circuit Court of Appeal (the "**D.C. Circuit**").  On February 14, 2019, the D.C. Circuit denied Venezuela's appeal, and the Judgment remained in full force and effect.  Venezuela did not take any steps to request review by the United States Supreme Court and the period to do so has now expired.  As a result, the Judgment is now final and binding in the United States.  This represents a significant victory for the Company because the

Judgment underpins the Writ of Attachment (as defined below) and is the basis for all of the Company's enforcement efforts in the United States.

**(ii)    Enforcement of Judgment against PDVSA**

11.        In June 2017, Crystallex registered the Judgment in the United States District Court for the District of Delaware (the "**Delaware Court**") and thereafter brought a motion seeking to execute the Judgment against PDVSA's shares in its U.S. subsidiary PDV Holding, Inc. ("**PDVH**"), which in turn holds the shares in the holding company, CITGO Holding Inc. ("**CITGO Holding**"), which in turn owns 100% of the American oil company, CITGO Petroleum Corp. ("**CITGO**").  The motion was brought on the grounds that PDVSA is the alter ego of Venezuela, and as such its shares in PDVH (the "**PDVH Shares**") ought to be treated as assets of Venezuela (the "**Alter Ego Claim**").

12.        After substantial further proceedings, on August 9 and 23, 2018, the Delaware Court issued orders (collectively, the "**Delaware Order**") in the Alter Ego Claim holding that PDVSA was indeed the alter ego of Venezuela and authorizing the attachment of the PDVH Shares (the "**Writ of Attachment**") pursuant to the Judgment.

13.        PDVSA which had been permitted to intervene before the Delaware Court, filed three appeals, including a petition for a writ of mandamus, of the Delaware Order and the issuance of the Writ of Attachment with the United States Court of Appeals for the Third Circuit (the "**Third Circuit**", and the "**Third Circuit Appeal**").

14.        The Third Circuit Appeal was argued before the Third Circuit panel on April 15, 2019.  On July 29, 2019, the Third Circuit released its decision (the "**Third**

**Circuit Decision**") whereby it affirmed the Delaware Order finding that PDVSA was an alter ego of Venezuela and authorizing the Writ of Attachment.  Attached to my Affidavit as **Exhibit "A"** is a copy of the Third Circuit Decision.

15.        The Third Circuit Decision is a significant victory for Crystallex and is the product of years of successful strategic planning and litigation by the Company's Board, management and advisors.  The Third Circuit decision also addresses several issues of critical importance to Crystallex in its enforcement efforts against Venezuela, as it: (a) rejected PDVSA's and Venezuela's argument that the Delaware Court lacked jurisdiction over Venezuela and/or PDVSA under the *Foreign Sovereign Immunitites Act*, (b) affirmed the finding that PDVSA was the alter ego of Venezuela, and (c) affirmed that the PDVH Shares are not immune from execution under the *Foreign Sovereign Immunities Act.*

16.        In response to the Third Circuit Decision, Venezuela applied to the Third Circuit for a panel rehearing or rehearing before all the judges of the Third Circuit of the Third Circuit Appeal.  The Company expects the Third Circuit to render a decision on the rehearing request in the near future.  PDVSA and Venezuela have indicated that if their application for a rehearing is unsuccessful, they expect to apply for leave to appeal the Third Circuit Decision to the United States Supreme Court.

        **(iii)    Settlement with Venezuela**

17.        As described in my previous Affidavits filed in this CCAA Proceeding, in November 2017, Crystallex concluded a settlement agreement with Venezuela (the "**Settlement Agreement**") of all of the outstanding issues between the parties, which

was approved by Order of this Court on November 24, 2017.  While Crystallex received certain payments under the Settlement Agreement, the terms of that agreement were not fulfilled by Venezuela.

18.        As a result of Crystallex's success in enforcement initiatives, which included the Writ of Attachment described above, the Company and Venezuela engaged in further efforts to negotiate an amendment to the Settlement Agreement.  As a result of these efforts, the parties reached an Amended and Restated Settlement Agreement dated September 10, 2018 (the "**Amended Settlement Agreement**"), which was approved by this Court on September 17, 2018.

19.        Pursuant to the Amended Settlement Agreement, Venezuela agreed to make an initial payment in securities or cash with a market value equal to $425,000,000 (the "**Initial Payment**").  The Initial Payment was received in securities (the "**Initial Payment Securities**") and cash over the course of September through November 2018, and was finally received in full by November 23, 2018.  No further payments under the Amended Settlement Agreement have been received and Venezuela is in breach of the agreement.  Accordingly, Crystallex has continued to take steps to enforce the Award, which include steps in respect of the Writ of Attachment.

**C.      Recent Events Relevant to the Company and the Award**

20.        Although the Judgment is now final and the Third Circuit has affirmed the Delaware Order, there continue to be a number of factors which create significant uncertainty and may impact the ability of Crystallex to monetize the Award.  These include:

(a)    The effect of sanctions imposed by the U.S. Government;

(b)    The issues surrounding the legitimate government of Venezuela;

(c)    PDVSA's financial circumstances and potentially competing creditors; and

(d)    The continuing pending litigation with Venezuela and PDVSA.

These are discussed in detail in the following paragraphs.

*Sanctions Imposed by the U.S. Government*

21.      Commencing January 2019, the United States Department of Treasury and the Office of Foreign Assets Control ("**OFAC**") expanded the existing sanctions against Venezuela (the "**Sanctions**").  On August 5, 2019, President Trump escalated pressure against the Maduro regime by issuing an executive order (the "**Executive Order**") entitled "Blocking Property of the Government of Venezuela." This Executive Order reaches all property and interests in property of the Government of Venezuela that are subject to the jurisdiction of the United States and further regulates the conduct of any U.S. person with respect to Venezuela's property outside of the United States.  It also authorizes the Secretary of the Treasury, in consultation with the Secretary of State, to impose sanctions on persons who provide support to Nicolas Maduro and his regime.  ██████████████████████████████████████████

██████████████████████████████████████████████

██████████

22.      PDVSA has taken the position that the Sanctions affect the ability of the Company to continue with its execution against Venezuelan assets, and in particular,

the PDVH Shares pursuant to the Writ of Attachment.  The Third Circuit recognized that OFAC would "likely" need to approve any "execution against PDVSA's shares of PDVH". [at p. 43 of the Third Circuit Decision, referencing OFAC guidance].

23.    ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

*Questions Respecting the Legitimate Government of Venezuela*

24.        There continues to be a question of who constitutes the legitimate government of Venezuela and who may act on behalf of that country with respect to any discussions with Crystallex; President Nicolas Maduro or Juan Guaido, the President of the National Assembly who declared himself the acting president of Venezuela on January 23, 2019 (the "**Guaido Government**").  The United Nations, Russia, China, among others, continue to recognize the Maduro regime as the legitimate government of Venezuela, while the United States, Canada, the European Union and more than 50 other governments consider Venezuela's legitimate head of state to be Mr. Guaido. The stalemate between the two competing regimes remains unresolved.  ████████

████████████████████████████████████████████████████████

█████████████████████████████████

*PDVSA's Financial Circumstances*

25. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  As described above, PDVSA through PDVH and CITGO Holding, owns CITGO, the American Oil company.  CITGO represents Venezuela's most valuable overseas asset.  Among other things, CITGO owns three oil refineries in the United States and a pipeline.  According to CITGO, it is the fifth largest oil refiner in the United States, and is of significant strategic value to both the United States and Venezuela.

26.        PDVSA is required to make a US$913 million payment on its bonds due in 2020 (the "**2020 Bonds**") on October 28, 2019 (the "**October Payment**").  The 2020 Bonds are secured by 50.1% of the CITGO Holding shares – the remaining 49.9% has been used to secure loans by Rosneft, a Russian oil company.

27.        The Boards of PDVSA, PDVH, CITGO Holding and CITGO, were replaced by the Guaido Government in February 2019, however, that government does not have operational control over PDVSA, nor does it have access to government finances from PDVSA's non-U.S. oil sales. While the Guaido government controls CITGO, it has stated that CITGO's debt covenants prevent it from using CITGO funds to make the October Payment.  Separately, the Maduro regime has disclaimed any responsibility of PDVSA to make the October Payment.

28.        The U.S. Treasury Department previously granted a license ("**General License 5**") exempting the holders of the 2020 Bonds from the Sanctions that prohibit United States businesses from conducting financial transactions involving Venezuelan

assets. The exemption was put in place to prevent the Maduro regime from citing the Sanctions as a reason not to make payments on the 2020 Bonds.  Under General License 5, the holders of the 2020 Bonds were allowed to realize on the CITGO shares if the October Payment is not made notwithstanding the Sanctions.

29.        It has been reported that in anticipation of a default by PDVSA on the 2020 Bonds as a result of not making the October Payment, the Guaido Government is considering seeking an injunction against MUFG Union Bank, the trustee of the holders of the 2020 Bonds, to prevent them from realizing on the CITGO shares.  The Guaido Government has also asked the U.S. government for an Executive Order to shield CITGO from the 2020 Bondholders, or otherwise lifting the license previously granted to the 2020 Bondholders.

30.        On October 24, 2019, the U.S. Treasury replaced General License 5 with General License 5A ("**General License 5A**").  General License 5A permits the same transactions allowed under the previous General License 5, but now such transactions are not allowed to take place before January 22, 2020.  Consequently, absent a further license from OFAC, the holders of the 2020 Bonds cannot sell or otherwise transfer the CITGO shares in satisfaction of the October Payment until the authorization to do so pursuant to General License 5A becomes effective.  The introduction of General License 5A provides the Guaido Government with 90 days to negotiate an acceptable agreement with the holders of the 2020 Bonds in respect of the October Payment.  For this reason, the Guaido's Government's request for a new Executive Order and potential claim for an immediate injunction appear to be moot.

31.        It is difficult to predict how PDVSA's financial circumstances will be
resolved ████████████████████████████████████████████████████████

████████████████████████████████

*The Stays of Further Proceedings*

32.        On November 23, 2018, the Third Circuit, on its own motion, and without
requesting briefing from Crystallex, issued a stay of further proceedings in the Delaware
Court pending its decision on the Third Circuit Appeal (the "**Third Circuit Stay**").

33.        Pursuant to the Amended Settlement Agreement, Crystallex was required
to seek a stay of further proceedings from the Delaware Court upon receipt of the Initial
Payment.  The Initial Payment was received on November 23, 2018.  Accordingly, on
November 26, 2018, Crystallex requested a stay of further proceedings from the
Delaware Court until January 10, 2019.  On November 30, 2018, the Delaware Court
granted Crystallex's motion and issued a stay of further proceedings (the "**Delaware
Stay**") until the later of two events: the passing of January 10, 2019, or the disposition of
the Third Circuit Appeal.

34.        On August 12, 2019, following the release of the Third Circuit Decision,
Crystallex moved the Third Circuit for an order lifting the Third Circuit Stay.  That motion
was granted on September 30, 2019.  This was a significant achievement for Crystallex
as both the Third Circuit Stay and the Delaware Stay prevent the Company from
pursuing enforcement of the Judgment.  As a result of the Third Circuit's order lifting the
stay, on October 10, 2019, Crystallex requested that the Delaware Court lift the
Delaware Stay, contending that, because Venezuela had breached the terms of the

Amended Settlement Agreement, there was no further basis for the Delaware Stay. Venezuela and PDVSA jointly opposed Crystallex's request.  The application to lift the Delaware Stay is currently awaiting the decision of the Delaware Court.

35.        While the Delaware Stay remains in place, Crystallex is not permitted to execute upon the Writ of Attachment.  As described above, PDVSA and Venezuela have sought a rehearing of the Third Circuit Appeal and expressed their intention to appeal the Third Circuit Decision to the United States Supreme Court.  While the pending rehearing application and any appeal to the Supreme Court do not prohibit Crystallex from pursuing its enforcement efforts, I am advised by my counsel that the Delaware Stay decision may not be released until there is clarity on the outcome of the Third Circuit Appeal rehearing requests.  If, and when, the Delaware Stay is lifted, Crystallex will advance its efforts to sell the shares of PDVH in satisfaction of the Judgment.

36.        I am advised by my U.S. counsel that, if the Delaware Stay is lifted, Venezuela and PDVSA are expected to continue to challenge the Writ of Attachment before the Delaware Court.  They have stated in public filings that they intend to pursue a motion to modify the Delaware Order on the basis that PDVSA is no longer controlled by the Maduro regime and thus, should no longer be considered an alter ego of Venezuela.

37.        Finally, notwithstanding the challenging and ever-changing political landscape in Venezuela, in continuing pursuit of the ██████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

**D.      Priorities and Necessary Next Steps**

    **(i)      Immediate Priorities**

38.        Since the last stay extension in this matter, and as described above, there have been numerous developments which have created significant risk and uncertainty for the Company. Crystallex must remain completely focused on continuing with its enforcement strategy to retain and maximize stakeholder value, while concurrently pursuing the possibility of a negotiated settlement.  It remains an understatement to say that responding to these various developments while maintaining the dual-track strategy continues to require a significant amount of focus from the Company and its advisors. In this current environment, Crystallex has identified the priorities which it will be pursuing during the requested extension of the Stay Period.  These are summarized in the following paragraphs.

39.        First, the Delaware Order must be upheld.  This decision remains subject to possible rehearing before the Third Circuit or proceedings before the U.S. Supreme Court. ████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████

40.        Second, any adverse impacts of the Sanctions against Venezuela on Crystallex's ability to enforce and monetize the Award must be addressed.  As previously disclosed to this Court, ████████████████████████████████████

████████████████████ █████████████████████████████████

████████████████████████████ The Sanctions impair the ability to monetize the

Initial Payment Securities as they limit the market for selling such securities and ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████

41.    █████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████

42.    █████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████

43.    █████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████

### (ii)    The Application of Arbitration Proceeds Statement

44.        As part of its strategy to frustrate the Company's enforcement efforts, Venezuela appealed the Judgment of the D.C. Court confirming the Award. If they were ultimately successful, any settlement of the Award and payments made pursuant thereto would arguably have been invalid.  Venezuela's appeal rights in respect of the Judgment had not expired until recently, ████████████████████████████████ ████████████████████████████████████████ he appeal period lapsed in July,

---

[1] ████████████████████████████████████████████
███████████████████████████████████████

which means the Award and Judgment are final and valid and by extension, any payments made under the Amended Settlement Agreement are the property of Crystallex, ███████████████████t.

45.        Pursuant to the DIP credit agreement (as amended, the "**DIP Credit Agreement**") dated as of April 23, 2012 between Crystallex and Tenor Special Situation Fund I, LLC and ultimately assigned to Luxembourg Investment Company 31 S.à.r.l. (the "**DIP Lender**") and related orders of this Court, prior to distribution or application of arbitration proceeds, the Company is required, upon the receipt of arbitration proceeds, to submit a statement to the DIP Lender and the Monitor setting out its calculation and determination of how such arbitration proceeds are to be applied pursuant to the the waterfall (the "**Waterfall**") set out in Exhibit F to the DIP Credit Agreement (the "**AAP Statement**").[2]

46.        The Company is in the process of preparing an AAP Statement for the period from November 1, 2018 to September 30, 2019 (the "**Third AAP Statement**") in respect of the Initial Payment.   The Company expects to deliver the Third AAP Statement to the DIP Lender, the Monitor, the Trustee and the Noteholders in the near future.

### (iii)    Waterfall and Taxes

47.        As described in my Affidavit sworn April 4, 2019 ("**April 4 Affidavit**"), under the second step of the Waterfall, Crystallex is required "to pay any taxes, payable or required to be withheld by the Borrower or by any government in respect of the

---

[2] Pursuant to the endorsement of Mr. Justice Hainey issued on May 9, 2018, Crystallex will also provide a copy of the AAP Statement to the trustee of the Company's Senior 9.375% Unsecured Notes due December 23, 2011 (the "**Trustee**") and to the ad hoc Noteholders (the "**Noteholders**").

settlement, judgment or collection in relation to the Arbitration Proceeding…". Crystallex has engaged tax professionals (the "**Tax Advisors**") to prepare tax reports with respect to the amount of taxes that must be paid or withheld in respect of the Award, prior to the Company making any distributions under the subsequent steps of the Waterfall.  While the uncertainties respecting the monetization and enforcement of the Award, and Venezuela's default under the Amended Settlement Agreement have complicated the tax analysis, the Tax Advisors have made significant progress in developing a tax position and related strategy since the last extension of the Stay Period.

48.         In reliance on an order of this Court made May 3, 2019, the Company has shared tax information with the Monitor and has held numerous meetings with the Tax Advisors and the Monitor's tax counsel to discuss and develop the Company's tax strategy.  Also, as described below, the Company has held a number of meetings with its Tax Advisors and tax counsel for the DIP Lender and the Noteholders.

**E.      Stakeholder Updates**

49.         The Monitor proposed a mediation (the "**Mediation**") among the Company, DIP Lender, and Noteholders (collectively, the "**Mediation Participants**") to discuss issues relating to this CCAA Proceeding.  The Mediation Participants settled on a mediation agreement and agreed to appoint the Honourable Robert Blair as the mediator (the "**Mediator**").  The Mediation Participants exchanged mediation briefs and reply mediation briefs.  The first Mediation session was held over the course of two days on May 28 and 29, 2019 and provided the Mediation Participants with an opportunity to

present their respective positions to the Mediator.  On June 11, 2019, the Mediation Participants and their counsel attended a follow-up Mediation Session.

50.         Since that time, the Mediation Participants have advanced the Mediation in three ways.  First, representatives of the Company, DIP Lender and the Noteholders have attended a number of in-person and telephonic Mediation sessions.  These sessions have been attended by the Monitor, but none of the Mediator and counsel for the Mediation Participants and Monitor, to allow for more candid and productive discussions.

51.         Second, also under the terms of the Mediation, representatives of Crystallex and members of its Board have held detailed information update sessions with representatives of the DIP Lender and Noteholders.  The most recent of such session was held on October 24, 2019.  Many of the Company's professional advisors have attended certain of these information sessions to provide details to the DIP Lender and Noteholders on the technical aspects of Crystallex's enforcement strategies and the threshold matters that need to be addressed to allow for distributions to the Company's creditors.  For example, the Company arranged for its U.S. enforcement counsel to provide updates to counsel to the DIP Lender and Noteholders in July to explain the strategic implications of the appeal period lapsing in respect of the Judgment.  They also provided an update in September when the Third Circuit Decision was released.  The Company also arranged for its financial advisor to provide an update to the DIP Lender and Noteholders on the status of the CITGO situation and related strategies.

52.         Third, as previously indicated, the Company has also held in-person and telephonic meetings with the Tax Advisors, the Monitor, its tax counsel, the Company's counsel and tax counsel for the DIP Lender and Noteholders to discuss tax issues and strategies.  The Company anticipates scheduling a further tax strategy meeting towards the end of November with the DIP Lender and Noteholders to provide further updates on the Company's tax strategy and planning.

53.         In the Company's view, the Mediation has been very positive in advancing contentious matters between the Mediation Participants. The Mediation has provided a forum to allow those parties to exchange and discuss confidential information related to a range of topics that are necessary precursors to facilitate productive discussions among the Mediation Participants.

**F.     Extension of the Stay**

54.         As described above, the current Stay Period expires on November 6, 2019.  Crystallex seeks an extension of the Stay Period until May 6, 2020 to allow the Company to focus on its enforcement and negotiation efforts while also dealing with an uncertain and volatile situation in Venezuela and with PDVSA.

55.         The Company has made significant progress to date in monetizing the Award but there are still critical matters that remain unresolved.  Given the Sanctions and other impediments to monetizing the Award, it is critical that the Company's dual-track strategy of enforcement and negotiation continues unabated for the benefit of all of the Company's stakeholders.  At the same time, Crystallex will continue to participate in the Mediation for the benefit of its stakeholders.

56.         Crystallex believes that a six month Stay Period is reasonable in the circumstances as it will provide the Company with time to continue to pursue the enforcement and monetization of the Award, and address the numerous issues summarized above.  After discussions with the Monitor the Company has decided to seek an extension of the Stay Period entirely consistent with the last extension of the Stay Period of six months.

57.         The Company will continue to work with the Monitor and its principal stakeholder groups during the Stay Period to continue to respond to information requests or provide updates, as may be appropriate, during the requested Stay Period. The Company also expects that the Mediation will continue during the Stay Period.

58.         The requested extension of the Stay Period is a condition precedent to the effectiveness of the Twelfth Credit Agreement Amendment (defined below) which agreement, extends the maturity date of the obligations owing thereunder, and will facilitate the Company's primary goal of maximizing recovery for all of its stakeholders.

59.         I believe that Crystallex has acted, and continues to act, in good faith and with due diligence and will continue to do so during the proposed Stay Period extension, if such extension is granted by the Court.

60.         In the circumstances, Crystallex requests that the Stay Period be extended to May 6, 2020 and does not believe that any stakeholder would be materially prejudiced if the Stay Period was so extended.

- 22 -

**G.    DIP Credit Agreement Maturity Extension and Amendment**

61.        As mentioned above, Crystallex is party to the DIP Credit Agreement.  In the Company's view, there are no existing events of default under the DIP Credit Agreement.

62.        On April 16, 2012, Mr. Justice Newbould made an Order granting: (i) a charge on the property of Crystallex to secure all obligations under the DIP Credit Agreement and related documents (the "**DIP Charge**"); and (ii) a charge on the property of Crystallex to secure certain compensation payable to the DIP Lender under the DIP Credit Agreement (the "**Lender Additional Compensation Charge**").

63.        The DIP Credit Agreement provides that the DIP Lender may unilaterally extend the Maturity Date (as defined therein) in its sole discretion.

64.        The Maturity Date under the DIP Credit Agreement is currently November 6, 2019, or the expiry of the Stay Period, if earlier.

65.        In light of the impending Maturity Date under the DIP Credit Agreement, the parties intend to enter into an agreement, subject to Court approval, on the terms of a further extension and amendment to the DIP Credit Agreement (called the "**Twelfth Credit Agreement Amendment**"), in substantially the form of agreement attached as **Exhibit "B"** to my Affidavit.  The Twelfth Credit Agreement Amendment provides for extension of the Maturity Date until May 6, 2020 or the expiry of the Stay Period, if earlier.

66.        The effectiveness of the Twelfth Credit Agreement Amendment is conditional upon, among other things: (i) the entry of an order: (a) extending the Stay

Period to May 6, 2020, without any conditions to such approval; and (b) approving the Twelfth Credit Agreement Amendment and authorizing Crystallex to enter into the Twelfth Credit Agreement Amendment and perform all of its obligations thereunder; and (ii) no motion, action, application or any other form of court process seeking an order has been filed, threatened in writing or pending that could be reasonably expected to, among other things: (a) adversely impair the DIP Lender's rights under the DIP Credit Agreement, orders made in connection therewith, or any other order or endorsement of this Court or the US Bankruptcy Court; or (b) interfere with Crystallex's efforts to monetize the Award or collect under the Amended Settlement Agreement.

67.         Crystallex believes the terms of the Twelfth Credit Agreement Amendment are fair, reasonable, and appropriate.  The Twelfth Credit Agreement Amendment and the extension of the Maturity Date and continued availability of the DIP facility will allow Crystallex, with the continued support of the DIP Lender, to continue to monetize the Award via its dual-track strategy and to properly address each of the threshold matters described herein.

68.         Further, the DIP Lender has agreed to again extend the impending Maturity Date without requiring the payment of any extension or amendment fee, which Crystallex believes is a material concession that will benefit all stakeholders.

**H.       Crystallex's Cash Flow Forecasts**

69.         The Company's cash flow forecasts in connection with this motion have been filed separately and will be subject to a protective order, if granted.  The cash flow forecasts show that the Company will have sufficient funds to meet its projected liquidity

requirements throughout the requested Stay Period Extension. The Company's disbursements during the proposed Stay Period relate almost entirely to professional fees, including for the Company's strategic initiatives related to asset preservation and enforcement and collection strategies in connection with the Award and its monetization and enforcement, and to address the threshold tax matters described above.

## I.    Request for a Protective Order

70.    As part of this Motion, Crystallex is requesting that the following materials be filed under a protective order:

(a)    the unredacted motion record of the Company, including the unredacted version of this Affidavit and the unredacted version of the notice of motion; and

(b)    the unredacted version of the Monitor's Thirty-Second Report,

(collectively, the "**Confidential Materials**").

71.    The Confidential Materials disclose certain key information regarding the Company's enforcement and monetization strategy. ███████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████

72.        The Confidential Materials also set out key information regarding the Company's financial position.  The disclosure of details of the Company's banking information, expenses and budgets could be detrimental to its ability to successfully pursue its enforcement and recovery strategies in relation to the Award because public knowledge of the Company's financial circumstances could undermine its enforcement efforts.  It remains critical that the Venezuelan government and any party that may have a competing claim against the Venezuelan government or interests adverse to Crystallex as it relates to Venezuela, not be given access to information concerning the Company's ████████████████████████████ expenses or relating to Crystallex's realization and enforcement efforts as it relates to the Award.  Crystallex continues to remain concerned that if Venezuela or such other third parties have access to the Confidential Information, they might use it for strategic purposes to the detriment of Crystallex and its stakeholders.

SWORN BEFORE ME at the City of        )
Toronto, in the Province of Ontario,        )
this 25th day of October, 2019.        )
                                        )
                                        )

_____              _____
Commissioner for taking Affidavits        **ROBERT FUNG**

Natale Renner

## **EXHIBIT A-8**

**Affidavit of Robert Fung Dated October 28, 2020 [Docket No. 315-5]**

CONFIDENTIAL

Court File No. CV-11-9532-00CL

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### (Commercial List)

**IN THE MATTER OF** the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C- 36 as amended

**AND IN THE MATTER OF** a Plan of Compromise or Arrangement of Crystallex International Corporation

### CRYSTALLEX INTERNATIONAL CORPORATION

Applicant

### AFFIDAVIT OF ROBERT FUNG
### Sworn October 28, 2020

I, Robert Fung, of the City of Toronto, in the Province of Ontario, **MAKE OATH AND SAY:**

1.　　　　I am the Chairman and CEO of Crystallex International Corporation ("**Crystallex**" or the "**Company**").  I have also been a director of Crystallex since 1996, Chairman of the Board of Directors of Crystallex since 1998 and CEO since June 2008. As such, I have knowledge of the matters to which I hereinafter depose, which knowledge is either personal to me, obtained from a review of the documents to which I refer, or, where indicated, based on information and belief, in which case I verily believe such information to be true.

**OVERVIEW**

2.          This Affidavit is sworn in support of a motion by Crystallex for an Order, among other things:

  (a)    that certain un-redacted materials in connection with this motion be filed under a sealing order and not form any part of the public record in this proceeding; and

  (b)    extending the Stay Period as defined in the Initial Order (defined below) until May 7, 2021.

3.          On December 23, 2011, an order (the "**Initial Order**") was made granting Crystallex protection from its creditors under the *Companies' Creditors Arrangement Act* (the "**CCAA Proceeding**").   Pursuant to the Initial Order, Ernst & Young Inc. was appointed as the monitor (the "**Monitor**").  Crystallex subsequently obtained an order of the United States Bankruptcy Court for the District of Delaware on December 28, 2011, recognizing this CCAA Proceeding as a foreign main proceeding.

4.          Crystallex's only asset is an award of USD $1.202 billion, plus interest, rendered by the World Bank's International Centre for the Settlement of Investment Disputes ("**ICSID**") against the government of Venezuela (the "**Award**").  The Award was rendered on April 4, 2016 in respect of Venezuela's expropriation from Crystallex of its rights to the Las Cristinas gold mine.

5.          In the more than four years since the Award was granted, Crystallex has been engaged in complex legal and geopolitical proceedings aimed at enforcing or otherwise realizing the value of the Award, in the face of opposition from large, well-

funded adversaries, two competing government regimes in Venezuela (being the Nicolas Maduro-led government and the opposition government led by Juan Guaido), as well as obstacles to enforcement created by the United States government.

6.        The Company's success in enforcing the Award is the single most important issue in this CCAA Proceeding; Crystallex's success on this front will dictate its ability to provide any meaningful recovery to its stakeholders.   Crystallex has made significant progress in its enforcement efforts to date but it is readily apparent to both the management and the board of directors of the Company, and Crystallex's U.S. legal advisors, that, as discussed in greater detail below, a number of parties adverse in interest to the Company will not hesitate to use any confidential information regarding the Company's enforcement and monetization strategy and financial position to attempt to frustrate and block these efforts thereby jeopardizing the prospect of recovery for the Company's stakeholders.   As outlined below, the sealing of certain confidential information is critical at this stage to ensuring that the Company can successfully complete its enforcement on the Award for the benefit of its stakeholders.

7.        Crystallex has been operating in good faith and with all due diligence in this CCAA Proceeding, including to monetize the Award and to resolve various stakeholder issues.  With all of the progress Crystallex has achieved to date, and its ongoing efforts that are detailed below, the Company has sought an extension of the Stay Period, and accompanying relief.

8.        This Affidavit is divided into two parts.  The first part will update this Court on the Company's ongoing enforcement efforts with respect to the Award and this CCAA

Proceeding.  The second part of this Affidavit will address the relief sought and the basis for such relief.

## PART I - UPDATE

### A.    UPDATE ON SETTLEMENT AND ENFORCEMENT EFFORTS WITH RESPECT TO THE AWARD

9.        As described in previous Affidavits filed in this CCAA Proceeding and in the reports of the Monitor, Crystallex, in consultation with the Monitor, developed and implemented a dual-track strategy for a negotiated resolution with Venezuela and enforcement of the Award. These efforts continue for the benefit of the Company's stakeholders and are set out in detail below.

### (i)        Settlement with Venezuela

10.        As described in my previous Affidavits filed in this CCAA Proceeding, in November 2017, Crystallex concluded a settlement agreement with Venezuela (the "**Settlement Agreement**") of all of the outstanding issues between the parties, which was approved by Order of this Court on November 24, 2017.  While Crystallex received certain payments under the Settlement Agreement, the terms of that agreement were not fulfilled by Venezuela.

11.        As a result of Crystallex's success in enforcement initiatives, which included the Writ of Attachment described below, the Company and Venezuela engaged in further efforts to negotiate an amendment to the Settlement Agreement.  As a result of these efforts, the parties reached an Amended and Restated Settlement Agreement dated

September 10, 2018 (the "**Amended Settlement Agreement**"), which was approved by this Court on September 17, 2018.

12.          Pursuant to the Amended Settlement Agreement, Venezuela agreed to make an initial payment in securities or cash with a combined market value equal to U.S.$425,000,000 (the "**Initial Payment**").  The Initial Payment was received in securities (the "**Initial Payment Securities**") and cash.  As will be discussed below, the Initial Payment Securities do not represent a good prospect of recovery for the Company's stakeholders at this time because they cannot be liquidated.  ███████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

█████████████████

**(ii)          Enforcement of the Award**

13.          On March 25, 2017, the United States Federal Court for the District of Columbia confirmed the Award and entered judgment in Crystallex's favour in the amount of approximately U.S.$1.4 billion (the "**Judgment**"), which became final and binding in the United States in 2019.

14.          As part of its enforcement efforts, Crystallex registered the Judgment in the United States District Court for the District of Delaware (the "**Delaware Court**") and thereafter obtained orders (collectively, the "**Writ Order**") declaring that Petroleos de Venezuela, S.A. ("**PDVSA**"), Venezuela's national oil company, was the alter ego of

Venezuela.  The Writ Order authorized the attachment (the "**Writ of Attachment**") of PDVSA's shares in its U.S. subsidiary PDV Holding, Inc. ("**PDVH**" and the "**PDVH Shares**").  As shown in the organizational chart below, if the Company successfully realizes on the PDVH Shares, the acquirer of the shares will effectively gain control of CITGO Petroleum Corp. ("**CITGO**").  CITGO is an American oil company and Venezuela's largest overseas asset, valued at billions of dollars.



15.        In July 2019, the United States Court of Appeals for the Third Circuit affirmed the Writ Order finding that PDVSA was an alter ego of Venezuela and authorizing the Writ of Attachment (the "**Third Circuit Decision**").  Venezuela and PDVSA petitioned the United States Supreme Court for a writ of certiorari for leave to appeal the Third Circuit Decision to the United States Supreme Court.  The Company's ability to enforce the Writ of Attachment and sell the PDVH Shares (and with them, control of CITGO) was stayed by the Delaware Court (the "**Delaware Stay**") while Venezuela and PDVSA sought leave to appeal to the United States Supreme Court.

16.         On May 18, 2020, the United States Supreme Court dismissed Venezuela and PDVSA's petition seeking leave to appeal.  This represents significant progress in the Company's enforcement efforts; both the Judgment and the Writ Order are now final.

17.         On May 22, 2020, Judge Stark of the Delaware Court (a) lifted the Delaware Stay, (b) directed PDVH to answer the Writ of Attachment, and (c) ordered simultaneous briefing on the sale process for the PDVH Shares and any motion to quash the Writ of Attachment, which Venezuela, PDVSA or any other party[1] wished to raise in response. As part of his Order, Judge Stark specifically invited the U.S. government to provide its views on the matters before the Delaware Court (the "**CITGO Litigation**").

18.         In response, Venezuela, PDVSA and CITGO[2] requested Judge Stark to quash the Writ of Attachment (the "**Motion to Quash**") and asked the Delaware Court to revisit the alter-ego determination on the basis that the circumstances underlying the Writ Order have changed (the "**Rule 60 Motion**" and together with the Motion to Quash, the "**Opposition Motions**"), which the Company vigorously opposed.

19.         On the evening of July 16, 2020, the day prior to the hearing of the Opposition Motions, the Department of Justice, on behalf of the U.S. government, filed a statement of interest (the "**Statement of Interest**"), which is attached as **Exhibit "A"** to my Affidavit, in which it informed the Court that the CITGO Litigation and possible enforcement of the Writ of Attachment implicated issues relevant to U.S. policy towards

---

[1]     The current intervenors are BlackRock Financial Management Inc. and Contrarian Capital Management L.L.C. (holders of PDVSA 2020 Bonds); Rosneft Trading S.A. (holder of a 49.9% interest in CITGO as collateral for a loan to Venezuela); Phillips Petroleum Company Venezuela Limited and ConocoPhillips Petrozuata B.V.; and CITGO

[2]     All references to Venezuela, PDVSA and CITGO throughout this Affidavit in the context of the CITGO Litigation after January 23, 2019 refer to Venezuela, PDVSA and CITGO represented through the Guaido Government (defined below).

Venezuela.  The position adopted by the U.S. government is discussed more fully below under the heading "U.S. Policy Towards Venezuela".  The Company is awaiting a decision on the Motion to Quash and the Rule 60 Motion.  ███████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████

20.        In the interim, on September 17, 2020 the Delaware Court held a hearing to address the sales process for the PDVH Shares (the "**Sales Process Motion**") and other remaining issues from the July 17, 2020 hearing.  The parties are now waiting for the Delaware Court to rule on the Sales Process, in addition to the Motion to Quash and the Rule 60 Motion (collectively, the "**Delaware Decisions**").  The Delaware Decisions may be delivered concurrently or separately.  Depending on the nature and grounds of the Delaware Decisions, Venezuela may be able to appeal any or all of the Delaware Decisions once they have been rendered.  The Company expects that Venezuela will take any opportunity to appeal, no matter how questionable the appeal, or even the right to an appeal, may be.

## B.    RECENT EVENTS RELEVANT TO THE COMPANY AND THE AWARD

21.        Although the Judgment and Writ Order are now final, there continue to be a number of factors in addition to the Opposition Motions that create significant uncertainty and may impact the ability of Crystallex to monetize the Award.  These include:

(i)      Competing government regimes in Venezuela;

(ii)     U.S. policy with respect to Venezuela;

(iii)    CITGO's uncertain future; and

(iv)    Venezuela's financial and humanitarian crisis.

These are discussed in detail in the following paragraphs.

**(i)        The Competing Government Regimes in Venezuela**

22.        There continues to be a question of who constitutes the legitimate government of Venezuela and who may act on behalf of that country with respect to any discussions with Crystallex; President Nicolas Maduro or Juan Guaido, the President of the National Assembly (the "**Guaido Government**").  The United Nations, Russia, China, among others, continue to recognize the Maduro regime as the legitimate government of Venezuela, while the United States, Canada, the European Union and more than 50 other governments consider Venezuela's legitimate head of state to be Juan Guaido.

23.        Venezuelan National Assembly elections are scheduled for December 6, 2020.  Juan Guaido and approximately 37 other opposition parties have pledged to boycott the elections citing a lack of transparency and free process.

24.        Despite American and international support for the Guaido Government, Juan Guaido's support is ███████████████████████████████████ ██████████████████████████████.  While Guaido retains diplomatic support in some countries, he continues to ████████████████████.  Guaido declared himself Interim President in January 2019 and has led several █████████████████ █████████████████    ████████████████████████ ████████████████████████████████████████

is 

Attached to my Affidavit as **Exhibit "B"** are recent articles from Bloomberg and the Economist that provide a more complete overview of Guaido's ███████ ███████ in Venezuela.

25.      There may be some resolution to this issue in December following the National Assembly elections but given the number of opposition parties that have boycotted the elections, the outcome is difficult to predict.  In the meantime, Crystallex is required to engage in delicate diplomacy and expects that it will continue to experience difficulty engaging with Venezuela in the coming months regardless of which regime is in power; Maduro, Guaido or an alternate government.

**(ii)**        **U.S. Policy Towards Venezuela**

26.      The Trump Administration has been very active in opposing the Maduro regime and supports the Guaido Government.  Attached to **Exhibit "C"** to my Affidavit are recent articles from the New York Times and The Oppenheimer Report detailing the Trump Administration's foreign policy objectives towards Venezuela.

27.      U.S. strategy has emphasized diplomatic efforts to bolster Guaido and isolate Maduro through broad sanctions on the economy and government designed to cut off Maduro's sources of revenue.  Attached as **Exhibit "D"** to my Affidavit is an excerpt from the U.S. Department of State's webpage entitled "U.S. Government Support for the Democratic Aspirations of the Venezuelan People" which outlines this strategy.

28.    ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████

***Participation in the CITGO Litigation***

29.        The United States has taken the position in the Delaware Court that its foreign policy objectives are implicated by the CITGO Litigation.  The United States further requested that the Delaware Court not authorize the sale of the PDVH Shares at this time because:

> […] such a sale is dependent on a license from Treasury's Office of Foreign Assets Control ("OFAC"), and moving forward in the manner Crystallex suggested could imperil U.S. foreign policy and national security interests […] assets such as PDVH shares, which provide indirect ownership of CITGO are at the ***heart of the United States' current foreign policy efforts with respect to Venezuela***. [***emphasis added***]

30.        Attached as **Exhibit "E"** to my Affidavit is a letter from Elliott Abrams, U.S. Special Representative for Iran and Venezuela, dated July 16, 2020, which was attached as Exhibit 1 to the Statement of Interest.  In that letter, Mr. Abrams emphasizes the foreign policy and national security risks of allowing the sale of the PDVH Shares as follows:

> […] the Maduro regime has built a close relationship with foreign adversaries of the United States and which but for the regime's existence would have little foothold in South America, Russia, China and most recently Iran.  That these relationships include military and intelligence aspects makes them even more worrying for U.S. national security. […] Critical to U.S. foreign policy, the United States assesses that the domestic legitimacy of the interim government under Guaido would be severely eroded were a forced sale of CITGO to take place while the illegitimate Maduro regime still attempts to cling to de facto power in Caracas.

31.      On multiple occasions, including in written orders issued in December 2019 and May 2020, Judge Stark invited the U.S. government to file a statement of interest in connection with the CITGO Litigation.  It was not until Crystallex's motion to sell the PDVH Shares was pending - almost six months after Judge Stark's first invitation and on the eve of the Opposition Motions in *July 2020*, that the Statement of Interest was filed.

32.      ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

**Sanctions**

33.      As previously disclosed to this Court, the United States Department of Treasury and the Office of Foreign Assets Control ("**OFAC**") have imposed sanctions[3] against Venezuela (the "**Sanctions**"), which the U.S. Government and Venezuela allege make it impossible for the Company to providently monetize the Initial Payment Securities

---

[3]      Including by way of an executive order made on August 5, 2019 entitled "Blocking Property of the Government of Venezuela".

or execute on the PDVH Shares subject to the Writ of Attachment, without first obtaining a license from the U.S. Government.

34.        Crystallex has now submitted its application for a specific license authorizing the sale of the PDVH Shares and is awaiting OFAC's decision.    OFAC provides scant public information about the approval process for licenses but OFAC has indicated that the licensing process is a political, rather than legal, process.    Attached to my Affidavit as **Exhibit "F"** is a copy of the OFAC frequently asked questions and answers FAQ 78 wherein OFAC broadly states that many of its licensing determinations are "guided by U.S. foreign policy and national security concerns".

35.



In the weeks leading up to the U.S. elections, the Trump Administration has expanded[4] the Sanctions on Venezuela.

36.

Attached as **Exhibit "G"** to my Affidavit is a July 16, 2020 letter to the U.S. Department of Justice from Andrea M. Gacki, the Director of OFAC, which was appended as Exhibit 2 to the Statement of Interest.    In the letter, Ms. Gacki states:

---

[4]        On September 22, 2020, the United States imposed sanctions on the leaders of the four main Venezuelan opposition parties who intend to participate in the December 6 elections; Miguel Ponente, Guillermo Luces, Bernabe Gutierrez and Chaim Bucaran.  The Sanctions freeze any U.S. assets of those who are blacklisted and generally bars Americans from dealing with them.

- 14 -

> Crystallex's [OFAC license] submission implicates a series of complicated legal and policy questions, such as (1) the rapidly evolving and delicate political and economical situation in Venezuela, including the United States' recognition of Juan Guaido as the Interim President of Venezuela; (2) developments in OFAC sanctions to address the changed circumstances in Venezuela; and (3) the claims of numerous other creditors against Venezuela arising from the malign actions of the regimes of former President Hugo Chavez and Nicolas Maduro.  Moreover, other creditors have submitted license applications that implicate PDVH shares.  Based on complex considerations such as these, OFAC's internal review of Crystallex's license application, as well as the U.S. government's corresponding interagency review, remain ongoing.

37.    ██████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████

**(iii)      CITGO's Uncertain Future**

38.    As previously disclosed to this Court, PDVSA pledged a 50.1% interest in its CITGO Holding shares to secure their bonds due in 2020 (the "**2020 Bonds**").  The 2020 Bonds are in default owing to the failure by PDVSA to make a US$913 million payment due on October 28, 2019, placing the holders of the 2020 Bonds (the "**2020 Bondholders**") in competition with the Company for the control of the sale of CITGO. The 2020 Bondholders however, like Crystallex, are currently prohibited by the Sanctions from enforcing on their debt.  OFAC initially granted a license ("**General License 5**") that authorized the 2020 Bondholders to sell the CITGO shares but General License 5 was superseded most recently on October 7, 2020 by General License 5E, which prevents the holders of the 2020 Bonds from engaging in any transactions relating to the sale or

transfer of the CITGO shares until January 19, 2021, which incidentally coincides with the last date of the current U.S. presidency.

39.        On October 29, 2019, the Guaido Government commenced an action before the U.S. Federal District Court for the Southern District of New York (the "**Federal District Court**") against the 2020 Bonds trustee Mitsubishi Union Financial Group Union Bank NA (the "**2020 Trustee**") and the collateral agent Glas Americas LLC (the "**2020 Collateral Agent**") seeking, among other things, a declaratory judgment that the 2020 bonds are invalid and unenforceable because they were not approved by the Venezuelan National Assembly (the "**Declaratory Judgment Action**").[5] The 2020 Trustee and the 2020 Collateral Agent have agreed with the Guaido Government to forbear from foreclosing on the collateral securing the 2020 Bonds until after the Federal District Court rules on the motions.

40.        On October 16, 2020, the Federal District Court in New York found in favour of the 2020 Bondholders and dismissed PDVSA's claims in the Declaratory Judgment Action, removing a significant obstacle to enforcement of the 2020 Bonds.  The 2020 Bondholders, ███████████ have the benefit of an OFAC license (General License 5) entitling them to sell the shares of CITGO ahead of Crystallex's interest in the PDVH Shares.  I note that General License 5E currently prevents the 2020 Bondholders from pursuing enforcement action until January 2021 but the Company cannot predict if the Sanctions will continue beyond this time.  ████████████████████████

---

[5]        The Guaido Government has argued that the 2020 Bonds should be invalidated because Venezuela's National Assembly was the only legitimate branch of government in 2016; Guaido relies on the fact that the U.S. government recognized the National Assembly and Juan Guaido as Interim President in 2019 and argues this recognition would have retroactive effect to 2016.  This would imply ignoring that Nicolas Maduro was the recognized head of state at that time.



**(iv)        Venezuela's Financial and Humanitarian Crisis**

41.        Venezuela is facing a major financial and humanitarian crisis.  Among many major economic and humanitarian woes, Venezuela is suffering from serious hyperinflation, a deeply devalued currency and severe shortages of food and medicine. In the Spring of 2020, Venezuela faced two new economic pressures: oil price wars between Russia and Saudi Arabia and the global coronavirus pandemic ("**COVID-19**"), which impact the Company's ability to monetize the Award.

42.        Venezuela has the world's largest proven reserves of oil, and its economy is built on oil.  The collapse in oil prices and the tightening Sanctions targeting the oil sector have accelerated a decline in oil production in Venezuela and a corresponding contraction in Venezuela's economy.  Venezuela lacks the resources to effectively fight the COVID-19 pandemic and cannot afford an economic shutdown due to their fragile economy.  Declining oil prices and production and COVID-19 have exacerbated the economic and political instability in Venezuela, which, in addition to the factors cited above, will make it more difficult for Crystallex to currently engage with the Venezuelan government with respect to the Award and potentially erode the value of Venezuela's assets, including the value of the PDVH Shares.

43.        Notwithstanding the challenging and ever-changing political landscape in Venezuela and the economic and humanitarian crisis resulting from COVID-19, in continuing pursuit of the previously-described dual-track strategy with respect to the Award, Crystallex will continue to entertain the possibility of a negotiated solution with Venezuela.

## C.    NEXT STEPS

### (i)    Enforcement Efforts

44.        Currently, Crystallex has three possible avenues of recovery for its stakeholders (a) settlement with Venezuela, (b) monetization of the Initial Payment Securities, and (c) enforcement of the Writ of Attachment.  As discussed above, Crystallex ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ██████████████████████████████████████████ the Initial Payment Securities cannot be monetized at this time due to applicable Sanctions and as a result, are highly illiquid with an unknown market value.  The Writ of Attachment therefore, currently represents the best prospect for recovery to stakeholders; the PDVH Shares underpinning the Writ of Attachment represent an indirect ownership interest in CITGO, Venezuela's largest overseas asset.  Crystallex remains focused on protecting the Company's interest in the Writ of Attachment through the CITGO Litigation and addressing any adverse impacts of the Sanctions on the Company's ability to enforce and monetize the Award.  As discussed below however, Crystallex is concerned that the publication of its enforcement and monetization strategy and financial position could be

used by Venezuela and its competing creditors to the detriment of Crystallex in the CITGO Litigation and in connection with its OFAC license application.

**(ii)     Taxes**

45.          The DIP Credit Agreement contains several key provisions that relate to procedures for Crystallex's tax determination, reporting and filing obligations as well as the priority and timing of any payments to Canada Revenue Agency ("**CRA**").   As described in my prior affidavits sworn in this CCAA Proceeding, under the second step of the Waterfall contained in the DIP Credit Agreement, Crystallex is required "to pay any taxes, payable or required to be withheld by the Borrower or by any government in respect of the settlement, judgment or collection in relation to the Arbitration Proceeding…". As required pursuant to the DIP Credit Agreement, Crystallex engaged leading Canadian accounting and legal tax professionals (the "**Tax Advisors**") to advise Crystallex with respect to (a) the amount of taxes that must be paid or withheld in respect of the Award, prior to the Company making any distributions under the subsequent steps of the Waterfall, and (b) the characterization of the Award by Crystallex in any tax return filed.

46.          The Company held numerous meetings with the Tax Advisors and the Monitor's tax counsel, and detailed discussions were held among the Board to discuss and develop the Company's tax strategy and filing position.  Those discussions included taking into account the views of the DIP Lender (as required under the DIP Credit Agreement) and the views of the ad hoc committee of the holders of the Company's 9.375% Notes (the "**Ad Hoc Committee**").   Based on those discussions, it became apparent to Crystallex that the parties shared a similar view on taxes and subsequent engagement with the CRA to resolve same.  In August 2020, Crystallex, the DIP Lender

and the Ad Hoc Committee ultimately reached an agreement with respect to the Company's taxes that, among other things, addressed the timing of filing and paying taxes by the Company.

47.         As a result of the COVID pandemic, CRA extended the time for the filing of corporate tax returns in respect of the fiscal year 2019 to August 31, 2020.

48.         Based on the detailed advice of its Tax Advisors, and in compliance with the terms of the DIP Credit Agreement, the Company (in consultation with the Monitor, the DIP Lender and the Ad Hoc Committee) filed its tax returns on August 7, 2020 (the "**Tax Filing**").

49.         Following the Tax Filing, Crystallex, through its counsel and with the involvement of the Monitor, has started to engage with CRA to address and seek comfort with respect to the tax return filed by Crystallex.  The Company continues to update counsel for the DIP Lender and the Ad Hoc Committee on its discussions and progress with CRA.

        (iii)    **Mediation**

50.         Matters between the Company, the DIP Lender and the Ad Hoc Committee have been contentious throughout this CCAA Proceeding.  On January 27, 2020, the Company, the DIP Lender and the Ad Hoc Committee were directed by Justice Hainey to mediate their disputes.

51.         Representatives of the Company, the DIP Lender and the Ad Hoc Committee, with the assistance and oversight of the Monitor, have attended numerous mediation sessions since January 2020 and the mediation is ongoing.  The Company

remains optimistic that the mediation will allow the parties to resolve their disputes and avoid the need for lengthy and costly litigation before this Court.  The Company intends to continue to mediate in good faith and believes there is value in allowing the mediation to continue.

### (iv)    Appointment of a New Independent Director

52.        In early October 2020, Mr. Near advised that he would be tendering his resignation imminently.  Mr. Near has been a director of Crystallex for 23 years, since May 5, 1997, and in 2012 was affirmed by the DIP Lender and Crystallex as the independent director, pursuant to the terms of the DIP Credit Agreement.

53.        The Board, with input from the Monitor, and advice from the Company's legal advisors, established a process and criteria for the identification and selection of a new independent director, also having regard to, among other things, the requirements for appointing a new independent director under the DIP Credit Agreement (including the necessary "independence" standards required thereunder), the Corporation's articles and by-laws, and the *Canada Business Corporations Act*.

54.        The Board, with the assistance and direct involvement of the Monitor, identified potential candidates and conducted interviews.  On October 13, 2020, the Board resolved to appoint The Honourable Mr. Sergio Marchi as the new independent director of the Corporation.  Mr. Near resigned concurrently with Mr. Marchi's acceptance of the Board position.

55.        Mr. Marchi has had a distinguished public sector career and maintains strong political ties to the Canadian government.  Attached as **Exhibit "H"** to my affidavit

is a copy of Mr. Marchi's curriculum vitae.  Mr. Marchi is a former Member of Parliament and served as the Cabinet Minister of International Trade, Immigration and Environment. After leaving Federal politics, Mr. Marchi served as Canada's ambassador to the World Trade Organization and served as Chairman of the WTO General Council (which was a peer-appointment).  Currently, Mr. Marchi sits on a number of Canadian and international corporate boards.  He is also a member of the Canada Institute Advisory Board, which, according to its website, was "founded in 2001 to increase awareness and knowledge about Canada and Canada-U.S. relations among U.S. policymakers and opinion leaders." Crystallex is very fortunate to have Mr. Marchi join its Board.  Crystallex believes that Mr. Marchi's unparalleled experience and deep relationships in government provide the Company with the invaluable ability to engage with both the U.S. and Canadian governments on the various significant political elements of the Company's enforcement strategy, including OFAC and the Sanctions regime.

56.        On July 6, 2020, Mr. Near had retained his own independent advisor as permitted under the DIP Credit Agreement.  Specifically, Mr. Near retained Pirinate Consulting Group, LLC and its principal, Mr. Gene Davis, as independent advisor to the independent director (the "**Independent Advisor**").  Mr. Davis, a former U.S. lawyer, has over 30 years of corporate and restructuring experience (including CCAA restructuring experience) and governance expertise, having sat on over 200 boards of public and private companies.  Mr. Davis participated in recent mediation sessions with Mr. Blair, on behalf of the Independent Director.  Mr. Marchi has confirmed that Mr. Davis and Pirinate will continue the role as Independent Advisor to Mr. Marchi, as Independent Director.

## PART II – RELIEF SOUGHT

### D.    REQUEST FOR A SEALING ORDER

57.        As part of this Motion, Crystallex is requesting that the following materials be filed under a sealing order:

(a)    the unredacted motion record of the Company, including the unredacted version of this Affidavit; and

(b)    the unredacted version of the Monitor's Thirty-Fifth Report,

(collectively, the "**Confidential Materials**").

58.        The information (the "**Confidential Information**") that the Company seeks to redact in the Confidential Materials generally falls into two categories: (a) certain financial information of the Company, and in particular the Company's current cash balance (the "**Financial Information**"), and (b) descriptions of the Company's monetization and enforcement strategy, including views and predictions by Crystallex about positions taken by Venezuela, competing creditors and the U.S. government.

59.        In connection with its previous stay extension motion in May 2020, Crystallex sought an order of this Court sealing the Company's then cash balance and other financial information contained in the unredacted version of the Monitor's Thirty-Third Report (the "**Historical Information**"), which relief was denied (the "**Decision**").[6] Crystallex is currently seeking leave to appeal the Decision and, as a result, the Historical Information has not been made public.  Even if Crystallex's motion for leave to appeal, or

---

[6]        The Decision was rendered pursuant to an order of the Honourable Justice Hainey dated June 8, 2020 and August 31, 2020.

an ensuing appeal, are ultimately unsuccessful, as will be discussed below, I still believe that disclosure of the Confidential Information (which includes the current Financial Information of Crystallex) will cause Crystallex and its stakeholders to suffer significant and irreparable harm and pose a serious threat to the commercial interests underpinning this CCAA Proceeding – namely, the enforcement of the Award.

60.        I understand from my counsel Natalie Renner at Davies that the Monitor has made a proposal to Crystallex, the DIP Lender and the Ad Hoc Committee to adjourn any hearing on the sealing of the Confidential Materials (the "**Sealing Motion**") until completion of the appellate process noted above in paragraph 59.  The Company and the DIP Lender are supportive of the Monitor's proposal and believe it is a practical solution to deal with sealing at this time.  If the Monitor's proposal is accepted, the Company may, if necessary, provide further updated affidavit evidence in respect of the Sealing Motion with respect to the basis for sealing the Confidential Materials.

61.        Crystallex and its stakeholders will suffer significant and irreparable harm if the Confidential Information is made public.  The specific harm from the disclosure of Confidential Information is detailed in Confidential Appendix I to my Affidavit, which forms part of my Affidavit.

## E.    EXTENSION OF THE STAY

62.        The Initial Order granted a stay of proceedings against Crystallex and its directors and officers during the Stay Period, which was most recently extended by Order of the Court on May 4, 2020 until November 6, 2020.

63.         Crystallex seeks an extension of the Stay Period until May 7, 2021 to allow the Company to remain focused on its enforcement and negotiation efforts while also dealing with an uncertain and volatile situation in Venezuela and with PDVSA.

64.         The Company has made significant progress to date in monetizing the Award but there are still critical matters that remain unresolved.  ███████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

65.         Crystallex believes that a six-month Stay Period is reasonable in the circumstances as it will provide the Company with time to continue to pursue the enforcement and monetization of the Award and allow for the U.S. elections and the National Assembly elections to be held.  After discussions with the Monitor, the Company has decided to seek an extension of the Stay Period entirely consistent with the last extension of the Stay Period of six months.

66.         Finally, the Company will continue to work with the Monitor and its principal stakeholder groups during the Stay Period to continue to respond to information requests or provide updates, as may be appropriate, and to mediate the various issues between the parties in good faith.

67.         I believe that Crystallex has acted, and continues to act, in good faith and with due diligence and will continue to do so during the proposed Stay Period extension, if such extension is granted by the Court.

68.        In the circumstances, Crystallex requests that the Stay Period be extended to May 7, 2021 and does not believe that any stakeholder would be materially prejudiced if the Stay Period was so extended.

**F.        DIP CREDIT AGREEMENT MATURITY EXTENSION AND AMENDMENT**

69.        On April 16, 2012, Mr. Justice Newbould made an Order (the "**DIP Order**") approving a debtor-in-possession loan to the Company (the "**DIP Loan**") and : (i) a charge on the property of Crystallex to secure all obligations under the DIP Credit Agreement and related documents; and (ii) a charge on the property of Crystallex to secure certain compensation payable to the DIP Lender under the DIP Credit Agreement.

70.        The DIP Credit Agreement provides that the DIP Lender may unilaterally extend the Maturity Date (as defined therein) in its sole discretion.  The last extension of the Maturity Date under the DIP Credit Agreement expires on November 6, 2020.  The Maturity Date of the DIP Credit Agreement has not been further extended at this time.  The Company remains in discussions with the DIP Lender over a further amendment to the DIP Credit Agreement.  The DIP Lender has advised Crystallex that it remains fully supportive of the Company and its enforcement efforts against Venezuela.

71.        ██████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████

72.        It should be noted that the DIP Loan is fully drawn and Crystallex is not relying on the availability of funds thereunder during the requested Stay Period.

## G.    CRYSTALLEX'S CASH FLOW FORECASTS

73.        The Company's cash flow forecasts in connection with this motion have been filed separately and will be subject to a protective sealing order, if granted.  The cash flow forecasts show that the Company will have sufficient funds to meet its projected liquidity requirements throughout the requested Stay Period Extension.  The Company's disbursements during the proposed Stay Period relate almost entirely to professional fees, including for the Company's strategic initiatives related to asset preservation and enforcement and collection strategies in connection with the Award and its monetization and enforcement.

SWORN BEFORE ME at the City of Toronto, in the Province of Ontario, this 28th day of October, 2020.

)
)
)
)
)

_____
Natalie Renner
Commissioner for taking Affidavits

_____
**ROBERT FUNG**